**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

SCALE BIOSCIENCES, INC. and ROCHE
SEQUENCING SOLUTIONS, INC.,

    *Plaintiffs,*

    v.

PARSE BIOSCIENCES, INC.,

    *Defendant,*

PARSE BIOSCIENCES, INC. and
UNIVERSITY OF WASHINGTON,

    *Counterclaim-Plaintiffs,*

    v.

SCALE BIOSCIENCES, INC.,

    *Counterclaim-Defendant.*

Civil Action No. 1:22-cv-01597-CJB



**REDACTED VERSION
Filed: March 12, 2025**

---

**COUNTERCLAIM-PLAINTIFFS' OMNIBUS OPENING BRIEF IN SUPPORT OF
MOTIONS FOR SUMMARY JUDGMENT AND MOTION TO
EXCLUDE EXPERT OPINIONS AND TESTIMONY**

*Of Counsel:*

Byron L. Pickard
R. Wilson Powers III, Ph.D.
Chandrika Vira
Christopher M. Gallo
Brady P. Gleason
David Y. Wang
Louis P. Panzica, Jr.
Ryan N. Kaiser
Cristen A. Corry
**STERNE, KESSLER, GOLDSTEIN
& FOX, P.L.L.C.**
1101 K Street, NW, 10th Floor
Washington, DC 20005
(202) 371-2600

**YOUNG CONAWAY STARGATT & TAYLOR LLP**
Karen L. Pascale (#2903)
Robert M. Vrana (# 5666)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
(302) 571-6600
kpascale@ycst.com
rvrana@ycst.com

*Attorneys for Defendant/Counterclaim-
Plaintiff Parse Biosciences, Inc. and
Counterclaim-Plaintiff University of
Washington*

February 24, 2025

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENTS ........................................................1

NATURE AND STAGE OF THE PROCEEDINGS ......................................................3

MSJ #1: THE ASSERTED CLAIMS OF THE '442, '752, AND '256 PATENTS LACK
    WRITTEN DESCRIPTION AND ENABLEMENT .........................................................4

I.    FACTUAL BACKGROUND ............................................................................5

    A.    The '442, '752, and '256 patents' asserted claims cover the use of a vast
        number of antibodies, aptamers, or both, the scope of which is limited
        only by the antibodies' and aptamers' ability to bind to target molecules. ............5

        1.    The '752 patent's asserted claims cover the use of antibodies and
            aptamers to bind to target molecules. ..........................................................5

        2.    The '442 patent's asserted claim covers the use antibodies or
            aptamers to bind to target RNA molecules. ..................................................5

        3.    The '256 patent's asserted claims cover the use of UBA-aptamers
            to label "nucleic acid targets." ...................................................................6

    B.    The claims cover an incalculably large number of possible antibodies and
        aptamers. ....................................................................................................6

    C.    The claims cover a "vast" number of target molecules within or on "cells." ..........8

    D.    Identifying which antibodies effectively bind to a given target molecule is
        not predictable and requires excessive trial-and-error experimentation. ...............10

    E.    Identifying which aptamers effectively bind to a given target molecule is
        not predictable and requires excessive trial and error experimentation................10

II.    ARGUMENT ....................................................................................................12

    A.    The '442, '752, and '256 patents are invalid for lack of written
        description....................................................................................................12

        1.    Scale's specification does not disclose a representative number of
            antibodies that bind to the full scope of claimed target molecules. ...........13

        2.    Scale's specification does not disclose a representative number of
            aptamers. ....................................................................................................15

3.    Scale's specification does not disclose structural features common to the antibodies or aptamers that satisfy the claimed functionality. ..........16

B.    The '752, '256, and '442 patents are invalid for lack of enablement. ..................18

MSJ #2: THE ASSERTED CLAIMS ARE INVALID Under § 112 FOR FAILING TO CLAIM ESSENTIAL FEATURES ....................................................................................19

I.    FACTUAL BACKGROUND ................................................................................20

II.    ARGUMENT .....................................................................................................21

MSJ #3: PARSE DOES NOT LITERALLY INFRINGE  THE '442, '256, or '752 PATENTS ...............................................................................................................23

I.    FACTUAL BACKGROUND ................................................................................24

A.    The transcriptome. ..................................................................................24

B.    Whole transcriptome sequencing technology. ........................................24

C.    Person of ordinary skill in the art. ..........................................................25

II.    ARGUMENT .....................................................................................................25

A.    "Target molecules" means "specific molecules of interest with a known individual identity sufficient to distinguish the molecules that are being detected or quantified." ...........................................................................25

1.    "Target molecules" should be construed according to its plain and ordinary meaning which requires knowledge of its individual identity. ..........................................................................................25

2.    The intrinsic record supports Parse's proposed construction. ..................26

3.    The extrinsic evidence aligns with the intrinsic record. ..........................29

B.    Scale's proposal conflicts with the Court's Order. ..................................31

C.    The preamble of the '752 patent is limiting. ...........................................31

D.    The asserted claims of the Target Patents all require "target molecules," "nucleic acid targets," or "target RNA." .................................................32

E.    Parse's accused products do not label, identify, or barcode "target molecules," "nucleic acid targets," or "target RNA." .............................32

MSJ #4: PARSE'S ACCUSED PRODUCTS, WHEN USED FOR NUCLEI, DO NOT INFRINGE THE '442, '256, OR '341 PATENTS ...........................................................34

I.      FACTUAL BACKGROUND ...................................................................34

        A.      The asserted claims recite that their method is performed on "cells."..................34

        B.      Nuclei are organelles or cell compartments; they are not cells. ...........................34

II.     ARGUMENT ..................................................................................35

        A.      The disclosure-dedication rule makes "organelles" and "cell
                compartments" unavailable as equivalents. .........................................................35

████████████████████████████████████████████
█████████████████████████████████████ ...............................................36

I.      FACTUAL BACKGROUND ...................................................................36

II.     ARGUMENT ..................................................................................38

MOTION TO EXCLUDE MR. MOONEY'S OPINIONS RELYING SOLELY ON AN
        UNVERIFIED CONVERSATION AND UNSUPPORTED DEPOSITION
        TESTIMONY ..................................................................................42

I.      FACTUAL BACKGROUND ...................................................................42

II.     ARGUMENT ..................................................................................44

MOTION TO EXCLUDE DR. PAZ'S OPINIONS REGARDING HER DEFINITION
        OF THE MARKET AND COMPETITION BETWEEN PARSE AND SCALE .............45

I.      FACTUAL BACKGROUND ...................................................................45

II.     ARGUMENT ..................................................................................46

        A.      Dr. Paz's definition of the two-player market is based on speculation. ...............47

        B.      Dr. Paz's opinions that Parse's early entry in the market hurt Scale has no
                basis in facts and should be excluded. ..................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AbbVie Deutschland GmbH & Co. v. Janssen Biotech, Inc.*,
  759 F.3d 1285 (Fed. Cir. 2014)........................................................................12

*Amgen Inc. v. Sanofi*,
  598 U.S. 594 (2023)...............................................................................10, 18

*Apple Inc. v. Wi-LAN Inc.*,
  25 F.4th 960 (Fed. Cir. 2022) ...........................................................41, 44, 45

*Ariad Pharmaceuticals, Inc. v. Eli Lilly & Co.*,
  598 F.3d 1336 (Fed. Cir. 2010)....................................................................17, 18

*Baxalta Inc. v. Genentech, Inc.*,
  81 F.4th 1362 (Fed. Cir. 2023) .............................................................17, 18, 19

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
  289 F.3d 801 (Fed. Cir. 2002)......................................................................31

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993)...................................................................................47

*Schneider ex rel. Estate of Schneider v. Fried*,
  320 F.3d 396 (3d Cir. 2003) .........................................................................47

*Fundamental Innovation Sys. Int'l v. Anker Innovations Ltd.*,
  No. 21-339-RGA, 2025 WL 459916 (D. Del. Feb. 11, 2025)...........................39, 40

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997)...................................................................................47

*Goldberg v. 401 N. Wabash Venture LLC*,
  755 F.3d 456 (7th Cir. 2014) .......................................................................44

*Guardant Health, Inc. v. Found. Med., Inc.*,
  No. 17-1616, 2020 WL 2461551 (D. Del. May 7, 2020), *Report &
  Recommendation adopted*, 2020 WL 5994155 (D. Del. Oct. 9, 2020)...................42

*ICU Med., Inc. v. Alaris Med. Sys., Inc.*,
  558 F.3d 1368 (Fed. Cir. 2009)......................................................................22

*Johnson & Johnston Assocs. Inc. v. R.E. Serv. Co.*,
  285 F.3d 1046 (Fed. Cir. 2002)......................................................................35

*Juno Therapeutics, Inc. v. Kite Pharma, Inc.*,
  10 F.4th 1330 (Fed. Cir. 2021) .......................................................12, 14, 15, 16, 17

*Koninklijke Philips Elecs. N.V. v. Zoll Lifecor Corp.*,
  No. 12-1369, 2017 WL 3140798 (W.D. Pa. July 25, 2017) ...................................44

*Littelfuse, Inc. v. Mersen USA EP Corp.*,
  29 F.4th 1376 (Fed. Cir. 2022) .............................................................................5

*LizardTech, Inc. v. Earth Resource Mapping, Inc.*,
  424 F.3d 1336 (Fed. Cir. 2005)...............................................................20, 21, 22

*MagSil Corp. v. Hitachi Glob. Storage Techs., Inc.*,
  687 F.3d 1377 (Fed. Cir. 2012).............................................................................18

*Meadows v. Anchor Longwall & Rebuild, Inc.*,
  306 F. App'x 781 (3d Cir. 2009) ..........................................................................44

*NNCrystal US Corp. v. Nanosys, Inc.*,
  No. 19-1307-RGA, 2023 WL 2891453 (D. Del. Apr. 11, 2023)............................41

*Omega Pats., LLC v. CalAmp Corp.*,
  13 F.4th 1361 (Fed. Cir. 2021) .......................................................................38, 40

*PSC Comput. Prods., Inc. v. Foxconn Int'l, Inc.*,
  355 F.3d 1353 (Fed. Cir. 2004).............................................................................35

*PureCircle USA Inc. v. SweeGen, Inc.*,
  No. 2022-1946, 2024 WL 20567 (Fed. Cir. Jan. 2, 2024) .....................................4

*Rite-Hite Corp. v. Kelly Co.*,
  56 F.3d 1538 (Fed. Cir. 1995)...............................................................................36

*Summit 6, LLC v. Samsung Elecs. Co.*,
  802 F.3d 1283 (Fed. Cir. 2015).............................................................................46

*Uniloc USA, Inc. v. Microsoft Corp.*,
  632 F.3d 1292 (Fed. Cir. 2011).............................................................................40

*In re Wands*,
  858 F.2d 731 (Fed. Cir. 1988)...............................................................................19

*Zimmer Surgical, Inc. v. Stryker Corp.*,
  365 F. Supp. 3d 466 (D. Del. 2019).......................................................................41

**Statutes**

35 U.S.C. § 112...............................................................................................1, 19, 22

## TABLE OF EXHIBITS[1]

| Exhibit No. | Description |
|:---:|:---|
| 1. | U.S. Patent No. 10,626,442 (SCALE0011086–131) (the "'442 patent) |
| 2. | U.S. Patent No. 10,982,256 (SCALE0011132–77) (the "'256 patent) |
| 3. | U.S. Patent No. 11,512,341 (SCALE0011178–223) (the "'341 patent) |
| 4. | U.S. Patent No. 11,634,752 (SCALE0013031–78) (the "'752 patent) |
| 5. | U.S. Patent No. 10,900,065 (UW0000305–35) (the "'065 patent) |
| 6. | U.S. Patent No. 11,168,355 (UW0001493–523) (the "'355 patent) |
| 7. | U.S. Patent No. 11,427,856 (UW0001546–76) (the "'856 patent) |
| 8. | Excerpts from the Opening Expert Report of Drew D. Mooney Regarding Damages Arising from Parse's Infringement of the Asserted Scale Claims, dated October 10, 2024 ("Mooney Opening Rpt.") |
| 9. | Excerpts from the Opening Expert Report of Maria Fe Paz De Paz Regarding the Single Cell Analysis Market, dated October 10, 2024 ("Paz Opening Rpt.") |
| 10. | Excerpts from the Opening Expert Report of Peter A. Sims, Ph.D. Regarding Parse's Infringement of the Asserted Scale Claims, dated October 10, 2024 ("Sims Opening Rpt.") |
| 11. | Excerpts from the Opening Expert Report of Lior Pachter, Ph.D. on the Invalidity of U.S. Patent Nos. 10,626,442, 10,982,256, 11,512,341, and 11,634,752, dated October 10, 2024 ("Pachter Opening Rpt.") |
| 12. | Excerpts from the Rebuttal Expert Report of Alex K. Shalek, Ph.D. Regarding Non-Infringement of the Asserted Parse Claims, dated November 12, 2024 ("Shalek Rebuttal Rpt.") |
| 13. | Excerpts from the Rebuttal Expert Report of Peter A. Sims, Ph.D. Regarding Validity of the Asserted Scale Claims, dated November 12, 2024 ("Sims Rebuttal Rpt.") |
| 14. | Excerpts from the Rebuttal Expert Report of Lior Pachter, Ph.D. on Non-Infringement, dated November 12, 2024 ("Pachter Rebuttal Rpt.") |
| 15. | Excerpts from the Rebuttal Expert Report of Rahul Satija, Ph.D. on Validity of U.S. Patent Nos. 10,900,065, 11,168,355, 11,427,856, dated November 12, 2024 ("Satija Rebuttal Rpt.") |
| 16. | Excerpts from the Reply Expert Report of Drew D. Mooney Regarding Damages Arising from Parse's Infringement of the Asserted Scale Claims, dated December 13, 2024 ("Mooney Reply Rpt.") |

---

[1] The Exhibits are attached to the Declaration of Brady P. Gleason, filed contemporaneously with this Omnibus Motion.

| 17. | Excerpts from the Reply Expert Report of Maria Fe Paz De Paz Regarding the Single Cell Analysis Market, dated December 13, 2024 ("Paz Reply Rpt.") |
|---|---|
| 18. | Excerpts from the Reply Expert Report of Peter A. Sims, Ph.D. Regarding Parse's Infringement of the Asserted Scale Claims, dated December 13, 2024 ("Sims Reply Rpt.") |
| 19. | Excerpts from the Reply Expert Report of Lior Pachter, Ph.D. on the Invalidity of U.S. Patent Nos. 10,626,442, 10,982,256, 11,512,341, and 11,634,752, dated December 13, 2024 ("Pachter Reply Rpt.") |
| 20. | Excerpts from the transcript of the Videotaped Deposition of Giovanna Prout, taken July 22, 2024 ("Prout Tr.") |
| 21. | Excerpts from the transcript of the Videotaped Deposition of Thomas Joseph Albert, Ph.D., taken August 15, 2024 ("Albert Tr.") |
| 22. | Excerpts from the transcript of the Videotaped Deposition of Peter A. Sims, Ph.D., taken January 24, 2025 ("Sims Tr.") |
| 23. | Excerpts from the transcript of the Videotaped Deposition of Maria Fe Paz De Paz, M.D., Ph.D., MBA, taken January 29, 2025 ("Paz Tr.") |
| 24. | Excerpts from the transcript of the Videotaped Deposition of Drew D. Mooney, CPA, taken February 5, 2025 ("Mooney Tr.") |
| 25. | Excerpts from the transcript of the Videotaped Deposition of Lior S. Pachter, Ph.D., taken February 10, 2025 ("Pachter Tr.") |
| 26. | U.S. Patent Application Publication No. US 2023/0049314 (SCALE0011887–957) ("Nolan 2014") |
| 27. | O'Huallachain, M., *et al.*, "Ultra-high throughput single-cell analysis of proteins and RNAs by split-pool synthesis," *Commun. Biol.* 3:223 (May 7, 2020) (RSS_00036026–44) ("O'Huallachain") |
| 28. | Parse Biosciences Brochure titled, "Single Cell 3.0, Scalable Single Cell Sequencing, No Instrument Required," (2022) (PARSE0001396–403) ("Parse Brochure") |
| 29. | Report titled, "Single Cell Analysis (SCA): Market Size, Segmentation, Growth, Competition and Trends (2019-2025) (5th Edition)," prepared by DeciBio Consulting and dated February 14, 2023 (PARSE0368071) ("DeciBio 2023 Report"), including Excerpted Text from Page 23 |
| 30. | PowerPoint Presentation titled, "███████████████████████ ███████," prepared by Ian Pittam, a Field Applications Scientist with Parse Biosciences (PARSE0392983–3013) ("Parse Presentation") |
| 31. | Parse Biosciences User Manual titled, "Evercode™ Cell Fixation v3," Version 1.1 – UM0027 (Mar. 2024) (PARSE0702596–629) ("Parse User Manual") |

| 32. | Email from Emma Frank (counsel for Scale and Roche) to counsel for Parse and UW regarding Plaintiffs' *Corrected* Case Narrowing Step Two, dated February 23, 2025 |
|---|---|
| 33. | De Simone, M., *et al.*, "Comparative Analysis of Commercial Single-Cell RNA Sequencing Technologies," *bioRxiv* (Jun. 18, 2024), doi: https://doi.org/10.1101/2024.06.18.599579 (SCALEBIO0339953–83) ("Marco") |
| 34. | Yu, H., *et al.*, "In vitro isolation of small-molecule-binding aptamers with intrinsic dye-displacement functionality," *Nucleic Acids Res.* 46(8):e43 (May 4, 2018) (SCALEBIO0013791–799) ("Yu") |

## INTRODUCTION AND SUMMARY OF ARGUMENTS

1.       **The '442, '752, and '256 patents' asserted claims are invalid under § 112.** The Court should grant summary judgement that claim 11 of the '442 patent, claims 1, 2, 6–11, and 14 of the '752 patent, and claims 1, 2, 5, and 6 of the '256 patent are invalid for lack of written description and enablement. These claims cover the use of an antibody or aptamer, of which there are billions, designed to bind a given target molecule. Yet the specification provides no information (*e.g.*, common structures or representative examples) about which antibodies or aptamers will bind to which target molecules. It provides no information that distinguishes the antibodies and aptamers that are capable of binding to a target molecule from those that cannot. This problem is compounded by the vast number of target molecules that fall within the scope of the claims, made worse by Scale's expansive reading of the claims to read on Parse's products. The specification leaves artisans to engage in painstaking, unpredictable experimentation to see what works, and what does not. Summary judgment of invalidity is appropriate.

2.       **Scale's asserted claims lack § 112 support for unclaimed, but required features.** The Court should grant summary judgement that claim 11 of the '442 patent; claims 1, 2, 6–11; and 14 of the '752 patent; claims 1, 2, 5, and 6 of the '256 patent; and claim 13 of the '341 patent are invalid for lack of written description. Every embodiment in the specification discloses labeling a target molecule with a "unique binding agent (UBA)" and an "epitope specific barcode (ESB)," both inventor-defined terms to describe the concepts these molecules embody in the  invention. Despite this uniformity, the claims omit at least one of these necessary elements, expanding the claims' scope beyond its written description. Summary judgment of invalidity is appropriate

3.       **No literal infringement of Scale's asserted patents requiring "target molecules."** The Court should grant summary judgement of no literal infringement of all

1

asserted claims of the '442, '256, and '752 Patents. Each asserted claim requires the labeling, identification, or barcoding of certain "target molecules," which include "nucleic acid targets" and "target RNA." The Court had previously provided a partial construction for the term "target molecules": "at least 'molecules of interest … that are being detected or quantified.'" Under Parse's proposed correct construction—"specific molecules of interest with a known individual identity sufficient to distinguish the molecules that are being detected or quantified"—it is undisputed that the Accused Parse Products do not label, identify, or barcode "target molecules" because they label *all* RNA using an untargeted approach.

    **4.**    **No infringement of Scale's asserted patents requiring "cells" when Parse's accused products are used for nuclei.** The Court should grant summary judgement that Parse's accused products, when used with nuclei, do not infringe the asserted claims of the '442, '256, and '341 Patents. Each asserted claim recites that its method is performed on "cells." It is undisputed that ▮▮▮▮▮▮ of users use nuclei in the Parse products. Nuclei are "organelles" and "cell compartments," but are not themselves cells. Scale cannot dispute that embodiments of methods performed on "organelles" and "cell compartments" were disclosed in the asserted patents but not claimed, which dedicates these embodiments to the public. Accordingly, Scale is legally barred by the disclosure-dedication rule from claiming that "organelles" or "cell compartments" are equivalent to "cells." As Scale asserts that these claims, when used for nuclei, are infringed only under the doctrine of equivalents, summary judgment of no infringement is appropriate.

    **5.**    **Mr. Mooney's use of ▮▮▮▮▮▮ as a comparable license is unreliable.** The Court should exclude Scale's expert Mr. Mooney's damages opinion that ▮▮▮▮▮▮ is a comparable license, ▮▮▮▮▮▮ ▮▮▮▮▮▮. Mr. Mooney's

opinions are based on facts not in the record and an undocumented and unverified conversation with Scale's CEO, ███████████████████████. Mr. Mooney's use of ███████ ███████ is fundamentally unreliable and should not be permitted to go to the jury.

6.     **Mr. Mooney's opinions based on "discussions" with Scale CEO and her deposition testimony are unreliable.** Mr. Mooney relies on two phone calls with Scale's CEO and Ms. Prout's deposition testimony for several of his opinions. The calls were unrecorded and unverified and the facts elicited during those calls are contrary to facts in the record and the facts elicited from Ms. Prout's deposition testimony. Mooney's opinions should be excluded.

7.     **Dr. Paz's opinions regarding the market and competition are unreliable.** Dr. Paz's market analysis and opinion that Parse and Scale are the only two competitors in the "smaller instrument-free and highly scalable" should be excluded because they are based entirely on speculation and has no reliable basis.

## <u>NATURE AND STAGE OF THE PROCEEDINGS</u>

Plaintiff Scale Biosciences, Inc. initiated this patent-infringement lawsuit against Parse Biosciences, Inc. on December 14, 2022. D.I. 1. Roche Sequencing Solutions, Inc., initially a nominal defendant, realigned as a Plaintiff on May 3, 2023. Parse and the University of Washington filed an answer and second amended counterclaims for patent infringement. D.I. 71; D.I. 87; D.I. 93. This Court issued claim construction rulings, D.I. 118; D.I. 119; D.I. 121; D.I. 239; D.I. 241, though the precise construction of certain terms remains unresolved. D.I. 267 at 2. Fact and expert discovery are essentially complete, having only the need to resolve recent discovery disputes. D.I. 288; D.I. 290; D.I. 293. Trial is set for October 20, 2025. D.I. 266.

3

## MSJ #1: THE ASSERTED CLAIMS OF THE '442, '752, AND '256 PATENTS LACK WRITTEN DESCRIPTION AND ENABLEMENT

A patentee must describe and enable *the full scope* of its patent claims. All of the asserted claims in the '442, '752, and '256 patents cover using a "UBA" to label a target. SUF1, ¶¶53-62. Unique binding agent ("UBA")—a coined term—covers vast categories of classes of molecules, including antibodies and aptamers. Each patent addressed in this motion, which share a common specification, claims kits or methods for labeling target molecules within or on a cell. The term UBA denotes a category of molecules or assemblies whose single common feature is the ability to specifically bind to target molecules. The Court's claim construction (D.I. 118) confirms this. SUF1, ¶1-5.

UBAs are a class of molecules, functionally defined. *Id.* Indeed, Scale's specification describes the "present invention" as "providing UBAs that are capable of binding individual target molecules." Ex. 1 ('442 patent), 34:33-34. Scale proposed and this Court construed UBAs in functional terms: "a molecule or assembly that is designed to bind with at least one target molecule …." D.I. 118. By defining UBAs by what they do, there is no dispute that, in all of the asserted claims, a UBA is a functional element. SUF1, ¶¶1-5. *PureCircle USA Inc. v. SweeGen, Inc.*, 2024 WL 20567, at *2 (Fed. Cir. Jan. 2, 2024). As Scale's technical expert explained: the "definition of a UBA informs some of its properties"; that is, it "must be designed to bind with at least one target molecule." Ex. 22 (Sims Tr.) 141:1-22; *see also id.* 168:2-23 (similar).

The specification discloses two categories of potential UBAs that are especially important for this motion—aptamers and antibodies. SUF1, ¶¶1-5. Ex. 1, 4:18-20, 5:42-4; 7:27-29, 9:43-46. The problem for Scale, however, is that the specification is fatally lacking written description for the full scope of UBAs that are capable of binding to the full scope of targets within or on the full scope of cells, also, an incalculably large genus. Similarly, the specification

4

fails to comport with the enablement requirement given the vast breadth of the asserted claims and their functional requirements. Accordingly, each of the asserted claims is invalid.

## I.    FACTUAL BACKGROUND

### A.    The '442, '752, and '256 patents' asserted claims cover the use of a vast number of antibodies, aptamers, or both, the scope of which is limited only by the antibodies' and aptamers' ability to bind to target molecules.

The '442, '752, and '256 patents' asserted claims encompass the use of antibodies or aptamers (or both).

#### 1.    The '752 patent's asserted claims cover the use of antibodies and aptamers to bind to target molecules.

Scale asserts claim 1 and its dependent claims 2, 6-11, and 14 of the '752 patent, all of which are directed to kits "for split-pool barcoding." Ex. 4; SUF1, ¶60. Claim 1 requires, in relevant part, "at least two sets of assayable polymer subunit (APS) oligonucleotides." Claim 5 narrows that APS limitation such that the APSs "comprise a unique binding agent (UBA)." Claim 1's APSs therefore encompass APSs comprising UBAs. And there is nothing in the asserted dependent claims that narrows claim scope to exclude UBAs. Thus, there is no dispute that the '752 patent's claimed UBA can be an antibody or aptamer, so long as it has the functionality of binding "target molecules." Ex. 1, 4:18-20, 5:42-46, 7:27-29, 9:43-46; Ex. 22, 203:2-10.

#### 2.    The '442 patent's asserted claim covers the use antibodies or aptamers to bind to target RNA molecules.

Scale asserts claim 11 of the '442 patent. Ex. 1; SUF1, ¶54. Claim 11 depends from claim 9 and recites that "the target molecules are RNA and wherein step (a) comprises the hybridizing the common linker to the RNA." Claim 13 also depends from claim 9, and recites, inter alia, that step "(a) comprises *binding the antibodies* comprising the common linker sequence and the epitope specific barcode sequence to the protein, peptide, or antigen," (emphasis added). In turn,

claim 14 recites that step "(a) comprises *binding the aptamer to* the protein, peptide, or antigen," (emphasis added). Put another way, claim 9 necessarily covers using antibodies and aptamers to bind to target molecules. *Littelfuse, Inc. v. Mersen USA EP Corp.*, 29 F.4th 1376, 1380 (Fed. Cir. 2022) ("By definition, an independent claim is broader than a claim that depends from it ….").

That means that claim 11 also covers using antibodies and aptamers to bind to target molecules. Claim 11 narrows claim 9 in just two respects. First, it narrows the "target molecules" to RNA. Ex. 1. Second, it requires that "step (a) comprises hybridizing the common linker to the RNA." *Id.* But the specification states that antibodies can be linked to a nucleic acid including a common linker. *Id.*, 18:60-61 ("[i]n some embodiments, the antibodies described herein are attached to a nucleic acid, e.g., linker oligo or nucleic acid ESB.") And the same goes for aptamers. *Id.*, 19:61-63. Thus, there is nothing recited in claim 11 to exclude using antibodies or aptamers; the specification and claim differentiation mandate the opposite.

### 3.    The '256 patent's asserted claims cover the use of UBA-aptamers to label "nucleic acid targets."

Scales asserts claims 1-2, 5, and 6 of the '256 patent. Ex. 2; SUF1, ¶56. Those claims all recite "unique binding agent (UBA) nucleic acid tags," and the patent states that UBAs can be aptamers. *Id.* 19:16-19. Aptamers are also nucleic acids. *Id.* So the claims covers the use of UBA-aptamers to bind to targets. Scale's Dr. Sims agreed. Ex. 22, 115:20-116:10. The '256 patent's remaining asserted claims do not exclude the UBA-aptamers embodiment. SUF1, ¶¶55-56.

### B.    The claims cover an incalculably large number of possible antibodies and aptamers.

Antibodies are proteins comprising chains of amino acids that can bind to a target molecule (epitope). SUF1, ¶37. The specification defines antibodies as follows:

> [T]he terms antibody and antibodies are used in a broad sense, to include not only intact antibody molecules … [but also] immunoglobulin A, immunoglobulin G and … any immuno-reactive component(s) of an antibody molecule that immunospecifically bind to at least one [target molecule, including] … single chain antibody fragments (scFv), miniantibodies, diabodies, … and the like.

Ex. 1, 17:66-18:5. The specification also states that the covered antibodies "can be obtained from a variety of sources," including "polyclonal antibod[ies], monoclonal antibod[ies], monospecific antibod[ies], recombinantly expressed antibod[ies]," from "a variety of animal species." *Id.*18:21-28. The specification recognizes "a vast number of commercially available antibodies … can be found on the World Wide Web." *Id.* 18:51-56; *see also* SUF1, ¶¶6-10.

Parse's expert Dr. Pachter estimated the number of monoclonal antibodies (mAbs)—which is just one subclass of the claimed UBAs—to be in the order of "tens of millions to billions." Ex. 19 (Pachter Reply Rpt.) ¶ 68. This number does not account for all the other subclasses of antibody-based UBAs encompassed by the specification's definition (*e.g.*, "single chain antibody fragments (scFv), miniantibodies, diabodies, … and the like." Ex. 1, 17:66-18:5. Scale's Dr. Sims did not estimate the number of antibodies, conceding that "many organisms are producing vast numbers of different antibodies. There are also very large numbers of commercially available antibodies, synthetic antibodies." Ex. 22, 81:4-13.

**Aptamers** are nucleic-acid or polypeptide molecules that can fold into complex, three-dimensional structures. SUF1, ¶18. For use in targeted methods or kits, such as in the asserted claims, aptamers must be generated through an iterative trial-and-error process to specifically "bind target molecules in a highly specific, conformation-dependent manner, typically with very high affinity." Ex. 1, 19:18-42; Ex. 22, 113:4-11. In this way, aptamers are similar to antibodies because, like the antibody-antigen reaction, the aptamer-target reaction is highly specific. Ex. 22, 113:4-114:1. Aptamers are generated in a laboratory from vast libraries containing up to $10^{15}$ unique oligonucleotide sequences, "often as large as 60-100 nucleotides long." Ex. 1, 19:35-42.

The class size of potential aptamers is "enormous." Ex. 25 (Pachter Tr.), 138:2–4; SUF1, ¶¶19-30; Ex. 34, 1.

The '442, '752, and '256 patents' asserted claims cover *every* aptamer that satisfies the claimed functionality, whether or not the aptamer was previously known or yet to be discovered. That incalculably large population swells in the context of the '442 and '752 patents' asserted claims, which also cover *every* antibody or antibody fragment (as defined above) that satisfies the claimed functionality, whether or not the antibody or fragment was previously known or yet to be discovered. Ex. 22, 154:4-19.

### C.    The claims cover a "vast" number of target molecules within or on "cells."

The scope of the claims expands exponentially, in light of the number of possible targets in or on "cells" the UBAs must bind. SUF1, ¶¶31-52. The specification states that the "target molecule is selected from the group consisting of a peptide, a polypeptide, a oligopeptide, a protein, a phosphoprotein, an antibody, a nucleic acid, a peptide nucleic acid, a synthetic small molecule, a disaccharide, a trisaccharide, a oligosaccharide, a polysaccharide, a lipid, a steroid, and a phospholipid." SUF1, ¶31; Ex. 1, 2:63-3:2; Ex. 22, 44:14-45:16, 47:23-48:23. Dr. Pachter estimates that "there are millions of potential targets" based on this list alone. Ex. 19, ¶ 100. For a few subcategories, Dr. Pachter estimates 20,043 human proteins (*id.* ¶ 69), over 200 million polysaccharides (*id.* ¶ 70), and "millions of [small molecules] that would each require its own specific solution to be targeted" (*id.* ¶ 71). Scale's Dr. Sims admitted that, for a peptide that is just five amino acids long, there would be "20 to the fifth possible peptides." (3.2 million). Ex. 22, 67:8-15. Dr. Sims did not provide his own estimates but agreed that the number molecules within *each* classification was "vast." *Id.* 61:18-22 (synthetic small molecules), 80:10-21 (peptides, polypeptides, oligopeptides, and proteins), 84:25-85:5 (steroids), 85:8-15 (sugars), 85:16-20 (lipids generally), 86:11-17 (phospholipids specifically).

Several of Scale's asserted claims are maximally broad in their coverage of the scope of target molecules disclosed in the specification. For example, the '752 patent's asserted claims do not limit the scope of "target molecules" in the slightest. Ex. 4. Claim 11 of the '442 patent limits the field of target molecules to "RNA," and claims 1, 2, 5, and 6 of the '256 patent limit the scope of target molecules to "nucleic acid targets." Ex. 1; Ex. 2. Notwithstanding these two limitations, the number of target molecules encompassed by each asserted claim remains staggering.

Scale's interpretation of the claim term "targets" does it no favors in this respect. Scale imbues the term "target" with *broadening* characteristics. *First*, under Scale's definition, the claimed targets can "encompass[] both specific molecules *and classes* of molecules." Ex. 18 (Sims Reply Infringement Rpt.), ¶ 118 (emphasis added). This means that in the covered UBA-antibody and -aptamer embodiments discussed above, a UBA-antibody or -aptamer satisfies the functional binding limitation if it binds to one target or some desired set of targets (for example one specific protein molecule or a subclass of proteins present in a sample). SUF1, ¶¶1-5, 32, 33, 38, 48. But the various discrete subclasses of even just proteins, is incalculably vast, not mention of all possible subclasses of the other classes of targets (*e.g.*, lipids, RNA, and trisaccharides). SUF1, ¶31-42. *Second*, under Scale's definition, the claimed targets cover ones *unknown beforehand*; a class of molecules meets the definition of "target, simply if "a UBA can bind to them." Ex. 18, ¶ 49.

The magnitude grows further as the claims embrace *any* kind of cell. Ex. 19, ¶ 63; SUF1, ¶43. The specification's methods may be used on "virtually any organism," including "bacteria or other organisms, such as diatoms, dinoflagellates, algae, among others, such as in certain marine or earth-based samples." Ex. 1, 40:1−2, 40:50−53. As Dr. Pachter explained, "[e]ach of these organisms would have their own unique proteome, with tens of thousands of additional

unique protein target molecules falling within the scope of the claims." Ex. 19, ¶¶ 69, 152.  Thus, the claims cover a "vast" number of target molecules within *any* "cell."

### D.    Identifying which antibodies effectively bind to a given target molecule is not predictable and requires excessive trial-and-error experimentation.

Although antibodies and methods of generating antibodies, were known in 2012, "aspects of antibody science remain unpredictable." *Amgen Inc. v. Sanofi*, 598 U.S. 594, 600 (2023). Even if it is known that "changing even one amino acid … can alter an antibody's structure and function," "scientists cannot always accurately predict exactly how trading one amino acid for another will affect an antibody's structure and function" *Id.* (cleaned up); SUF1, ¶¶9-14.

Both sides' technical experts agree that testing would be needed to find a suitable antibody. As Dr. Pachter explained, a POSA would be faced with screening tens of millions to billions of clones to ascertain binding affinities to each individual target, leading to thousands of antibodies that bind distinct epitopes on the same target antigen. Ex. 19, ¶ 68. Yet still more experimentation is required to ensure that the antibodies actually work as intended. *Id.*; SUF1, ¶¶9-14 The POSA would need to further confirm that they bind only to the specific target molecule intended, as opposed to off-target binding. Ex. 22, 145:19-150:9; Ex. 25, 192:6-193:15. Finally, the POSA would need to run experiments to confirm that the antibody candidates actually worked in the practice of the claimed methods or the use in the claimed kit. Ex. 22, 40:17–43:6. Dr. Sims agrees with Dr. Pachter that some experimentation is required to make and use the invention. Ex. 22, 42:20–43:6.

### E.    Identifying which aptamers effectively bind to a given target molecule is not predictable and requires excessive trial and error experimentation.

The specification describes one general method of generating aptamers, a process known as SELEX. Ex. 1, 19:35-51. This iterative, trial-and-error process involves the loading of a library of candidate-aptamers (polynucleotides) into an affinity column with a target molecule.

SUF1, ¶¶22-25, 28-30; Ex. 34, 1-2. The candidate-aptamers with binding affinity for the target molecule will bind, but candidate-aptamers with lower affinity will flow through the column and be discarded. *Id.* The candidate-aptamers show some binding to the target in the first step are then collected and mutagenized to create a second library of candidate-aptamers. *Id.* This second library of candidate-aptamers is then loaded back into the affinity column with the target molecule, and the process is repeated again and again until the polynucleotide aptamers are evolved to have the desired affinity for the target. *Id.*

The SELEX process produces aptamer *candidates* that require additional testing to assess whether the aptamer *properly* binds to the *intended* target molecule. *Id.*. As Dr. Sims admitted, the SELEX process can yield aptamer candidates, *not one of which* will "have the desired features, such as affinity for a target." Ex. 22, 122:9-22, 134:22-135:14. In such instances, Dr. Sims conceded that the artisan would have to "start over" and "[t]ry again." *Id.* 122:9-22. Then, even if the SELEX process yields aptamers with the "desired features," there is still a likelihood that the synthesized aptamers improperly bind to "many targets," including targets that were not "even included in the SELEX experiment." *Id.* 138:5-15. There is no dispute that generating an aptamer is an trial-and-error exercise. *Id.* 135:2-6, 135:23-136:9. And that is to develop just *one* aptamer.

As with antibodies, generating aptamers to bind specifically with limitless number of target molecules from thousands of different classifications is daunting. Ex. 11 (Pachter Opening Rpt.), ¶ 88. That process remains daunting, even if the class of target molecules were limited to a particular species. Even if the claimed "unfathomably large universe" of target molecules were limited to a single molecule, it would still be "very hard to know amongst this enormous universe of aptamers . . . you could consider to try bind" to the target. Ex. 25, 139:9–21..

## II.    ARGUMENT

### A.    The '442, '752, and '256 patents are invalid for lack of written description.

With the number of antibodies and aptamers estimated in at least the billions, there is no dispute that the claims cover an enormous number of possible UBAs, only a tiny fraction of which will suitably bind to any given target molecule. SUF1, ¶¶1-10, 20, 21, 31, 53-62. Yet, the Scale patents do not describe the full scope of antibodies or aptamers that satisfy the functional-binding limitation, nor any structural features that indicate which are suitable for targeting versus those that are not.

Written description strikes at the "bargain" an inventor makes with the public; the applicant "must describe his or her invention so that the public will know what it is and that he or she has truly made the claimed invention." *AbbVie Deutschland GmbH & Co. v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1298 (Fed. Cir. 2014). Broad, functionally defined genus claims, such as Scale's, are "inherently vulnerable to invalidity challenge[s] for lack of written description support, especially … where it is difficult to establish a correlation between structure and function for the whole genus or to predict what would be covered by the functionally claimed genus." *AbbVie*, 759 F.3d at 1301.

Two factors to determine whether claims to functionally-defined genera satisfy written description: "a genus can be sufficiently disclosed by 'either [1] a representative number of species falling within the scope of the genus or [2] structural features common to the members of the genus so that one of skill in the art can 'visualize or recognize' the members of the genus.'" *Juno*, 10 F.4th at 1335. Scale cannot make either showing.

12

1. **Scale's specification does not disclose a representative number of antibodies that bind to the full scope of claimed target molecules.**

The specification does not disclose a representative number of UBA-antibodies that possess the claimed functionality. Indeed, the specification does not disclose a *single embodiment* that identifies by name or accession number *a single antibody*. SUF1, ¶16. As Dr. Pachter explains, "targeting a molecule necessarily requires designing molecules that bind to a particular region of the target, which is exactly how a UBA is defined." Ex. 19, ¶ 148. On the UBA side of the equation, there are billions of different antibodies spanning countless classification groups and sub-groups according to Scale's own reading of the claims. On the other side, there are a countless number of different target molecules, each drastically different such that "there can be no general solution for binding tags across this scope"; "each type of target molecule requires a unique solution." *Id.* ¶ 155. Yet, the specification fails to disclose even a single specific antibody by name and accession number for even a single given target. And, given the diversity of antibodies covered, the complexities of working with the myriad target species, and the diversity of cells contemplated (*see* Sections I.B & I.C), the patent description falls woefully short. Ex. 19, ¶ 155. Indeed, the specification contains "nowhere near appropriate disclosure for the vast numbers of antibodies that may be used." *Id.* a ¶ 150.

Dr. Sims points to two prophetic examples, which mention CD1, CD3, and a handful of other antigens, but no specific antibodies to them. Ex. 13 (Sims Rebuttal Rpt.), ¶ 339. Based on these examples, and an artisan's unspecified[2] abundance of knowledge, Dr. Sims concludes that the "antibodies disclosed in [the specification]" are "representative of molecules that can be used for labeling target molecules that are proteins, peptides or antigen." *Id.*

---

[2] Dr. Sims simply says, without any evidence, that "[v]ast numbers of antibodies" and methods of making monoclonal and polyclonal antibodies were well known. Ex. 13, ¶ 339.

Dr. Sims's rebuttal does not create a triable issues. *First*, Dr. Sims has not specified which antibody or antibodies he believes are representative, let alone why they are representative. Nor does Dr. Sims meaningfully grapple with the diversity of antibodies, the complexity of working across the myriad target molecules, or the challenges of working with cells from a staggering array of organisms. *Second*, the specification's mention of a handful of specific proteins comes nowhere close to providing a representative number of UBA-antibodies that possess the claimed functionality. Even if a POSA knew hundreds of antibodies that bind to each of the disclosed antigens, a POSA would not know: (i) whether those antibodies are representative; or (ii) how one could identify the species of antibodies capable of binding to the limitless number of *other* target molecules encompassed by the claims. Ex. 19, ¶¶152, 153. *Third*, as noted above, not one of the asserted claims limits "target molecules" to only the classes of target molecules mentioned by Dr. Sims—"proteins, peptides or antigen." Ex. 13, ¶ 339. Thus, even if Dr. Sims's conclusory opinions here (which no reasonable jury could credit) could be rehabilitated, Scale has not identified a representative antibody for the other classes of "target molecules," such as lipids, nucleic acids, synthetic small molecules, disaccharides, trisaccharides, oligosaccharides, polysaccharides, and steroids. SUF1, ¶17. Nor has he at all addressed UBA antibodies binding to RNA, as is within the scope of the '442 patent's claim 11, as discussed above.

The Federal Circuit's decision in *Juno* is instructive here. 10 F.4th 1330. There, Juno claimed a polymer comprising a *single* class of antibodies—single chain antibodies (scFv)—capable of binding to "any target." *Id.* 1334, 1336. The patent also recited dependent claims specific to a given target molecule (CD19), and the specification disclosed two working embodiments, one of which identified by name a scFv bound to CD19 . *Id.* 1336. Juno argued that these embodiments were representative. *Id.* 1336-37.

The Federal Circuit disagreed, finding that "no reasonable jury could find" the written description requirement satisfied. *Id.* 1336-40. "Even accepting that scFvs were known and that they were known to bind," "the specification provides no means of *distinguishing which scFvs will bind to which targets*," a problem compounded by the "limitless number of targets" within the claim scope. *Id.* 1337-38 (emphasis added). The same conclusion is proper here.

Scale's claims are also considerably broader than those invalidated in *Juno*, yet they stem from a specification even more lacking: the claims cover *any* antibody (a genus much larger than the millions of billions of scFvs at issue in *Juno*) that specifically binds to *any* target molecule (a genus much larger and more complex than the targets claimed in *Juno*). At the same time, Scale's specification does not disclose a single specific antibody, and certainly not a "representative" number. It does not indicate in any way that the handful of antigens mentioned in the specification are representative of any target. In sum, Scale's specification describes much less, while claiming much more than the patent invalidated in *Juno. Id.* 1336.

### 2. Scale's specification does not disclose a representative number of aptamers.

As with antibodies, the specification uniformly refers to aptamers as a class, without disclosing a single embodiment that identifies a *specific* aptamer. As Dr. Pachter explains, finding "antibodies and aptamers that are suitable for specific targeting is very difficult." Ex. 25, 137:21-138:4; Ex. 11, ¶ 88. Like antibodies, working with aptamers is unpredictable and requires considerable experimentation. *See* Section I.E; SUF1, ¶¶22-25, 28-30. Yet, at most, the specification mentions six prior-art references that provide "[d]etailed descriptions of aptamers, including relevant protocols." Ex. 1, 19:51-60. These disclosures do not show that the inventor possessed the full scope of aptamers that bind to a nearly limitless number of targets within the

claim scope, or even the "nucleic acid" or "RNA" targets (of the '256 and '442 patents, respectively). Ex. 19, ¶ 124.

Scale has not proffered any evidence that the specification discloses a representative aptamer; there is nothing on the other side of the ledger. Dr. Sims's testimony corroborates (rather than negates) that Scale's specification provides no means of distinguishing which aptamers will bind to which targets without extensive trial and error. *Compare* Ex. 22, 129:6-21 (claiming "this invention could be used to assess aptamers" affinity to bind and "you could learn about that from practicing this invention"); *with Juno*, 10 F.4th at 1339 (stating that a patentee cannot claim a "problem to be solved while claiming all solutions to it," such as an aptamer "later actually invented and determined to fall within the claim's functional boundaries").

As in *Juno*, the specification must provide "'a precise definition, such as by structure, formula, [or] chemical name,' of the claimed subject matter sufficient to distinguish it from other materials." *Id.* 1338. Nothing in the specification comes close to "a precise definition" of a representative number of aptamers capable of binding to the various "target molecules" claimed. Thus, the inventor did not possess the full scope of the invention claimed. *Id.* 1337.

### 3.    Scale's specification does not disclose structural features common to the antibodies or aptamers that satisfy the claimed functionality.

Nor are there disclosed common structural features of the antibodies and aptamers that satisfy the claimed functionality sufficient to distinguish them from those that do not. Dr. Pachter's opinion that the Scale's asserted patents provide no details regarding the characteristics, sequences, or structures that would allow a POSA to determine which antibodies and aptamers will bind to which targets has gone unrebutted. Ex. 11, ¶ 195; Ex. 19, ¶ 156. That is unsurprising. The specification is devoid of any guidance on an appropriate selection of antibody or aptamer (or class of antibodies or aptamers) to bind to *any* given target molecule. Nor has

16

Scale identified anything in the specification that would help a POSA distinguish between antibody or aptamer candidates that are capable of binding from those incapable of binding to any given target molecule.

In fact, Scale's infringement case basically concedes the issue. Dr. Sims argued in his Reply Infringement Report that a POSA would *not know* which antibodies or aptamers will bind to which target molecules or the structure of those antibodies or aptamers that do bind. Ex. 18, ¶ 48. Sims continued that—because "of how target molecules can be identified"—"it is impossible to know all of the individual molecules in the class of molecules that are targeted" or "what would be in the class of target molecules." *Id.* ¶¶ 129-130. Without such information, a POSA could not therefore predict which antibodies or aptamers will bind to given target molecules; as Dr. Sims stated, "one would know only that the target molecules include a shape that the antibody or aptamer can bind to. *But one would not necessarily know what structures or sequences of that target molecule or any portion of it.*" *Id.* ¶ 129 (emphasis added); SUF1,¶¶47-52.

Even if some antibodies and aptamers were well known and known to possess some common structure generally, without "a way to distinguish" those that are capable of binding to a given or representative target from those "incapable" of doing so, "no reasonable jury could find the inventors satisfied the written description requirement." *Juno*, 10 F.4th at 1340. Scale needed to provide a disclosure that reasonably conveys possession of *the full scope* of the claimed subject matter. *Id.* 1342; *Ariad*, 598 F.3d at 1341. "The test is the same whether the claim element is essential or auxiliary to the invention." *Juno*, 10 F.4th at 1341 (cleaned up). Scale failed to provide such a disclosure for the claimed functional process of labeling "target molecules," "nucleic acid targets," or target "RNA." Thus, the asserted claims of the '442, '752, and '256 patents are invalid for lack of written description.

17

**B.    The '752, '256, and '442 patents are invalid for lack of enablement.**

Enablement is distinct from written description, although the two requirements "often rise and fall together." *Ariad*, 598 F.3d at 1352. Enablement is a question of law based on underlying factual findings. *Baxalta Inc. v. Genentech, Inc.*, 81 F.4th 1362, 1365 (Fed. Cir. 2023). The enablement requirement is met if the specification contains sufficient information to permit a POSA "to make and use the full scope of the claimed invention without undue experimentation." *MagSil Corp. v. Hitachi Glob. Storage Techs., Inc.*, 687 F.3d 1377, 1380 (Fed. Cir. 2012) (cleaned up). Where, as here, "a patent claims an entire class of processes, machines, manufactures, or compositions of matter, the patent's specification must enable a person skilled in the art to make and use *the entire class*." *Amgen*, 598 U.S. at 610 (emphasis added). "[T]he more a party claims, … the more it must enable." *Id.* 613.

The facts of this case are highly similar to those in *Amgen* and *Baxalta*—both controlling and both fatal. *Amgen*, 598 U.S. 594; *Baxalta*, 81 F.4th 1362. The patents-at-issue in *Amgen* claimed all antibodies that (1) bind to specific amino acid residues on a protein; and (2) block action at a given receptor. *Amgen*, 598 U.S. at 613. The specification disclosed 26 specific antibodies that performed the claimed functions and a "roadmap" on how to make and use the undisclosed antibodies, which the patentee argued was an enabling disclosure because artisans "can make and use every undisclosed but functional antibody if they simply follow" its techniques. *Id.* 613-14. The Supreme Court disagreed, finding the "roadmap" as nothing more than an invitation to engage in "random trial-and-error discovery." *Id.* 614-15.

The Federal Circuit encountered a similarly constructed patent in *Baxalta.* 81 F.4th at 1366. There, the patent claimed all antibodies that could (1) bind to a given target receptor; and (2) increase procoagulant activity. *Id.* The specification disclosed 11 antibodies that performed the claimed functions and a "roadmap" like *Amgen*'s. *Id.* The Federal Circuit, upon review,

18

identified five similarities between *Baxalta* and *Amgen* relevant here. *Id.* 1365-67. Each is addressed in turn below regarding the Scale patents. Indeed, the facts here are far worse for the Scale than those in *Amgen* and *Baxalta.*

1) Scale's specification provides no information on how to structurally identify which antibodies and which aptamers possess the claimed functionality. Sections II.A.1-2. 2) Scale's specification contains no disclosures that would allow a POSA to predict which antibodies and which aptamers possess the claimed functionality. *Id.* 3) Scale's specification does not disclose any common structural (or other) feature delineating which antibodies and which aptamers possess the claimed functionality from those that do not. Section II.A.3. 4) Scale's specification does not describe why any antibodies or aptamers disclosed perform the claimed functions, or why others do not; indeed, the Asserted Scale Patents do not identify a single working example or any specific antibody or aptamer by name. *Id.*; SUF1, ¶¶15-16. 5) To practice the full scope of Scale's claims, a POSA must make candidate antibodies and aptamers and then screen them to determine which ones perform the claimed functions through extensive trial and error. Sections I.D & I.E; SUF1, ¶¶ 11-14, 23-25, 28-30.

Scale's patents invite others to engage in painstaking experimentation to see what works and finish the claimed invention. Given this, the unpredictability in the art, the breadth of the claims, and lack of any meaningful guidance in the specification, the *Wands* factors point to a finding that undue experimentation is necessary to practice the full scope of the claims. 858 F.2d 731, 736-37 (Fed. Cir. 1988); Ex. 19, ¶ 102; *Baxalta*, 81 F.4th at 1367. Thus, the asserted claims of the '752, '256, and '442 patents are invalid for lack of enablement.

## MSJ #2: THE ASSERTED CLAIMS ARE INVALID UNDER § 112 FOR FAILING TO CLAIM ESSENTIAL FEATURES

The common specification does not provide written description support for claims that do

not recite elements requiring the use of an UBA *and* an ESB. Because Scale's asserted claims omit one or both features, they are each invalid as a matter of law.

## I.    FACTUAL BACKGROUND

Scale's patents coined the terms "UBA" and "ESB" to define concepts. Ex. 13, ¶ 158. SUF2, ¶16–25. UBAs are the molecules "designed to bind with at least one target molecule." '442 patent, 17:18-20; SUF2, ¶10. ESBs are the molecules "designed to bind with at least one UBA" and associate unique codes with target molecules. *Id.* 20:29-33; SUF2, ¶¶11-12. The specification calls out both elements in its definition of "the present invention" and their respective roles in executing its stated intent—*i.e.*, labeling target molecules in single cells. Ex. 1, 34:32-40). The specification's treatment of kits is no different—UBAs and ESBs are always required, else they lack utility. *Id.* 13:9-12; 50:18-23; Ex. 19, ¶ 95.

Conspicuously *missing* from the specification is any mention of even the possibility of labeling target molecules *without* using UBAs *and* ESBs. SUF2, ¶26. That itself is a remarkable fact, given the patents' extraordinary effort to identify possible ways to arrange and use the various components of the invention. Indeed, the specification is replete with sentences beginning "[i]n some embodiments …" that do not show how one might make or use other possibilities. Despite this, not one of the asserted claims recites *both* UBAs and ESBs, either by their coined phrases or initialisms. Granted, the '256 patent's claims recite the use of UBAs to label target molecules but not one asserted claim in any Scale patent specifies ESB. SUF2, ¶¶1-8.[3]

---

[3] Although many of the asserted claims do not *explicitly require* the use of UBAs to label target molecules, it remains undisputed that the use of UBAs to label target molecules nonetheless falls within the scope of the asserted claims, as discussed in MSJ #1.

## II.    ARGUMENT

The issue here is whether a patentee can describe one way of how to make and use the invention, yet enforce broader claims that cover both disclosed and *undisclosed* embodiments. *LizardTech, Inc. v. Earth Resource Mapping, Inc.*, 424 F.3d 1336, 1346 (Fed. Cir. 2005). In such situations, the broader claims are invalid unless "the specification would reasonably convey to a [POSA] that the inventor had possession of the claimed subject matter … and would enable one [the POSA] to practice the full scope of the claimed invention." *Id.* (internal citations omitted).

The specification fails in this regard. As shown above, and explained by Dr. Pachter, the specification provides only one embodiment for labeling target molecules, which is to use *both* UBAs and ESBs. Ex. 19, ¶¶ 90-91, 113-114, 128, 133, 268. Because the specification does not disclose (let alone describe) another way, a POSA would not have surmised that the inventor was in possession of another way. *Id.*; SUF2, ¶26

Scale's expert Dr. Sims proffers three rejoinders—none points to an embodiment that omits UBAs *and* ESBs. *First*, Dr. Sims claims that UBAs must be optional because the phrase "in some embodiments," scattered throughout the specification hundreds of times, sometimes proceeds a description of UBAs. Ex. 13, ¶329; Ex. 22, 200:18-201:3. But, Dr. Sims does not identify what the other option would be, or *how* a POSA would have reached a similar conclusion. *Id.* He just concludes as much, summarily.

Second, Dr. Sims claims that ESBs must be optional for one of two reasons. His first reason is because one passage states that "the UBAs comprise … an ESB" "and/or" additional components. Ex. 13, ¶ 330 (quoting Ex. 1, 35:29-34). Dr. Sims cannot be right here because this passage simply states that UBAs may comprise additional components, including ESBs—a scenario that decidedly does not omit either UBAs or ESBs or suggest their use is optional. Ex. 19, ¶ 94. His second reason is because a different passage states that cell origination barcodes

(COBs) can comprise its own unique codes. Ex. 13, ¶ 332 (quoting Ex. 1, 17:9-14). Although unstated, Dr. Sims implies that ESBs are not necessary if COBs can also be unique. Again, Dr. Sims cannot be correct because the specification identifies disparate purposes for ESBs and COBs: ESBs encode target molecules, whereas COBs indicate *cell of origin*." Ex. 1, 16:49-52 (emphasis added). Both are unique by design to accomplish different tasks; nothing in here suggests COBs can simultaneously function as ESBs. Ex. 19, ¶ 146. And, again, the names given to these molecule reflect concepts: all that matter is the functions each molecule provides.

*Third*, Dr. Sims indicates that the '752 patent does not suffer the same flaw because its claims are not directed to "target molecules" but instead kits. Ex. 13, ¶ 498. But, as explained in Section II.D of MSJ#3, the preamble of these claims is limiting, which means the claims recite and the specification must describe "[a] kit for split-pool barcoding target molecules that are in or on cells or cell organelles." Ex. 4 ('752 patent). Again, the specification discloses only one way of labeling target molecules, which is to use both UBAs *and* ESBs. The kit claims omit both features, and fail under § 112 for the same reasons as every other asserted claim.

On similar facts, the Federal Circuit affirmed a summary judgement of invalidity for a lack of written description. In *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, the patent claimed a medical valve comprising a body and a seal, but not one that required the presence of spikes. 558 F.3d 1368, 1377 (Fed. Cir. 2009). Summary judgement was entered, and later affirmed, because a POSA "would not understand the inventor … to have invented a spikeless medical valve" because "the specification describes only medical valves with spikes." *Id.* 1378.

Summary judgment is similarly appropriate here. The Asserted Scale Patents do not show that the inventor possessed an invention that would omit the use of either UBAs or ESBs. Disclosing one method of labeling target molecules "does not entitle the inventor … to claim any and all means for achieving that objective." *LizardTech*, 424 F.3d at 1346.

22

## MSJ #3: PARSE DOES NOT LITERALLY INFRINGE
## THE '442, '256, OR '752 PATENTS

The Court should grant a summary judgement of non-infringement as to Scale's '442 patent, '256 patent, and '752 patent (collectively, "the Target Patents"). Parse's accused products do not label, identify, or barcode "target molecules" under the term's proper construction. Thus, a threshold issues to this MSJ is the correct meaning of the shared[4] claim term in the Target Patents: "target molecules." Parse proposes that "target molecules" be construed as "specific molecules of interest with a known individual identity sufficient to distinguish the molecules that are being detected or quantified." The intrinsic and extrinsic evidence shows the plain and ordinary meaning advanced by Parse is the correct one. And under that construction, Parse's accused products do not infringe because they take a completely untargeted approach to label *all RNA*—hundreds of thousands of RNA molecules per cell in bulk—with no means to discriminate between them or even know what they have labeled using the technology in the Target Patents

Each asserted claim of the Target Patents either requires, or depends from a claim that requires, a "target molecule." Under a proper construction of the term, Parse does not literally infringe any asserted claim of any Target Patents because Parse's accused products do not identify, label, or barcode specific molecules of interest with a known individual identity. Instead, Parse's accused products label essentially all RNA in a cell, consisting of all mRNA molecules and other RNA molecules in an agnostic approach as to their identity, *i.e.*, the molecules are labeled without specificity and without distinguishing one mRNA molecule from another based on their label. SUF3 ¶¶ 4-9. There is no dispute about the methods and function of Parse's accused products. SUF3 ¶¶ 3-5. Both parties agree that Parse's accused products label

---

[4] The '256 Patent uses the term "nucleic acid targets" instead of "target molecules," but there is no disagreement between the parties that "nucleic acid targets" are a subset of "target molecules" and should be construed similarly. Ex. 14, ¶ 132; Ex. 18, ¶ 114.

the whole transcriptome, which in a typical mammalian cell can range between 100,000 to 1,000,000 individual mRNA molecules, and more, including non-mRNA molecules. SUF3 ¶¶ 2-4. The only disagreement is about the scope and meaning of the term "target molecules," which makes this non-infringement issue amenable to summary judgment.

## I.    FACTUAL BACKGROUND

### A.    The transcriptome.

The genetic information in a DNA molecule is made into RNA through a process called "transcription." Certain kinds of RNA, called mRNA, are used as a template to create the myriad diverse proteins present in cells. Ex. 14 (Pachter Rebuttal Rpt.), ¶ 51. Each individual mRNA molecule is also known as a "transcript," and the set of all mRNA molecules for all genes in a cell are called the "transcriptome."  SUF3 ¶ 1; Ex. 10 (Sims Opening Rpt.), ¶ 20. On average, a typical mammalian cell's transcriptome has about 100,000 to 1,000,000 transcripts. SUF3 ¶ 2; Ex. 14, ¶ 137.

### B.    Whole transcriptome sequencing technology.

Parse's accused products use a technique developed by the co-founders of the company that allows researchers to analyze the entire mRNA content of a cell, known as "transcriptome sequencing." Ex. 15 (Satija Rebuttal Rpt.), ¶ 42. Rather than examine any target, the Parse approach allows researchers to conduct experiments on bulk RNA within the sample, *e.g.*, hundreds of thousands of different mRNAs per cell. SUF3 ¶ 3-4. This is all done without knowing the identity of any mRNA. And based on the techniques Parse's accused products use, there is no way to identify which mRNAs have been captured and enter the remaining workflow. SUF3 ¶¶ 5, 8-9.

C.    **Person of ordinary skill in the art.**

The parties offer very similar definitions of a POSA; there are no difference between them that matter for this motion. Ex. 14, ¶¶ 13-15; Ex. 18, ¶ 21.

II.    **ARGUMENT[5]**

A.    **"Target molecules" means "specific molecules of interest with a known individual identity sufficient to distinguish the molecules that are being detected or quantified."**

The Court has partially construed "target molecules" to mean "at least 'molecules of interest… that are being detected or quantified,'" but additional construction of that term is needed. D.I. 119. Parse's proposed meaning—"specific molecules of interest with a known individual identity sufficient to distinguish the molecules that are being detected or quantified"—comports with the Court's partial construction and adopts the plain and ordinary meaning of "target molecules" to a POSA; they would understand that "target molecules" are specific molecules of interest with a known individual identity sufficient to distinguish the molecules. Ex. 14, ¶ 135.

1.    **"Target molecules" should be construed according to its plain and ordinary meaning which requires knowledge of its individual identity.**

The plain and ordinary meaning of "target molecules" is specific molecules of interest with an individual identity sufficiently known to distinguish the molecules. Ex. 14, ¶ 135. As confirmed by the common specification, target-molecule detection "can be used for diagnostic, prognostic, therapeutic, patient stratification, drug development, treatment selection, and screening purposes." Ex. 1, 47:9-13. To achieve these applications, a POSA would have chosen "target molecules" to be "either patient markers (such as a cancer marker) or markers of

---

[5] The Court's familiarity with claim-constructions is presumed, so a separate discussion of overall legal principles is omitted. Authorities are cited for precise legal points raised.

infection with a foreign agent, such as bacterial or viral markers"—*specific* markers with a known identity. *Id.* 50:1-5.

Scale proposes a different construction: "specific molecules *and classes of molecules* that are being detected or quantified, *where the individual molecules in the class may be known or unknown beforehand*." Scale's proposal is much broader in that it includes classes of molecules where the individual molecules in the class may be known or unknown beforehand, and it is contrary to the Court's partial construction, renders the "target" adjective meaningless, while defeating the intent of a POSA using target-molecule detection, and should be disregarded. Ex. 14, ¶ 134.

## 2.    The intrinsic record supports Parse's proposed construction.

The specification uses "target molecules" consistent with its plain and ordinary meaning, *i.e.*, as requiring sufficient knowledge of the specific molecule's individual identity to be able to distinguish it. "Target molecules" is described not by what they are, but in relation to what detects, or targets, them: the specification discloses that "[t]he term 'epitope' and 'target molecule' are used interchangeably" and that "[t]arget molecules or epitopes are the molecules detected or measured by binding of a [Unique Binding Agent ("UBA")] whose target-specific region(s) recognize thereto."  Ex. 1, 16:15-18, 33:40-42. And a POSA would have understood that an "epitope" meant a specific molecular structure that is part of an antigen recognized by an antibody, or UBA, that specifically binds to that "epitope." Ex. 14, ¶ 81.

The specification also explains that "[e]ach UBA in the population is *specific* for a target molecule. Thus, the UBA provides the *specificity* for the target molecule recognized in a cell." Ex. 1, 16:44-47 (emphases added). This too, is consistent with a POSA's understanding that antibodies and aptamers uniquely bind a specific epitope, like a lock ("target molecule") and key ("UBA"). Ex. 14, ¶ 82. Thus, *each* UBA specifically binds only to intended "target molecule,"

26

and the disclosed methods are performed to determine whether that specific "target molecule" is present in a cell based on the specific UBA that binds the target. *Id*. ¶ 84. As a result of the target-specific UBA-target binding, a researcher would need to know the individual identity of the "target molecule" *a priori* to choose a suitable UBA. *Id*. ¶¶ 84, 139. Without this knowledge, it would be impossible to select a UBA, like asking a locksmith to design a key without saying which lock to open. It then follows that "target molecules" must be specific molecules with a known individual identity, resulting in a definition of "target molecule."

The specification is replete with disclosures consistent with the plain and ordinary meaning of "target molecules." The Target Patents are directed to the "detection, identification, and quantification of *individual target molecules* in single cells of a complex cell population while retaining cell specific information regarding that target molecule." Ex. 1, 1:53-57 (emphasis added). This target-specific label is achieved by using "*target molecule-specific* unique binding agent[s]" ("UBAs") that bind *uniquely to specific target molecules*." Ex. 14, ¶ 75-76 (emphasis added); Ex. 1, 4:31-32, 4:39-40, 4:48-49 ; *id*. 2:59-60, 3:6-7, 10:29-30, 10:51-52, 34:56-57 ("a first [UBA] *specific for a first target molecule*") (emphasis added). The specification consistently discloses that the UBA is target-specific, meaning it uniquely binds to only a specific molecule.

The prophetic examples in the patents support this reading. Example 6 uses antibodies to detect the target molecules "CD1, CD3, CD8, and CD4." Ex. 1, 56:63-57:18. These are specific molecules of interest with a known individual identity. Ex. 14, ¶ 138. Similarly, Example 7 uses the antibodies "[r]abbit anti-cleaved caspase-3, rabbit anti phos-p38, rabbit anti-phos-ERK2, mouse anti-ERK2, and mouse anti-β-tubulin" to detect specific "target molecules." Ex. 1, 57:20-59. To use these antibodies for detection, a POSA would need knowledge of the "target

molecule's" individual identity, and those identities are: cleaved caspase-3, phos-p38, phos-ERK2, ERK2, and β-tubulin as the antibodies used are specific to those targets. Ex. 14, ¶ 138.

Scale's definition also reads out the adjective "target" from the term "target molecules." It suggests that "target molecules" should also encompass "classes of molecules[,] … where the individual molecules in the class may be known or unknown beforehand."

And, the word "class" does not appear *once* in the common specification. Instead, the specification states that varying numbers of "different target molecules are detected." Ex. 1, 11:38-41. The specification discloses that "up to 2000 different target molecules are detected," but never in terms of any broad "class" of molecules. *Id*. Instead, this is a reference to discrete, unrelated targets, which the specification does not link to any common "class." Ex. 14, ¶ 84. Even in embodiments where "methods of detection are performed in multiplex assays" the specification sets the upper bound at "up to 5000 target molecules." Ex. 1, 28:51-29:15. But even 5,000 "different target molecules" cannot to encompass a broad group of molecules containing tens to hundreds of thousands of different species of individual molecules within the group, like a full transcriptome which contains about 100,000 to 1,000,000 individual mRNA molecules. Ex. 14, ¶ 137. If the specification embraced classes of targets, it would have said so. *Id*.

Scale incorrectly proposes that the target can be "unknown." Scale points to a single sentence: "[T]he target molecule can have either a known or unknown structure or sequence." Ex. 1, 33:66-67; Ex. 18, ¶ 49. But this quote does not suggest that the *identity*, or *entire* structure or sequence, is completely unknown. Rather, it relates to situations where there are slight variations between different forms of the same "target molecule," *i.e.*, when the "target molecule" is a specific molecule "such as Stat-3." Ex. 1, 36:5-8. For example, some proteins, like Stat-3, may have slight sequence variations. Ex. 25, 252:14-255:4. Although these minor differences may result in slight variance in structure, the identity of the "target molecule" is still

known, and the epitope used to target them is the same. Again, if the entire sequence or structure of a target was unknown, it would be impossible to design a UBA to bind it. Ex. 14, ¶¶ 84, 139.

Scale also cites the disclosure that "[q]uantification of the UBA … can be used to … detect a novel transcript in order to diagnose or [sic] condition, i.e. fetal abnormality or cancer" to support its construction. Ex. 1, 41:45-51; Ex. 18, ¶ 49 (citing the '442 patent). However, Scale misinterprets "novel transcript" to mean a "target[] whose identity is not known in advance." Ex. 18, ¶ 135. But again, without knowing at least an epitope on a target sufficient to distinguish it from all the others, a scientist could not design a target-specific UBA. Ex. 14, ¶¶ 84, 139.

### 3.    The extrinsic evidence aligns with the intrinsic record.

Extrinsic evidence, further bolsters Parse's proposed construction. The inventor, Dr. Nolan, consistently used "target molecule" as requiring knowledge of its individual identity. His publications consistently differentiate between target-specific approaches which involve known "target molecules" and non-specific, or untargeted, approaches, which involve the transcriptome. The most notable example is U.S. Pat. App. Publ'n. No. US 2023/0049314 ("Nolan 2014"). Ex. 26 (Nolan 2014). Dr. Nolan filed this application shortly after filing the priority application to the Target Patents. SUF3 ¶ 12. Nolan 2014 identifies itself as "an extension of the methods, compositions, and kits described previously in the published patent applications [for the Target Patents]" and incorporates them by reference. Ex. 26, [0068]. Unlike the specification of the Target Patents, Nolan 2014 discloses untargeted approaches in addition to targeted labeling.

When discussing targeted labeling, Nolan 2014 uses the same coined terms as the Target Patents. Nolan 2014, [0071] ("Each UBA is capable of binding or hybridizing to a *single species* of target molecule. It is this specificity of binding or hybridization that enables detection of the target molecule in a given individual cell."); *id.* [0072] ("*In common with the published patent applications [for the Target Patents]*, the terms 'epitope' and 'target molecule' are used

interchangeably herein to refer to the molecule of interest (or a portion thereof) that is being detected and/or quantified by the methods described herein.") (emphasis added).

In stark contrast, when discussing untargeted labeling, Nolan 2014 eschews "target molecules," and instead discloses using a "non-specific binding agent comprising a poly-dT oligonucleotide probe sequence for *non-specific hybridization with mRNA molecules*." *Id.* [0020] (emphasis added). There is no doubt that in Nolan 2014 and the Target Patents, the definition of "target molecule" is the same. *Id.* [0072]. Thus, Nolan 2014's "targets" versus "non-specific hybridization with mRNA molecules" shows the transcriptome is not a "target molecule."

Dr. Nolan also published "Ultra-high throughput single-cell analysis of proteins and RNAs by split-pool synthesis" ("O'Huallachain"), which discusses to the same technology disclosed in the Target Patents. SUF3 ¶¶ 13-17; Ex. 27 (O'Huallachain). O'Huallachain describes the process disclosed in U.S. Pat. App. No. 61/437,854, from which the Target Patents claim priority. SUF3 ¶ 14-17; Ex. 27. O'Huallachain states that it "opted to target specific RNAs to enable higher coverage for regions of interest." Ex. 27, 2. The publication describes using "gene specific" primers to perform "[t]argeted mRNA" analysis of specific RNA from 14 known genes. *Id.* 10-12, Figs. 7-9. Importantly, O'Huallachain *differentiates* this targeted approach from a whole-transcriptome approach, stating "[s]imilar combinatorial indexing approaches were previously applied to single cells and nuclei for analyses of transcriptomes." *Id.* 2, 8 (citing a 2018 publication by the Parse founders of Parse, describing early Parse technology).

Furthermore, Dr. Thomas Albert, Roche's Global Head of Research and Early Development, testified that analyzing the whole transcriptome of a cell is not a targeted approach because whole transcriptome analysis does not use "███████████." And in the Target Patents ("QBC"), he testified that "████████████████████████████████ ████████████████████" Ex. 21 (Albert Tr.), 93:7-95:17. Dr. Albert's testimony

explains that "███████████" are "████████████████████████"—

specific molecules of interest with a known individual identity—and because whole

transcriptome analysis is not an analysis of "██████████," it is not a targeted approach. *Id*.

**B.    Scale's proposal conflicts with the Court's Order.**

Scale's proposed construction also does not comport with the Court's partial construction

that "target molecules" means "at least 'molecules of interest … that are being detected or

quantified." D.I. 119. Scale's proposal would eliminate the required "of interest" language from

its definition. SUF3 ¶ 11; Ex. 18, ¶¶ 118, 140. Furthermore, Scale's proposed construction does

nothing to address the confused *Markman* record. It has only broadened the definition to include

"classes of molecules" and added the clause, "where the individual molecules in the class may be

known or unknown beforehand." *Id*. But Scale's proposal contains no wording at all directly

related to the nub of the parties' dispute: how much of the identity of the molecule must be

known. D.I. 119. Such a construction is unhelpful in resolving the dispute at hand. In contrast,

Parse's proposed construction adds to the Court's partial construction and addresses how much

of the identity must be known (sufficient to distinguish the molecules), reflects the term's plain

and ordinary meaning, and is supported by the intrinsic and extrinsic evidence. Therefore, Parse

respectfully requests the Court adopt its proposed construction of "target molecules.

**C.    The preamble of the '752 patent is limiting.**

"In general, a preamble limits the invention if it recites essential structure or steps, or if it

is 'necessary to give life, meaning, and vitality' to the claim." *Catalina Mktg. Int'l, Inc. v.

Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002). Additionally, the Federal Circuit has

explained that where preamble language "recite[s] additional structure or steps underscored as

important by the specification, the preamble may operate as a claim limitation." *Id.*

In the '752 patent, the preamble's reference to "target molecules" is to a structure that the specification describes as essential to the alleged invention. For one, the title of the '752 patent itself is "Kit for Split-Pool Barcoding Target Molecules That Are In or On Cells or Cell Organelles." Ex. 4, 1:1-3. The remainder of the specification reiterates that the invention is for "detection, identification, and quantification of target molecules." *Id*. 1:58-60. In total, the specification refers to "target molecules" nearly 200 times. In the '752 patent's claims, the function of the "cell or organelle origination barcode[s]" is to label "target molecules." *Id*. 4:31-33. Thus, the very purpose of the kit claimed in the '752 patent is to detect "target molecules." *Id*. 16: 6-12. Scale's expert admitted this. Scale's expert testified that, "The kit is for split-pool barcoding of target molecules. So it would be used for split-pool barcoding of target molecules." Ex. 22 (Sims Tr.), 234:20-235:18. Accordingly, using the kit on "target molecules" is an essential aspect of the claims because identifies the purpose of the kit and is therefore limiting.

### D.    The asserted claims of the Target Patents all require "target molecules," "nucleic acid targets," or "target RNA."

In view of the preamble's limiting nature in the '752 patent, all of the asserted claims require "target molecules" because they recite them directly or depend from claims that do.

### E.    Parse's accused products do not label, identify, or barcode "target molecules," "nucleic acid targets," or "target RNA."

Under the proper construction of "target molecules"—"specific molecules of interest with a known individual identity sufficient to distinguish the molecules that are being detected or quantified," there is no dispute of material fact that Parse's accused products do not label, identify, or barcode "target molecules," "nucleic acid targets," or "target RNA." SUF3 ¶ 10. Instead, Parse's accused products use ██████████████████ in an untargeted approach to label all of a cell's RNA, including its transcriptome and other RNA. SUF3 ¶¶ 5-7; Ex. 14, ¶ 101. The █████████████████

██████████ will thus non-uniquely ██████ to any molecule within the cell ████████

█████████████████████████████████████. SUF3 ¶ 6; Ex. 14, ¶ 99.

█████████████████████████████████████████████████████████████

███████████████ Ex. 14, ¶ 100. ████████████████████████████████ will

non-uniquely ████████ to any molecule within the cell that contains █████████████,

these include *any type* of RNA, not just mRNA. SUF3 ¶ 7. ██████████████████████

do not label "target molecules" because they do not ████████ to specific target molecules with a

known individual identity. SUF3 ¶¶ 6-7; Ex. 14, ¶ 146. Instead, because the ████████ label all

RNA molecules, the individual identity of each RNA molecule cannot be known and cannot be

distinguished from any other RNA molecule based on the labeling. SUF3 ¶¶ 8-9. Indeed, ████████

███████████████████████ used in Parse's accused products will label *any* molecules

in the cell that at any point in their structure contains a ████████████████████████

█████████████████████████. SUF3 ¶¶ 6-7; Ex. 14, ¶¶ 147-

148. Therefore, no "target molecules" are labeled by Parse's accused products as the individual

identity of each labeled molecule is unknown and is certainly not distinguishable from other

molecules based on the binding ██████████████████████████.

There is no dispute that Parse's accused products use █████████████████████ to

label the entire transcriptome of a cell. SUF3 ¶¶ 4-5¶. There is also no dispute that the asserted

claims of the Target Patents require the labeling, identification, or barcoding of "target

molecules," "nucleic acid targets," or "target RNA."  SUF3 ¶¶ 19-28. The only disagreement is

the scope and meaning of these related terms. Under Parse's proposed construction of "target

molecules," Parse's accused products, which bulk label *all* RNA in the cell do not label, identify,

or barcode "target molecules," "nucleic acid targets," or "target RNA," Parse does not literally

infringe the asserted claims of the '442, '256, or '752 patents. SUF3 ¶ 10.

## MSJ #4: PARSE'S ACCUSED PRODUCTS, WHEN USED FOR NUCLEI, DO NOT INFRINGE THE '442, '256, OR '341 PATENTS

To literally infringe the asserted claims of the '442,'256, and '341 patents, the claimed "cells" must be used. But it is undisputed that when individuals use Parse's accused products, ██ ████████████████████████████ do so with nuclei ████████████████████████. Scale has attempted to avoid that consequence by seeking to broaden its "cell" limitations under the doctrine of equivalents ("DOE") to ensnare uses of Accused Parse Products that do not use cells but do use nuclei. Scale is legally barred from doing that under the disclosure-dedication rule. Put another way, its patents disclosed, but did not claim, embodiments where its methods are performed on "organelles" and "cell compartments," categories in which "nuclei" are a prominent member, and those embodiments are therefore dedicated to the public and outside the permissible range of equivalents that Scale may pursue. Accordingly, because Scale accuses Parse's use with nuclei as infringing only under DOE, the Court should grant summary judgment that Parse's accused products do not infringe when used for nuclei.

## I.    FACTUAL BACKGROUND

### A.    The asserted claims recite that their method is performed on "cells."

Scale asserts claim 11 of the '442 patent, claims 1-2, 5, and 6 of the '256 patent, and claim 13 of the '341 patent. SUF4, ¶ 1. Each claim plainly requires the use of "cells." SUF4, ¶¶ 2-9.

### B.    Nuclei are organelles or cell compartments; they are not cells.

Parse's accused products use fixed samples. SUF4, ¶¶ 17-18. When the sample to be used consists of cells, the intact cells are fixed. SUF4, ¶¶ 17-18. However, when the sample to be used is nuclei, ████████████████████████ SUF4, ¶¶ 17-18. The ████████ nuclei are then fixed and used in the subsequent workflow. SUF4, ¶¶ 17-18.

34

Organelles and cell compartments are specialized subcellular structures within a cell. Ex. 11 (Pachter Opening Rpt.), ¶ 89. A POSA would understand that a nucleus is a membrane-bound organelle and also considered a cell compartment. SUF4, ¶ 11; Ex. 14, ¶¶ 116, 129. Furthermore, it is undisputed that although "[a nucleus] is a part of the cell, [it is] not a cell on its own," and "a nucleus removed from a cell … is not itself a cell." Ex. 12 (Shalek Rebuttal Rpt.), ¶ 290; SUF4, ¶¶ 13-14. Therefore, a nucleus is an organelle and a cell compartment, but a nucleus is never a cell itself.

## II.    ARGUMENT

### A.    The disclosure-dedication rule makes "organelles" and "cell compartments" unavailable as equivalents.

Under the disclosure-dedication rule, the DOE is unavailable for subject matter disclosed in the patent but not included in the claims. *Johnson & Johnston Assocs. Inc. v. R.E. Serv. Co.*, 285 F.3d 1046, 1054-55 (Fed. Cir. 2002) (en banc). For disclosure-dedication to apply: (1) the disclosure must be of such specificity that a POSA can identify the subject matter that is disclosed and not claimed; and (2) the unclaimed subject matter must be identified by the patentee as an alternative to a claim element not literally met by the accused product. *PSC Comput. Prods., Inc. v. Foxconn Int'l, Inc.*, 355 F.3d 1353, 1360 (Fed. Cir. 2004). Scale's disclosure of "organelles" and "cell compartments" meets both requirements. The techniques of the '442, '256, and '341 patents used on "organelles" and "cell compartments" are disclosed with sufficient specificity that a POSA can identify the subject matter. And, the specification discloses "organelles" and "cell compartments," as expressly distinct from cells.

*First*, "organelles" are disclosed in the common specification of Scale's asserted patents with sufficient specificity so that a POSA can identify the subject matter. Scale's asserted patents disclose that "one discrete particle is selected from the group consisting of a *cell*, a liposome, an

35

*organelle*, a micelle, a droplet and a bead." Ex. 1, 3:19–22 (emphases added). The term

"organelle" is well known and well understood to a POSA. SUF4, ¶ 11; Ex. 15, ¶ 42. By listing

both an "organelle" and a "cell" for the discrete particle, Scale's asserted patents expressly

identify that an "organelle" is distinct from a "cell," showing they are distinct alternatives.

The same is true for "cell compartment." Scale's asserted patents disclose that the

methods can be performed "within *cells or cellular compartments*." Ex. 1, 26:53-56; 39:54–40:9

(emphases added). "Cell compartments" are well known to a POSA. SUF4, ¶ 12; Ex. 14, ¶ 127.

Because the specification presents a choice between either a "cell" or a "cellular compartment,"

it expressly identifies the two as distinct subject matter and as distinct alternatives. SUF4, ¶ 10.

When Scale wanted to claim organelles and cell compartments, it knew how to. For

example, in claim 1 of the '751 patent, Scale claims "[a] kit for split-pool barcoding target

molecules that are in or on *cells or cell organelles*." Ex. 4, claim 1 (emphasis added). Similarly,

claim 5 of the '341 patent recites: "The method of claim 1, wherein the *cells or cell

compartments* are fixed and/or permeabilized." Ex. 3, claim 5 (emphasis added). Therefore,

when Scale did not recite "organelle" or "cell compartment" in the asserted claims of the

'442,'256, and '341 patents, it chose not to claim them. Scale cannot recapture "organelles" or

"cell compartments" through the DOE.

Since Scale accuses Parse's use with nuclei of infringement only under DOE, summary

judgment of non-infringement for use of Parse's accused products for nuclei is appropriate.

## MOTION TO EXCLUDE MR. MOONEY'S OPINIONS RELYING ON ██████ ██████ FOR FAILURE TO APPORTION

## I.     FACTUAL BACKGROUND

Scale's expert, Mr. Mooney submitted an expert report offering an opinion on an

appropriate royalty rate for the Asserted Scale Patents using the "hypothetical negotiation"

approach, which "envision[s] the terms of a licensing agreement reached as the result of a supposed meeting between the patentee and the infringer at the time infringement began." Ex. 8 (Mooney Opening Rpt.), ¶ 117; *Rite-Hite Corp. v. Kelly Co.*, 56 F.3d 1538, 1554 (Fed. Cir. 1995). Mr. Mooney opined that ███████████████████████████████████████████ ███████████████ is "economically and technically comparable to the hypothetical negotiation" in this case, and on that basis concluded the ██████ royalty rate in ███████████████ "██████ ████████████████████" for a reasonable royalty rate. Ex. 8, ¶¶ 127, 133. Specifically, Mr. Mooney stated that █████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████." *Id.* ¶ 127. Mr. Mooney then determined that Parse and Scale would have agreed to a ██████ royalty rate for the Asserted Scale patents in the hypothetical negotiation. *Id.* ¶ 221.

But, as Mr. Mooney recognized, there are several key differences between ████████ ███████ and the hypothetical negotiation. *Id.* ¶ 128. Among those are:

- The hypothetical negotiation would "████████████████████████████ ███████████████████████████████████████████████████████ ████." *Id.* ¶ 144. ███████████████████████████████████████ ███████████████████████████████████████████████████████ ██████ *Id.* Specifically, ███████████████████████████, ████████████████ ████████████████████████████████████████████████ ██████. Ex. 24 (Mooney Tr.), 152:22-153:5.

- ███████████████████████████████████████████████████ ███████████████████████████████ Ex. 8, ¶¶ 125-126. Based solely on a conversation Mr. Mooney had with Scale's CEO, Giovanna Prout, Mr. Mooney valued ████████████████████

██████████████████. *Id.* ¶ 145. In contrast, ████████████████████████████████

██████████████████████████. *E.g., id.* ¶¶ 118, 225.

Mooney nevertheless determined the license had "████████████████." *Id.* ¶ 213. He

reasoned this was because (1) the license "██████████████████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████" and (2) "████████████████████

████████████████████████" *Id.*  For the latter statement, Mr. Mooney

relies on his discussion with Ms. Prout and on her deposition testimony. Ex. 24, 159:23-160:21.

Mr. Mooney then claims he "properly accounted for the differences" between ██████████████

and the hypothetical negotiation because ██████████████████████████████

████████████████████████████████████████. Ex. 8, ¶ 213.

## II.    ARGUMENT

Mr. Mooney's comparable-license opinion is unreliable because he failed to show built-in

apportionment and to properly account for the differences between ██████████████ and the

hypothetical negotiation. That opinion should be excluded. Where an expert uses an existing

license as the basis for determining an appropriate royalty rate, if the license is "sufficiently

comparable," further apportionment may not necessarily be required. *Omega Pats., LLC v.

CalAmp Corp.*, 13 F.4th 1361, 1376-77 (Fed. Cir. 2021). The rationale is that a comparable

license may in some cases have "built-in apportionment," which requires that the royalty rate

negotiated in the comparable license reflects the value of the asserted patents. *Id.* 1377. The

patentee bears the burden of proving "that the licenses were sufficiently comparable[.]" *Id.* Mr.

Mooney concludes that ██████████████ is a comparable license that contains built-in

apportionment. Mr. Mooney has no factual underpinnings for his opinion; it is not reliable.

**Relates to the same type of products as the Accused Parse Products:** Mr. Mooney admits that neither he nor anyone he relies on has given an opinion that any *Scale* product *practices* the Asserted Scale Patents. Ex. 24, 25:14-26:5, 83:12-17, 94:9-13. So, Mr. Mooney has no basis to believe that the Scale products practice the Asserted Scale Patents, which in turn guts his opinion that ████████████ was related to the same product-types as the Parse products.

**Royalty relates specifically to the patents-in-suit and related patented technology:** the only basis for Mr. Mooney's opinion that the ████ royalty rate of ████████ "relates specifically to the patents-in-suit and related patented technology" is his call with Ms. Prout where Ms. Prout apparently told him that ████████████████████████ ████████████," (Ex. 24, 186:14-23), "████████████████████ ████████████████," (*id.* 187:13-23), that ████████ ████████████████████ (*id.* 161:18-162:11), and ████████████████ (*id.* 163:10-164:5). Ex. 8, ¶¶ 130, 214. But, Mr. Mooney's reliance on Ms. Prout's testimony is improper because it relies on hearsay and non-expert testimony about the value of the Asserted Scale Patents, unsupported by any other evidence in the record. *Fundamental Innovation Sys. Int'l v. Anker Innovations Ltd.*, 2025 WL 459916, at *12 (D. Del. Feb. 11, 2025) (excluding expert's built-in apportionment opinion that relied in part on conclusory statements from "personnel that negotiated the licenses" that "the four asserted patents drove negotiations over the comparable licenses") ████████████████████████ ████████████████████ Ex. 24, 161:13-163:9. Furthermore, Ms. Prout is not offered as an expert by Scale, as ████████████ ████████████████ Ex. 20 (Prout Tr.), 154:10-

15. "Experts cannot be used as conduits for hearsay or non-expert testimony with the expert's 'gloss[,].'" *Fundamental*, 2025 WL 459916, at \*12 (citations omitted).

Notably, other facts in the record undercut Mooney's opinion. For example, there is no evidence in the record that ███████████████████████████████████████████████████████████████████████████████████████████. Ex. 24, 42:25-43:12. Further, at the time of ███████████████ only one of the four Asserted Scale Patents had issued, and would not issue until after Parse first launched a product. *Id.* 43:13-23. Mr. Mooney had no explanation for ████████████████████████████████████████████████████████████████████████. *Id.* 163:10-25; *id.* 164:17-165:1. There is "no basis in fact" to associate the royalty rate used in ███████████ to the particular hypothetical negotiation at issue. *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011)

**Properly accounted for the differences between** ███████████ **and the hypothetical negotiation:** Mr. Mooney fails to properly account for material differences between ███████████ and the hypothetical negotiation. It is a fundamental requirement of apportionment that while "allegedly comparable licenses may cover more patents than are at issue in the action," or cover, for example, "foreign intellectual property rights," the patentee is "nonetheless required to 'account for such distinguishing facts when invoking [the licenses] to value the patented invention.'" *Omega*, 13 F.4th at 1380 (citations omitted); *Fundamental*, 2025 WL 459916, at \*12 ("[e]ven if the negotiations 'focused' on the four asserted patents … that does not excuse a failure to apportion" for the additional patents included in the comparable agreements). To be sure, Mr. Mooney *identified* relevant differences between ███████████ and the hypothetical negotiation. But he side stepped addressing those differences by placing the

four Asserted Scale Patents in one bucket (attributing the ███ royalty rate to them) and everything else—including ██████████████████████████████—in a second one. But, Mr. Mooney had no factual basis to divvy up the licensed assets as he did.

As explained above, there is no factual evidence in the record that ████████████████ ████████████████████. Further, Mr. Mooney did not analyze the ██████████████████ ████████████████████████████████████████████████████████████. At most, he noted that ████████████████████████████ ████████████████████████████████████ Ex. 24, 158:5-17, 165:7-15. For that last point, he could not point to any expert testimony he relied on—*id.* 166:16-168:10— and generally identifying the subject matter of patents is insufficient to show technological comparability. *Zimmer Surgical, Inc. v. Stryker Corp.*, 365 F. Supp. 3d 466, 495 (D. Del. 2019). And, █████████████████████████████████████████████ Mr. Mooney did not explain why ████████████ the four Asserted Scale Patents, three of which hadn't issued yet, did not drive the royalty rate. *Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 973 (Fed. Cir. 2022) (excluding damages testimony in part because expert failed to address extent that other patents in license agreement contributed to royalty rate); *NNCrystal US Corp. v. Nanosys, Inc.*, 2023 WL 2891453, at *3 (D. Del. Apr. 11, 2023).

Mr. Mooney's only accounting for ████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████, Ex. 8, ¶¶ 213-215. But, his analysis on that point is entirely untethered from any actual evidence or reliable means of offsetting. Mr. Mooney's only explanation on this point is that ██████████████████████████ ██████████████████████████████████████████████

41

████████████████████████████████████████████████████████████████████████████.

Ex. 16 (Mooney Reply Rpt.), ¶ 90.

Even assuming, for sake of argument, the ███████████████████████████████ ███████████████████████████████████████, that does not excuse Mr. Mooney from providing a formula or method to justify his allocation. Indeed, "merely labelling a value 'conservative'" or "significant" "is no substitute for a showing that there is an evidentiary foundation for the particular [value] selected." *Guardant Health, Inc. v. Found. Med., Inc.*, 2020 WL 2461551, at *18 (D. Del. May 7, 2020), *Report & Recommendation adopted*, 2020 WL 5994155 (D. Del. Oct. 9, 2020).

Mr. Mooney has no basis for his opinion that the royalty rate in ████████████ reflects the specific value of the four Asserted Scale Patents and his opinion should be excluded.

## MOTION TO EXCLUDE MR. MOONEY'S OPINIONS RELYING SOLELY ON AN UNVERIFIED CONVERSATION AND UNSUPPORTED DEPOSITION TESTIMONY

### I.    FACTUAL BACKGROUND

In his opening expert report, Mr. Mooney relies on two telephone conversations between him and Ms. Prout, one before his opening report and the second one before his reply report (Ex. 24, 160:18-21), and Ms. Prout's deposition testimony to support the opinions described below. Mr. Mooney has no other support for these opinions.

**(1)** His opinion that ████████████████ is a comparable license with built-in apportionment because the entire royalty rate value of the agreement can be attributed to the asserted Scale patents. Ex. 8, ¶ 130; Ex. 16, ¶ 84. According to Mr. Mooney, Ms. Prout told him:

- ███████████████████████████████████████████████████████████████

████████████ Ex. 8 ¶¶ 130, 214 (citing call), 129 (citing Ms. Prout's deposition), Ex. 16, ¶ 88; Ex. 24, 158:5-23, 159:8-160:21, 162:14-163:9, 185:18-25, 186:18-23, 187:8-12.

- ██████████████████████████████████████████████

████████████████████. Ex. 8 ¶ 130 (citing call); *see also* Ex. 24, 187:13-23. ██████████

██████████████████████████████ Ex. 8 ¶ 150 (citing call); Ex. 24, 157:2-8.

- ██████████████████████████████████████████████

(Ex. 24, 161:18-162:11), ████████████████████████████████ (*id.* 163:10-

164:5). *Id.* 159:23-160:21, 162:14-163:9; Ex. 8, ¶ 150.

- ███████████████████████████████████████ Ex. 8 ¶

145 (citing call); Ex. 16, ¶ 90; Ex. 24, 151:14-23, 155:9-21.

**(2)** His opinion that ████████████████ is less relevant to the hypothetical

negotiation. Ex. 8, ¶ 205. According to Mr. Mooney, Ms. Prout gave him the following facts:

- █████████████████████████████████████████████

████████████████████████████████████████████████

████████ *Id.* ¶ 205 (citing Prout Tr., 157); Ex. 24, 183:20-184:5, 184:6-185:5, 195:11-17.

- ████████████████████████████████████████████

██████████████████ Ex. 8, ¶¶ 132, 209; Ex. 24, 184:3-5.

**(3)** Scale has already been affected by negative customer experiences with Parse. Ex. 8,

¶¶ 91, 214. According to Mr. Mooney, Ms. Prout told him:

- ██████████████████████████████████████████████

███████████████████████ *Id.* ¶ 91 (citing call); Ex. 24, 283: 20-284:1, 287:6-289:6.

- ████████████████████████████████████████████

██████████████ *Id.* ¶ 79, (citing call); Ex. 24, 295:13-25, 296:21-297:5, 307:9-18.

**(4)** His opinions on Scale and its competitors. Ex. 8, ¶ 67.



*Id.* ¶¶ 167 (citing to call), 206 (citing Tr., 205 and call).

Ex. 16, ¶¶ 46, 77.

## II.    ARGUMENT

Mr. Mooney's reliance on telephone calls with Ms. Prout and her deposition testimony is improper and renders his opinions unreliable. The facts that Ms. Prout conveyed to Mr. Mooney are unverified, undocumented, and unsupported by any other evidence. Courts have found reliance on such unverified and undocumented discussions improper. In *Koninklijke*, the court found a damages expert relaying the contents of an undocumented conversation with another expert unreliable. *Koninklijke Philips Elecs. N.V. v. Zoll Lifecor Corp.*, 2017 WL 3140798, at *4 (W.D. Pa. July 25, 2017). The Court stated that it remained "puzzled as to why such an important conversation would not have been documented." *Id.* *4, n.5 (internal citations omitted). As described in Parse's Motion to Exclude Mr. Mooney's Opinions on ████████████, at 38-40, above, there is no other basis or evidence of the facts that Ms. Prout provided to Mr. Mooney, and at least in the case of her conversation regarding ██████████████████████ ██████████████, existing facts contradict her testimony.  Therefore, Mr. Mooney's testimony lacks any factual foundation in the record, and should be excluded. *Meadows v. Anchor Longwall & Rebuild, Inc.*, 306 F. App'x 781, 790 (3d Cir. 2009).

Mr. Mooney's reliance on Ms. Prout's deposition testimony as his basis for allocating the value to the Scale Asserted Patents within ██████████████ also is improper and unsupported. In *Apple*, the Federal Circuit excluded expert testimony because the expert solely relied on the client's deposition testimony despite the fact that there was "no record evidence

supporting" his opinions. *Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 973 (Fed. Cir. 2022). The court found the expert's opinion regarding the comparability of two licenses, supported only by deposition testimony, was "untethered to the facts of the case," and excluded it. *Id.* 974. Essentially, Mr. Mooney is "parrot[ing] what some lay person has told him" without meaningfully examining the evidence in the record. *Goldberg v. 401 N. Wabash Venture LLC*, 755 F.3d 456, 461 (7th Cir. 2014). Such reliance is improper and all of Mr. Mooney's opinions that rely on the calls with Ms. Prout and her deposition testimony should be excluded.

## MOTION TO EXCLUDE DR. PAZ'S OPINIONS REGARDING HER DEFINITION OF THE MARKET AND COMPETITION BETWEEN PARSE AND SCALE

### I.    FACTUAL BACKGROUND

Scale's expert Dr. Maria Fe Paz De Paz purported to assess "the market and potential markets" for the RNA single-cell sequencing products sold by Parse and Scale, and opining as to the existence of a smaller specific sub-market within a large single-cell analysis market—a "smaller instrument-free and highly scalable market"—a definition that results in a market with two players Parse and Scale. Ex. 9 (Paz Opening Rpt.), ¶ 2, 54; Ex. 17 (Paz Reply Rpt.), ¶ 8. Dr. Paz also opined on the impact of Parse's earlier entry into the marketplace. Ex. 9, ¶¶ 64. Scale's other damages expert, Mr. Mooney, then relied on Dr. Paz to opine that Parse should be enjoined from selling its Accused Products because of the irreparable harm that Scale would suffer. Ex. 8, ¶¶ 64-95.

Dr. Paz claimed to base her opinions on her "education, experience, industry connections, and study," which she says makes her "familiar with [Scale] and Parse, their products, their customers, and their competition." Ex. 9, ¶15. Dr. Paz began her analysis with a discussion of the single-cell sequencing market, where the company 10X Genomics is the "well-understood leader," *id.* ¶ 21, but offers expensive equipment that customers have to install. *Id.* ¶¶15, 18-22.

According to Dr. Paz, as single-cell technology becomes more established, new market entrants seek to capture market share from 10X. *Id*. ¶¶ 23-24. She concluded that Parse and Scale have distinguished themselves from 10X by being "the only two companies offering instrument-free RNA single cell analysis kits that utilize split-pool barcoding technology, to the best of [her] knowledge," which "places the two companies in a smaller instrument-free and highly scalable market segment wherein they are currently the only two competitors." *Id.* ¶ 54.

According to Dr. Paz, Parse and Scale differ from other instrument-free products on "two key features" "consistently recognized as segmenting the companies' products into their own category": "(1) the split pool barcoding method" which enables a "high level of scalability and throughput; and (2) their products work with fixed cells." *Id.* ¶ 58. The only example Dr. Paz gives of this "consistent recognition," is a single article that did a comparative analysis of commercial single-cell RNA sequencing technologies that had the following graphic.

| Protocols Tested | Abbreviation | Technology Group | Detection Method | Transcript Coverage | Fixation | Sequencing Format [R1,R2,I1,I2] (bp) | Required Cell Loading |
|---|---|---|---|---|---|---|---|
| Chromium Single Cell 3' Reagent Kit, v3.1 Chemistry. (10x Genomics) | 10X 3' | Emulsion | Reverse Transcription | 3-prime end | no | [28,90,10,10] | 16,000 |
| Chromium Single Cell 5' Reagent Kit, v2 Chemistry. (10x Genomics) | 10X 5' | Emulsion | Reverse Transcription | 5-prime end | no | [28,90,10,10] | 16,000 |
| Chromium Fixed RNA Profiling Reagent Kit. (10x Genomics) | 10X FRP | Emulsion | Probe Hybridization | N/A | yes (CHO) | [28,90,10,10] | 16,000 |
| PIPseq T20 3' Single Cell RNA Kit v4.0. (Fluent Biosciences) | Fluent | Emulsion | Reverse Transcription | 3-prime end | no | [54,67,8,8] | 40,000 |
| BD Rhapsody WTA Reagent Kit. (Becton Dickinson) | BD | Microwell | Reverse Transcription | 3-prime end | no | [75,75,8,0] | 30,000 |
| HIVE CLX scRNA Seq Kit. (Honeycomb Biotechnologies) | Honeycomb | Microwell | Reverse Transcription | 3-prime end | uniform | [25,50,8,8] | 60,000 |
| GEXSCOPE® Single Cell RNA Library Kit. (Singleron Biotechnologies) | Singleron | Microwell | Reverse Transcription | 3-prime end | no | [150,150,8,0] | 50,000 |
| Evercode WT v2. (Parse Biosciences) | Parse | Combinatorial Indexing | Reverse Transcription | uniform | yes (unknown) | [74,86,6,0] | 350,000 |
| Single Cell RNA Kit. (Scale Biosciences) | Scale | Combinatorial Indexing | Reverse Transcription | 3-prime end | yes (MeOH) | [34,76,10,0] | 960,000 |
| ASTERIA Single-cell RNASeq Kit. (Scipio Bioscience) | Scipio | Matrigel | Reverse Transcription | 3-prime end | no | [28,75,6,0] | 15,000 |

*Id.*; Ex. 33 (Marco).

Dr. Paz also opines that Parse's prior market entry gave it with an "early foothold," which has "prove[d] difficult for [Scale] to overcome." Ex. 9, ¶ 64. She also observes that Parse's initial kits had "early poor technical results," which then "may have soured potential customers on split-pool barcoding," another barrier for Scale's entry into the market. *Id.*

## II.    ARGUMENT

Dr. Paz's market analysis and opinion that Parse and Scale are the only two competitors in the "smaller instrument-free and highly scalable" is based entirely on speculation and has no

reliable basis and should be excluded. Dr. Paz does not have the background or experience to be a market expert in RNA single-cell analysis, she did not rely on any particular methodology in determining the market, and the documents that Dr. Paz cites to do not support her conclusions.

The Federal Circuit has explained, "a district court may exclude evidence that is based upon unreliable principles or methods, legally insufficient facts and data, or where the reasoning or methodology is not sufficiently tied to the facts of the case." *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1295 (Fed. Cir. 2015). It is critical that the "principles and methodology" used by an expert be reliably "ground[ed] in the methods and procedures of science" and be "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590, 595; *Schneider*, 320 F.3d at 404. Therefore, a court must exclude expert testimony if the expert relies on unreliable methodology, such as solely relying on the expert's own perceptions or speculation to support their opinions and conclusions. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 137 (1997).

### A.    Dr. Paz's definition of the two-player market is based on speculation.

*First*, as to experience, Dr. Paz admitted to having only "a very general understanding of the single-cell analysis market," which was "[n]ot specific to RNA." Ex. 23, 153:11-16. Dr. Paz claimed to have relied on "many experts," that she had spoken to generally about the single-cell market, (and indeed she rattled off the names of several), *id.* 111:1-113:19, but then admitted that her conversations were "not specifically to prepare this report" but instead were "in the context of different discussions" where they discussed "different topics discussed within those conversations," *id.* 121:13-23, ultimately admitting "of course, it's a hearsay," *id.* 123:3-4; 114:5-12. She did not speak to either of Scale's technical experts for her report, *id.* 103:21-104:4, or use either the Scale or Parse Asserted Patents in her market analysis, *id.* 97:19-98:8, or even look at a physical Parse or Scale kit, *id.* 169:14-24.

*Next*, Dr. Paz admits she did not follow any methodology when conducting the market analysis for this case. Dr. Paz testified she had previously provided clients with "support on [] market strategy, go-to-market strategy, and specific actionable recommendations for the different markets in which [the company] wanted to operate." *Id.* 47:21-24. Dr. Paz testified when a client asks her and her company to analyze a "go-to-market strategy," to look at the competitive market, she would, as an example, speak to "key opinion leaders," and "different stakeholders" involved in the "value chain of that particular product," which would include regulators, payers, users, "influencers related to the use, adoption of that particular technology." *Id.* 68:22-69:9. Regarding stakeholders, she clarified she would talk to "technicians in a lab," the head of the lab, etc. depending on the technology. *Id.* 69:10-25. Dr. Paz also testified that she typically speaks with final users that will be involved, which include "research labs, clinical labs, diagnostic labs, academia, [and] the biopharmaceutical industry experts." *Id.* 50:17-24.

But, Dr. Paz did not do any of this for her opinions in this case. She admitted she did not speak to any key opinion leaders, influencers, any actual customers or users for purposes of this litigation. *Id.* 110:4-13. She did not speak to any competitor in the RNA single-cell sequencing market for the purposes of her report. *Id.* 110:14-23, and further did not speak to anyone at Parse or Scale[6] about their views on the market, *id.* 236:17-21, 283:6-11.

Given her lack of experience with RNA single-cell sequencing and the lack of any methodology used to analyze the market, Dr. Paz has no scientific basis to find the existence of narrow instrument-free and highly scalable market. There are several other factors and features that Dr. Paz could have considered but did not, presumably because they would have included other competitors besides Parse and Scale. Even as to scalability, Dr. Paz was very clear, the

---

[6] Scale's CEO testified that ███████████████████████████████████████████████ ███████████████████████████████████. Ex. 20, 16:7-17:12.

market required instrument-free kits that were "highly" scalable, not just "scalable." *Id.* 172:14-173:12. But, when asked the difference between scalable and highly scalable kits or whether there was a "numerical cutoff or a quantitative cutoff" for a product to be highly scalable, Dr. Paz had "no threshold," no cutoff, and simply stated that scalability was a "spectrum." *Id.* 173:13-174:13. Dr. Paz then insisted that "split-pool barcoding," the technology that both Parse and Scale use, "is what gives them a high level of scaleability," and that "they work with fixed cells as well that gives them that higher level of scaleability." *Id.* 181:13-16. But, Dr. Paz could point to no other evidence that described split-pool barcoding as having more scalability than other scalable technology. *Id.* 228:8-231:1. Dr. Paz could not even confirm whether Marco, the article she relied on, refers to split-pool barcoding as highly scalable (spoiler: it doesn't). *Id.* 183:18-184:14. Finally, Dr. Paz conceded that the basis for her opinion that split-pool barcoding allows for higher scalability was her "technical experience and years of experience," *id.* 184:7-14, which as described above, she does not have.

Additionally, the few documents that Dr. Paz points to directly contradict her opinions. For example, Dr. Paz described a DeciBio 2023 Report as naming Scale as a ██████████████ ████, but ignored the fact that the same sentence listed several other competitors. Ex. 28 (DeciBio 2023 Report), 23 ████████████████████████████████ ████████████████████████ Dr. Paz also relied on the DeciBio 2023 Report to conclude that another company, Fluent, with an instrument-free product, could not compete in the same market as Parse and Scale because of its different technology (Ex. 9, ¶ 57), but ignored that the report groups Parse and Fluent together several times. Ex. 29, 17, 21, 23, 25, 32, 35, 40, 48. Finally, Dr. Paz relies on a Parse presentation to conclude that Parse recognized the similarity between Parse and Scale's products, (Ex. 9, ¶ 59) ████████████████████████████ ████████████████████████████████████████ Ex. 30 (Parse Presentation),

49

PARSE0392997, ███████████████████████████████████

████████████████████████████████████████

███████████████████. *Id.* PARSE0392985. Dr. Paz defined a market without any factual

or evidentiary basis so that it only included Parse and Scale. Her opinion should be excluded.

      **B.**    **Dr. Paz's opinions that Parse's early entry in the market hurt Scale has no basis in facts and should be excluded.**

Dr. Paz's next opinion, that Parse's early entry in the market made it hard for Scale to

compete, and her opinion that Parse's initial kits had poor technical results thereby souring the

market for Scale is also based not on facts, but on speculation. Here Dr. Paz did not speak to any

stakeholders in this analysis. Regarding her opinion that Parse's alleged poor performance had

soured the market for Scale, she admitted she has not "had any conversation with any potential

Scale customer that decided not to go ahead because of this performance," Ex. 23, 293:21-23, or

talked to any customer who may be unwilling to try Scale's products having had a negative

experience with Parse's products, *id.* 298:14-24. She did not talk to any customers of Parse or

Scale products, including labs and experts to determine whether they would be willing to switch

between Parse and Scale products. *Id.* 236:17-21, 283:6-11, 283:18-21, 286:5-7. She did not

recall looking at any documents related to Scale's development of its products to understand why

it entered the market later than Parse, and did not know when Parse had launched its second

generation of products, which even in her opinion fixed the problems she identified with the first

generation, and didn't even know whether Parse had released its second version of its product

before or after Scale had entered the market. Ex. 9, ¶ 68, Ex. 23, 288:17-289:23.  Dr. Paz's

opinions on the allegedly detrimental impact to Scale caused by Parse's early entry into the

market should be excluded. These opinions and conclusions are based solely on Dr. Paz's own

speculation and no reliable scientific method.

DATED:  February 24, 2025

*Of Counsel:*

Byron L. Pickard
R. Wilson Powers III, Ph.D.
Chandrika Vira
Christopher M. Gallo
Brady P. Gleason
Louis P. Panzica, Jr.
David Y. Wang
Ryan N. Kaiser
Cristen A. Corry
**STERNE, KESSLER, GOLDSTEIN & FOX, P.L.L.C.**
1101 K Street, NW, 10th Floor
Washington, DC 20005
(202) 371-2600
bpickard@sternekessler.com
tpowers@sternekessler.com
cvira@sternekessler.com
cgallo@sternekessler.com
bgleason@sternekessler.com
lpanzica@sternekessler.com
dwang@sternekessler.com
rkaiser@sternekessler.com
ccorry@sternekessler.com

**YOUNG CONAWAY STARGATT & TAYLOR LLP**

*/s/ Karen L. Pascale*

Karen L. Pascale (#2903)
Robert M. Vrana (# 5666)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
(302) 571-6600
kpascale@ycst.com
rvrana@ycst.com

*Attorneys for Defendant/Counterclaim-Plaintiff Parse Biosciences, Inc. and Counterclaim-Plaintiff University of Washington*

## CERTIFICATE OF SERVICE

I, Karen L. Pascale, Esquire, hereby certify that on February 24, 2025, I caused to be electronically filed a true and correct copy of the foregoing sealed document with the Clerk of the Court using CM/ECF, and in addition caused true and correct copies of the foregoing sealed document to be served upon the following counsel of record by electronic mail:

---

***Attorneys for Plaintiff, Scale Biosciences, Inc.***
***and Nominal Defendant, Roche Sequencing Solutions, Inc.:***

Kelly E. Farnan                                              *farnan@rlf.com*
Sara M. Metzler                                             *metzler@rlf.com*
**RICHARDS LAYTON & FINGER, P.A.**
One Rodney Square
920 North King Street
Wilmington, DE 19801

***Attorneys for Plaintiff, Scale Biosciences, Inc.:***

**WOLF, GREENFIELD & SACKS, P.C.** : **wgs-scalebiosciencesv.parse@wolfgreenfield.com**

Stephen S. Rabinowitz                        *srabinowitz@wolfgreenfield.com*
605 Third Avenue
New York, NY 10158

Chelsea A. Loughran                          *cloughran@wolfgreenfield.com*
Emma L. Frank                                        *efrank@wolfgreenfield.com*
Stuart V. C. Duncan Smith                  *sduncansmith@wolfgreenfield.com*
Arden Bonzo                                    *arden.bonzo@wolfgreenfield.com*
600 Atlantic Avenue
Boston, MA 02210

***Attorneys for Nominal Defendant, Roche Sequencing Solutions, Inc.:***

**WILMERHALE**                              **WHRSS-ScaleLit@wilmerhale.com**

Robert J. Gunther                              *Robert.Gunther@wilmerhale.com*
Barish Ozdamar Ph.D.                        *Barish.Ozdamar@wilmerhale.com*
7 World Trade Center
250 Greenwich Street
New York, NY 10007

Madeleine C. Laupheimer                *Madeleine.Laupheimer@wilmerhale.com*
Kate Saxton                                          *Kate.Saxton@wilmerhale.com*
60 State Street
Boston, MA 02109

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

February 24, 2025

*/s/ Karen L. Pascale*

Karen L. Pascale (#2903) [kpascale@ycst.com]
Robert M. Vrana (#5666) [rvrana@ycst.com]
Rodney Square
1000 North King Street
Wilmington, DE  19801
Telephone: (302) 571-6600

*Attorneys for Parse Biosciences, Inc.*
*and University of Washington*