**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| SCALE BIOSCIENCES, INC., | |
| and | |
| ROCHE SEQUENCING SOLUTIONS, INC., | Civil Action No.  1:22-CV-01597-CJB |
| Plaintiffs, | |
| v. | **REDACTED PUBLIC VERSION** |
| PARSE BIOSCIENCES, INC., | |
| Defendant. | ████████████ |
| PARSE BIOSCIENCES, INC., | |
| and | |
| UNIVERSITY OF WASHINGTON, | |
| Counterclaim Plaintiffs, | |
| v. | |
| SCALE BIOSCIENCES, INC., | |
| Counterclaim Defendant. | |

**SCALE BIOSCIENCES, INC.'S
OPENING BRIEF IN SUPPORT OF ITS
<u>SUMMARY JUDGMENT AND *DAUBERT* MOTIONS</u>**

## TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDING.......................................................... 1

SUMMARY OF THE ARGUMENT ........................................................................... 1

STATEMENT OF THE FACTS ................................................................................. 2

LEGAL STANDARDS ............................................................................................ 3

ARGUMENT ......................................................................................................... 3

I.    Parse Infringes Claims 1, 2, 6 and 7 of Patent No. 11,634,752. ........................... 3

    A.    The Preamble of Claim 1 of the '752 Patent Is Not Limiting....................... 4

    B.    "Target Molecules" Need Not Be Specific Molecules With a  Known Individual Identity or Structure, and Their Presence  or Quantity Need Not Vary Between Individual Cells.......... 5

    C.    Each Set of APS Oligonucleotides Need Only Comprise At Least  10 APS Oligonucleotides That Satisfy the Specified Sequence  Requirements and May Include Additional Oligonucleotides. ........................... 7

    D.    The Accused Parse Kits Infringe Claims 1, 2, 6, and 7 of the '752 Patent................. 9

II.   The Asserted Claims of ScaleBio's U.S. Patent No. 11,634,752 Are Not Invalid. ............. 13

    A.    The Asserted '752 Claims Are Not Anticipated  by Brenner, Franch or Freskgard. ........................ 13

        1.    Brenner Discloses Oligonucleotide Tags That Identify the Individual, Not the Cell, From Which DNA Originated and Thus Are Not Configured to Form All or Part of a Cell or Organelle Origin Barcode.............14

        2.    The Oligonucleotide Tags of Franch Identify Synthetic Molecules That Do Not Originate in Cells and Thus Are Not Configured to Form All or Part of a Cell or Organelle Origin Barcode. .....................15

        3.    The Oligonucleotide Tags of Freskgard Identify Synthetic Molecules That Do Not Originate in Cells and Thus Are Not Configured to Form All or Part of a Cell or Organelle Origin Barcode.............16

        4.    Claim 6 of the '752 Patent Would Not Have Been Obvious Over Franch in Combination with Freskard. .......................17

    B.    The Asserted '752 Claims Are Not Invalid for Lack of Written Description. ........... 17

    C.    The Asserted '752 Claims Are Not Invalid for Lack of Enablement. ........................ 18

    D.    The Seelig Application Does Not Anticipate the Asserted '752 Claims. ................... 20

        1.    The Asserted '752 Claims Have An Effective  Filing Date No Later than January 31, 2012. ......................20

        2.    The Seelig Application Is Not Prior Art to the Asserted  '752 Claims and Accordingly Does Not Anticipate Them. .........................21

III.  Use of the Accused ScaleBio Products Does Not Infringe the Asserted Parse
      Claims. .................................................................................................................. 22

      A.  Use of the Accused ScaleBio Products Does Not Perform the  "Multiple
          Rounds of Appending Well-Specific Tags ... Within  Intact Cells" Required
          by the Court's Construction of the Preamble. ............................................... 22

          1.  Steps (e) and (i) Are the "Rounds of Appending Well-Specific Tags"
              That the Applicant Said Must Occur "Within Intact Cells." ..............................23

          2.  The PCR Reaction That Parse Relies on to Meet Step (i) Does Not
              Occur Within Intact Cells, and So Parse Cannot Prove Infringement...............26

      B.  Use of the Accused ScaleBio Products Does Not Involve "Appending Well-
          Specific Tags" When Performing Step (b)'s Reverse Transcription......................... 27

          1.  The Ordinary Meaning of "cDNA" is a Biopolymer Made of  Connected
              Nucleotides, Not Any One Separate Nucleotide. ................................................28

          2.  The Reverse Transcription Reaction That Parse Relies On  Does Not
              Involve "Appending Well-Specific Tags to cDNAs." ..........................................29

      C.  Use of the Accused ScaleBio Products Does Not "Coupl[e] the Secondary
          Nucleic Acid Tags That Were Provided in Step (h) to the Primary Nucleic
          Acid-Tagged cDNA Molecules That Were Produced in Step (e)," as Required
          by Step (i) Under the Parties Agreed-Upon Construction. ......................................... 30

          1.  As Confirmed by the Parties' Agreed-Upon Construction, Step (i)
              Requires Coupling a Tag to the Molecule Produced in Step (e). ......................30

          2.  Use of the Accused ScaleBio Products Does Not Infringe Because No
              Molecule Is Both Produced in Step (e) and Tagged in Step (i). .........................31

IV.   The Claims of the Asserted Parse Patents Are Invalid. ........................................ 33

      A.  The Challenged Claims of the '065 Patent Lack Written Description. ..................... 33

          1.  The Specification Does Not Disclose the Claimed Use of  Reverse
              Transcription Primers Without "a 5' Overhang Sequence." ...............................33

          2.  The Specification Does Not Disclose Reverse Transcription Primers
              That "Comprise a Barcode Sequence." ..............................................................38

      B.  The Challenged Claims of the '355 and '856 Patents Are Anticipated. .................... 40

          1.  "Rosenberg" Is Prior Art to the '355 and '856 Patents. ......................................40

          2.  "Rosenberg" Anticipates the '355 and '856 Patents. ..........................................41

V.    Parse's Experts Should Be Precluded from Providing Certain Opinions. ........................... 42

      A.  Dr. McDuff's Opinions Regarding the Apportionment of Value of the
          Asserted ScaleBio Patents Should Be Excluded. ................................................... 43

          1.  Dr. McDuff's ███████████████████████████
              ██████████████ is Unreliable. ...............................................................45

ii

2.    ████████████████████████ Is An Unreliable Benchmark for Apportionment of ████████████ ████████ . ...............................................................46

3.    Dr. McDuff Cites No Evidence That ████████████ Sheds Light on the ██████████ .................................................................47

B.    Dr. Satija and Dr. Pachter Do Not Meet Their Own Definition of a POSA and Should Be Precluded from Testifying From the Perspective of a POSA. .................. 49

CONCLUSION...............................................................................................50

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*ABS Glob., Inc. v. Cytonome/St, LLC*,
    84 F.4th 1034(Fed. Cir. 2023) ........................................................................... 31

*Ajinomoto Co. v. ITC*,
    932 F.3d 1342 (Fed. Cir. 2019).................................................................. 22, 23, 26

*Am. Med. Sys., Inc. v. Biolitec, Inc.*,
    618 F.3d 1354 (Fed. Cir. 2010)........................................................................... 9

*Amgen Inc. v. Mylan Inc.*,
    No. 2:17-CV-01235, 2018 WL 6061213 (W.D. Pa. Nov. 20, 2018)...................................... 32

*Anascape, Ltd. v. Nintendo of Am. Inc.*,
    601 F.3d 1333 (Fed. Cir. 2010).................................................. 34, 40, 41, 42

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
    598 F.3d 1336 (Fed. Cir. 2010) *(en banc)* ...................................................... 36, 38

*Artic Cat Inc. v. GEP Power Prods., Inc.*,
    919 F.3d 1320 (Fed. Cir. 2019)........................................................................... 5

*Atl. Rsch. Mktg. Sys., Inc. v. Troy*,
    659 F.3d 1345 (Fed. Cir. 2011)........................................................................... 34

*BASF Corp. v. SNF Holding Co.*,
    955 F.3d 958 (Fed. Cir. 2020)........................................................................... 8

*Bio-Rad Laby's, Inc. v. 10X Genomics Inc.*,
    No. 1:15-cv-00152-RGA, 2018 WL 4691047 (D. Del. Sept. 28, 2018)................................ 48

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
    289 F.3d 801 (Fed. Cir. 2002)........................................................................... 5

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)........................................................................... passim

*Comput. Docking Station Corp. v. Dell, Inc.*,
    519 F.3d 1366 (Fed. Cir. 2008)........................................................................... 23

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)........................................................................... 2, 43

*Elcock v. Kmart Corp.*,
    233 F.3d 734 (3d Cir. 2000)........................................................................... 43

*Glaxo Inc. v. Novopharm Ltd.*,
  52 F.3d 1043 (Fed. Cir. 1995)..................................................................................... 14

*Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*,
  336 U.S. 271 (1949)..................................................................................................... 36

*ICU Med., Inc. v. Alaris Med. Sys., Inc.*,
  558 F.3d 1368 (Fed. Cir. 2009)................................................................................... 34

*Integrated Tech. Corp. v. Rudolph Techs., Inc.*,
  734 F.3d 1352 (Fed. Cir. 2013)................................................................................... 33

*Invitrogen Corp. v. Biocrest Mfg., L.P.*,
  327 F.3d 1364 (Fed. Cir. 2003)................................................................................... 22

*Johnson & Johnston Assocs. Inc. v. R.E. Serv. Co.*,
  285 F.3d 1046 (Fed. Cir. 2002)................................................................................... 36

*KCJ Corp. v. Kinetic Concepts, Inc.*,
  223 F.3d 1351 (Fed. Cir. 2000)..................................................................................... 3

*Kyocera Senco Indus. Tools Inc. v. ITC*,
  22 F.4th 1369 (Fed. Cir. 2022) .............................................................................. 49, 50

*LizardTech, Inc. v. Earth Res. Mapping, Inc.*,
  424 F.3d 1336 (Fed. Cir. 2005)................................................................................... 34

*Lockwood v. Am. Airlines, Inc.*,
  107 F.3d 1565 (Fed. Cir. 1997)....................................................................... 38, 39, 40

*Maxwell v. J. Baker, Inc.*,
  86 F.3d 1098 (Fed. Cir. 1996)..................................................................................... 36

*Medtronic, Inc. v. Axonics Modulation Techs., Inc.*,
  No. 8:19-cv-02115, 2024 WL 4406929 (C.D. Cal., Aug. 29, 2024) ...................................... 49

*Moleculon Res. Corp. v CBS, Inc.*,
  793 F.2d 1261 (Fed. Cir. 1986),.................................................................................... 8

*Nielson Co. (US), LLC v. HyphaMetrics, Inc.*,
  No. 1-23-cv-00136-GBW-CJB (D. Del. May 22, 2024) ........................................................ 5

*NTP, Inc. v. Rsch. In Motion, Ltd.*,
  418 F.3d 1282 (Fed. Cir. 2005),................................................................................. 6, 7

*Oatey Co. v. IPS Corp.*,
  514 F.3d 1271 (Fed. Cir. 2008)................................................................................. 8, 9

*Ormco Corp. v. Align Tech., Inc.*,
  498 F.3d 1307 (Fed. Cir. 2007)...........................................................................26

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc)..........................................................28

*Schneider ex rel. Estate of Schneider v. Fried*,
  320 F.3d 396 (3rd. Cir. 2003) ...........................................................................43

*Southwall Techs., Inc. v. Cardinal IG Co.*,
  54 F.3d 1570 (Fed. Cir. 1995)...............................................................................4

*Tech. Licensing Corp. v. Videotek, Inc.*,
  545 F.3d 1316 (Fed. Cir. 2008)...........................................................................40

*Tech. Properties Ltd. LLC v. Huawei Techs. Co., Ltd.*,
  849 F.3d 1349 (Fed. Cir. 2017)...................................................................23, 26

*Traxcell Techs., LLC v. Nokia Sols. & Networks Oy*,
  15 F.4th 1136 (Fed. Cir. 2021) ....................................................................27, 31

*Warner-Lambert Co. v. Apotex Corp.*,
  316 F.3d 1348 (Fed. Cir. 2003)...........................................................................31

*Wi-Lan, Inc. v. Apple, Inc.*,
  811 F.3d 455 (Fed. Cir. 2016)......................................................................30, 32

*Zoltek Corp. v. United States*,
  672 F.3d 1309 (Fed. Cir. 2012) *(en banc)* ...........................................................6

**Rules**

Fed. R. Civ. P. 56(a) ...............................................................................................3

Fed. R. Evid. 702 ..................................................................................................43

**Statutes**

35 U.S.C. § 102.....................................................................................................22

35 U.S.C. § 102(a) ................................................................................................21

35 U.S.C. § 102(a)(1)......................................................................................22, 40

35 U.S.C. § 102(a)(2).............................................................................................22

35 U.S.C. § 102(e) .................................................................................................22

35 U.S.C. § 112......................................................................................................41

35 U.S.C. § 112(a) ........................................................................................................... 33

35 U.S.C. § 120 ................................................................................................................ 21

35 U.S.C. 271(a) ................................................................................................................ 3

**TABLE OF EXHIBITS**

| Ex. | Name | Description |
|---|---|---|
| 1 | '442 Patent | U.S Patent No. 10,626,442 |
| 2 | '256 Patent | U.S. Patent No. 10,982,256 |
| 3 | '341 Patent | U.S. Patent No. 11,512,341 |
| 4 | '752 Patent | U.S. Patent No. 11,634,752 |
| 5 | '065 Patent | U.S. Patent No. 10,900,065 |
| 6 | '355 Patent | U.S. Patent No. 11,168,355 |
| 7 | '856 Patent | U.S. Patent No. 11,427,856 |
| 8 | Parse's Invalidity Contentions | Excerpts of Parse's Final Invalidity Contentions |
| 9 | Pachter Op. Rep. | October 10, 2024 Opening Expert Report of Lior Pachter, Ph.D. on the Invalidity of U.S. Patent Nos. 10,626,442, 10,982,256, 11,512,341, and 11,634,752 |
| 10 | Pachter Reb. Rep. | November 12, 2024 Rebuttal Expert Report of Lior Pachter, Ph.D. on Non-Infringement |
| 11 | Pachter Reply Rep. | December 13, 2024 Reply Expert Report of Lior Pachter, Ph.D. on Invalidity of U.S. Patent Nos. 10,626,442, 10,982,256, 11,512,341, and 11,634,752 |
| 12 | Sims Op. Rep. | Excerpts of the October 10, 2024 Opening Expert Report of Peter A. Sims, Ph.D. regarding Parse's Infringement of the Asserted ScaleBio Claims |
| 13 | Sims Reb. Rep. | Excerpts of the November 12, 2024 Rebuttal Expert Report of Peter A. Sims, Ph.D. Regarding Validity of the Asserted ScaleBio Claims |
| 14 | Sims Reply. Rep. | Excerpts of the December 13, 2024 Reply Expert Report of Peter A. Sims Ph.D. Regarding Parse's Infringement of the Asserted ScaleBio Claims |
| 15 | Brenner | Patent Application Publication No. US 2006/0177833 A1 by Brenner |
| 16 | Franch | Patent Application Publication No. US 2009/0264300 A1 by Franch et al. |
| 17 | Freskgard | Patent Application Publication No. US 2006/0099592 A1 by Freskgard et al. |
| 18 | Pachter Depo. Tr. | Excerpts of the Transcript of the Deposition of Lior S. Pachter, Ph.D., taken on February 10, 2025 |

| Ex. | Name | Description |
|---|---|---|
| 19 | Seelig App. | Patent Application Publication No. US 2016/0138086 A1 by Seelig et al. |
| 20 | '065 FH | Excerpts of the File History of U.S. Application No. 14/941,433 |
| 21 | ScaleBio Manual | ScaleBio Single Cell RNA Sequencing Kit Protocol |
| 22 | Satija Op. Rep. | October 10, 2024 Opening Expert Report of Rahul Satija, Ph.D. on Infringement |
| 23 | Satija Reb. Rep. | November 12, 2024 Rebuttal Report of Rahul Satija, Ph.D. on Validity of U.S. Patents 10,900,065, 11,168,355, 11,427,856 |
| 24 | Satija Reply Rep. | December 13, 2024 Reply Expert Report of Rahul Satija, Ph.D. on Infringement |
| 25 | Kornberg | Excerpts of Arthur Kornberg, DNA Replication (1980) |
| 26 | Darnell 1990 | Excerpts of James Darnell et al., Molecular Cell Biology (1990) |
| 27 | Darnell 1986 | Excerpts of James Darnell et al., Molecular Cell Biology (1986) |
| 28 | Alberts | Excerpts of Bruce Alberts et al., Molecular Biology of the Cell (6th ed. 2015) |
| 29 | Shalek Op. Rep. | Excerpts of the October 10, 2024 Opening Expert Report of Alex K. Shalek, Ph.D. Regarding Invalidity of the Challenged Parse Claims |
| 30 | Shalek Reb. Rep. | Excerpts of the November 12, 2024 Rebuttal Expert Report of Alex K. Shalek, Ph.D. Regarding Non-Infringement of the Asserted Parse Claims |
| 31 | Shalek Reply Rep. | Excerpts of the December 13, 2024 Reply Expert Report of Alex K. Shalek, Ph.D. Regarding Invalidity of the Challenged Parse Claims |
| 32 | '055 Provisional | U.S. Provisional Application No. 62/080,055 |
| 33 | Rosenberg | Alexander B. Rosenberg et al., Single-cell profiling of the developing mouse brain and spinal cord with split-pool barcoding, 360 *Science* 176 (Apr. 13, 2018; electronically published March 15, 2018) with Table 12 |
| 34 | ████ Agreement | License Agreement between ████ and ███████ ., ████ |
| 35 | Mooney Op. Rep. | October 10, 2024 Opening Expert Report of Drew D. Mooney Regarding Damages Arising from Parse's Infringement of the Asserted ScaleBio Claims |
| 36 | McDuff Op. Rep. | October 10, 2024 Opening Expert Report of DeForest McDuff, Ph.D. |

| Ex. | Name | Description |
|---|---|---|
| 37 | McDuff Reb. Rep. | November 12, 2024 Rebuttal Expert Report of DeForest McDuff, Ph.D. |
| 38 | McDuff Reply Rep. | December 13, 2024 Reply Expert Report of DeForest McDuff, Ph.D. |
| 39 | McDuff Depo. Tr. | Excerpts of the Transcript of the Deposition of Robert DeForest McDuff, Ph.D., taken on January 28, 2025 |
| 40 | Guan | Taorui Guan (2020), *Evidence-Based Patent Damages*, 28(1) J. INTELLECTUAL PROPERTY LAW (2020) |
| 41 | Lee | William F. Lee & Mark A. Lemley, *The Broken Balance: How "Built-In Apportionment" and the Failure to Apply* Daubert *Have Distorted Patent Infringement Damages*, 37(2) HARVARD J. LAW & TECH. 255 (Spring 2024) |
| 42 | Lemley | Mark A. Lemley & Carl Shapiro, *Patent Holdup and Royalty Stacking*, 85 TEX. L. REV. 1991 (2007) |
| 43 | '950 Patent | U.S. Patent No. 10,144,950 |
| 44 | Parse Brochure | Parse Single Cell 3.0 Scalable Single Cell Sequencing Brochure (2022) |
| 45 | Evercode WT v3 User Manual | Parse Evercode WT v3 User Manual (Apr. 2024) |
| 46 | █████████ | █████████, produced at PARSE0550012 |
| 47 | █████████ | █████████, produced at PARSE0704049 |
| 48 | █████████ | █████████, provided in Ex. A to Parse Biosciences, Inc.'s Third Supplemental Objections and Responses to Scale Biosciences, Inc.'s Second Set of Interrogatories (Nos. 12-18) |
| 49 | Nolan 2012 | International Patent Application No. PCT/US2012/023411 by Nolan (published as WO 2012/106385 A2) |
| 50 | '411 PCT FH | Excerpts of the File History of International Patent Application No. PCT/US2012/023411 |
| 51 | '256 FH | Excerpts of the File History of U.S. Application No. 16/147,250 |
| 52 | '341 FH | Excerpts of the File History of U.S. Application No. 17/870,641 |
| 53 | '203 FH | Excerpts of the File History of U.S. Application No. 16/795,203 |

| Ex. | Name | Description |
|-----|------|-------------|
| 54 | '752 FH | Certified File History for U.S. Application No. 17/951,003, as received from the U.S. Patent and Trademark Office |
| 55 | '950 FH | Excerpts of the File History of U.S. Application No. 13/981,711 |

## NATURE AND STAGE OF THE PROCEEDING

Plaintiffs Scale Biosciences, Inc. ("ScaleBio") and Roche Sequencing Solutions, Inc. ("Roche") assert that Defendant Parse Biosciences, Inc. ("Parse") infringes U.S. Patent Nos. 10,626,442 ("the '442 Patent," Ex. 1), 10,982,256 ("the '256 Patent," Ex. 2), 11,512,341 ("the '341 Patent," Ex. 3), and 11,634,752 ("the '752 Patent," Ex. 4) (collectively, the "ScaleBio Asserted Patents") by commercializing specified "Accused Parse Products."   Parse and Counterclaim Plaintiff University of Washington ("UW") assert that ScaleBio infringes U.S. Patent Nos. 10,900,065 ("the '065 Patent," Ex. 5), 11,168,355 ("the '355 Patent," Ex. 6), and 11,427,856 ("the '856 Patent," Ex.7) (collectively, the "Asserted Parse Patents") by commercializing specified "Accused ScaleBio Products."

## SUMMARY OF THE ARGUMENT

ScaleBio moves for summary judgment on four bases:

(I)  In this action, ScaleBio asserts that Parse infringes claims 1, 2, 6-11, and 14 of the '752 Patent ("Asserted '752 Claims").  For efficiency, ScaleBio presently seeks summary judgment that Parse infringes claims 1, 2, 6, and 7 of the '752 Patent;

(II)  ScaleBio seeks summary judgment that all of the Asserted '752 Claims are not invalid for anticipation or for lack of written description or enablement.

(III)  After case narrowing, Parse asserts that ScaleBio infringes claims 1, 5, 12, 17, 20, and 24 of the '065 Patent; claims 1, 5, 6, 14, and 22 of the '355 Patent; and claims 1, 5, 6, 7, 14, and 22 of the '865 Patent ("Asserted Parse Claims").  ScaleBio seeks summary judgment that use of the Accused ScaleBio Products does not infringe any of the Asserted Parse Claims.

(IV)  ScaleBio also counterclaims for invalidity of claims 1, 5, 9, 12, 17, 20, 23, 24 and 25 of the '065 Patent; claims 1,  5, 6, 14, 19, 22, 25, and 26 of the '355 Patent; and claims 1, 5, 6,

7, 14, 19, 22, 25, and 26 of the '865 Patent (collectively, "Challenged Parse Claims"). ScaleBio seeks summary judgment that the Challenged Parse Claims are invalid.

ScaleBio also moves to exclude certain opinions from Parse's experts under *Daubert* on the basis that (a) the methods are unreliable or (b) they lack the qualifications they acknowledge are necessary to opine from the perspective of a person of ordinary skill in the art ("POSA").

## STATEMENT OF THE FACTS

ScaleBio and Parse are competitors in the field of single-cell sequencing. The Asserted ScaleBio Patents were invented by Dr. Garry Nolan, a professor at Stanford University, and date to a 2012 patent application (and earlier provisional patent applications). The fundamental character of Dr. Nolan's inventions is illustrated by the arguments below: Parse's only non-infringement arguments contradict the claim language and the Court's prior constructions, and Parse's invalidity arguments gloss over limitations and disclosures in the specification.

By contrast, the Asserted Parse Patents are newer; the earliest was filed in 2015 (claiming priority to late 2014). And to get them allowed, the applicant disavowed claim scope, as the Court has held (D.I. 241). To assert infringement and defend against invalidity, Parse must ignore the effects of its own disclaimer and the limits of what the claims actually require and what the specification actually discloses, as discussed below.

Pursuant to Paragraph 17(c) of the Amended Scheduling Order (D.I. 52), ScaleBio's four summary judgment motions are each supported by a Concise Statement of Undisputed Facts (cited herein as "Fact" followed by a unique letter and number). Pursuant to Paragraph 7(f)(ii) of that Order, ScaleBio also submits declarations from two of its experts: Dr. Peter Sims ("Sims Dec.") and Dr. Alexander Shalek ("Shalek Dec."), both professors with expertise relevant to the subject matter of this case. The authenticity of the cited exhibits is established by an attorney declaration ("Frank Dec.").

## LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A movant is entitled to judgment as a matter of law where "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## ARGUMENT

### I.   Parse Infringes Claims 1, 2, 6 and 7 of Patent No. 11,634,752.

ScaleBio asserts that Parse infringes four Asserted ScaleBio Patents. Fact A1. Three of these, the '442, '256 and '341 Patents, are directed to methods, whereas the '752 Patent claims a composition of matter (i.e., a "kit"). Without waiver as to the other claims, ScaleBio seeks summary judgment that Parse infringes under 35 U.S.C. § 271(a) claims 1, 2, 6 and 7 of the '752 patent by making, selling, offering for sale, and using the following kits: (1) Single Cell Whole Transcriptome Kit; (2) Evercode Whole Transcriptome Mini; (3) Evercode Whole Transcriptome Mega; (4) Evercode WT v2; (5) Evercode WT Mini v2; (6) Evercode WT Mega v2; (7) Evercode WT v3; (8) Evercode WT Mini v3; (9) Evercode WT Mega v3; (10) Evercode WT Mega v3 with INTEGRA ASSIST PLUS Barcoding; (11) Evercode TCR v2; (12) Evercode TCR Mini v2; (13) Evercode TCR Mega v2; (14) Evercode TCR v3; (15) Evercode TCR Mini v3; (16) Evercode TCR Mega v3; (17) Evercode BCR; (18) Evercode BCR Mini; and (19) Evercode BCR Mega (collectively, the "Accused Parse Kits"). Fact A4.

A determination of infringement requires a two-step analysis. First, asserted claims must be construed so as to ascertain their meaning and scope. Second, the claims as construed are compared to the accused product. *See KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1355 (Fed. Cir. 2000). To establish literal infringement, "every limitation set forth in a claim must be

found in an accused product, exactly." *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995).

In this motion, ScaleBio focuses on Parse's literal infringement of claims 1, 2, 6, and 7 of the '752 Patent. Parse stipulated that it "has sold, provided, or offered for sale" the Accused Parse Kits "to customers in the United States." D.I. 202 ¶¶ 3(a) & (b). As demonstrated below, the Accused Parse Kits meet every limitation of these claims.

### A.    The Preamble of Claim 1 of the '752 Patent Is Not Limiting.

Claim 1 of the '752 Patent with the preamble emphasized recites:

1. **A kit for split-pool barcoding target molecules that are in or on cells or cell organelles, comprising:**

(i) at least two sets of assayable polymer subunit (APS) oligonucleotides, wherein each set comprises at least 10 APS oligonucleotides that each comprise:

    a 5' end sequence that is common to the APS oligonucleotides in the set,

    a 3' end sequence that is common to the APS oligonucleotides in the set, and

    an internal sequence that distinguishes the APS oligonucleotides in the set from one another; and

(ii) one or more linking oligonucleotides, wherein a linking oligonucleotide is complementary to the 5' end sequence of the APS oligonucleotides of one set and the 3' end sequence of the APS oligonucleotides of another set,

    wherein the APS oligonucleotides from different sets are configured to link together in an ordered fashion in the presence of the one or more linking oligonucleotides to form all or part of a cell or organelle origination barcode.

Ex. 4 ('752 Patent) at 57:50-58:3.[1]

"[A] preamble limits the invention if it recites essential structure or steps, or if it is necessary to give life, meaning, and vitality to the claim" and is *not* limiting "where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a

---

[1] All emphasis added, and all original emphasis and internal citations removed, unless noted.

purpose or intended use for the invention." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002). Under this test, the preamble of claim 1 is not limiting, as Parse formally acknowledged in this litigation. Ex. 8 (Parse's Invalidity Contentions) at 13 n.4 ("Parse contends that the preamble of the '752 patent claims is ***not limiting*…**…") (quoting *Catalina*). The body of claim 1 is "structurally complete" because "deletion of the preamble phrase does not affect the structure or steps of the claimed invention." *Catalina*, 289 F.3d at 809. There is no "dependence on a particular disputed preamble phrase for antecedent basis." *Id*. at 808. Moreover, there was no "clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art…." *Id*.; Fact A3. *Accord Artic Cat Inc. v. GEP Power Prods., Inc.*, 919 F.3d 1320, 1328 (Fed. Cir. 2019) (preamble is not limiting because it "merely identifies an intended use for the claimed power distribution module"); *Nielson Co. (US), LLC v. HyphaMetrics, Inc.*, No. 1-23-cv-00136-GBW-CJB (D. Del. May 22, 2024) (D.I. 99) (preambles not limiting where they "simply recite[] the intended use for the network communications monitor, namely logging network communications). Thus, the preamble of claim 1 of the '752 Patent is not limiting.

### B.    "Target Molecules" Need Not Be Specific Molecules With a Known Individual Identity or Structure, and Their Presence or Quantity Need Not Vary Between Individual Cells.

The Court construed "target molecules" to mean at least "molecules of interest … that are being detected or quantified" but did not determine whether additional constraints apply. D.I. 119. Through its expert, Parse persists in its position that "target molecules" must be further limited to (i) "specific molecules with a known individual identity" (ii) "whose presence or quantity varies between individual cells." D.I. 108-1 at 5; Ex. 9 (Pachter Op. Rep.) ¶ 78; Ex. 10 (Pachter Reb. Rep.) ¶¶ 72-73; *see id.* ¶ 135 (arguing target molecules are "specific molecules of interest known *a priori*"). Parse takes this position even though, at the *Markman* hearing, it

5

expressly disavowed the requirement for varying between individual cells. *Markman* Tr. (D.I. 114) at 106:15-107:9. Parse also contradicts its concession in court that under its construction, this term would only require knowing "some small portion … not the entirety" of the target molecule. *Id*. at 109:3-23.

The Court should reject Parse's proposed construction and clarify: "Target molecules means molecules of interest that are being detected or quantified. Target molecules need not have a known individual identity, structure, or sequence and their presence or quantity need not vary between individual cells." This construction would be relevant to the '752 Patent if the Court finds the preamble is limiting, and in any event is relevant to the '442 and '256 Patents.

ScaleBio's proposed construction accords with the definition of "target molecules" in the specification as the Court has held. D.I. 119 ("[T]he patent specification defines the term in just this way.") (citing Ex. 1 ('442 Patent) at 16:15-18). Parse's insistence that target molecules must have a "known individual identity" that is known *a priori* contradicts the specification. *See* Ex. 1 ('442 Patent, 33:66-67 ("[T]arget molecule[s] can have either a known *or unknown* structure or sequence."); Ex. 14 (Sims Reply Rep.) ¶¶ 129-130. Indeed, the specification describes methods for "detect[ing] a *novel* transcript" (Ex. 1 ('422 Patent), 41:45-51), which by virtue of being "novel" is not "known *a priori*." Ex. 14 (Sims Reply Rep.) ¶ 130. Parse's construction relies on a selective reading of the specification that fails to account for these disclosures and accordingly must be rejected. *See NTP, Inc. v. Rsch. In Motion, Ltd.*, 418 F.3d 1282, 1296-97 (Fed. Cir. 2005) (construction that "contradicts the text and figures of the written description … must be rejected"), *abrogated on other grounds by Zoltek Corp. v. United States*, 672 F.3d 1309, 1323 (Fed. Cir. 2012) (en banc).

Parse's construction of "target molecules" relies on its expert's opinion that "[e]ach UBA in the population is specific for *a* target molecule." Ex. 10 (Pachter Reb. Rep.) ¶ 140. But the Court has already rejected that reading of the specification in determining a "UBA" is defined as "a molecule or assembly that is designed to bind with **at least one** target molecule, **at least one** target molecule surrogate, or both." D.I. 118 (quoting Ex. 1 ('442 Patent) at 17:18-20). As the Court noted: "The specification also makes reference to a single UBA binding to 'at least one target molecule.'" *Id.* (quoting Ex. 1 ('442 Patent) at 6:54-56). And the expert testimony indicates that "in the relevant time period, UBA was (and still is today) used to bind with more than one target molecule." *Id.* (citing *Markman* Tr. (D.I. 114) at 23-30); *see* Ex. 14 (Sims Reply Rep.) ¶¶ 41, 66. A "part" of a target molecule is the specific sequence or shape that a UBA binds to, which could be present in multiple different target molecules, i.e., a "class," as opposed to specific, singular molecules. A nucleic acid UBA will bind to the class of target molecules that comprise a complementary nucleic acid sequence recognized by the UBA. And an antibody or aptamer UBA will bind to the class of molecules that contain the epitope or conformational structure that the antibody or aptamer recognizes. Ex. 14 (Sims Reply Rep.) ¶ 48. In general, the researcher would not know in advance the identity of the molecules in a cell that will be recognized by a given antibody or aptamer, nor the conformational structure that is recognized, nor the sequences of the molecule(s) that are targeted by any given antibody or aptamer. *Id.*

Again, because Parse's construction contradicts these disclosures of the specification, it must be rejected. *NTP*, 418 F.3d at 1296-97.

### C. Each Set of APS Oligonucleotides Need Only Comprise At Least 10 APS Oligonucleotides That Satisfy the Specified Sequence Requirements and May Include Additional Oligonucleotides.

Element (i) of claim 1 of the '752 Patent requires at least two sets of APS oligonucleotides and requires that "each set *comprises* at least 10 APS oligonucleotides" that

satisfy specified sequence requirements (namely: a common 5' end sequence, a common 3' end sequence, and a distinguishing internal sequence).  Ex. 4 ('752 patent) at 57:50-65.

Parse incorrectly asserts that the recited sets may not include additional oligonucleotides, such as copies of the at least 10 APS oligonucleotides required by this claim element, arguing that "███████████████████████████████████████████████████████████."  Ex. 10 (Pachter Reb. Rep.) ¶ 288.  Under Parse's construction, an accused kit would not satisfy the claim if each set includes multiple copies of at least 10 APS oligonucleotides that satisfy the specified sequence requirements.

Parse's construction disregards the claim language, which uses the open term "comprises" to define each set.  As long as each set includes at least 10 APS oligonucleotides with the specified characteristics, that set may include additional oligonucleotides, such as copies of the "at least 10" required by the claim.  Parse's proposed construction would effectively rewrite claim 1 to require that "*every* APS," not just "*at least 10* APS oligonucleotides" within a set, must have different internal sequences.

The term "comprising" in element (i) of claim 1 appears in the body of the claim rather than the transition.  Dicta in some cases has stated that when used in this way, the term "comprising" "has no special legal effect as such" and "should be interpreted according to the normal rules of claim interpretation."  *Moleculon Res. Corp. v CBS, Inc.*, 793 F.2d 1261, 1272 n.8 (Fed. Cir. 1986), *abrogated on other grounds by BASF Corp. v. SNF Holding Co.*, 955 F.3d 958 (Fed. Cir. 2020).  Applying this principle here, the term "comprising" indicates that the recited set may include copies of the "at least 10 APS oligonucleotides" that satisfy the recited sequence requirements.  Indeed, Parse's construction would exclude multiple embodiments described in the specification, which is disfavored.  *See Oatey Co. v. IPS Corp.*, 514 F.3d 1271,

1276 (Fed. Cir. 2008) ("We normally do not interpret claim terms in a way that excludes embodiments disclosed in the specification.").

For example, the specification discloses, and Figure 4 illustrates, an embodiment in which a cell population is split into 20 tubes, and a single tube contains multiple copies of the same APS oligonucleotide (Sheet 5 of the figures depicts an embodiment in which a single tube contained 9 copies).  Ex. 14 (Sims Reply Rep.) ¶ 295; Ex. 4 ('752 Patent) at 36:24-37 & FIG. 4. In another embodiment, the specification explains that "first and second ordered sets of APSs" on different components of the same particle (e.g., on different RNA transcripts from the same cell or organelle) "*are the same*" and "at least two of the assayable polymer subunit (APS) sets *are identical*."  Ex. 14 (Sims Reply Rep.) ¶ 293; Ex. 4 ('752 Patent) at 6:27-66.  For two "ordered sets of APSs" in one cell or organelle to be the same, there must have been multiple copies of the same APSs from which those ordered sets could be assembled.  Ex. 14 (Sims Reply Rep.) ¶ 293.  Thus, as the specification states, "[i]n some embodiments, at least two of the assayable polymer subunit (APS) sets are identical."  Ex. 4 ('752 Patent) at 6:62-64.  The specification also explains mathematically that, in some embodiments, there must be multiple copies of the same APS in the same container.  Ex. 14 (Sims Reply Rep.) ¶ 294; Ex. 4 ('752 Patent) at 5:56-6:26.  Parse's construction would exclude these embodiments, and "where claims can reasonably [be] interpreted to include a specific embodiment, it is incorrect to construe the claims to exclude that embodiment, absent probative evidence on the contrary." *Oatey*, 514 F.3d at 1277.  Parse's construction must be rejected.

### D.    The Accused Parse Kits Infringe Claims 1, 2, 6, and 7 of the '752 Patent.

Parse infringes **<u>claim 1</u>**.  First, the preamble, as explained above, is not limiting and therefore cannot form the basis for a non-infringement argument.  *See Am. Med. Sys., Inc. v.*

*Biolitec, Inc.*, 618 F.3d 1354, 1363 (Fed. Cir. 2010) (reversing summary judgment ruling because preamble language relied upon for finding of non-infringement was not limiting).

Nonetheless, if the preamble were limiting, the Accused Parse Kits are "kits for split-pool barcoding," which Parse refers to as its "Evercode™ split pool combinatorial barcoding technology." Fact A5; Ex. 12 (Sims Op. Rep.) ¶¶ 335-36. Specifically, the Accused Parse Kits are kits for barcoding "the transcriptome of each fixed cell/nuclei," i.e., the mRNA within single cells. Fact A6; Ex. 12 (Sims Op. Rep.) ¶¶ 335-39. Parse disputes that barcoding the transcriptome is "barcoding target molecules" under its construction of "target molecules," which should be rejected for the reasons stated above. *Cf.* Ex. 10 (Pachter Reb. Rep.) ¶¶ 285-86. When "target molecules" is properly construed as "molecules of interest … that are being detected or quantified," the target molecules detected or quantified in the Accused Parse Kits are

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████. Facts A7-A8; Ex. 12 (Sims Op. Rep.) ¶ 337.

Claim 1 requires "at least two sets of assayable polymer subunit (APS) oligonucleotides, wherein each set comprises at least 10 APS oligonucleotides." The Accused Parse Kits ████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████. Facts A9-A10; Ex. 12 (Sims Op. Rep.) ¶¶ 341-44. Claim 1 further requires that the "at least 10 APS oligonucleotides" comprise "a 5' end sequence that is common to the APS oligonucleotides in the set." ████████████████

████████████  ███████████████████████████████████████████



Fact A11; Ex. 12 (Sims Op. Rep.) ¶¶ 345-46 & Appx. B.

Claim 1 further requires that the "at least 10 APS oligonucleotides" comprise a "3' end sequence that is common to the APS oligonucleotides in the set."

Fact A12; Ex. 12 (Sims Op. Rep.) ¶¶ 347-48 & Appx. C.

Claim 1 further requires that the "at least 10 APS oligonucleotides" comprise "an internal sequence that distinguishes the APS oligonucleotides in the set from one another."

Fact A13; Ex. 12 (Sims Op. Rep.) ¶¶ 349-50 & Appx. D. For the reasons set forth in Part I.C. above, the claim language permits multiple copies of the same barcode to be present within each well.

Claim 1 further requires "one or more linking oligonucleotides, wherein a linking oligonucleotide is complementary to the 5′ end sequence of the APS oligonucleotides of one set and the 3′ end sequence of the APS oligonucleotides of another set." The Accused Parse Products ████████████████. Fact A14; Ex. 12 (Sims Op. Rep.) ¶ 352.

███████████████████████. Fact A15; Ex. 12 (Sims Op. Rep.) ¶¶ 353-56 & Appx. E.

███████████████████████████████████████ Fact A15; Ex. 12 (Sims Op. Rep.) ¶ 353
& Appx. E. ████████████████████████████████

██████████████████████████████████████ Fact A16; Ex.

12 (Sims Op. Rep.) at ¶¶ 357-60. █████████████████████████████████████

████████████████████████ Fact A16; Ex. 12 (Sims Op. Rep.) ¶ 357 & Appx. E.

Claim 1 further requires that "the APS oligonucleotides from different sets are configured

to link together in an ordered fashion in the presence of the one or more linking oligonucleotides

to form all or part of a cell or organelle origination barcode." ████████████████



██████████████████████████████████████ Fact A17;

Ex. 12 (Sims Op. Rep.) ¶¶ 361-64 & Appx. G.

Parse infringes **claim 2**, which depends from claim 1 and requires that "the different APS

oligonucleotides of a set are in different wells of a multi-well plate." Ex. 4 ('752 Patent) at 58:4-

6. The Accused Parse Products █████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ Fact A10; Ex. 12 (Sims Op. Rep.) ¶¶ 365-67.

Parse infringes **claim 6**, which depends from claim 1 and requires that "the APS

oligonucleotides of at least one of the sets of APS oligonucleotides additionally comprise a

random sequence between the 5′ end sequence and the 3′ end sequence." Ex. 4 ('752 Patent) at

58:17-20. ████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████ Fact A18; Ex. 12 (Sims Op. Rep.) ¶¶ 370-72 & Appx. F.

Parse infringes **claim 7**, which depends from claim 1 and requires that "the APS oligonucleotides of at least one of the sets of APS oligonucleotides additionally comprise an affinity tag." Ex. 4 ('752 Patent) at 58:21-23. ██████████████████████████████

█████████████████████████████ Fact A19; Ex. 12 (Sims Op. Rep.) ¶¶ 373-74.

## II.    The Asserted Claims of ScaleBio's U.S. Patent No. 11,634,752 Are Not Invalid.

Although ScaleBio seeks summary judgment of infringement of only claims 1, 2, 6, and 7 of the '752 Patent, it continues to assert the other Asserted Parse Claims, namely claims 1, 2, 6-11, and 14 of the '752 Patent (the "Asserted '752 Claims"). As demonstrated below, Parse has not met its burden of going forward with evidence that any of the Asserted '752 Claims is invalid for any of the grounds discussed below.

### A.    The Asserted '752 Claims Are Not Anticipated by Brenner, Franch or Freskgard.

Parse has challenged Asserted '752 Claims as anticipated by three patent applications that were published in 2009 or earlier and are thus prior art to these claims: (i) US 2006/0177833 A1 by Brenner (Ex. 15); (ii) US 2009/0264300 A1 by Franch et al. (Ex. 16); and US 2006/0099592 A1 by Freskgard et al. (Ex. 17). Fact B1. The undisputed evidence shows that none of these references discloses a kit that comprises APS oligonucleotides and one or more linking oligonucleotides "wherein the APS oligonucleotides from different sets are configured to link

together in an ordered fashion…to form all or part of a ***cell or organelle origination barcode***"[2] as required by claim 1 of the '752 Patent (and through dependency by all the other Asserted '752 Claims).  Ex. 4 ('752 Patent) at 57:66-58:3.  Accordingly, the Court should grant summary judgment that the Asserted '752 Claims are not anticipated by Brenner, Franch, or Freskgard. *Glaxo Inc. v. Novopharm Ltd.*, 52 F.3d 1043, 1047 (Fed. Cir. 1995) ("A claim is anticipated and therefore invalid only when a single prior art reference discloses each and every limitation of the claim.").

**1.    Brenner Discloses Oligonucleotide Tags That Identify the Individual, Not the Cell, From Which DNA Originated and Thus Are Not Configured to Form All or Part of a Cell or Organelle Origin Barcode.**

Parse's expert admits that Brenner discloses "split-pool barcoding of genomes from different individuals, where the genomic fragments, e.g., target molecules, ***from one individual*** received the same set of tags."  Ex. 11 (Pachter Reply Rep.) ¶ 247 (emphasis added); Fact B2. Dr. Pachter opined ambiguously that "the tags form an origination barcode identifying the **cells** from the individual from which the cells originate."  Ex. 11 (Pachter Reply Rep.) ¶ 247 (emphasis added).  But when questioned at his deposition, he admitted that the tags of Brenner do not distinguish between nucleic acids from one cell and nucleic acids from another cell from the same individual.  Ex. 18 (Pachter Depo. Tr.) at 65:7-18; *accord id.* at 66:14-22 (admitting that the tags disclosed in Brenner do not distinguish between different cells from the same individual), 67:1-6 (admitting that all the cells from a given individual will receive the same tag); Fact B3.  The experts on both sides thus agree that Brenner does not disclose tags

---

[2]   The parties have stipulated that a "cell or organelle origination barcode" means "one or more molecular entities that collectively provide a code that ***indicates the cell or organelle of origin***." D.I. 108-1 at 3. (emphasis added)

(oligonucleotides) that provide a code that indicates the cell or organelle of origin.  *See* Ex. 13

(Sims Reb. Rep.) ¶¶ 665-667 & 675; Fact B4.  On the contrary, as Brenner expressly states,

"each ***individual*** is associated with a single unique oligonucleotide tag."  Ex. 15 (Brenner)

¶ [007] (emphasis added); Fact B5.  Since Brenner fails to meet the "wherein" element of claim 1

(the sole independent claim of the '752 Patent), it does not anticipate any of the Asserted '752

Claims.

### 2. The Oligonucleotide Tags of Franch Identify Synthetic Molecules That Do Not Originate in Cells and Thus Are Not Configured to Form All or Part of a Cell or Organelle Origin Barcode.

Parse's expert admits that Franch discloses "split-and-mix synthesis[3] of different

molecules each linked to a single-stranded identifier oligonucleotide comprising a plurality of

***tags identifying the molecule***."  Ex. 9 (Pachter Op. Rep.) ¶ 340 (quoting Ex. 16 (Franch)

¶ [0002]); Fact B6.  This generates "***barcoded small molecules*** [that] can be screened against

targets, which can include cell-surface molecules."  Ex. 11 (Pachter Reply Rep.) ¶ 203; Fact B8.

Dr. Pachter opines that when barcoded small molecules bind to targets on the surface of cells,

this constitutes "indirectly barcoding the target molecule ...."  Ex. 11 (Pachter Reply Rep.)

¶ 216.  ScaleBio disagrees that this would constitute "barcoding" if the preamble were limiting,

but assuming for the sake of argument that this were true, it still does not constitute a "cell or

organelle origin barcode" so as to satisfy the "wherein" limitation of claim 1.  On the contrary,

Dr. Pachter admitted at his deposition that the barcode of Franch identifies "the small molecule

that has been synthesized" (Ex. 18 (Pachter Depo. Tr.) at 112:11-13; Fact B9), and that

"[***Franch's***] ***barcoded compounds do not originate in cells***, even though they may later be used

---

[3]  The terms "split-and-mix" and "split-pool" are interchangeable in this context.  *See* Ex. 11
(Pachter Reply Rep.) ¶ 203 (describing Franch as disclosing "split-pool barcoding").  Fact B7.

to screen cells after they have been synthesized."  Ex. 18 (Pachter Depo. Tr.) at 116:19-117:5 ("Yeah, I mean, I would say that the small molecules, as I said before, do not originate in cells but again, they can target cell surface proteins."); *accord id.* at 113:16-20 (admitting that when Franch's barcoded molecules are synthesized, they are not in cells); Fact B10.

It is thus undisputed that Franch does not disclose tags (oligonucleotides) that are configured to provide a code that indicates a cell or organelle of origin.  *See* Ex. 13 (Sims Reb. Rep.) ¶ 616 ("It is not possible for the barcode of Franch to provide a code that indicates a cell or organelle of origin because the newly synthesized molecules of Franch did not originate from a cell or organelle.")  Since Franch fails to meet the "wherein" element of claim 1 (the sole independent claim of the '752 Patent) it does not anticipate any of the Asserted '752 Claims.

### 3. The Oligonucleotide Tags of Freskgard Identify Synthetic Molecules That Do Not Originate in Cells and Thus Are Not Configured to Form All or Part of a Cell or Organelle Origin Barcode.

Parse's expert opines that Freskgard discloses "split-pool barcoding [of] small molecules" and that "these barcoded small molecules can be screened against targets, which can include target molecules in or on cells."  Ex. 11 (Pachter Reply Rep.) ¶ 224; Fact B11.  Dr. Pachter opines that when the barcoded small molecule binds to a different molecule—a target molecule—on a cell, "the target molecule [is] indirectly barcoded …."  Ex. 11 (Pachter Reply Rep.) ¶ 225.  ScaleBio disagrees that this would constitute "barcoding" if the preamble were limiting, but assuming for sake of argument that this were true, it still does not constitute a "cell or organelle origin barcode" so as to satisfy the "wherein" limitation of claim 1.  On the contrary, Dr. Pachter admitted at his deposition that the barcoded small molecules of Freskgard do not originate in cells (Ex. 18 (Pachter Depo. Tr.) at 130:8-13), and do not originate in cell organelles.

*Id*. at 131:22-17; *see id*. at 131:18-132:7 (admitting that he relied on Freskgard's disclosure of "barcoded small molecules that did not originate in cell or cell organelles."); Fact B12.

It is thus undisputed that Freskgard does not disclose tags (oligonucleotides) that are configured to provide a code that indicates a cell or organelle of origin.  Fact B13; *see* Ex. 13 (Sims Reb. Rep.) ¶ 651 ("[B]ecause Freskgard does not barcode molecules that are 'in or on cells or cell organelles' there is no 'cell or organelle of origin' to identify.  I therefore disagree that Freskgard discloses this element [the wherein limitation] of claim 1.").  Since Freskgard fails to meet the "wherein" element of claim 1 (the sole independent claim of the '752 Patent) it does not anticipate any of the Asserted '752 Claims.

### 4.    Claim 6 of the '752 Patent Would Not Have Been Obvious Over Franch in Combination with Freskard.

Parse contends in the alternative that claim 6, if not anticipated, would have been obvious over Franch in combination with Freskgard.  Ex. 9 (Pachter Op. Rep.) ¶¶ 374-375.  As shown above, neither Franch nor Freskgard discloses tags (oligonucleotides) that provide a code that indicates a cell or organelle of origin, as required by the "wherein" limitation of claim 1, which is incorporated into claim 6 by dependency.  Accordingly, the combination of Franch and Freskgard also does not meet the "wherein" limitation, and claim 6 would not have been obvious over this combination of references.

### B.    The Asserted '752 Claims Are Not Invalid for Lack of Written Description.

Treating the preamble of claim 1 as limiting, Parse's expert opined that the Asserted '752 Claims are invalid for lack of a written description of barcoding the full scope of "target molecules," labeling molecules within cell organelles, or labeling target molecules without the use of UBAs and ESBs.  Ex. 9 (Pachter Op. Rep.) ¶¶ 216-219 (relying on the arguments set forth with respect to the method claims of the '442, '341, and '256 Patents).  But, as shown above, the

preamble of claim 1 of the '752 Patent is not limiting.  Moreover, ScaleBio's expert identified descriptive support for every element of the Asserted '752 Claims in the specification and figures of Nolan 2012, of which the '752 Patent is a continuation.  Ex. 13 (Sims Reb. Rep.) ¶¶ 481-537.

With respect to claim 1, Nolan 2012 provides a supporting written description for the preamble.  Fact B14.  Nolan 2012 provides a supporting written description for element (i) of claim 1.  Fact B15.  Nolan 2012 provides a supporting written description for element (ii) of claim 1.  Fact B16.  Nolan 2012 provides a supporting written description for the wherein limitation of claim 1.  Fact B17.  With respect to the dependent Asserted '752 Claims, Nolan 2012 provides a supporting written description for claim 2 (Fact B18), claim 6 (Fact B19), claim 7 (Fact B20), claim 8 (Fact B21), claim 9 (Fact B18), claim 10 (Fact B22), claim 11 (Fact B23), and claim 14 (Fact B24).

Accordingly, regardless of whether the Court determines that the preamble of claim 1 is not limiting, the Asserted '752 Claims are not invalid for lack of written description.

### C.    The Asserted '752 Claims Are Not Invalid for Lack of Enablement.

Parse's expert opined that the Asserted '752 Claims lack enablement "[t]o the extent ScaleBio contends that the preamble limits Claim 1…."  Ex. 9 (Pachter Op. Rep.) ¶ 188 (relying on the arguments set forth with respect to the method claims of the '442 and '341 Patents).  But, as shown above, the preamble of claim 1 is not limiting.  In any event, ScaleBio's expert provided evidence that every element of the Asserted '752 Claims was enabled.  Ex. 13 (Sims Reb. Rep.) ¶¶ 263-290.

With respect to claim 1, Dr. Sims explained that the claim is directed to a kit (a manufactured product) and that having multiple ingredients available in suitable and convenient forms is useful to scientists without requiring that a kit must contain all the necessary ingredients for performing an experiment.  *Id*. ¶ 265.  Elements (i) and (ii) of claim 1 describe sets of

oligonucleotides with particular features, and it would have been within the knowledge of a POSA to make these oligonucleotides as of the filing date of Nolan 2012 as the design and synthesis of oligonucleotides was a well-known laboratory technique.  Ex. 13 (Sims Reb. Rep.) ¶¶ 267-268; Fact B25.  Moreover, Nolan 2012 explains how to make oligonucleotides of desired sequence using a commercial DNA Synthesizer.  Ex. 13 (Sims Reb. Rep.) ¶¶ 267-268; Fact B26. Nolan 2012 provides instruction and a prophetic example that explain how to practice the "wherein" element of claim 1, which was also within the skill of a POSA as the design and synthesis of oligonucleotides was well known in the art.  Ex. 13 (Sims Reb. Rep.) ¶¶ 270-272. Accordingly, Nolan 2012 enabled claim 1.

Nolan 2012 also enabled the dependent Asserted '752 Claims.  Claim 2 was enabled as a POSA would be familiar with multi-well plates as a common piece of laboratory equipment.  *Id.* ¶¶ 274-275; Fact B27.  Claim 6 was enabled, as a POSA would have known how to make oligonucleotides that included a random sequence between the 3' and 5' end sequences as an aspect of established techniques of oligonucleotide design and synthesis.  Ex. 13 (Sims Reb. Rep.) ¶¶ 276-277; Fact B28.  Claim 7 was enabled, as a POSA would have known how to make oligonucleotides with an affinity tag as an aspect of established techniques of oligonucleotide design and synthesis.  Ex. 13 (Sims Reb. Rep.) ¶¶ 278-279; Fact B29.  Claim 8 was enabled, as elements (a), (b), and (c) describe sets of oligonucleotides with particular features, and it would have been within the knowledge of a POSA to make these oligonucleotides as of the filing date of Nolan 2012 as the design and synthesis of oligonucleotides was a well-known laboratory technique.  Ex. 13 (Sims Reb. Rep.) ¶¶ 280-283; Fact B25. Moreover, Nolan 2012 explains how to make oligonucleotides of desired sequence using a commercial DNA Synthesizer.  Ex. 13 (Sims Reb. Rep.) ¶¶ 267-268; Fact B26.  Nolan 2012 provides instruction and a prophetic

example that explain how to practice the "wherein" element of claim 8, which was also within

the skill of a POSA as the design and synthesis of oligonucleotides was well known in the art.

Ex. 13 (Sims Reb. Rep.) ¶¶ 284-285; Fact B25.  Accordingly, Nolan 2012 enabled claim 8.

Claim 9 was enabled, as a POSA would be familiar with multi-well plates as a common piece of

laboratory equipment.  Ex. 13 (Sims Reb. Rep.) ¶¶ 286-287; Fact B27.  Claim 10 was enabled, as

a POSA would have known how to make oligonucleotides and hybridize them to one another,

given that hybridization was a well-known technique.  Ex. 13 (Sims Reb. Rep.) ¶ 288; Fact B30.

Claim 11 was enabled, as a POSA would have known how to make linking oligonucleotides that

do not comprise an internal sequence that is complementary to any of the internal sequences of

the APS oligonucleotides, as the design and synthesis of oligonucleotides was a well-known

laboratory technique.  Ex. 13 (Sims Reb. Rep.) ¶ 289; Fact B25.  Claim 14 was enabled, as the

design and synthesis of oligonucleotides was a well-known laboratory technique, Fact B25, and

making more than 10 oligonucleotides, would have been within the knowledge of a POSA.  Ex.

13 (Sims Reb. Rep.) ¶ 290; Fact B31.  Accordingly, Nolan 2012 enabled all the Asserted '752

Claims.

### D.    The Seelig Application Does Not Anticipate the Asserted '752 Claims.

Parse's expert opined that the Asserted '752 Claims are anticipated by Patent Application

US 2016/0138086 A1 by Seelig et al. (the "Seelig App.") (Ex. 19).  But the Asserted '752

Claims have an effective filing date years earlier than the Seelig Application was filed or

published, and accordingly are not anticipated by this application.

### 1.    The Asserted '752 Claims Have An Effective Filing Date No Later than January 31, 2012.

As shown in Parts II.B and II.C above, the specification and figures of Nolan 2012, filed

on January 31, 2012, described and enabled each of the Asserted '752 Claims.  The '752 Patent

claims priority to Nolan 2012 through a series of co-pending continuations.  Specifically, the '752 Patent issued from Application No. 17/951,003, filed on September 22, 2022 as a continuation of Application No. 17/870,641.  Fact B32.  Application No. 17/870,641 was filed on July 21, 2022 as a continuation of Application No. 16/795,203 and issued on September 29, 2022 as the '341 Patent.  Fact B33.  Application No. 16/795,203 was filed on February 19, 2020 as a continuation of Application No. 16/147,250 and was abandoned on July 26, 2022 by lack of response to an Office Action mailed on April 26, 2022.  Fact B34.  Application No. 16/147,250 was filed on September 28, 2018 as a continuation of Application No. 13/981,711 and issued on April 20, 2021 as the '256 Patent.  Fact B35.  Application No. 13/981,711 was filed on April 15, 2016 as the U.S. national phase of PCT/US2012/023411 and issued on December 4, 2018 as U.S. Patent No. 10,144,950.  Fact B36.  PCT/US2012/023411 was filed on January 31, 2012 and was published as Nolan 2012.  Fact B37.

As shown by the above dates of filing, issuance, and abandonment, the '752 Patent is a continuation of Nolan 2012 through a continuous chain of copendency.  Moreover, each of these patents and applications names a common inventor: Garry P. Nolan.  Fact B38. In addition, the continuations have identical disclosures to those of Nolan 2012 (Fact B39), which describes and enables the Asserted '752 Claims.  Accordingly, the Asserted '752 Claims have an effective filing date no later than January 31, 2012.  35 U.S.C. § 120.

## 2.    The Seelig Application Is Not Prior Art to the Asserted '752 Claims and Accordingly Does Not Anticipate Them.

The Seelig Application was published on May 19, 2016 (Fact B40), years after the effective filing date of the Asserted '752 Claims, and thus is not prior art under 35 U.S.C.

§ 102(a) or (b) (pre-AIA) or under 35 U.S.C. § 102(a)(1) (AIA).[4]   Moreover, the Seelig Application has an asserted priority date no earlier than November 14, 2014 (Fact B40), which is also after the effective filing date of the Asserted '752 Claims, and thus is not prior art under 35 U.S.C. § 102(e) (pre-AIA) or 35 U.S.C. § 102(a)(2) (AIA).   Accordingly, the Seelig Application is not prior art to, and does not anticipate, any of the Asserted '752 Claims.

## III.    Use of the Accused ScaleBio Products Does Not Infringe the Asserted Parse Claims.

Parse alleges that use of the Accused ScaleBio Products infringes the Asserted Parse Claims.  Facts C1, C12.  But Parse cannot meet its burden of proving infringement for three reasons, each of which is a legal question of claim construction.  *See Ajinomoto Co. v. ITC*, 932 F.3d 1342, 1352 (Fed. Cir. 2019).  Since each reason applies to the sole independent claim of each Asserted Parse Patent, the dependent claims are also not infringed.

### A.    Use of the Accused ScaleBio Products Does Not Perform the "Multiple Rounds of Appending Well-Specific Tags … Within Intact Cells" Required by the Court's Construction of the Preamble.

The Court previously construed the preamble of each independent claim of the Asserted Parse Patents as "[a] method of generating labels that identify the cell of origin of RNA molecules, where the cell-specific labels are the product of *multiple rounds of appending well-specific tags to cDNAs within intact cells*."  D.I. 241.  The parties agree that the Court's construction is limiting.  Fact C10; *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 327 F.3d 1364, 1370 (Fed. Cir. 2003) ("[C]lear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art transforms the preamble into a claim limitation….").

---

[4] The '752 Patent issued from applications that never included any claim with an effective filing date on or after March 16, 2013, so that this analysis is governed by the pre-AIA version of 35 U.S.C. § 102.  However, the same conclusion follows under § 102 as amended by the AIA.

The Court construed the preamble on the basis of prosecution disclaimer, which "protects the public's reliance on definitive statements made during prosecution."  D.I. 241 (quoting *Comput. Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374-75 (Fed. Cir. 2008)).  The Court agreed with ScaleBio's proposed construction "because during prosecution of the 065 patent, in an effort to overcome rejection of the claims, the patentee clearly and repeatedly stated that the cell-specific labels described in the patent's claims were 'the product of multiple rounds of appending well-specific tags to cDNAs within each cell….'"  D.I. 241; Fact C8.

In prior briefing, Parse acknowledged the meaning of ScaleBio's proposed construction, telling the Court, "Scale's construction would introduce a limitation that *every* step of the labeling method must take place 'within intact cells.'"  D.I. 101 at 53 (emphasis original); *see id.* at 54 ("Scale's construction requires that every step occur 'within intact cells….'").

Now that the Court has adopted that construction, the consequence is clear: steps (e) and (i), which are the only two recited rounds of "coupling … tags" to cDNA molecules, must occur "within intact cells."  But Parse cannot show infringement under the Court's construction, because Parse cannot show that step (i) occurs "within intact cells."  Shalek Dec. ¶ 34. Therefore, summary judgment of non-infringement is appropriate.  *Celotex*, 477 U.S. at 323.

### 1.    Steps (e) and (i) Are the "Rounds of Appending Well-Specific Tags" That the Applicant Said Must Occur "Within Intact Cells."

Prosecution disclaimer "hold[s] patentees to the actual arguments made."  *Tech. Properties Ltd. LLC v. Huawei Techs. Co., Ltd.*, 849 F.3d 1349, 1359 (Fed. Cir. 2017).  "The question is what a person of ordinary skill would understand the patentee to have disclaimed during prosecution."  *Id.*; *Ajinomoto*, 932 F.3d at 1351 (same).

At the time of the applicant's disclaimer, the claims had been amended into the form that later issued in the '065 Patent.  Fact C9.  Then, as now, the claims recited "generating [cDNA]

molecules" in step (b), followed by two rounds of "coupling … tags" to cDNAs in steps (e) and (i).  Ex. 20 ('065 FH) at PARSE0000954-55; Ex. 5 ('065 Patent) at 29:49-31:3.

Thus, when the applicant explained that the "presently claimed method" requires "multiple rounds of appending well-specific tags" within intact cells (Ex. 20 ('065 FH) at PARSE0000964), the only two recited steps at all relating to appending "tags" were the "coupling … tags" steps (e) and (i).  The applicant could only have been referring to those two steps, so must have meant that those two steps occur "within intact cells."  Shalek Dec. ¶ 44.

The applicant could not have meant any other step in the "presently claimed method" to be a "round[] of appending well-specific tags.  For example, the applicant never called the reverse transcription primer used in step (b) a "tag" or the cDNAs made from it "tagged."  *See* Ex. 20 ('065 FH) at PARSE0000964-70.  And in the claims the applicant was describing, which are identical to those in the '065 Patent, the "cDNA molecules" generated in step (b) are not "tagged"—in contrast to the "tagged cDNA molecules" produced in steps (e) and (i) after "coupling … tags" to the cDNAs.  *Id.* at PARSE0000954-55; Shalek Dec. ¶ 45.

Further, in the claims the applicant was addressing, only the "nucleic acid tags" coupled in steps (e) and (i), which differ between "aliquots," are "well-specific."  Ex. 20 ('065 FH) at PARSE0000954-55.  The specification explains that "an aliquot or group of cells can be separated into different reaction vessels" such as "wells of a 96-well plate."  *Id.* at PARSE0000047 ([0033]).  Thus, the "well-specific tags" are specific to the aliquots of cells in those wells, as recited in the claims.  Shalek Dec. ¶ 46.

By contrast, step (b)'s primers are not well-specific, so they cannot be the "well-specific tags."  Ex. 20 ('065 FH) at PARSE0000964.  Although the claims could encompass a primer with a barcode sequence that is well-specific, the claims also encompass primers **without** well-

24

specific barcode sequences.  Thus, for the "presently claimed method" to require "well-specific tags" (*id.*), the applicant could not have meant step (b)'s primers.  Shalek Dec. ¶ 46.

Although the reverse transcription occurs within intact cells, the applicant was clear that the claims require both (1) that "the cells … **must not be lysed** prior to reverse transcription" and also (2) "**multiple rounds** of well-specific tagging of **unlysed cells**."  Ex. 20 ('065 FH) at PARSE0000970 (emphasis original); *id.* at PARSE0000964 ("Elements that are important to the analysis are underlined and in bold."); The applicant illustrated this with a graphic showing a "commercial embodiment of the claimed method," with both (1) reverse transcription in step 1 and (2) two rounds of "*append[ing]*" additional well-specific barcodes in steps 3 and 5, prior to cell lysis in step 7.  Ex. 20 ('065 FH) at PARSE0000965-66.  Shalek Dec. ¶¶ 42, 43.

Notably, the "append[ing]" in the proffered commercial embodiment occurs by "ligation" (*id.* at PARSE0000966), which uses a ligase enzyme.  Ex. 5 ('065 Patent) at 5:50-53; Shalek Dec. ¶ 42.  The applicant explained that such reactions must occur within cells:  "Critically, the initial reverse transcription reaction and all subsequent enzymatic reactions take place separately within each individual cell of the cell population…."  Ex. 20 ('065 FH) at PARSE0000965.  Thus, in this example, it was "[c]ritical" (*id.*) that **both** reverse transcription and **multiple** rounds of appending occur within intact cells.  Shalek Dec. ¶ 42.  The graphic that the applicants relied on during prosecution identifies two steps of **appending** well-specific barcodes. *Id.* (highlighted).  Those steps (in splits 3 and 5) occur after reverse transcription and correspond to steps (e) and (i) of the claims.

Consistent with the applicant's disclaimer, the specification never describes the primer as a "tag" or describes reverse transcription as "tagging."  Rather, the specification consistently distinguishes reverse transcription from tagging.  *E.g.*, Ex. 5 ('065 Patent) at 3:11-26 (generating

cDNAs with reverse transcription in step (a), and then providing and binding tags in step (c)), 10:18-32 (same); Shalek Dec. ¶¶ 47-49.  And as discussed in Part IV.A.2 below, the specification does not describe primers comprising a barcode sequence at all.

The Court already determined that "there is no question here that if disclaimer was made as to the claims of the 065 patent (as it was), then it should also apply as to the use of the same term in the 856 and 355 patents."  D.I. 241 (citing *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1314 (Fed. Cir. 2007)).  The independent claims of the '355 and '856 Patents recite a primer comprising a barcode sequence, but that primer is still not described as a "tag," and the resulting cDNAs are still not "tagged" until steps (e) and (i). Ex. 6 ('355 Patent) at 29:47-48; Ex. 7 ('856 Patent) at 29:49-51.  Tellingly, the "tags" of step (e) remain the "primary" tags, even though they follow the primers comprising a barcode sequence.  But even more to the point, the additional language in step (b) of the '856 and '355 Patents does not retroactively change the applicant's disclaimer during prosecution of the '065 Patent, which requires that the "multiple rounds of appending well-specific tags" are those in steps (e) and (i).

A POSA would have clearly understood the phrase "rounds of appending well-specific tags" to mean steps (e) and (i).  Shalek Dec. ¶ 49.  Prosecution disclaimer holds applicants "to the actual arguments made, not the arguments that could have been made."  *Tech. Props.*, 849 F.3d at 1359.  Parse must be held to its disclaimer.  *Ajinomoto*, 932 F.3d at 1351 ("A patentee must be held to what he declares during the prosecution of his patent, because a contrary rule would undermine the public notice function of a patent.").

## 2.    The PCR Reaction That Parse Relies on to Meet Step (i) Does Not Occur Within Intact Cells, and So Parse Cannot Prove Infringement.

Parse cannot show infringement in view of the above disclaimer.  Use of the Accused ScaleBio Products involves three "Split" steps, including a "Split 3" step, as illustrated below:



Fact C13; Ex. 21 (ScaleBio Manual) at SCALEBIO0160909; Shalek Dec. ¶ 51.

Parse relies on the "Indexed PCR" reaction that occurs in Split 3 to meet step (i). Ex. 22 (Satija Op. Rep.) ¶¶ 288-297, 505-514, 711-720. However, it is undisputed that the "Indexed PCR" reactions occur after the cells are lysed. Facts C24-C25.

Consequently, the "Indexed PCR" that Parse relies on to meet step (i) does not occur "within intact cells," and so does not meet the requirement (*see* Part III.A.1 *supra*) that step (i) occurs within intact cells. Shalek Dec. ¶ 53. Parse cannot rely on the doctrine of equivalents to recapture the claim scope that it disclaimed. *Traxcell Techs., LLC v. Nokia Sols. & Networks Oy*, 15 F.4th 1136, 1145 (Fed. Cir. 2021) ("If a patentee surrenders some scope during prosecution, that territory isn't available later as a doctrine-of-equivalents battleground."). For this reason alone, summary judgment of infringement is, therefore, appropriate. *Celotex*, 477 U.S. at 323.

**B. Use of the Accused ScaleBio Products Does Not Involve "Appending Well-Specific Tags" When Performing Step (b)'s Reverse Transcription.**

Parse asserts that the "multiple rounds of appending well-specific tags to cDNAs within intact cells" required by the Court's construction of the preamble (D.I. 241) can be met by the reverse transcription and ligation reactions during "Split 1" and "Split 2." Ex. 22 (Satija Op. Rep.) ¶¶ 168-170, 385-387, 602-604. This argument fails for reasons stated in Part III.A, *supra*. But it also fails for a separate and independent reason, as set forth below.

Even if reverse transcription primers could be considered "well-specific tags," and even if generating cDNA with reverse transcription using such primers could be considered a round of "appending well-specific tags" to *something*, use of the Accused ScaleBio Products would still not meet the Court's construction because reverse transcription does not "append[] well-specific tags **to cDNAs**." D.I. 241. That is because the ordinary meaning of "cDNA" is a biopolymer, and reverse transcription involves appending individual nucleotides—which are monomers, not a biopolymer—to the primer. Fact C17; Shalek Dec. ¶ 57.

Consequently, even if the Court does not agree that the applicant's disclaimer requires step (i) to occur "within intact cells," use of the Accused ScaleBio Products still does not infringe because the reverse transcription that Parse relies on for step (b) cannot be a "round[] of appending well-specific tags **to cDNAs**," as the Court's construction requires. D.I. 241. For this independent reason, summary judgment is appropriate. *Celotex*, 477 U.S. at 323.

### 1. The Ordinary Meaning of "cDNA" is a Biopolymer Made of Connected Nucleotides, Not Any One Separate Nucleotide.

Claim terms are generally given their plain and ordinary meaning to POSAs in the context of the specification. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc). Extrinsic evidence is relevant to the ordinary meaning of "technical terms." *Id.* at 1314.

Here, the ordinary meaning of "cDNA," which is a type of DNA, is clear: a biopolymer synthesized from separate monomer nucleotides. Fact C17; Shalek Dec. 59. That ordinary meaning is a matter of textbook molecular biology. Ex. 25 (Kornberg) at 4 ("The two kinds of nucleic acid—the ribonucleic acids, RNA, and the deoxyribonucleic acids, DNA—are polymers of nucleotides."); Ex. 26 (Darnell 1990) at 66 ("Cells have two closely related information-carrying molecules: deoxyribonucleic acid (DNA) and ribonucleic acid (RNA). … DNA and RNA are linear polymers."), 44 (Figure 2-1: "Nucleic acids, also linear biopolymers, are formed

from four monomers termed nucleotides…."); Ex. 28 (Alberts) at 70 ("The nucleic acids (DNA and RNA) … are all polymers…."), 100 ("Nucleotides are the subunits of the nucleic acids.").

Parse's expert on the Asserted Parse Claims (Dr. Satija) acknowledges this ordinary meaning of cDNA. He explains that cDNA is a type of DNA. Ex. 23 (Satija Reb. Rep.) ¶ 60; He acknowledges that DNAs are "biopolymers." Ex. 23 (Satija Reb. Rep.) ¶ 43 ("Nucleic acids, including DNA and RNA, are naturally occurring biopolymers that are essential to all known forms of life."). And he distinguishes the DNA biopolymers from the individual nucleotide monomers. Ex. 23 (Satija Reb. Rep.) ¶ 44 ("DNA and RNA are linear chains of individual building blocks known as 'nucleotides.'").

The specification and claims are consistent with this ordinary meaning. Step (b) in the claims recites "reverse transcribing the RNA molecules within the plurality of cells, thereby generating [cDNA] molecules." *E.g.*, ('065 Patent) at 29:49-52; *see also id* at 3:13-17 (describing a similar step). But reverse transcription is not a process of "generating" nucleotides; it uses nucleotides as building blocks to extend primers to generate a biopolymer (i.e., the actual cDNA). Facts C18-C19; Shalek Dec. ¶ 60-61; *see* Ex. 5 ('065 Patent) at 14:5-10 (describing a kit for reverse transcription that includes nucleotides (i.e., "dNTPs") as a reagent).

### 2.    The Reverse Transcription Reaction That Parse Relies On Does Not Involve "Appending Well-Specific Tags to cDNAs."

Parse cannot show infringement because it is undisputed that the Indexed Reverse Transcription extends the primer by appending one *nucleotide* at a time. Facts C23, C25, C26; *e.g.*, Ex. 22 (Satija Op. Rep.) ¶¶ 201 ("Reverse transcription extends the [primer] in a template-dependent manner by a polymerase. … [T]he [polymerase] enzyme will use its DNA polymerase activity to synthesize cDNA by adding a nucleotide base to the 3′ end of the [primer]…."), 417 (same), 635 (same).

29

However, those nucleotides are monomers, not biopolymers and, therefore, not cDNAs. Fact C17; Shalek Dec. ¶ 23, 62, 63.  Consequently, even if reverse transcription primers could be a "well-specific tag[]" and even if reverse transcription could be "appending well-specific tags" to separate nucleotides, reverse transcription is not "appending well-specific tags **to cDNAs**." For this independent reason, summary judgment is appropriate.  *Celotex*, 477 U.S. at 323.

**C.    Use of the Accused ScaleBio Products Does Not "Coupl[e] the Secondary Nucleic Acid Tags That Were Provided in Step (h) to the Primary Nucleic Acid-Tagged cDNA Molecules That Were Produced in Step (e)," as Required by Step (i) Under the Parties Agreed-Upon Construction.**

Step (i) of claim 1 in each of the Asserted Parse Patents recites "coupling the provided secondary nucleic acid tags of (h) to the primary nucleic acid-tagged cDNA molecules of (e)." *E.g.*, Ex. 5 ('065 Patent) at 30:61-63.  During claim construction, the parties agreed that step (i) requires "[c]oupling the secondary nucleic acid tags that were provided in step (h) to the primary nucleic acid-tagged cDNA molecules that were produced in step (e)." D.I. 108-1 at 15; Fact C11.

Use of the Accused ScaleBio Products does not infringe under that construction, because the agreed-upon construction requires that the product of step (e)—i.e., the "primary nucleic acid-tagged cDNA molecules"—be what is coupled to the "secondary nucleic acid tags" in step (i).  By contrast, the molecules produced by the reaction that Parse asserts meets step (e) are not the same as the molecules that Parse asserts are coupled to tags in step (i).  Shalek Dec. ¶ 64.

**1.    As Confirmed by the Parties' Agreed-Upon Construction, Step (i) Requires Coupling a Tag to the Molecule Produced in Step (e).**

In the claims, step (e) recites "producing primary nucleic acid tagged molecules," and step (i) recites "coupling … to the primary nucleic acid tagged cDNA molecules of (e)." *E.g.*, Ex. 5 ('065 Patent) at 30:44-63.  The use of the definite article "the" in step (i) means that the "primary nucleic acid-tagged cDNA molecules" in step (i) and its antecedent in step (e) must be the same molecules. *Wi-Lan, Inc. v. Apple, Inc.*, 811 F.3d 455, 462 (Fed. Cir. 2016) (holding

that a step that "produce[s] modulated data symbols" and a step that "combine[s] the modulated data symbols" refers to the same symbols: "Subsequent use of the definite article[] 'the' … in a claim refers back to the same term recited earlier in the claim."); *Traxcell Techs., LLC v. Nokia Sols. & Networks Oy*, 15 F.4th 1136, 1143–44 (Fed. Cir. 2021) (holding that "a computer" and "the computer" refer to a single computer: "As a matter of plain language, reciting "a computer" (or a "first computer") that performs a function, and then further reciting that "the computer" (or "said first computer") performs multiple additional functions, suggests that such "computer" must be tied to all those functions."); *ABS Glob., Inc. v. Cytonome/St, LLC*, 84 F.4th 1034, 1040 (Fed. Cir. 2023) ("The reference-back 'the' language takes its meaning from the meaning of the antecedent…."). *See generally Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1356 (Fed. Cir. 2003) ("[I]t is a rule of law well established that the definite article 'the' particularizes the subject which it precedes. It is a word of limitation as opposed to the indefinite or generalizing force of 'a' or 'an.'").

The claims confirm this common sense reading by referring expressly to "the primary nucleic acid-tagged cDNA molecules *of (e)*." *E.g.*, Ex. 5 ('065 Patent) at 30:61-63; Shalek Dec. ¶¶ 65-71. The parties agreed phrase refers to "the primary nucleic acid-tagged cDNA molecules ***that were produced in step (e)***." D.I. 108-1 at 15. Consequently, infringement requires both producing "primary nucleic acid-tagged cDNA molecules" in step (e) and then coupling tags to those *same* "primary nucleic acid-tagged cDNA molecules" in step (i).

### 2. Use of the Accused ScaleBio Products Does Not Infringe Because No Molecule Is Both Produced in Step (e) and Tagged in Step (i).

Parse asserts that step (e) is met by the Indexed Ligation reaction that occurs with Split 2. Ex. 22 (Satija Op. Rep.) ¶¶ 244-252, 460-468, 666-674. And Parse relies on the "Indexed PCR" reaction that occurs in Split 3 to meet step (i). *Id.* ¶¶ 288-297, 505-514, 711-720.

But molecules that are produced by the Indexed Ligation reaction cannot be "the primary nucleic acid-tagged cDNA molecules" in step (i).  By the time the "Indexed PCR" reaction occurs during Split 3, molecules that are produced by the Indexed Ligation reaction have already been altered by the intervening Tagmentation reaction, which simultaneously fragments the molecules (i.e., removes a portion of the original cDNA sequence) and attaches additional sequences to the fragment that remains.  Fact C23, C25, C26; Shalek Dec. ¶ 74.

As a result of the Tagmentation reaction, molecules that are produced by the Indexed Ligation reaction that Parse asserts meets step (e) no longer exist.  Their sequence is different, both because they lack the portion removed by fragmentation and because they gained the addition sequences.  Shalek Dec. ¶ 75.  And for that same reason, the molecule used in the "Indexed PCR" reaction during Split 3, which Parse asserts meets step (i)—the fragmented and supplemented cDNA produced in the Tagmentation reaction—did not exist during the "Split 2: Indexed Ligation" that Parse asserts meets step (e).  Shalek Dec. ¶ 75.

Consequently, there are no "primary nucleic acid-tagged cDNA molecules" that are both produced in step (e) and coupled to tags in step (i).  Shalek Dec. ¶ 76.  Without such a molecule, use of the ScaleBio Accused Products does not infringe, and summary judgment is appropriate. *E.g.*, *Amgen Inc. v. Mylan Inc.*, No. 2:17-CV-01235, 2018 WL 6061213, at *8 (W.D. Pa. Nov. 20, 2018) (citing *Wi-Lan*, 811 F.3d at 462 for the proposition that the "solubilization solution" referenced twice in the claims must be the same:  "If components were removed from a particular solubilization solution that was utilized in Step (a), it would no longer be the same solution being referred to in Step(b)."); *Celotex*, 477 U.S. at 323

Further, Parse cannot rely on the doctrine of equivalents because the requirement in step (i) that tags be coupled to "the primary nucleic acid-tagged cDNA molecules of (e)" was added

during prosecution.  Ex. 20 ('065 FH) at PARSE0000229-30; Facts C3-C7.  Prior to that amendment, the claims recited "coupling the molecules within each of the at least two secondary aliquots with the provided secondary nucleic acid tags."  *Id.* at PARSE0000075.  The amendment narrowed the claims from "the molecules within each of the at least two secondary aliquots" to "the primary nucleic acid-tagged cDNA molecules of (e)."  Shalek Dec. ¶ 78.  Because the amendment was made to overcome a rejection by the USPTO (Ex. 20 ('065 FH) at PARSE0000206-17, PARSE0000240-46), prosecution history estoppel prevents Parse from "recapturing through the doctrine of equivalents the subject matter that the applicant surrendered during prosecution."  *Integrated Tech. Corp. v. Rudolph Techs., Inc.*, 734 F.3d 1352, 1356 (Fed. Cir. 2013) ("[Prosecution history estoppel] presumptively applies when the applicant made a narrowing claim amendment related to patentability.").

## IV.    The Claims of the Asserted Parse Patents Are Invalid.

ScaleBio challenges the validity of the Challenged Parse Claims.  Fact D1.  The challenged claims of the '065 Patent are invalid for lack of written description in the application from which it issued.  The lack of description in that application means the challenged claims of the '355 and '856 Patents cannot claim priority to those applications.  And without that priority date, the challenged claims of the '355 and '856 Patents are anticipated by intervening prior art.

### A.    The Challenged Claims of the '065 Patent Lack Written Description.

"The specification shall contain a written description of the invention."  35 U.S.C. § 112(a).  The challenged claims of the '065 Patent fall short of that requirement for two reasons.

#### 1.    The Specification Does Not Disclose the Claimed Use of Reverse Transcription Primers Without "a 5' Overhang Sequence."

The '065 Patent issued from U.S. Patent Application No. 14/941,433 ("the '433 Application").  Fact D2.  When the '433 Application was filed, the original claims that recited

33

reverse transcription all required a "reverse transcription primer **comprising a 5' overhang sequence**." Fact D4. However, through a series of amendments, the application canceled the claims that required a "reverse transcription primer comprising a 5' overhang sequence" (i.e., independent claims 24, 38, and 53, and their dependent claims) and then amended claim 1 to recite a reverse transcription primer without any requirement for a 5' overhang sequence. Ex. 20 ('065 FH) at PARSE0000075-92 (original claims), PARSE0000229 (amending original claim 1); Fact D6. As a consequence, none of the claims in the '065 Patent require a reverse transcription primer comprising "a 5' overhang sequence." Ex. 5 ('065 Patent) at 29:43-32:42.

Claims are invalid for lack of written description where the claims encompass a genus (e.g., using reverse transcription primers with or without "a 5' overhang sequence"), but the specification discloses just a species of that genus (e.g., using reverse transcription primers with "a 5' overhang sequence"). *LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1345-46 (Fed. Cir. 2005) (holding that a generic method claim lacked support from disclosure of a species of the method); *see also ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1378 (Fed. Cir. 2009); *Atl. Rsch. Mktg. Sys., Inc. v. Troy*, 659 F.3d 1345, 1355 (Fed. Cir. 2011); *Anascape, Ltd. v. Nintendo of Am. Inc.*, 601 F.3d 1333, 1340 (Fed. Cir. 2010).

Under that authority, the challenged claims of the '065 Patent lack written description support because the specification of the '433 Application consistently discloses the reverse transcription primers ***having*** "a 5' overhang sequence." Ex. 20 ('065 FH) at PARSE0000045 ([0029]: "primer comprising a 5' overhang sequence"), PARSE0000051 ([0043]: primer "with a 5' overhang"), PARSE0000052 ([0045]: "primer including a 5' overhang"), PARSE0000055 ([0055]: "primer that includes the adapter sequence on the 5' end"), PARSE0000057 ([0063]: "primer comprising a 5' overhang sequence"), PARSE0000058 ([0066]: "primer comprising a

5' overhang sequence").  All depictions are of a reverse transcription primer with "a 5' overhang sequence" (e.g., sequence "1" in Figures 1, 2, and 8; sequence "u" in Figures 4 and 5; and sequence "s0" in Figures 10, 11, 14-17).  *Id.* at PARSE0000043 ([0006]-[0007]), PARSE0000054 ([0053]), PARSE0000057-58 ([0065]), PARSE0000063-64 ([0082]-[0084]), PARSE0000094-96, PARSE0000098, PARSE0000100, PARSE0000102-05; Ex. 29 (Shalek Op. Rep.) ¶¶ 101-102.

The specification explains that the 5' overhang sequence provides the function of providing "a binding sequence for nucleic acid tags."  *Id.* at PARSE0000052 ([0045]).  The "nucleic acid tag[s]" can have a sequence that is "complementary to … the 5' overhang sequence."  *Id.* at PARSE0000057 ([0064]); *see id.* at PARSE0000059 ([0068]: similar), PARSE0000057-58 (discussing Fig. 8: "[T]he highlighted cell first ends up in well 'a', wherein it is the 1st tag added to it that hybridizes to the overhang of all the cDNA transcripts….").

The '065 Patent asserts priority to U.S. Provisional Patent Application No. 62/080,005 ("the '055 Provisional," Ex. 32).  Ex. 5 ('065 Patent) at [60].  But nothing in the '055 Provisional discloses using the claimed methods with a reverse transcription primer lacking "a 5' overhang sequence."  Ex. 32 ('055 Provisional) at UW0000003-4 ([5]: "a primer comprising a 5' overhang"), UW0000004 ([6]: "a primer comprising a 5' overhang"), UW0000007 ([24]: "a primer with a 5' overhang"), UW0000012 (claim 1: "a primer comprising a 5' overhang"), UW0000013 (claim 11: "a primer comprising a 5' overhang"), UW0000016-18 (Figures 1-3 identifying the 5' overhang as sequence 1); Ex. 29 (Shalek Op. Rep.) ¶ 103.

During expert discovery, Parse never identified any disclosure in the specification or the '055 Provisional that allegedly describes using reverse transcription primers that lack "a 5' overhang sequence."  *See* Ex. 23 (Satija Reb. Rep.) ¶¶ 88-94.  Rather, Parse's expert (Dr. Satija)

disavowed any need for the original application to provide a written description—asserting "it would make little sense to do so"—on the basis that "using a reverse transcription primer without a 5' overhang would render the method inoperable." *Id.* ¶ 89.  He is wrong for two reasons:

**First**, the specification "must describe an invention understandable to that skilled artisan and show that the inventor actually invented the invention claimed." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc); *see id.* at 1353-54 ("[T]he purpose of the written description requirement is to ensure that the scope of the right to exclude, as set forth in the claims, does not overreach the scope of the inventor's contribution to the field of art as described in the patent specification.").  That obligation extends to alleged inoperable embodiments.  For example, in *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, the claims encompassed a genus of "nine metallic silicates which had been proved operative," and also other species that had proved operable, and the Supreme Court held the claims invalid because "they overclaim the invention."  336 U.S. 271, 276-77 (1949), *adhered to on reh'g*, 339 U.S. 605 (1950).[5]

**Second**, Parse's expert is wrong that using a reverse transcription primer without "a 5' overhang sequence" would be an inoperable embodiment of the claims.  *See* Ex. 23 (Satija Reb. Rep.) ¶ 89.  His claim of inoperability is based on purported challenges with "ligation of nucleic acid tags to cDNA molecules."  *Id.* ¶ 92.  But nothing in the '065 Patent's claims requires ligating the nucleic acid tags to the cDNA molecules, so any challenges to doing so do not make

---

[5] *See also Johnson & Johnston Assocs. Inc. v. R.E. Serv. Co.*, 285 F.3d 1046, 1053 (Fed. Cir. 2002) (describing *Graver Tank*: "[T]he Court found those claims too broad because they encompassed some inoperative silicates along with the nine operative metallic silicates in the specification."); *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1107 (Fed. Cir. 1996) (describing *Graver Tank*: "[T]he Court affirmed the district court's decision in which it held these broad claims to be invalid on the ground that many metal silicates embraced by the claims, but not disclosed in the specification, were inoperative.").

the **claimed method** inoperable.  Ex. 5 ('065 Patent) at 29:43-32:42.  Moreover, ligation does not require a reverse transcription primer with "a 5' overhang sequence"—as Parse's expert acknowledges.  Ex. 23 (Satija Reb. Rep.) ¶ 89 ("[N]ucleic acid tags may be ligated to a primer without overhanging ends on either molecule, referred to as blunt-end ligation."); *see* Shalek Dec. ¶¶ 95-96.  He asserts it would be "up to 100 times less efficient" (Ex. 23 (Satija Reb. Rep.) ¶ 91), but the claims do not recite any efficiency threshold, so even a less efficient method is within the scope of the claims.  Shalek Dec. ¶ 96; Ex. 31 (Shalek Reply Rep.) ¶ 32.

Alternatively, ligation of the primary nucleic acid tag could be done by providing an overhang *on the nucleic acid tag* that can bind to the reverse transcription primer without a 5' overhang sequence, which avoids altogether the concerns that Dr. Satija raises with "blunt-end ligation."  Shalek Dec. ¶¶ 84-91.  Or ligation can be done by adding an overhang after the reverse transcription step.  Shalek Dec. ¶ 93; Ex. 31 (Shalek Reply Rep.) ¶ 31.  All of these options are within the scope of the claims but are not disclosed in the specification.  Shalek Dec. ¶¶ 92, 94, 96.

Parse's expert asserts that for a primer to have a barcode sequence, it must have "a 5' overhang sequence."  Ex. 23 (Satija Reb. Rep.) ¶ 93.  That assertion only relates to a subset of the Challenged Parse Claims, since only claim 25 of the '065 Patent and the claims of the '355 and '856 Patents recite reverse transcription primers that comprise a barcode sequence.  But even as to those claims, Parse's expert is wrong since the barcode sequence could be internal to the primer and, therefore, not located in "a 5' overhang sequence."  Shalek Dec. ¶ 97-101.  Moreover, as discussed in the next subpart below, the specification does not disclose primers comprising a barcode sequence.

### 2.    The Specification Does Not Disclose Reverse Transcription Primers That "Comprise a Barcode Sequence."

The original claims of the '433 Application do not disclose reverse transcription primers that comprise a barcode sequence.  Fact D5.  However, during prosecution, the applicant added a claim that recited "wherein the primers further comprise a barcode sequence."  Ex. 20 ('065 FH) at PARSE0000961 (adding new claim 88); Fact D7.  That claim issued as claim 25 of the '065 Patent.  Ex. 5 ('065 Patent) at 32:34-35.

Although claims can lack written description support in the specification by encompassing more scope than was described, as discussed in Part IV.A.1 above, a claim can also lack written description support by adding an undescribed limitation.  The written description must be of "*the invention*, with all its claimed limitations."  *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997) (emphasis original); *see also Ariad*, 598 F.3d at 1353 (written description ensures the inventors conceived of a "complete and final invention with all its claimed limitations—and disclose the fruits of that effort to the public").

The specification does not disclose reverse transcription primers that "comprise a barcode sequence."  Ex. 29 (Shalek Op. Rep.) ¶ 107-108.  All depictions of reverse transcription primers are without a barcode sequence.  *Id.* at PARSE0000094-96 (Figs. 1, 2, 4, 5), PARSE0000098 (Fig. 8), PARSE0000100 (Fig. 10), PARSE0000102-105 (Figs. 14-17); Ex. 29 (Shalek Op. Rep.) ¶ 107.  In the only example of using a reverse transcription primer, the sequence of the primer ("BC_0055") contains just a binding sequence and an overhang sequence, but no barcode sequence.  Ex. 20 ('065 FH) at PARSE0000063-64 ([0082]), PARSE0000100 (Fig. 10: showing the sequence of "BC_0055").

The specification discloses using reverse transcription primers in a process where the barcode sequences are added after reverse transcription in the "nucleic acid tags."  *Id.* at

38

PARSE0000045-46 ([0029]), PARSE0000052 ([0045]), PARSE0000057 ([0063]).  In contrast to the reverse transcription primers, the "nucleic acid tags" expressly include barcode sequences (or "labeling sequence").  *Id.* at PARSE0000046 ([0030], PARSE0000053 ([0049]), PARSE0000057-59 ([0064]-[0068]); Ex. 29 (Shalek Op. Rep.) ¶ 108.

The only instance where the terms "reverse transcription primer" and "barcode" are used in the same phrase concerns using the primer to **select** what is subsequently barcoded:

> In some embodiments, the reverse transcription primer may be configured to reverse transcribe all, or substantially all, RNA in a cell (e.g., a random hexamer with a 5'overhang).  In some other embodiments, the reverse transcription primer may be configured to reverse transcribe RNA having a poly(A) tail (e.g., a poly(dT) primer, such as a dT(15) primer, with a 5' overhang).  In yet some other embodiments, the reverse transcription primer may be configured to reverse transcribe predetermined RNAs (e.g., a transcript-specific primer).  *For example, the reverse transcription primer may be configured to barcode specific transcripts such that fewer transcripts may be profiled per cell, but such that each of the transcripts may be profiled over a greater number of cells.*

*Id.* at PARSE0000051 ([0043]).   But as a matter of grammatical syntax, that paragraph explains the specificity of the reverse transcription primer—i.e., the targets that it is configured to bind to and transcribe.  In the first three sentences, the word "configured" refers to the targets that the primer is designed to reverse transcribe.  The final sentence (italicized) gives an example of a primer that may be designed to reverse transcribe certain targets so as to facilitate adding a barcode to just those targets in the subsequent split-pool steps.  Ex. 29 (Shalek Op. Rep.) ¶ 107; Ex. 31 (Shalek Reply Rep.) ¶¶ 39-41 (explaining the POSA's understanding of the paragraph).  A disclosure that "would lead one to speculate as to modifications that the inventor might have envisioned, but failed to disclose" is insufficient.  *Lockwood*, 107 F.3d at 1572.

Nothing additional in the '055 Provisional discloses a primer comprising a barcode sequence.  Ex. 29 (Shalek Op. Rep.) ¶109; Ex. 31 (Shalek Reply Rep.) ¶¶ 42-50.  Without any disclosure of primers that "comprise a barcode sequence" (Ex. 29 (Shalek Op. Rep.) ¶110), the

specification fails to disclose the claimed invention "with all its claimed limitations." *Lockwood*, 107 F.3d at 1572. For that independent reason, claim 25 of the '065 Patent is invalid.

**B.    The Challenged Claims of the '355 and '856 Patents Are Anticipated.**

In this motion, ScaleBio identifies one of its bases that the challenged claims of the '355 and '856 Patents are anticipated. As discussed in the following two subparts, a journal article is prior art to the challenged claims of the '355 and '856 Patents and undisputedly discloses all elements of those claims.

**1.    "Rosenberg" Is Prior Art to the '355 and '856 Patents.**

"Rosenberg" (Ex. 33) is a journal article that was published on April 31, 2018. Fact D9. The applications that issued as the '355 and '856 Patents were filed on February 25, 2021 and November 8, 2021, respectively, which is about three years after Rosenberg's publication. Fact D10. On that basis, Rosenberg is prior art to the challenged claims of the '355 and '856 Patents under 35 U.S.C § 102(a)(1), which includes "printed publications" published "before the effective filing date of the claimed invention."

To disqualify Rosenberg as prior art, Parse has the burden of showing that the challenged claims of the '355 and '856 Patents are entitled to an earlier "effective filing date." *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1327 (Fed. Cir. 2008) ("[Patent owner] has the burden of going forward with evidence either that the prior art does not actually anticipate, or, as was attempted in this case, that it is not prior art because the asserted claim is entitled to the benefit of a filing date prior to the alleged prior art.").

The only applications that could help Parse are the '433 Applicant and the '055 Provisional, which were both filed before Rosenberg's April 31, 2018 publication date. But to meet its burden, Parse must show "why the written description in the earlier application[s] support[] the claim[s]" of the '355 and '856 Patents. *Id.*; *see also Anascape*, 601 F.3d at 1337

40

("For a parent application to provide the filing date for claims of a continuing application, the description in the parent must meet the requirements of 35 U.S.C. § 112, first paragraph, as to that claimed subject matter.").

Parse cannot meet its burden because the challenged claims of the '355 and '856 Patents have the same written description issues as the challenged claims of the '065 Patent. Ex. 29 (Shalek Op. Rep.) ¶¶ 104, 110. Claim 1 in each of the '355 and '856 Patents (and all the claims that depend on them) recite in step (b) a reverse transcription primer that both (1) lacks "a 5' overhang sequence" like claim 1 of the '065 Patent and (2) comprises a "barcode sequence" like claim 25 of the '065 Patent. Fact D11. Thus, neither the '433 Application nor the '055 Provisional supports those limitations for all of the reasons discussed in Part IV.A above.

Further, claim 1 of the '856 Patent has an additional issue, since it recites that the primer's "barcode sequence is specific to each well or compartment." Ex. 7 ('856 Patent) at 29:50-51; Ex. 29 (Shalek Op. Rep.) ¶ 106. Thus, even if the Court were to find that specification discloses a primer comprising a "barcode sequence," there is no disclosure of that primer being "specific to each well or compartment." Again, only the "nucleic acid tags" are disclosed as having well-specific barcodes. And, there is no disclosure of performing the reference transcription in separate wells, so even if the primer could comprise a barcode sequence, it is not well-specific. Parse cannot meet its burden for that additional reason.

For these reasons, Parse cannot meet its burden to disqualify Rosenberg as prior art to the challenged claims of the '355 and '056 Patents. *Anascape*, 601 F.3d at 1337.

### 2. "Rosenberg" Anticipates the '355 and '856 Patents.

Rosenberg discloses "a single-cell RNA-seq (scRNA-seq) method that labels the cellular origin of RNA through combinatorial barcoding" that Rosenberg coins as "SPLiT-seq." Ex. 33 (Rosenberg) at SCALEBIO0006582 (abstract); Ex. 29 (Shalek Op. Rep.) ¶ 78. Rosenberg notes

that several of its authors are the named inventors of the '433 Application, which Rosenberg concedes "covers the SPLiT-seq method." *Id.* at SCALEBIO0006588 (col. 3).

Given Rosenberg's relationship with the '433 Application—which, again, issued as the '065 Patent and is the parent to the '355 and '856 Patents—Rosenberg unsurprisingly discloses the challenged claims of the '355 and '856 Patents:  Rosenberg disclosed all the elements of claim 1 (Fact D12), claim 5 (Fact D13), claim 6 (Fact D14), claim 14 (Fact D15), claim 19 (Fact D16), claim 22 (Fact D17), claim 25 (Fact D18), and claim 26 (Fact D19) of the '355 Patent, arranged as set forth in that claim.  Rosenberg disclosed all the elements of claim 1 (Fact D20), claim 5 (Fact D21), claim 6 (Fact D22), claim 7 (Fact D23), claim 14 (Fact D24), claim 19 (Fact D25), claim 22 (Fact D26), claim 25 (Fact D27), and claim 26 (Fact D28), of the '856 Patent, arranged as set forth in that claim.  Further, a POSA would have been able to perform the method disclosed in Rosenberg and would have expected to succeed in doing so.  Fact D29.

Parse's only argument against anticipation is that Rosenberg is not prior art.  Ex. 23 (Satija Reb. Rep.) ¶ 158.  But Parse is wrong for the reasons discussed in Part IV.B.1 above. Consequently, Rosenberg anticipates the challenged claims of the '355 and '856 Patents. *Anascape*, 601 F.3d at 1341 (reversing jury verdict of no anticipation because the claims are not entitled to a parent application's filing date and the intervening prior art undisputed closed all limitation of the claims).

## V.    Parse's Experts Should Be Precluded from Providing Certain Opinions.

Parse provided expert reports from Dr. McDuff (Exs. 36-38), Dr. Pachter (Exs. 9-11), and Dr. Satija (Exs. 22-24).  ScaleBio seeks to exclude certain of the opinions in those reports.

A.    **Dr. McDuff's Opinions Regarding the Apportionment of Value of the Asserted ScaleBio Patents Should Be Excluded.**

Pursuant to Fed. R. Evid. 702, ScaleBio moves to exclude certain unreliable opinions offered by Parse's expert Dr. McDuff who opines on a *Georgia-Pacific* analysis to determine a reasonable royalty from Parse's assumed infringement of one or more claims of the Asserted ScaleBio Patents.  Rule 702 governs the admissibility of qualified expert testimony and embodies "three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit."  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993); *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000).  With regard to the second requirement of reliability, Rule 702 mandates that the relevant expert testimony "must be supported by appropriate validation—i.e., 'good grounds,' based on what is known."  *Daubert*, 509 U.S. at 590; *see also Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3rd. Cir. 2003).  Analysis provided by experts should be "ground[ed] in the methods and procedures of science" and be "more than subjective belief or unsupported speculation."  *Daubert*, 509 U.S. at 590.

The damages experts in this case—Dr. McDuff and ScaleBio's expert witness Mr. Drew Mooney—***agree*** that for purposes of a hypothetical negotiation over Parse's infringement of the ScaleBio Asserted Patents, ███████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████ is the most "informative" available agreement.  Ex. 35 (Mooney Op. Rep.) ¶¶ 120-33; Ex. 37 (McDuff Reb. Rep.) ¶ 111b, 113a.

The stated royalty in the ███████████████████████ ████████████████████████████████████████████ ██████████████████████████████████

████████. Ex. 34 (████████████████████) at SCALEBIO_00000007-09 (████). In opining on his "alternative" reasonable royalty, Dr. McDuff starts with ████████████ representing █████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████ ████████████████████ Ex. 37 (McDuff Reb. Rep.) ¶¶ 78, 106b; Ex. 34 (████████████████ ████████) at SCALEBIO_00000009.[6] Dr. McDuff *then applies* an apportionment adjustment to this ████ in which he attempts to assign a value to ████████████ █████████████████████████████████████████████████ █████████████████████████████████████████████████████████ █████████████████████████████████████████████████ Ex. 37 (McDuff Reb. Rep.) ¶¶ 106, 113d & FIG. 5. But Dr. McDuff's apportionment draws *again* from ████████████████████████████ ██ ████████████████████████. He calculates that █████████████████████ ████████████████████ *See* Ex. 36 (McDuff Op. Rep.) at EX. C-3 (calculating the ████████████████████████). He then arbitrarily adopts the ████ ████████ and applies that to his ████████ to arrive at a ████████████ ████████████, to which he then ████████████ based on his *Georgia-Pacific* factor analysis to arrive at ██. Ex. 37 (McDuff Reb. Rep.) ¶¶ 113-115 & FIG. 5.

Dr. McDuff's ████████████████████████ and his selection of ████ "as a reasonable downward adjustment" to account for an apportioning of ████████

---

[6] Though committed to the idea that the relevant rate is what ScaleBio ████ ████████████, Dr. McDuff concedes that this ████████████████ ████████████████████████████████████████████ ████████████████████████████. Ex. 37 (McDuff Reb. Rep.) ¶ 79.

███████████████████████████████████████████████ (*id.*) are
unreliable, ungrounded in any scientific or generally adopted methodology, and conflate two
separate licensing concepts in a bid to over-depress the ██████████ starting royalty rates
articulated in the ████████████████. Such opinions should be excluded.

      **1.**     **Dr. McDuff's** ██████████████████████
██████████ **is Unreliable.**

    Dr. McDuff accounts for ████████████████████████████████ *twice* to
drive the ████████████████████████████████ *before* adjusting per his *Georgia-
Pacific* analysis. In using the so-called ██████████████████ of the Agreement (i.e., ██████
███████████████████████████████████████████████████████████
██████████████████████ ), Dr. McDuff ██████████████████████. Ex. 37
(McDuff Reb. Rep.) ¶ 106b; Ex. 36 (McDuff Op. Rep.) ¶ 45 & EX. F-2; Ex. 39 (McDuff Depo.
Tr.) at 182:3-15. He accounts for the same ██████████████████████████████
███████████████████████████████ when he calculates the ██████████████
███████████████████████████ Ex. 36 (McDuff Op. Rep.) ¶ 88a &
EXS. C-1, C-2, C-3; Ex. 39 (McDuff Depo. Tr.) at 184:21-186:18. Dr. McDuff provides no
explanation, case citation, literature article, study, or any other piece of guidance suggesting that
such a heavy reliance on ██████████████ to drive a stated royalty rate down in a hypothetical
negotiation analysis is appropriate. And there is no logic to his methodology.

    A stacking provision is a risk-mitigation tool used in licensing agreements, pre-
commercialization, and is designed to avoid a scenario where the ultimate royalty burden of a
commercial product becomes too high to warrant bringing the commercial product to market at
all. Ex. 39 (McDuff Depo. Tr.) at 351:14-352:20; Ex. 40 (Guan) at 7. Stacking provisions are
used by parties to such an agreement *before* they have any insight into just how high such a

royalty burden may be under the theory that a licensor would be willing to reduce its royalty rate

to help facilitate a commercial product making it to market rather than face a scenario where no

product is ever sold and the licensor collects no royalties at all.

██████████████████████████████████████████████████████████████

███████████████████████████████████  Ex. 39 (McDuff Depo. Tr.) at 316:22-

318:18.  By contrast, the hypothetical negotiation takes place between ***competitors*** in the

instrument-free and highly-scalable segment of the Single Cell Analysis Market for

commercially-ready, competitive products.  Ex. 39 (McDuff Depo Tr.) at 155:16-156:11.  There

is simply no evidence—and Dr. McDuff cites none—that ████████████████████

███████████████████████  would have such an outsized impact on the parties'

valuation of the infringed Asserted ScaleBio Patents in the hypothetical negotiation.

2.      ████████████████████████████  **Is
An Unreliable Benchmark for Apportionment
of** ████████████████████████████.

Dr. McDuff concedes that for ███████████████  he examined (███████████

███████████  and two others ████████████████████), the ██████████████████

██████████████████████████████████████████████████████████████

███████████.  Ex. 39 (McDuff Depo. Tr.) at 355:20-356:9.  However, his analysis assumes

that what the parties to the ███████████████  would have agreed to for purposes of

valuing the ████████████████████████████  (assuming that █

███████████  can be interpreted that way which ScaleBio does not concede it can) is

informative for answering the question of what the value of ██████████████████

████████████████████████████████.  What Dr. McDuff

alleges is that ████████████████████████████████████

██████████████████████████████████████████████████████████████

46

████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████. Dr. McDuff offers no explanation or rationale whatsoever for why this would be true other than his bald assertion, without support or detail, that the two comparisons are "economically analogous" because they both ███████████████████████. Ex. 39 (McDuff Depo. Tr.) at 189:7-195:9. When pressed to explain what basis he had to say such comparisons were "economically analogous," Dr. McDuff retreated to what was "in [his] mind, as an economist." *Id.* at 348:14-351:12. Dr. McDuff agrees that the hypothetical negotiation itself would not include a stacking provision. *Id.* at 327:7-328:7. And so his unsupported reliance on that provision, with no clear link between its purpose in the comparable agreements and the apportionment he seeks to accomplish is unreliable, misleading, and should be excluded.

     **3.**    **Dr. McDuff Cites No Evidence That ██████████████ Sheds Light on the ████████████████████.**

    Dr. McDuff cites a series of literature articles and cases to purportedly support his apportionment analysis. Ex. 38 (McDuff Reply Rep.) ¶¶ 15-24. However, none of these materials relates to the idea Dr. McDuff advances—that stacking provision percentages can serve as a "benchmark" for how parties to a hypothetical negotiation would value ████████████████ ████████████████████. While the Lee article calls for the need for accurate apportionment methodologies, it also cautions courts "to exclude unreliable apportionment theories or gamesmanship.... Many of these 'models' have not been published, peer reviewed, or validated in any way." Ex. 41 (Lee) at 264. Dr. McDuff's reliance on ████████████████ ████████████████ is just such an unvalidated methodology that will mislead the jury to link the motivations and practical considerations of ███████████████████ with the unrelated considerations of how parties would undertake a hypothetical negotiation for

infringed patents.  Likewise, many of Dr. McDuff's articles discuss the use of royalty stacking

provisions in apportionment scenarios where the asserted patents cover only a small component

of the accused products, but ***none*** of them point to use of a stacking provision in a comparable

license to ███████████████████████████  Ex. 42 (Lemley) at 38 ("Parties

negotiating royalty rates for a ***patent covering a component*** of a product rationally ought to take

into account of the value of the patented contribution…").  ***Neither*** expert in this case opines that

█████████████████████████████████████████████████.  Ex. 39

(McDuff Depo. Tr.) at 165:3-19.

Finally, Dr. McDuff cites the *Bio-Rad* case as an example of an expert's reliance "on

stacking provisions for royalties paid outside of an agreement to adjust royalty rates within a

comparable agreement."  Ex. 38 (McDuff Reply Rep.) ¶ 23.  However, in the *Bio-Rad* case, the

expert's testimony was allowed over Plaintiff's "double benefiting" objection (relating to the fact

that the third-party agreement also included a stacking provision); the analysis there ***did not***

relate to use of a stacking provision to apportion ████████████████████.

*Bio-Rad Laby's, Inc. v. 10X Genomics Inc.*, No. 1:15-cv-00152-RGA, 2018 WL 4691047, at *4

(D. Del. Sept. 28, 2018) (D.I. 361).

Ultimately, Dr. McDuff can identify no case, article, study, or other piece of literature

where a stacking provision—which is a pre-development risk-mitigation tool reducing a royalty

obligation relative to ***third-party IP***—was used to apportion value of ████████████

█████████████████████████  as such value would be understood

by parties to a hypothetical negotiation.  Unreliable and unsupported testimony attempting to

assess the value of asserted patents to a party in a hypothetical negotiation should be excluded.

*See Medtronic, Inc. v. Axonics Modulation Techs., Inc.*, No. 8:19-cv-02115, 2024 WL 4406929, at *43-44 (C.D. Cal., Aug. 29, 2024) (D.I. 549).

### B.    Dr. Satija and Dr. Pachter Do Not Meet Their Own Definition of a POSA and Should Be Precluded from Testifying From the Perspective of a POSA.

"[T]o be qualified to offer expert testimony on issues from the vantage point of an ordinarily skilled artisan in a patent case, an expert must at a minimum possess ordinary skill in the art." *Kyocera Senco Indus. Tools Inc. v. ITC*, 22 F.4th 1369, 1376-78 (Fed. Cir. 2022) (abuse of discretion to admit non-POSA testimony "on any issue that is analyzed through the lens of an ordinarily skilled artisan" including on "claim construction, validity, or infringement").

Dr. Satija and Dr. Pachter agree that a POSA has an advanced degree in "molecular biology, genetics, biochemistry, biophysics, chemistry, or a related discipline." Ex. 9 (Pachter Op. Rep.) ¶ 11; Ex. 10 (Pachter Reb. Rep.) ¶ 13; Ex. 22 (Satija Op. Rep.) ¶ 21; Ex. 23 (Satija Reb. Rep.) ¶ 10.  However, neither of them has such a degree; Dr. Pachter's advanced degree is in Mathematics, and Dr. Satija's advanced degree is in Statistics.  Ex. 9 (Pachter Op. Rep.) ¶ 8; Ex. 22 (Satija Op. Rep.) ¶ 9.

Both are experts in the *analysis* of data derived from single-cell sequencing.  But that does not mean their degrees are in "a related discipline," because as Dr. Pachter acknowledges, a POSA in this case must have "ordinary skill in the field of molecular biology" specifically.  Ex. 9 (Pachter Op. Rep.) ¶ 2; Ex. 10 (Pachter Reb. Rep.) ¶ 5.  Both side's patents are about the techniques for performing those techniques, not for analyzing the resulting data.  *E.g.*, Ex. 4 ('752 Patent) at 57:50-51 (claim 1: "kit for split-pool barcoding target molecules that are in or on cells or cell organelles…."); Ex. 5 ('065 Patent) at 29:44-45 ("A method of [] cell-specifically labeling RNA molecules within a plurality of cells….").

Although Dr. Pachter and Dr. Satija may testify in the area of their expertise, ScaleBio requests that both be precluded from opining "on any issue that is analyzed through the lens of an ordinarily skilled artisan" (*Kyocera*, 22 F.4th at 1376-78) related to the field of the molecular biology of single-cell sequencing, including such opinions in the following paragraphs: Ex. 9 (Pachter Op. Rep.) ¶¶ 78, 79, 81-463 (claim construction and validity of the Asserted ScaleBio Claims); Ex. 11 (Pachter Reply Rep.) ¶¶ 49, 50, 52-273 (same); Ex.10 (Pachter Reb. Rep.) ¶¶ 73-84, 109-358 (claim construction, infringement, and embodiment of the Asserted ScaleBio Claims); Ex. 22 (Satija Op. Rep.) ¶¶ 148-788 (claim construction and infringement regarding the Asserted Parse Claims); Ex. 24 (Satija Reply Rep.) ¶¶ 48-159 (same); Ex. 23 (Satija Reb. Rep.) ¶¶ 86-159 (claim construction and validity of the Challenged Parse Claims).

## CONCLUSION

Plaintiff and Counterclaim Defendant ScaleBio respectfully requests that the Court grant its motions for summary judgment and to exclude certain opinion testimony.

OF COUNSEL:

Stephen S. Rabinowitz
srabinowitz@wolfgreenfield.com
WOLF, GREENFIELD, & SACKS, P.C.
605 Third Avenue
New York, NY 10158
212.697.7890

Chelsea A. Loughran
cloughran@wolfgreenfield.com
Stuart V.C. Duncan Smith
sduncansmith@wolfgreenfield.com
Emma L. Frank
efrank@wolfgreenfield.com
Arden E. Bonzo
abonzo@wolfgreenfield.com
WOLF, GREENFIELD, & SACKS, P.C.
600 Atlantic Avenue
Boston, MA 02210
617.646.8000

/s/ *Sara M. Metzler*
Kelly E. Farnan (#4395)
farnan@rlf.com
Sara M. Metzler (#6509)
metzler@rlf.com
RICHARDS, LAYTON, & FINGER, P.A.
920 North King Street
One Rodney Square
Wilmington, DE 19801
302.651.7700

*Counsel for Plaintiff Scale Biosciences, Inc.*

Dated: February 24, 2025

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 24, 2025, true and correct copies of the foregoing

document were caused to be served on the following counsel of record as indicated:

<u>BY ELECTRONIC MAIL</u>
Karen L. Pascale
Robert M. Vrana
Young Conaway Stargatt & Taylor, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801

<u>BY ELECTRONIC MAIL</u>
Byron L. Pickard
R. Wilson Powers III, Ph.D.
Chandrika Vira
Christopher M. Gallo, Ph.D.
Brady P. Gleason
Louis P. Panzica, Jr.
David Y. Wang
Jamie Dohopolski
Ryan N. Kaiser
Cristen A. Corry
Sterne, Kessler, Goldstein & Fox, P.L.L.C.
1101 K Street, NW, 10th Floor
Washington, DC 20005

*/s/ Sara M. Metzler*
Sara M. Metzler (#6509)
metzler@rlf.com