## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SCALE BIOSCIENCES, INC.,<br><br>and<br><br>ROCHE SEQUENCING SOLUTIONS, INC.,<br><br>Plaintiffs.<br>v.<br><br>PARSE BIOSCIENCES, INC.,<br><br>Defendant. | Civil Action No.  1:22-CV-01597-CJB<br><br>**REDACTED**<br>**PUBLIC VERSION** |
| PARSE BIOSCIENCES, INC.,<br><br>and<br><br>UNIVERSITY OF WASHINGTON,<br><br>Counterclaim Plaintiffs,<br>v.<br><br>SCALE BIOSCIENCES, INC.,<br><br>Counterclaim Defendant. | |

**SCALE BIOSCIENCES, INC.'S ANSWERING BRIEF IN
OPPOSITION TO PARSE'S MOTIONS FOR SUMMARY
JUDGMENT AND TO EXCLUDE EXPERT OPINIONS AND TESTIMONY**

## <u>TABLE OF CONTENTS</u>

I.    Parse's MSJ #1 Should Be Denied. ........................................................................ 1

  A.   MSJ #1 Should Be Denied As to the '752 Patent. ..................................... 1

      1.   The Patent Need Only Describe and Enable the Invention as Claimed...............3

          a.   Only the "Claimed" Invention Need Be Described. ......................4

          b.   Only the "Claimed" Invention Need Be Enabled. ........................6

      2.   Summary Judgment of Invalidity Should Be Denied. ...........................7

  B.   MSJ #1 Should Be Denied As to the '442 Patent. ..................................... 9

      1.   Claim 11 of the '442 Patent Requires "Hybridizing" a Nucleic Acid Linker to a Nucleic Acid Target. ........................................10

      2.   Summary Judgment of Invalidity Should Be Denied. ...........................11

          a.   The Requirement for "Hybridizing" Makes Antibodies and Peptide Aptamers Immaterial. ............................11

          b.   ScaleBio's Evidence Creates Genuine Issues of Material Fact That Preclude Summary Judgment. ....................12

  C.   MSJ #1 Should Be Denied As to the '256 Patent. ..................................... 14

      1.   The Challenged Claims of the '256 Patent Require Binding Nucleic Acid Targets to UBA Nucleic Acid Tags. ........................14

      2.   Summary Judgment of Invalidity Should Be Denied. ...........................14

  D.   MSJ #1 Should Be Denied for the Separate and Independent Reason That the '442 and '256 Patents Claim Methods, Not Compounds. ......................... 15

II.   Parse's MSJ #2 Should Be Denied. ..................................................................... 16

  A.   MSJ #2 Should Be Denied As to the '752 Patent. ..................................... 17

      1.   The Specification Describes UBAs and ESBs As Optional for Kits. ................17

      2.   Parse's Evidence About Lack of Utility Is Disputed. ........................17

  B.   MSJ #2 Should Be Denied As to the '422, '256, and '341 Patents. .......................... 18

      1.   The Specification Describes UBAs and ESBs As Optional. ....................18

      2.   The Challenged Claims of the '442, '256, and '341 Patents Do Not Omit Any "Concepts" That Are Essential. ............................20

III.  Parse's MSJ #3 Should Be Denied. ..................................................................... 22

  A.   "Target Molecules" Should Be Construed to Mean "Molecules of Interest That Are Being Detected or Quantified" Without Further Limitation. ..................... 22

      1.   ScaleBio's Construction Accords With the Definition of "Target Molecules" in the Specification. ........................23

i

    2.    Parse's Construction Relies on a Flawed Reading of the Specification That the Court Has Already Rejected in Construing "UBA." .................24

    3.    Relevant Extrinsic Evidence Does Not Support Parse's Construction. .............25

  B.   The Accused Parse Products Selectively Label Target Molecules That Are Defined by the Binding Regions of the Primers In Those Products. .........................29

  C.   The Preamble of Claim 1 of the '752 Patent Is Not Limiting. ......................................30

IV.   Parse's MSJ #4 Should Be Denied As Moot. ........................................................32

V.    Parse's *Daubert* Motions Regarding Mr. Mooney Should Be Denied. ...............................33

  A.   Mr. Mooney's Reliance on the ███████████ Should Not Be Excluded. ............33

    1.    The Damages Experts Agree that ████████████ is the Most Relevant License At The Hypothetical Negotiation. .........................................33

    2.    Mr. Mooney Performed a Reliable and Valid Apportionment Analysis. ..........34

        a.    Mr. Mooney's First Apportionment Dealt With Whether the Asserted Patents Were Directed to a Component of the Saleable Units of the Royalty Base or the Full Units Themselves. ........................34

        b.    Mr. Mooney Also Performed an Apportionment to Address ████████████████████████████████ ..........................37

    3.    The Mechanics of Mr. Mooney's Apportionment Calculation Were Reliable and Based On the Available Evidence. ................................................41

  B.   Mr. Mooney's Reliance Upon ████████████████████████████ Should Not Be Excluded. .....................................43

    1.    ████████████████████████████████. .........................43

    2.    The Material Relied Upon From Mr. Mooney's ████████████████ is Consistent With Other Evidence in this Case and Can Be Probed for Credibility at Trial. ..................................................................................45

VI.   Parse's *Daubert* Motion Regarding Dr. Paz Should Be Denied. ..........................................45

  A.   Dr. Paz Is Eminently Qualified as a Market Expert. .....................................................46

  B.   Dr. Paz's Instrument Free and Highly Scalable Market Definition Is Based on Her Extensive Experience Analyzing Markets. ...........................................................48

  C.   Dr. Paz's Opinions On the Impact of ████████████████ on ScaleBio Is Based on Her Experience with Similar Outcomes in Other Markets. ....................... 50

## **TABLE OF AUTHORITIES**

### CASES

*10x Genomics, Inc. v. Parse Biosciences, Inc.*,
No. CV 22-1117, 2025 WL 572788 (D. Del. Feb. 21, 2025) ................................ 40, 45, 46, 48

*360Heros, Inc. v. GoPro, Inc.*,
569 F. Supp. 3d 198 (D. Del. 2021) ................................................................................ 48, 50

*ActiveVideo Networks, Inc. v. Verizon Communs., Inc.*,
694 F.3d 1312 (Fed. Cir. 2012) ............................................................................................ 43

*Ajinomoto Co. v. Int'l Trade Comm'n*,
932 F.3d 1342 (Fed. Cir. 2019) ............................................................................................ 12

*Allergan USA, Inc. v. MSN Laboratories Private Ltd.*
111 F.4th 1358 (Fed. Cir. 2024) ....................................................................................... 8, 20

*Allscripts Healthcare, LLC v. Andor Health, LLC*,
2022 WL 3021560 (D. Del. July 29, 2022) ........................................................................... 50

*Already, LLC v. Nike, Inc.*,
568 U.S. 85 (2013) ................................................................................................................ 32

*Amgen Inc. v. Sanofi*,
598 U.S. 594 (2023) ................................................................................................... 6, 11, 12

*Amgen Inc. v. Sanofi*,
872 F.3d 1367 (Fed. Cir. 2017) .............................................................................................. 3

*Arctic Cat Inc. v. GEP Power Prods., Inc.*,
919 F.3d 1320 (Fed. Cir. 2019) ...................................................................................... 30, 31

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
598 F.3d 1336, 1351 (Fed. Cir. 2010) *(en banc)* ........................................................... passim

*Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*,
672 F.3d 1335 (Fed. Cir. 2012) ............................................................................................ 31

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com. Inc.*,
289 F.3d 801 (Fed. Cir. 2002) ...................................................................................... 30, 31

*Cordis Corp. v. Medtronic Ave, Inc.*,
339 F.3d 1352 (Fed. Cir. 2003) .............................................................................................. 4

*Cornell Univ. v. Hewlett-Packard Co.*,
654 F. Supp. 2d 119 (N.D.N.Y. 2009) ................................................................................... 5

*DeGeorge v. Bernier*,
    768 F.2d 1318 (Fed. Cir. 1985) ................................................................. 6

*Dialect, LLC v. Amazon.com Inc.*,
    2024 WL 4123507 (E.D. Va. 2024) ........................................................... 44

*Dialect, LLC v. Amazon.com, Inc.*,
    No. 1:23CV581 (DJN), 2024 WL 4010111 (E.D. Va. Aug. 30, 2024) .................... 7

*Dolbear v. Am. Bell Tel. Co.*,
    126 U.S. 1 (1888) ................................................................................. 16

*Edwards Lifesciences AG v. CoreValve, Inc.*,
    699 F.3d 1305 (Fed. Cir. 2012) ............................................................... 16

*Emerson Elec. Co. v. Suzhou Cleva Elec. Appliance Co.*,
    2015 WL 8916113 (E.D. Mo. Dec. 15, 2015) .............................................. 43

*Enzo Biochem, Inc. v. Gen-Probe Inc.*,
    323 F.3d 956 (Fed. Cir. 2002) ........................................................... 1, 12

*Evans v. Imo Indus., Inc.*,
    2019 WL 3253781 (D. Del. July 19, 2019) ................................................. 47

*Fundamental Innovation Sys. Int's v. Anker Innovations Ltd.*,
    2025 WL 459916 (D. Del. Feb. 11, 2025) .................................................. 39

*Georgia-Pacific Corp. v. U.S. Plywood-Corp.*,
    318 F. Supp. 1116 (S.D.N.Y. 1970) ..................................................... 33, 39

*Guardant Health, Inc. v. Found. Med., Inc.*,
    2020 WL 2461551 (D. Del. May 7, 2020) .................................................. 39

*Hammond v. Int'l Harvester Co.*,
    691 F.2d 646 (3d Cir. 1982) ................................................................... 47

*Hologic, Inc. v. Minerva Surgical, Inc.*,
    325 F. Supp. 3d 507 (D. Del. 2018) ....................................................... 5, 7

*ICU Med., Inc. v. Alaris Med. Sys., Inc.*,
    558 F.3d 1368 (Fed. Cir. 2009) ............................................................... 20

*In re Entresto*,
    125 F.4th 1090 (Fed. Cir. 2025) ........................................................ passim

*In re Paoli R.R. Yard PCB Litig.*,
    35 F.3d 717 (3d Cir. 1994) .................................................................... 46

iv

*Int'l Rectifier Corp. v. IXYS Corp.*,
No. CV-00-6756-R(CTX), 2001 WL 37124503 (C.D. Cal. July 25, 2001) ............................ 5

*INVISTA N. Am. S.À.R.L. v. M & G USA Corp.*,
951 F. Supp. 2d 626, 635, 652 (D. Del. 2013) ........................................................ 8

*Invitrogen Corp. v. Clontech Lab'ys, Inc.*,
429 F.3d 1052 (Fed. Cir. 2005) ................................................................... 1, 9

*Janssen Pharms., Inc. v. Tolmar, Inc.*,
718 F. Supp. 3d 394 (D. Del. 2024) ................................................................. 7

*Juno Therapeutics, Inc. v. Kite Pharmaceuticals, Inc.*,
10 F.4th 1330 (Fed. Cir. 2021) ................................................................ 9, 12

*Knight v. Otis Elevator Co.*,
596 F.2d 84 (3d Cir. 1979) ...................................................................... 47

*Koninklijke Philips Elecs. N.V. v. Zoll Lifecor Corp.*,
2017 WL 3140798 (W.D. Pa. July 25, 2017) ........................................................ 44

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) ............................................................................ 48

*Lochner Techs., LLC v. Vizio, Inc.*,
567 F. App'x 931 (Fed. Cir. 2014) ............................................................ 4, 6, 9

*Markman v. Westview Instr., Inc.*,
52 F.3d 967 (Fed. Cir. 1995) *(en banc)* ............................................................ 25

*Marrin v. Griffin*,
599 F.3 1290 (Fed. Cir. 2010) ................................................................... 31

*Martek Bioscience Corp. v. Nutrinova, Inc.*,
579 F.3d 1362 (Fed. Cir. 2009) .................................................................. 23

*Omega Patents, LLC v. CalAmp Corp.*,
13 F.4th 1361 (Fed. Cir. 2021) .................................................................. 35

*Pers. Audio, LLC v. Google LLC*,
No. CV 17-1751-CFC-CJB, 2021 WL 5038740 (D. Del. Oct. 25, 2021) ........................... 49, 50

*Pineda v. Ford Motor Co.*,
520 F.3d 237 (3d Cir. 2008) ..................................................................... 46

*Science Applications Int'l Corp. v. United States*,
2024 WL 94499 (Ct. Fed. Cl. 2024) .............................................................. 44

*Shire Dev., LLC v. Watson Pharms., Inc.*,
  787 F.3d 1359 (Fed. Cir. 2015) ........................................................ 27

*Spectrum Pharms., Inc. v. Innopharma, Inc.*,
  No. 12-260-RGA-CJB, 2015 WL 3374922 (D. Del. May 22, 2015) ...................................... 32

*Summit 6, LLC v. Samsung Elecs. Co.*,
  802 F.3d 1283 (Fed. Cir. 2015) ........................................................ 50

*Sunoco Partners Mktg. & Terminals L.P. v. Powder Springs Logistics, LLC*,
  No. CV 17-1390-LPS-CJB, 2020 WL 1234822 (D. Del. Mar. 13, 2020) ................................ 5

*Symantec Corp. v. Comput. Assocs. Int'l, Inc.*,
  522 F.3d 1279 (Fed. Cir. 2008) ........................................................ 27

*SZ DJI Tech. Co. v. Autel Robotics USA LLC*,
  No. CV 16-706-LPS, 2021 WL 1910037, (D. Del. May 12, 2021) ........................................ 18

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
  789 F. 3d 1335 (Fed. Cir. 2015) ........................................................ 27

*Thorner v. Sony Computer Ent. Am. LLC*,
  669 F.3d 1362 (Fed. Cir. 2012) ........................................................ 25

*TwinStrand Biosciences, Inc. v. Guardant Health, Inc.*,
  No. CV 21-1126-GBWSRF, 2023 WL 3773700 (D. Del. June 2, 2023) ................................ 19

*Uniloc USA, Inc. v. Microsoft Corp.*,
  632 F.3d 1292 (Fed. Cir. 2011) ........................................................ 41

*United Therapeutics Corp. v. Liquidia Techs., Inc.*,
  74 F.4th 1360 (Fed. Cir. 2023) ........................................................ 5, 6

*Utter v. Hiraga*,
  845 F.2d 993 (Fed. Cir. 1988) ........................................................ 4

*ZF Meritor, LLC v. Eaton Corp.*,
  696 F.3d 254 (3d Cir. 2012) ........................................................ 50

*Zimmer Surgical, Inc. v. Stryker Corp.*,
  365 F. Supp. 3d 466 (D. Del. 2019) ........................................................ 37, 43

**STATUTES**

35 U.S.C. § 112 ........................................................ 4, 6

35 U.S.C. § 282 (1994) ........................................................ 1

**OTHER AUTHORITIES**

Robert A. Matthews, Jr., Annotated Patent Digest (2020) ............................................................. 5

**TABLE OF EXHIBITS**[1]

| Ex. | Name | Description |
|---|---|---|
| *Exhibits Filed With Parse's Motions (D.I. 328 & 329)* | | |
| 1 | '442 Patent | U.S Patent No. 10,626,442 |
| 2 | '256 Patent | U.S. Patent No. 10,982,256 |
| 3 | '341 Patent | U.S. Patent No. 11,512,341 |
| 4 | '752 Patent | U.S. Patent No. 11,634,752 |
| 9 | Paz Op. Rep. | Excerpts of the October 10, 2024 Opening Expert Report of Maria Fe Paz De Paz Regarding the Single Cell Analysis Market |
| 17 | Paz Reply Rep. | Excerpts of the December 13, 2024 Reply Expert Report of Maria Fe Paz De Paz Regarding the Single Cell Analysis Market |
| 23 | Paz Tr. | Excerpts of the Transcript of the Deposition of Maria Fe Paz De Paz, M.D., Ph.D., MBA, taken January 29, 2025 |
| 26 | Nolan 2014 | U.S. Patent Application Publication No. US 2023/0049314 |
| *Exhibits Filed Herewith* | | |
| A | Sims Op. Rep. | Excerpts of the October 10, 2024 Opening Expert Report of Peter A. Sims, Ph.D. Regarding Parse's Infringement of the Asserted ScaleBio Claims |
| B | Sims Reb. Rep. | Excerpts of the November 12, 2024 Rebuttal Expert Report of Peter A. Sims, Ph.D. Regarding Validity of the Asserted ScaleBio Claims |
| C | Pachter Tr. | Excerpts of the Transcript of the Deposition of Lior S. Pachter, Ph.D., taken on February 10, 2025 |
| D | Darnell 1986 | Excerpts of James Darnell et al., Molecular Cell Biology (1986) |
| E | Darnell 1990 | Excerpts of James Darnell et al., Molecular Cell Biology (2d 1990) |
| F | Lewin | Excerpts of Benjamin Lewin, Genes IV (4th 1990) |

---

[1] Exhibits identified solely by number are attached to the declaration filed with Parse's motions. D.I. 328 & 329.  Exhibits identified by letters are attached to the Second Declaration of Emma L. Frank filed herewith.  Certain additional numbered exhibits were filed with ScaleBio's motions (D.I. 308 & 326), which ScaleBio does not refile here to avoid duplicative exhibits, and are identified with express reference to that declaration using D.I. numbers.

| Ex. | Name | Description |
|---|---|---|
| G | Kornberg 1980 | Excerpts of Arthur Kornberg, DNA Replication (2d 1980) |
| H | Alberts | Excerpts of Bruce Alberts et al., Molecular Biology of the Cell (6th ed. 2015) |
| I | Maniatis | Excerpts of T. Maniatis et al., Molecular Cloning, A Laboratory Manual (1982) |
| J | '938 Patent | U.S. Patent No. 6,582,938 |
| K | Horoszewicz Pat. | U.S. Patent No. 5,162,504 |
| L | Horoszewicz 1987 | Julius S. Horoszewicz et al., Monoclonal Antibodies to a New Antigenic Marker in Epithelial Prostatic Cells and Serum of Prostatic Cancer Patients, *Anticancer Research* 7:927-926 (1987) |
| M | Chang | Sam S. Chang, Prostate-Specific Membrane Antigen: Present and Future Applications, *Urology* 5:622-629 (2000) |
| N | Boulton | Teri G. Boulton et al., ERKs: A Family of Protein-Serine/Threonine Kinases That Are Activated and Tyrosine Phosphorylated in Response to Insulin and NGF, *Cell* 65: 663-675 (1991) |
| O | EPR17526 Product Sheet | Product information sheet for "Anti-ERK-1 + ERK-2 antibody [EPR17526]" (Abcam Ltd., Cambridge) |
| P | ERK-7D8 Product Sheet | Product information sheet for "Anti-ERK1 + ERK2 antibody [ERK-7D8]" (Abcam Ltd., Cambridge, UK) |
| Q | McDuff Tr. | Excerpts of the Transcript of the Deposition of Robert DeForest McDuff, taken on January 28, 2025 |
| R | ██████ | ████████████████████████████████████ |
| S | Paz Tr. | Excerpts of the Transcript of Maria Fe Paz De Paz, taken on January 29, 2025 |
| T | ██████ | ████████████████████████████ |
| U | ScaleBio 30(b)(6) Notice | July 2, 2024 Email from E. Frank re Parse Biosciences, Inc.'s Notice of 30(b)(6) Deposition of Scale Biosciences, Inc. and aforementioned Notice |
| V | ██████████ | ███████████████████████████████ |

| Ex. | Name | Description |
|---|---|---|
| *Exhibits Filed With ScaleBio's Motions (D.I. 308 & 326)* | | |
| D.I. 308, Ex. 8 | Parse's Invalidity Contentions | Excerpts of Parse's Final Invalidity Contentions |
| D.I. 308, Ex. 9 | Pachter Op. Rep. | October 10, 2024 Opening Expert Report of Lior Pachter, Ph.D. on the Invalidity of U.S. Patent Nos. 10,626,442, 10,982,256, 11,512,341, and 11,634,752 |
| D.I. 308, Ex. 10 | Pachter Reb. Rep. | November 12, 2024 Rebuttal Expert Report of Lior Pachter, Ph.D. on Non-Infringement |
| D.I. 326, Ex. 14 | Sims Reply Rep. | Excerpts of the December 13, 2024 Reply Expert Report of Peter A. Sims Ph.D. Regarding Parse's Infringement of the Asserted ScaleBio Claims |

Plaintiff Scale Biosciences, Inc. ("ScaleBio") hereby answers and opposes Defendant Parse Biosciences, Inc.'s ("Parse") four motions for summary judgment (D.I. 314, 316, 318, 322) and three motions to exclude expert testimony (D.I. 310, 311, 312). Pursuant to Paragraph 17(c) of the Amended Scheduling Order (D.I. 52), ScaleBio responds to Parse's "Concise Statements of Undisputed Facts" (D.I. 315, 317, 320, 323). Pursuant to Paragraph 7(f)(ii) of that Order, ScaleBio also submits a declaration from Dr. Peter Sims ("Sims 2nd Dec."). The authenticity of certain exhibits is established by an attorney declaration ("Frank 2nd Dec."). For the reasons discussed below, Parse's motions should be denied.

## I.    Parse's MSJ #1 Should Be Denied.

Parse's MSJ #1 asserts that claims of the '752, '442, and '256 Patents are invalid for lack of written description and enablement. D.I. 325 ("Parse Br.") at 5-6, 12-19; D.I. 314 (motion and proposed order). Parse's MSJ #1 does not address or seek invalidity of the '341 Patent.

Written description is a question of fact. *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc). Enablement is a question of law with underlying questions of fact. *Invitrogen Corp. v. Clontech Lab'ys, Inc.*, 429 F.3d 1052, 1072 (Fed. Cir. 2005). "A patent is presumed to be valid, 35 U.S.C. § 282 (1994), and this presumption can be overcome only by facts supported by clear and convincing evidence to the contrary." *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 323 F.3d 956, 962 (Fed. Cir. 2002). Parse has not met and cannot meet its burden, so MSJ #1 should be denied.

### A.    MSJ #1 Should Be Denied As to the '752 Patent.

Parse contends that claims 1, 2, 6-11, and 14 (the "Challenged Kit Claims") of the '752 Patent lack description or enablement because they "cover using a 'UBA,'" which purportedly "covers vast categories of classes of molecules, including antibodies and aptamers." Parse Br. at

4. Parse's challenge is misdirected. UBAs are not part of the invention as claimed in the Challenged Kit Claims and, accordingly, need not be described or enabled.

Claim 1 of the '752 Patent is directed to a "kit" that comprises two types of oligonucleotides specified in the claim limitations:

> (i) at least two sets of assayable polymer subunit (APS) oligonucleotides, wherein each set comprises at least 10 APS oligonucleotides that each comprise [specified sequence requirements]; and
>
> (ii) one or more linking oligonucleotides [that satisfy specified sequence complementarity requirements],
>
> wherein the APS oligonucleotides from different sets are configured to link together in an ordered fashion in the presence of the one or more linking oligonucleotides to form all or part of a cell or organelle origination barcode.

Ex. 4 ('752 Patent) at 57:52-58:3. Notably absent from claim 1 is any requirement for a UBA—or for that matter, antibodies or aptamers. The same is true for the other Challenged Kit Claims of the '752 Patent. *Id*. at 58:4-7; 58:17-61, 59:1-4; *see also* Sims 2nd Dec. ¶ 13.

Parse relies on claim 5—which is neither asserted nor challenged in the action—which depends from claim 1 and requires that some of the APS oligonucleotides "comprise a unique binding agent (UBA)." Parse Br. at 5 (arguing that "[c]laim 1's APSs therefore encompass APSs comprising UBAs"). Parse's focus on what the claims should be "*construed to cover*," rather than "that which is claimed" as determined by the claim limitations, "conflate[s] the distinct issues of patentability and infringement." *In re Entresto*, 125 F.4th 1090, 1098 (Fed. Cir. 2025) (emphasis original). UBAs are not embodiments of the "APS oligonucleotides" recited in the Challenged Kit Claims, but are an additional feature that might optionally be included in the kits defined by the Challenged Kit Claims (and are required only by claim 5).

### 1.    The Patent Need Only Describe and Enable the Invention as Claimed.

In *Entresto*, the claims recited a "pharmaceutical composition comprising" two drugs (i.e., "valsartan" and "sacubitril") "administered ***in combination***." *Id.* at 1094.[2]  The defendant sought to limit the claims to compositions comprising these agents "as two separate components," *id.*  at 1095, but the District Court "construed the asserted claims to cover valsartan and sacubitril as a physical combination ***and as a complex***." *Id.* at 1096.  In view of this construction, the defendant challenged the claims as invalid for lack of description and enablement.  However, the Federal Circuit concluded that "[t]he fact that the…patent does not describe a complexed form…does not affect the validity of the patent." *Id.*  at 1098.  The Court explained that the specification need not address everything "cover[ed]" by the claims; rather, it must disclose and enable only what is "claimed." *Id.*  ("[T]he invention is, for purposes of the 'written description' inquiry, *whatever is now claimed*." (emphasis original)); *id.* at 1098 ("[A] specification must only enable the claimed invention.").  Because the "complex" was not a recited element, it was not "claimed," so it did not need to be described or enabled, even if the claims covered a pharmaceutical composition comprising the complex. *Id.*  at 1097-1100.

The "complex" at issue in *Entresto* was an after-arising invention, *id.* at 1097, but the Federal Circuit's written description holding did not turn on that rationale.  On the contrary, the Federal Circuit had previously held that "post-priority-date evidence to show that a patent does not disclose a representative number of species of a claimed genus is proper." *Amgen Inc. v. Sanofi*, 872 F.3d 1367, 1375 (Fed. Cir. 2017).  The "complex" in *Entresto* that was covered by the claims did not need to be described, not because it was a later-discovered species, but rather because the complex "is not what is claimed."  125 F.4th at 1098.

---

[2] All emphasis added, and all original emphasis and internal citations removed, unless noted.

3

The Court's reasoning in *Entresto* reaffirms the general rule, discussed further in the subparts below, that the written description and enablement requirements concern the claimed invention, not whatever the claim may encompass. *See Lochner Techs., LLC v. Vizio, Inc.*, 567 F. App'x 931, 938-39 (Fed. Cir. 2014) (vacating finding of invalidity based on "the district court's belief that use of an open-ended term 'including' requires patentees to disclose the recited as well as unrecited elements," because "there is no precedent requiring a patentee to disclose or enable unclaimed elements"). If claim 5 of the '752 Patent were at issue in this action, Parse's arguments about UBAs might be pertinent to that claim. But those arguments are irrelevant here because UBAs are not part of the invention defined by the Challenged Kit Claims.

### a.    Only the "Claimed" Invention Need Be Described.

A patent's specification "shall contain a written description of the invention." 35 U.S.C. § 112. A specification adequately describes an invention when it "reasonably conveys to those skilled in the art that the inventor had possession of the ***claimed subject matter***." *Ariad*, 598 F.3d at 1351. In other words, the written description requirement ensures that the inventors "conceive[d] of the complete and final invention with all its ***claimed limitations***." *Id.* at 1353.

The written description requirement does not require the inventors to disclose more than the invention recited in the claims. For example, a claim may cover a variety of applications of the invention. But "[a] specification may, within the meaning of 35 U.S.C. § 112, para. 1, contain a written description of a broadly claimed invention without describing all the species that [the] claim encompasses." *Cordis Corp. v. Medtronic Ave, Inc.*, 339 F.3d 1352, 1365 (Fed. Cir. 2003) (quoting *Utter v. Hiraga*, 845 F.2d 993, 998 (Fed. Cir. 1988)) (alteration in original).

*Entresto* explained that the line between what must be disclosed and what need not be disclosed is defined by "*whatever is now claimed*." 125 F.4th at 1097 (emphasis original). There, the lack of disclosure of the complexes "does not affect the validity of the patent" because

4

"[t]hat complex…is not what is claimed." *Id.* at 1098 ("Written description asks whether that which is claimed is adequately described."). *See United Therapeutics Corp. v. Liquidia Techs., Inc.*, 74 F.4th 1360, 1371 (Fed. Cir. 2023) (explaining that no description is required for features "safety and efficacy [which] are not recited in the claims"), *cert. denied*, 144 S. Ct. 873 (2024).

This Court dealt with a similar written description issue in *Sunoco Partners Mktg. & Terminals L.P. v. Powder Springs Logistics, LLC*, No. CV 17-1390-LPS-CJB, 2020 WL 1234822, at *2 (D. Del. Mar. 13, 2020), *report and recommendation adopted*, 2020 WL 3060458, at *5 (D. Del. June 9, 2020). There, the parties disputed whether an unclaimed aspect (i.e., "pipeline blending") was supported. *Id.* at *2. But the Court observed that the "written-description requirement generally does not require a description of unclaimed aspects of the invention, unless those aspects are critical to the claimed invention." *Id.* (quoting Robert A. Matthews, Jr., Annotated Patent Digest § 22:34 (2020)).[3]

And this Court is not alone in recognizing that unclaimed features need not be described. *Hologic, Inc. v. Minerva Surgical, Inc.*, 325 F. Supp. 3d 507, 526 (D. Del. 2018) (patents need not describe "plasma formation feature" not recited in the claims: "There is no requirement that a patent describe the unclaimed features of the infringing product."), *aff'd on other grounds*, 957 F.3d 1256 (Fed. Cir. 2020), *vacated and remanded*, 594 U.S. 559 (2021), *reinstated in part by* 44 F.4th 1358 (Fed. Cir. 2022); *Cornell Univ. v. Hewlett-Packard Co.*, 654 F. Supp. 2d 119, 126 (N.D.N.Y. 2009) ("A patent need not, however, disclose unclaimed subject matter."); *Int'l Rectifier Corp. v. IXYS Corp.*, No. CV-00-6756-R(CTX), 2001 WL 37124503, at *2 (C.D. Cal. July 25, 2001) (rejecting written description challenge to "an unclaimed 'mode of operation'" since "it is only the invention as claimed that must satisfy the written description requirement").

---

[3] The challenged claims do not lack any "critical" aspects, as discussed in Part II below.

5

**b.    Only the "Claimed" Invention Need Be Enabled.**

"[T]he specification must enable the full scope of the invention as defined by its claims. The more one claims, the more one must enable." *Amgen Inc. v. Sanofi*, 598 U.S. 594, 610 (2023). But this requirement does not demand that the specification enable everything possibly within the scope of the claims. Rather, "a specification must only enable the *claimed* invention." *Entresto*, 125 F.4th at 1099 (citing *Amgen*, 598 U.S. at 610) (emphasis in original). In *Entresto*, the Federal Circuit found the claims enabled "for reasons similar to" the reasons for its "written description determination." *Id.* Namely, since "the patent does not claim as its invention valsartan-sacubitril complexes," the specification need not enable such complexes. *Id.*

*Entresto* illustrates that the written description and enablement requirements are, in this respect, consistent: The lack of the description of "a complexed form of valsartan and sacubitril does not affect the validity of the patent," even though such complexes undisputedly infringed and so were within the scope of the claims, because the complexes are "not what is claimed." *Id.* at 1098-1100. *See Lochner*, 567 F. App'x at 938-39 (vacating finding of invalidity: "there is no precedent requiring a patentee to disclose or enable unclaimed elements").

The requirement for enabling disclosure of just the recited limitations of the claimed invention reflects the long-standing rule that not everything the claims encompass needs to be enabled. For example, in *United Therapeutics*, the Federal Circuit held that the claimed "therapeutically effective single event dose" of a drug was enabled, and no enablement of "safety and efficacy" requirements was required because those requirements "are not recited in the claims." 74 F.4th at 1371. *See also DeGeorge v. Bernier*, 768 F.2d 1318, 1324 (Fed. Cir. 1985) (holding enablement not required for circuity in non-limiting preamble with which the recited circuity would interact: "the enablement requirement of § 112 was satisfied by disclosure of

detailed, *claimed* TCCPI circuitry without requiring detailed disclosure of all related, *unclaimed* circuitry with which the TCCPI might be interfaced" (emphasis original)).

And District Courts have applied the rule. *E.g.*, *Dialect, LLC v. Amazon.com, Inc.*, No. 1:23CV581 (DJN), 2024 WL 4010111, at *9 (E.D. Va. Aug. 30, 2024) ("Claim 1 of the '720 Patent does not recite (and therefore need not enable) the concept of speech recognition writ large… Patents, in short, do not need to teach techniques that they do not claim."); *Janssen Pharms., Inc. v. Tolmar, Inc.*, 718 F. Supp. 3d 394, 417 (D. Del. 2024) (finding claims enabled because they "say nothing about drug concentrations or a therapeutic window" and so "they have no bearing on a person's ability to practice the claims and therefore have no bearing on enablement"), *reconsideration denied*, 2024 WL 2972832 (D. Del. June 13, 2024); *Hologic*, 325 F. Supp. 3d at 526 (rejecting enablement argument about a "plasma formation feature" because the "claims at issue herein do not recite" that feature).

### 2.    Summary Judgment of Invalidity Should Be Denied.

Under the correct legal standards for description and enablement, Parse's MSJ #1 regarding the '752 Patent must fail.  Parse relies on a purported lack of disclosure and enablement of the class of antibodies or aptamers that can function as UBAs.  Parse Br. at 4-5. But as discussed in Part I.A above, the Challenged Kit Claims of the '752 Patent do not claim the invention in terms of  UBAs, antibodies, or aptamers, meaning those are not claimed features, and so no description or enablement of those optional features is required.

Parse's focus on what the challenged claims "cover" rather than the invention defined by the limitation that those claims recite (Parse Br. at 5) is exactly the error that *Entresto* corrected. "By stating that the claims were 'construed to cover complexes…,'" the district court erroneously conflated the distinct issues of patentability and infringement, which led it astray in evaluating written description."  125 F.4th at 1098; *see id.* at 1099-1100 (ruling on enablement for the same

7

reason).  Thus, even if the Challenged Kit Claims cover a kit comprising a "UBA," as recited in unchallenged claim 5, UBAs are not part of the invention defined by the Challenged Kit Claims and thus need not be described or enabled.

This distinction is illustrated further by *Allergan USA, Inc. v. MSN Laboratories Private Ltd.*, where the challenged claims were directed to a therapy comprising a drug "and optionally, a glidant and/or lubricant." 111 F.4th 1358, 1364 (Fed. Cir. 2024).  The District Court had found that formulation undisclosed.  The Federal Circuit reversed because an optional component is not one that "must be specifically described, for § 112 purposes."  *Id.* at 1373.  Here, a UBA is optional in claim 1 and the other Challenged Kit Claims, and so it need not be disclosed.

This District addressed a similar situation in *INVISTA N. Am. S.À.R.L. v. M & G USA Corp.*, where the independent claims recited polyesters containing a "metal sulfonate salt."  951 F. Supp. 2d 626, 635, 652 (D. Del. 2013).  The defendant argued that the specification failed to describe and enable such polyesters since they would turn yellow in the absence of an undisclosed reagent (i.e., "sodium acetate").  *Id.* at 654-55.  However, the Court disagreed because the "enablement and written description requirements are both based on the invention **as claimed**," and lack of yellowness was not a recited element.  *Id.* at 653-54 (emphasis original).

Of particular significance for the present dispute, one non-asserted dependent claim in *INVISTA* did have a "non-yellowness requirement."  *Id.* at 654 (claim 26).  Thus, under Parse's reasoning (*see* Parse Br. at 5), the asserted independent claim "covered" such non-yellow polyester.  Yet in *INVISTA*, the lack of disclosure of sodium acetate to make such non-yellow polyester was irrelevant to the sufficiency of description and enablement since non-yellowness was "not a limitation in any of the asserted claims."  951 F. Supp. 2d at 654.

Since none of the Challenged Kit Claims of the '752 Patent defines the claimed invention as including a "UBA," those claims cannot be invalid for lack of description or enablement of a "UBA." *Lochner*, 567 F. App'x at 938-39 ("[T]here is no precedent requiring a patentee to disclose or enable unclaimed elements."); *Invitrogen*, 429 F.3d at 1071 ("Although Clontech's validity argument might have force had Invitrogen limited its claims to modified RT by reference to point mutation, Clontech overlooks the fact that the claims are not limited by the method of achieving the mutation.").

Parse has not challenged the description or enablement of the elements actually recited in the Challenged Kit Claims. ScaleBio's evidence shows that the specification describes and enables the invention defined by the Challenged Kit Claims. *E.g.*, Sims 2nd Dec. ¶¶ 33-35; Ex B (Sims Reb. Rep.) ¶¶ 263-290, 481-537. Consequently, if Parse were to challenge the description or enablement of the elements recited in the Challenged Kit Claims, that would do no more than establish a dispute of material fact, precluding summary judgment. For all the above reasons, Parse's MSJ #1 should be denied as to the Challenged Kit Claims of the '752 Patent.

### B.    MSJ #1 Should Be Denied As to the '442 Patent.

Parse's MSJ #1 regarding the '442 Patent is also misdirected. The method defined by claim 11—the sole challenged claim of the '442 Patent—concerns hybridization between nucleic acids, which was well understood and highly predictable in 2011-2012 (and long before), and which has nothing to do with the much less predictable art of binding antibodies or peptides to their targets. Accordingly, Parse's arguments about antibodies and peptides and its reliance on cases about functionally-defined classes of antibodies and peptides that bind to targets—like *Amgen Inc. v. Sanofi* and *Juno Therapeutics, Inc. v. Kite Pharmaceuticals, Inc.*, 10 F.4th 1330 (Fed. Cir. 2021)—are entirely misplaced.

1.    **Claim 11 of the '442 Patent Requires "Hybridizing" a Nucleic Acid Linker to a Nucleic Acid Target.**

Parse's motion ignores key language in claim 11 of the '442 Patent that limits step (a) of that claim to *hybridization between nucleic acids* and instead makes a straw-man argument about antibodies binding to target molecules. Parse's focus on claim 13 to show the alleged breadth of claim 11 (Parse Br. at 5-6) is misleading, because claims 11 and 13 are directed to methods that concern entirely different categories of targets:

> 1. A method of uniquely labeling target molecules within a plurality of cells, the method comprising: (a) coupling a common linker sequence to target molecules within the plurality of cells….

> 9. The method of claim 1, wherein the target molecules are selected from at least one of **RNA**, cDNA, DNA, **protein, peptide, and antigen**.

> 11. The method of claim 9, **wherein the target molecules are RNA** and wherein step (a) comprises **hybridizing** the common linker **to the RNA**.

> 13. The method of claim 9, **wherein the target molecules are protein, peptide, or antigen**, wherein the common linker sequence is coupled to an epitope specific barcode (ESB) sequence that is couples [sic, coupled] to an antibody…wherein step (a) comprises **binding** the antibodies comprising the common linker sequence and the epitope specific barcode sequence **to the protein, peptide, or antigen**.

Ex. 1 ('442 Patent) at cols. 57-59. As shown by the above claim language, claim 11 concerns target molecules that are RNA, whereas claim 13 concerns target molecules that are protein, peptide or antigen. Claims 11 and 13 both depend from claim 9, which lists those categories of target molecules as alternatives. Moreover, claim 11 requires that the "coupling" of step (a) must comprise "hybridizing"—a term of art that has a very specific meaning.

Hybridization refers to the selective physical association of two nucleic acids with each other (also called "annealing") based on the complementarity of at least part of their nucleotide sequences. Sims 2nd Dec. ¶ 18 (discussing background references). The specification's use of "hybridizing" is consistent with its art-recognized meaning. *Id.* ¶ 19; *see also* Ex. 1 ('442 Patent)

at 13:59-62, 15:3-21.  In order to "hybridize" with the target RNA molecules, the common linker of claim 11 must also be a nucleic acid.  Sims 2nd Dec. ¶ 20.  Accordingly, step (a) of claim 11 requires nucleic acids (RNA target molecules and common linkers) that hybridize to each other.  *Id*.  Binding an antibody to a target would not satisfy step (a) of claim 11 since binding of an antibody to a target molecule is not "hybridizing."  *Id*. ¶ 21.  Nor would binding of a *peptide* aptamer to a target molecule satisfy step (a) of claim 11.  Ex. 1 ('442 Patent) at 19:18-21 (aptamers can be nucleic acids or peptides); Sims 2nd Dec. ¶ 22 ("hybridizing" to an aptamer requires a nucleic acid aptamer).  An aptamer whose binding can satisfy step (a) of claim 11 must itself be a nucleic acid.  *Id*.

### 2.    Summary Judgment of Invalidity Should Be Denied.

#### a.    The Requirement for "Hybridizing" Makes Antibodies and Peptide Aptamers Immaterial.

Claim 11's requirement of "hybridizing" makes wholly inapplicable Parse's arguments concerning description and enablement of *antibodies* and *peptide aptamers*.  *See* Parse Br. at 5-19.  Since antibodies or peptide aptamers are not part of the claimed invention of claim 11 of the '442 Patent (as discussed in Part I.B.1 above), there is no requirement to describe or enable such antibodies or peptide aptamers (for the reasons discussed in Part I.A.1).  Even if the common linker were attached to an antibody or aptamer, as Parse asserts (*id.* at 6 (citing Ex. 1 ('442 Patent) at 18:60-61, 19:61-63)), step (a) of claim 11 would not be met by binding between RNA target molecules and the antibody, since hybridization refers to the nucleic acid linker associating with the RNA.  Sims 2nd Dec. ¶ 21.  Consequently, the attachment of an antibody to the linker is an optional feature that need not be described or enabled.

Further, Parse's cited caselaw concerns the unpredictability of *antibodies* and *peptides*. For example, *Amgen* concerned a functionally-defined class of *antibodies* that was not enabled

because scientists could not accurately predict how exchanging one amino acid for another would affect an antibody's structure and function, 598 U.S. at 600, so that they needed "painstaking experimentation to see what works." *Id*. at 614. *Juno* concerned nucleic acid polymers encoding a receptor that included a functionally-defined *peptide* "binding element that specifically interacts with a selected target," 10 F.4th at 1334, where there was no written description that supported "this functional binding limitation." *Id* at 1336. As discussed in the next subpart, the state of the art regarding nucleic acid hybridization was very different, and ScaleBio's evidence creates genuine issues of fact that preclude summary judgment of invalidity.

### b. ScaleBio's Evidence Creates Genuine Issues of Material Fact That Preclude Summary Judgment.

ScaleBio's expert testimony shows that the structure of nucleic acids that will hybridize to each other was, as of the relevant filing date, among the most well-known, well-characterized, and well-understood structure-function correlations in molecular biology. Sims 2nd Dec. ¶ 38. Parse attacks these claims as "functionally defined genus claims." Parse Br. at 12. But "functional claim language can meet the written description requirement when the art has established a correlation between structure and function." *Ariad*, 598 F.3d at 1350 (citing *Enzo Biochem*, 323 F.3d at 964); *see also Ajinomoto Co. v. Int'l Trade Comm'n*, 932 F.3d 1342, 1360 (Fed. Cir. 2019) (citing *Ariad*, 598 F.3d at 1350, for that rule).

The structural features needed for complementary nucleic acids to hybridize were well-known: they must be single-stranded polymers of nucleotides. Sims 2nd Dec. ¶ 38. The Watson-Crick base-pairing rules enabled a person of ordinary skill in the art to predict and visualize the sequence of nucleic acid binding regions that would hybridize to any desired nucleic acid target sequence under appropriate conditions. *Id.* Moreover, the appropriate conditions (e.g., temperature, pH, ionic strength, buffer composition) to achieve hybridization between

12

nucleotides of a given length and sequence were also known and predictable. *Id.* The conditions under which nucleic acids of a given composition will hybridize to one another were predictable and did not require trial and error experimentation except for purposes of optimization. *Id*. ¶¶ 39-43 (discussing background references); *see id.* ¶¶ 44-52 (discussing relevant disclosures in the specification in light of the knowledge in the art). A POSA would have known from the specification how to design the oligonucleotides suitable for use in these methods and would have concluded that the inventor was in possession of such oligonucleotides. *Id*. ¶ 53. A POSA would have known how to synthesize such oligonucleotides and have been able to do so without experimentation (except for purposes of optimization). *Id*.

The above evidence of description and enablement applies equally to nucleic acid aptamers that bind nucleic acid targets. *Id*. ¶ 57. Parse makes generalized arguments about aptamers (Parse Br. at 6-19) but fails to recognize the distinction between aptamers in general and the specific class of *nucleic acid* aptamers that bind *nucleic acid* targets. Parse asserts that there are challenges to identifying aptamers (Parse Br. at 10-11), focusing myopically on the SELEX technique as the "one general way of generating aptamers" described in the specification. *Id*. at 10. But nucleic acid aptamers that hybridize to nucleic acid targets can be designed directly using complementary sequences selected according to the Watson-Crick base pairing rules that correlate structure with function, in the same way as any other nucleic acid probe or primer, without the need to utilize techniques such as SELEX. Sims 2nd Dec. ¶ 59.

There is thus a sharp dispute between Dr. Sims and Parse's expert, Dr. Pachter, regarding the sufficiency of written description and enablement of claim 11 of the '422 Patent. A jury is entitled to credit Dr. Sims' testimony and conclude that Parse has failed to prove by clear and

convincing evidence that the disclosure of the specification does not describe and enable the invention defined by claim 11 of the '442 Patent.

### C.    MSJ #1 Should Be Denied As to the '256 Patent.

Parse's MSJ #1 fails for similar reasons with respect to the challenged claims of the '256 Patent, which are likewise directed to methods that require binding of nucleic acids to each other.

### 1.    The Challenged Claims of the '256 Patent Require Binding Nucleic Acid Targets to UBA Nucleic Acid Tags.

Parse challenges claims 1, 2, 5, and 6 of the '256 Patent. Parse Br. at 6. Claim 1—the sole independent claim—recites in relevant part::

> A method for identifying whether a plurality of nucleic acid targets is present in a plurality of cells comprising: a) binding to the ***nucleic acid targets*** in the plurality of cells a plurality of unique binding agent (UBA) ***nucleic acid tags***…."

Ex. 2 ('256 Patent) at col. 58. Claims 2, 5, and 6 add further limitations that do not concern step (a). *Id.* Thus, the challenged claims of the '256 Patent all require binding between nucleic acid targets and nucleic acid UBAs.

### 2.    Summary Judgment of Invalidity Should Be Denied.

The challenged claims' recited binding of nucleic acids makes wholly inapplicable Parse's arguments and cited authorities concerning description and enablement of *antibodies* and *peptides*. *See* Parse Br. at 5-19. Parse does not contend that these claims cover the use of antibodies. *Id*. at 6. Nor do these claims cover the use of peptide aptamers, since they require binding between nucleic acids. Thus, for the same reasons discussed in Part I.B.2.a above regarding claim 11 of the '442 Patent, the validity of these claims does not require description or enablement of antibodies or peptide aptamers, and Parse's cited caselaw concerning antibodies and peptides is inapposite.

For the reasons set forth in Part I.B.2.b above regarding claim 11 of the '442 Patent, ScaleBio's expert testimony creates genuine issues of fact with respect to description and enablement of nucleic acid UBAs that can hybridize to nucleic acid targets.  To the extent that Parse contends the "binding" of step (a) may be accomplished by ligation rather than hybridization, ScaleBio's expert testimony shows that the specification describes and enables the class of nucleic acids required for ligation.  Sims 2nd Dec. ¶¶ 60-62.

There is thus a sharp dispute between Dr. Sims and Parse's expert, Dr. Pachter, regarding the sufficiency of written description and enablement of the challenged claims of the '256 Patent.  A jury is entitled to credit Dr. Sims' testimony and conclude that Parse has failed to prove by clear and convincing evidence that the disclosure of the specification does not describe and enable the invention defined by the challenged claims of the '256 Patent.

> **D.    MSJ #1 Should Be Denied for the Separate and Independent Reason That the '442 and '256 Patents Claim Methods, Not Compounds.**

The challenged claims of the '442 and '256 Patents are directed to methods for "uniquely labeling target molecules within a plurality of cells" and "identifying whether a plurality of nucleic acid targets is present in a plurality of cells," respectively and not to the genus of compounds that can be used to carry out the claimed methods.  Accordingly, *Ariad* does not require the specification to describe or show possession of the genus of compounds that can used to carry out the claimed methods.  In addressing the method claims at issue in *Ariad*, the Federal Circuit explained that the patentee "must describe ***some way*** of performing the claimed methods…by sufficiently disclosing ***molecules*** capable of reducing NF-κB activity."  598 F.3d at 1355.  The claims in *Ariad* were held invalid because the patent in suit "discloses no working or even prophetic examples of methods that reduce NF-κB activity, and no completed synthesis of any of the molecules prophesized to be capable of reducing NF-κB activity."  *Id*. at 1357-58.

Applying *Ariad* in this way comports with the Supreme Court's approach in upholding the validity of Alexander Graham Bell's fifth claim in *Dolbear v. Am. Bell Tel. Co.*, 126 U.S. 1 (1888). Bell's patent sought to describe and claim two types of apparatus for telephony: a "magneto" apparatus "in which an electro-magnet is employed" and a "variable resistance apparatus." *Id*. at 538. It also claimed a method of "transmitting vocal or other sounds telegraphically, as herein described, by causing electrical undulations similar in form to the vibrations of the air accompanying the said vocal or other sounds, substantially as set forth. " *Id.* at 537. Only the magneto apparatus was adequately described, and Bell's attempt to claim the variable resistance apparatus failed. *Id*. ("[T]he variable resistance mode is not described."). Nevertheless, the Court upheld the validity of Bell's broad method claim, which "is not to be confined to the mere means he improvised to prove the reality of his conception." *Id* at 539. *Accord Edwards Lifesciences AG v. CoreValve, Inc.*, 699 F.3d 1305, 1309 (Fed. Cir. 2012) ( "[T]he enablement requirement is met if the description enables any mode of making and using the invention.").

As discussed in Parts I.B and I.C above, the specification discloses and enables the claimed methods with nucleic acids that hybridize to nucleic acid targets, including nucleic acids containing a poly-dT sequence. Sims 2ⁿᵈ Dec. ¶ 52. MSJ #1 should be denied for the separate and independent reason that description and enablement of the challenged method claims of the '442 and '256 Patents do not require describing and enabling the entire class of compounds that can be used to carry out these methods.

## II.    Parse's MSJ #2 Should Be Denied.

Parse's MSJ #2 asserts that the "specification does not provide written description support for claims that do not recite elements requiring the use of an UBA *and* an ESB," but that

the challenged claims purportedly omit one or both of these "essential features."  Parse Br. at 19-20.  For the reasons set forth below, MSJ #2 should be denied.

**A.    MSJ #2 Should Be Denied As to the '752 Patent.**

**1.    The Specification Describes UBAs and ESBs As Optional for Kits.**

The specification discloses that kits can include only APS oligonucleotides and linker oligonucleotides and that UBAs and ESBs are optional components:

> The invention further provides kits comprising *one or more components of the invention*. The kits can comprise, for example, one or more UBAs, one or more ESBs, and/*or one or more APSs*. The kits can be used for any purpose apparent to those of skill in the art, including those described above.…
>
> The kits *can comprise other reagents such as linker oligos* and bridging oligos.

Ex. 4 ('752 Patent) at 50:11-16; 50:39-40; *see also id.* at 50:32-33 ("The kits can contain a population of COBs, *APSs*, UBAs, ESBs *and/or a combination thereof* as described herein."). The repeated use of "and/or" with reference to APSs when describing what the kits contain are clear disclosures of kits comprising APSs with or without UBAs and/or ESBs.  Ex. B (Sims Reb. Rep.) ¶¶ 483, 503; Sims 2nd Dec. ¶ 31.  The specification thus discloses embodiments of the kits that do not necessarily include UBAs or ESBs.  This alone is fatal to Parse's motion.  *Allergan*, 111 F.4th at 1373 (specification disclosed that a "glidant" was an optional component by "describ[ing] at least two embodiments in which a glidant is not required.").

**2.    Parse's Evidence About Lack of Utility Is Disputed.**

Parse argues that the preamble of claim 1 of the '752 Patent is limiting and that the kits are "for split-pool barcoding target molecules that are in or on cells or cell organelles."  Parse Br. at 22.  Parse further relies on the testimony of its expert that the kits lack utility without UBAs and ESBs.  *Id*. at 20 (citing Ex. 19 (Pachter Reply Rep.) ¶ 95).

As discussed in Part III.C below, the preamble is not limiting.  Even if it were held to be limiting, Dr. Pachter's evidence of lack of utility is sharply disputed.  Dr. Sims testified that a kit suitable for use in split pool barcoding target molecules need not contain all the components that might be needed for split pool barcoding.  Ex. B (Sims Reb. Rep.) ¶ 502.  To have multiple ingredients available in suitable and convenient forms and quantities is advantageous without requiring that a kit must contain all necessary ingredients to be a "laboratory in a box."  *Id*.  For example, commercial kits for performing PCR are sold that do not include "primers," which are a critical element for performing PCR.  *Id*.; *see also* Ex. C (Pachter Tr.) at 134:8-11 (admitting that "PCR cannot be performed without primers").  This disputed expert testimony further precludes granting MSJ #2 as to the '752 Patent.

**B.      MSJ #2 Should Be Denied As to the '422, '256, and '341 Patents.**

**1.      The Specification Describes UBAs and ESBs As Optional.**

The specification describes methods that do not involve UBAs or EBSs.  *Compare* Ex. 1 ('442 Patent) at 1:58-2:21 (method of "binding to the targets a plurality of tags" without requiring a UBA or ESB), *with id.* 2:33-37 ("In some embodiments, the tag comprises a UBA. … In some embodiments, the tag comprises a ESB.").  *Compare id.* at 5:50-6:20 ("methods for identifying target molecules sharing a common particular origin" and "methods of imparting a particle specific code to a component of a particle of a population of particles" without requiring a UBA or ESB), *with id.* at 6:54-56 ("In some embodiments, said at least one target molecule is directly bound to said first UBA and said ESB is directly bound to said UBA.").

The use of "some embodiments" is instructive: "[t]he logical implication of this language is that some embodiments do ***not*** require" an ESB.  *SZ DJI Tech. Co. v. Autel Robotics USA LLC*, No. CV 16-706-LPS, 2021 WL 1910037, at *4 (D. Del. May 12, 2021); *see also TwinStrand Biosciences, Inc. v. Guardant Health, Inc.*, No. CV 21-1126-GBWSRF, 2023 WL

18

3773700, at *6 (D. Del. June 2, 2023) ("The [specification] explains that, '[i]n some embodiments, the degenerate or semi-degenerate SMI sequence may be a random degenerate sequence,' implying that random generation of the sequence is not required in all embodiments.").

The specification further discloses that an ESB is optional and that a UBA can be linked to a COB directly.  In "certain embodiments," the UBA comprises "a linker oligo."  Ex. 1 ('442 Patent) at 17:51-53 ("In certain embodiments, the UBAs comprise an identity portion or at least part of an identity portion, for example, an ESB, a COB, an ESB *and/or a linker oligo*."), 35:29-31 (similar).  And the COB can be attached to the UBA via that linker sequence, though the ESB is present only in "some instances."  Ex. 1 ('442 Patent) at 24:64-25:3 ("The COB can be attached to the UBA via a common linker (CL). The CL can also be part of an oligonucleotide. … In some instances, the epitope specific barcode can be included in the oligonucleotide that comprises the common linker.").  To a POSA, such disclosures indicate that an ESB is optional, since it is not needed to connect a UBA to a COB.  Ex. B (Sims Reb. Rep. ) ¶¶ 330-31.

Further, an ESB is not required to create a cell-specific code that identifies the cell of origin of the labeled target molecules since the COB alone suffices.  Ex. 1 ('442 Patent) at 16:2-3 ("The invention also provides the use of cell origination barcodes to indicate the cell of origin.), 16:65-17:4 ("[S]aid APS comprises a unique sequence and/or a detectable molecule, and wherein the combination of one or more different APS in each COB has a detectable signal or sequence that distinguishes it from other COBs in said population."), 21:20-22 ("Each COB provides a unique code that can be associated to a specific cell of origin").  Consequently, the specification repeatedly refers to using a COB *or* an ESB.  *E.g.*, *id.* at 16:7-9 ("Methods of making and using such unique binding agents *and/or* epitope specific barcodes *and/or* cell origination barcodes are

19

also provided."), 17:9-14 ("Accordingly, certain aspects of the present invention provide a population of unique COBs *or* ESB/COBs, each comprised of a unique APS-based combination, wherein each COBs *or* ESB/COBs in the population is distinct from the other COBs *or* ESB/COBs in the population.").  Ex. B (Sims Reb. Rep. ) ¶ 332.

As to the necessity of UBAs, the specification states: "Any of the embodiments described herein can be used in the detection of multiple target molecules.  In *some embodiments*, the invention provides methods comprising UBA for the analysis of target molecules."  Ex. 1 ('442 Patent) at 39:32-35.  Such embodiments without a UBA are possible because "[i]n any of the embodiments herein, COBs may be assembled on targets from a single cell."  Ex. 1 ('442 Patent) at 28:28-30; *see id.* at 16:62-63 ("In some embodiments, the COB is composed of one or more assayable polymer subunit (APS)."); Ex. B (Sims Reb. Rep. ) ¶ 329.

In view of these disclosures, Parse's reliance on *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1377 (Fed. Cir. 2009) is inapposite.  Parse Br. at 22.  *See Allergan*, 111 F.4th at 1375 (distinguishing *ICU* where the specification "discloses at least two embodiments in which the formulation does not necessarily include the unclaimed glidant").

Accordingly, ScaleBio's expert testimony shows that the specification discloses methods in which UBAs and ESBs are optional.  The parties' factual dispute on this issue is reason alone to deny Parse's MSJ #2.

### 2.    The Challenged Claims of the '442, '256, and '341 Patents Do Not Omit Any "Concepts" That Are Essential.

Parse asserts that the "patents coined the terms 'UBA' and 'ESB' to define concepts," where "UBAs are the molecules 'designed to bind with at least one target molecule,'" and "ESBs are the molecules 'designed to bind with at least one UBA' and associate unique codes with target molecules."  Parse Br. at 20.  Without any supporting legal analysis or factual evidence,

Parse asserts that the challenged claims "omit one or both [allegedly essential] features." Parse Br. at 20. ScaleBio's expert testimony shows that Parse is wrong.

**Claim 11 of the '442 Patent** requires that step (a) comprise "***hybridizing*** the common linker to the RNA" target molecules. Ex. 1 ('442 Patent) at 58:62-64. Dr. Sims' testimony shows that "hybridizing" means selective physical association of two nucleic acids with each other based on the complementarity of at least part of their nucleotide sequences. Sims 2nd Dec. ¶ 18. Such a common linker sequence is designed to bind to the target RNA, and so there is a least a factual dispute about whether step (a)'s hybridizing of a common linker provides the "concept" of a UBA that Parse contends is missing. Moreover, as shown above, there is at least a factual dispute about whether the specification describes an ESB as an essential feature.

**Claim 1 of the '256 Patent** requires "the use of UBAs to label target molecules," as Parse admits. Parse Br. at 20. Dr. Sims' testimony shows that "extending the UBAs bound to the targets," as required by step (b), Ex. 2 ('256 Patent) at 58:15, provides the "concept" of an ESB that Parse contends is missing. Ex. B (Sims Reb. Rep.) ¶ 448. As Dr. Sims explains, "Nolan 2012 explained that the ESB can be the cDNA product of reverse transcription." *Id*. As a "'DNA representation of mRNA,' the cDNA ESB would 'comprise[] a unique code that can be associated to a specific target molecule' and would 'form a molecular complex comprising the ESB, the UBA and the target molecule.'" *Id*. Thus, there is a least a factual dispute about whether step (b) provides the "concept" of an ESB that Parse contends is missing. Moreover, as shown above, there is at least a factual dispute about whether the specification describes an ESB as an essential feature.

**Claim 13 of the '341 Patent**, via its dependence from claim 1, recites in step (a) "producing cDNA in the cells or cell compartments." Ex. 3 ('341 Patent) at 58:14. Dr. Sims'

testimony shows that cDNA is made by a process called "reverse transcription," which requires annealing one or more primers to the RNA to be reverse transcribed.  Ex. B (Sims Reb. Rep.) ¶¶ 50-51; *see also* Sims 2nd Dec ¶ 18 (annealing means hybridizing).  For the same reason as discussed above regarding the '442 Patent, there is thus a least a factual dispute about whether step (a)'s "producing cDNA"—which requires hybridizing a primer to an RNA target—provides the "concept" of a UBA that Parse contends is missing.  Moreover, for the same reason as discussed above regarding the '256 Patent, there is at least a factual dispute about whether the cDNA produced in step (a) provides the "concept" of an ESB that Parse contends is missing. Ex. B (Sims Reb. Rep.) ¶ 448.

Accordingly, MSJ #2 should be denied as to the '422, '256, and '341 Patents.

### III.    Parse's MSJ #3 Should Be Denied.

Parse's MSJ #3 seeks summary judgment that the '442, '256, and '752 Patents are not literally infringed because the Accused Parse Products supposedly do not label, identify or barcode "target molecules."  Parse Br. at 23.  This motion should be denied as to these three patents because Parse's construction of "target molecules" should be rejected, and under ScaleBio's construction, there is at least a dispute of material fact whether use of Parse's accused products involves the claimed target molecules.  MSJ #3 should also be denied as to the '752 Patent for the additional and independent reason that the preamble of claim 1 of the '752 Patent (which recites the term "target molecules") is not limiting.

### A.    "Target Molecules" Should Be Construed to Mean "Molecules of Interest That Are Being Detected or Quantified" Without Further Limitation.

ScaleBio's construction of "target molecules" has been consistent throughout this litigation, and is derived directly from the specification.  "Target molecules" are "molecules of interest that are being detected or quantified."  D.I. 108-1 at 5.  The only modification that

ScaleBio now proposes is a second sentence negating the additional limitations that Parse seeks to impose on "target molecules."   ScaleBio has never proposed the straw-man construction that Parse sets forth and attacks in its opening brief.  *See* Parse Br. at 26.

Parse, by contrast, has presented ever-changing constructions that add a shifting set of narrowing limitations.  Parse contended initially that "target molecules" means "specific molecules with a known individual identity *whose presence or quantity varies between individual cells*."  D.I. 108-1 at 5.  At the *Markman* hearing on December 15, 2023, Parse changed its construction by disavowing the italicized portion of its original construction (D.I. 114 (Markman Tr.) at 106:15-107:9) and by conceding that "it is not Parse's position, that you have to know the entire target."  *Id*. at 109:5-6.  Then, in its expert reports served on October 10 and December 13, 2024, Parse—by that time represented by new counsel—retracted these disavowals by reasserting its original construction in full.  D.I. 308, Ex. 9 (Pachter Op. Rep.) ¶ 78; D.I. 308, Ex. 10 (Pachter Reb. Rep.) ¶¶ 72-73.  Now, Parse presents yet another construction under which "target molecules" would be limited to "*specific* molecules of interest *with a known individual identity sufficient to distinguish the molecules* that are being detected or quantified."   *E.g.*, Parse Br. at 23.

### 1.    ScaleBio's Construction Accords With the Definition of "Target Molecules" in the Specification.

ScaleBio's construction accords with the way the specification defines target molecules, as the Court has already recognized.  D.I 119 ("[T]he patent specification defines the term in just this way." (citing Ex. 1 ('442 Patent) at 16:15-18.  The Court should give effect to this definition: "When a patentee explicitly defines a claim term in the patent specification, the patentee's definition controls."  *Martek Bioscience Corp. v. Nutrinova, Inc.*, 579 F.3d 1362, 1380 (Fed. Cir. 2009).  Accordingly, the Court should clarify that "target molecules" means

"molecules of interest that are being detected or quantified.  Target molecules need not be specific molecules with a known individual identity."

> ### 2.      Parse's Construction Relies on a Flawed Reading of the Specification That the Court Has Already Rejected in Construing "UBA."

In support of its proposed construction, Parse asserts that the specification "consistently discloses that the UBA is target-specific, meaning it ***uniquely*** binds to only ***a*** specific molecule." Parse Br. at 27 (emphasis added).  The Court has already rejected that reading of the specification in holding that a "UBA" is defined in the specification as "a molecule or assembly that is designed to bind with ***at least one*** target molecule, ***at least one*** target molecule surrogate, or both."  D.I. 118 (quoting Ex. 1 ('442 Patent) at 17:18-20).  As the Court noted in so holding, "[t]he specification also makes reference to a single UBA binding to 'at least one target molecule.'"  *Id*. (quoting Ex. 1 ('442 Patent) at 6:54-56).  Parse even quotes—but ignores the import of—an additional passage in which the specification explains that target molecules (plural) can be detected by binding of a UBA (singular), which can include multiple target-specific regions: "[t]arget molecules or epitopes are the molecule**s** detected or measured by binding of **a** [Unique Binding Agent ("UBA"] whose target-specific region**(s)** recognize thereto." Parse Br. at 26 (quoting Ex. 1 ('442 Patent) at 33:40-42) (alterations in original).

Ignoring the import of these disclosures, Parse focuses instead on specific embodiments in which a given UBA is specific for a particular target, including "multiplexed" assays in which a population of target-specific UBAs are deployed.  For example, Parse quotes a portion of the specification that states: "[e]ach UBA in the population is *specific* for a target molecule.  Thus the UBA provides the *specificity* for the target molecule recognized in a cell."  Parse Br. at 26 (quoting Ex. 1 ('442 Patent) at 16:44-47) (emphasis added in original).  But Parse has omitted from its quote the immediately preceding sentence, which explains that this relates to particular

24

embodiments for conducting multiplexed assays: "*In some embodiments*, the invention provides a UBA population for use in a multiplexed assay." Ex. 1 ('442 Patent) at 16:43-44 (emphasis added). Parse's reading contradicts the Court's construction of "UBA" as ***not*** limited to an assembly that is specific for a single target molecule (D.I. 118), and seeks to limit the scope of "target molecules" by relying on specific embodiments described in the specification, which is improper. *Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012) ("[The Court does] not read limitations from the specification into claims; [the Court does] not redefine words. Only the patentee can do that."). *See also* Parse Br. at 27-28 (seeking to limit "target molecules" in accordance with specific embodiments and prophetic examples).

Nothing in the specification states that target molecules must have a known individual identity. On the contrary, the specification discloses that a target molecule can have "either a known or unknown structure or sequence." Ex. 1 ('442 Patent) at 33:66-67. Accordingly, a faithful reading of the specification does not support, but rather contradicts, Parse's contention that "target molecules" must be "specific molecules with a known individual identity."

**3. Relevant Extrinsic Evidence Does Not Support Parse's Construction.**

Parse relies on a subsequent patent application by Nolan and on scientific publications co-authored by Nolan in support of its proposed construction of "target molecules." D.I 325 (Parse Br.) at 29-31. Patent Publication No. US 2023/0049314 (Nolan 2014) does not support Parse's proposed construction for multiple reasons. First, "[t]he subjective intent of the inventor when he used a particular term is of little or no probative weight in determining the scope of a claim (except as documented in the prosecution history)." *Markman v. Westview Instr., Inc.*, 52 F.3d 967, 985 (Fed. Cir. 1995) (en banc), *aff'd,* 517 U.S. 370 (1996). The Nolan 2014 application has a different specification from the patents in suit, does not claim priority to the '442, '256 or '752 Patents or to any application whose priority is claimed by those patents, and is

not part of the prosecution history of these patents.  Second, Parse has misstated the record in asserting that "Nolan 2014 eschews 'target molecules'" when discussing what Parse calls "untargeted labeling."   D.I 325 (Parse Br.) at 29-31.  On the contrary, Nolan 2014 discloses embodiments in which "a UBA comprising…a poly-dT oligonucleotide probe sequence" is "hybridiz[ed] with *target RNA sequences*" prior to "reverse transcription and barcoding reactions" in order to "identify[] individual cells that contain one or more *target RNA molecules* of interest."  Ex. 26 (Nolan 2014) at [0065] (describing Fig. 29); *accord id.* at [0066] (describing Fig. 30) & [0067] (describing Fig. 31).  In other words, Nolan 2014 uses the term "target… molecules" to describe the class of RNA molecules that bind to a poly-dT UBA primer—the exact same approach that Parse wrongly denominates as "untargeted."  The non-patent publication co-authored by Dr. Nolan is likewise irrelevant to the way that "target molecules" is defined in the common specification of the '442, '256 and '752 Patents, and in any event does not describe whole transcriptome analysis as "untargeted."  *Cf.* D.I 325 (Parse Br.) at 30.  And Parse's reliance on the deposition testimony of ████████████████████████████ (*id.* at 30-31) is likewise unavailing because the cited testimony is both irrelevant to how "target molecules" is defined in the specification of the '442, '256 and '752 Patents and moreover is consistent with the fact that "the whole transcriptome [approach] targets the transcriptome but does not target any particular transcripts."  D.I. 326, Ex. 14 (Sims Reply Rep.) ¶ 149.

Parse also relies on expert testimony purporting to construe the intrinsic evidence.  Parse cites Dr. Pachter's testimony about "[t]he plain and ordinary meaning of 'target molecules.'"  Parse Br. at 25 (citing Ex. 14 ¶ 135).  But the cited testimony does not set forth any art-recognized meaning of "target molecules" at the time the Nolan application was filed.  Rather, it provides Dr. Pachter's opinion about what a POSA would conclude "[b]ased on the disclosure in

the ScaleBio Asserted Patents and the level of skill in the art…." D.I. 308, Ex. 10 (Pachter Reb. Rep.) ¶ 135. Dr. Pachter's opinion "that simply recites how [the expert] would construe the term…based on his own reading of the specification" and "which does not identify the accepted meaning in the field to one skilled in the art, is unhelpful." *Symantec Corp. v. Comput. Assocs. Int'l, Inc.*, 522 F.3d 1279, 1289 n.3 & 1290-91 (Fed. Cir. 2008); *see Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F. 3d 1335, 1342 (Fed. Cir. 2015); *Shire Dev., LLC v. Watson Pharms., Inc.*, 787 F.3d 1359, 1368 (Fed. Cir. 2015).

The evidence about underlying scientific principles that inform a reading of the specification supports ScaleBio's proposed construction. The specification explains that "[t]arget molecules or epitopes are the molecules detected or measured by binding of a UBA whose target-specific region(s) recognize thereto" (Ex. 1 ('442 Patent) at 33:40-42), and that UBAs can bind to target molecules in a "sequence-specific" manner and/or a "confirmation-specific manner. *Id.* at 17:43-48. ██████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████ .

That binding is specific to the sequence in the target molecule, even if multiple target molecules include that sequence and could each bind to the UBA. D.I. 326, Ex. 14 (Sims Reply Rep.) ¶ 30. There are many reasons why different RNAs would have some portion of their sequences in common, including randomness, alternative splicing, homology, gene fusion, and a poly-A tail. *Id*. ¶¶ 31-35. Gene fusion creates novel transcripts whose identity and sequence are unknown until the transcript has been detected and sequenced. *Id*. ¶ 34. Detection of a "novel transcript" is specifically disclosed as an embodiment of the invention. Ex. 1 ('442 Patent) at 41:49.

27

███████████████████████████████████

███████ the specification's description of antibody UBAs also guides claim construction. Antibodies selectively bind to portions of antigens (called "epitopes") in a conformation-specific manner. D.I. 326, Ex. 14 (Sims Reply Rep.) ¶ 37. An antigen that is specific for an epitope will bind to any antigen that contains the epitope, even if the antigens are otherwise different molecules. This well-described phenomenon is called "cross-reactivity" and was utterly ignored in Dr. Pachter's expert reports, which present an incomplete account of the relevant background science that is tailored to support his claim construction. At his deposition, Dr. Pachter admitted that cross-reactivity is "an important concept in immunology" that occurs when "different antigens have the same or similar epitopes" so that "you might have an antibody binding to different proteins or antigens …" Ex. C (Pachter Tr.) at 192:6-193:1. But his Rebuttal Report presented a diagram that ignores cross-reactivity and depicts multiple antibodies that each "uniquely bind to one specific antigen." D.I 308, Ex. 10 (Pachter Reb. Rep.) ¶ 80. When confronted with a diagram that includes cross-reacting antibodies (D.I. 326, Ex. 14 (Sims Reply Rep.) ¶ 68), Dr. Pachter explained that he was writing "not generally about immunology but specifically the content of the ScaleBio asserted patents…." Ex. C (Pachter Tr.) 194:16-18.

The specification's examples include cross-reacting antibodies. For example, the specification discloses that a UBA can be an antibody specific for "a phospho-epitope on a kinase such as Stat-3." Ex. 1 ('442 Patent) at 36:5-8. But Stat-3 refers to a family of proteins that includes Stat-3 alpha, Stat-3 beta, Stat-3 gamma and Stat-3 delta. D.I. 326, Ex. 14 (Sims Reply Rep.) ¶ 38. Commercial antibodies are available that are specific for a phospho-epitope that is present on both Stat-3-alpha and Stat-3 beta and that are designed to bind to both these proteins in their phosphorylated state. *Id*. Dr. Pachter quibbles that these are "four isoforms" of

a single protein that arise from "alternative splicing" of a single gene, not members of a family (Ex. C (Pachter Tr. at 252:14-253:9), but he admits that they differ in their amino acid sequences. *Id*. at 253:10-15. In other words, they are distinct molecular entities. Sims 2nd Dec. ¶ 69. The specification also includes a prophetic example that utilizes an antibody against a target called "ERK-2." Ex. 1 ('442 Patent) at 57:34. But the ERKs are a family of proteins that are encoded by distinct genes and include at least ERK-1, ERK-2 and ERK-3. Sims 2nd Dec. ¶ 70. And commercial monoclonal antibodies cross-react with ERK-1 and ERK-2. *Id*. The examples in the specification thus include antibody UBAs that can each bind to multiple distinct targets.

Parse asserts that "if the entire sequence or structure of a target was unknown, it would be impossible to design a UBA to bind it." D.I 325 (Parse Br.) at 29 (citing D.I. 308, Ex. 10 (Pachter Reb. Rep.) ¶¶ 84, 139). The cited paragraphs do not support this proposition, which is flatly wrong. As Dr. Sims explains, scientists could, since the 1980s, design an antibody to bind a target antigen whose identity, sequence and structure were unknown, by harnessing the immune systems of animals such as mice in conjunction with hybridoma technology. Sims 2nd Dec. ¶ 68. Production of antibodies in this way led to the identification of the antigen that was later called "PSMA," whose discovery was a substantial advance in the field of prostatic cancer. *Id*. ¶¶ 65-67. As shown above, Parse's reading of the specification is based on an incomplete and incorrect version of the background science that is tailored to support its claim construction.

### B. The Accused Parse Products Selectively Label Target Molecules That Are Defined by the Binding Regions of the Primers In Those Products.

Parse's contention that the Accused Parse Products achieve "untargeted" labeling is unsupported by the evidence—or at least sharply disputed, thereby precluding summary judgment that "no 'target molecules' are labeled by Parse's accused products. Parse Br. at 33. The molecules of interest detected or quantified by the Parse Accused Products include the

mRNA molecules in the transcriptome of a cell or nucleus.  Those mRNA molecules are targeted by using a ████████, which binds selectively to the specific class of RNA molecules that contain a ████████.  The Accused Parse Products also target other RNA molecules in cells or nuclei by using ████████, each of which binds to a specific class of nucleic acids that contain ████████████████████.  Ex. A (Sims Op. Rep.) ¶ 110; D.I. 326, Ex. 14 (Sims Reply Rep.) ¶ 141.  This is not an untargeted approach.  The ████ in those products do not bind to double-stranded DNA.  D.I. 326, Ex. 14 (Sims Reply Rep.) ¶ 143.  Nor do those ████ lead to barcoding of other types of molecules such a proteins or lipids.  *Id*.; Ex. C (Pachter Tr.) 174:11-17 (admitting same).

For the above reasons, the Court should deny MSJ #3 in its entirety.

### C.    The Preamble of Claim 1 of the '752 Patent Is Not Limiting.

Regardless of how "target molecules" is construed, summary judgment of non-infringement should be denied with respect to the '752 Patent for the separate and independent reason that the preamble of claim 1 of the '752 Patent is not limiting.

Here again, Parse's position has flip-flopped.  On September 13, 2024, Parse (represented by its current litigation counsel) served Final Invalidity Contentions, which stated:

> Parse contends that the preamble of the '752 patent claims *is not limiting* because it *does not* 'recite[] essential structure or steps' and is not 'necessary to give life, meaning, and vitality' to the claims. *Catalina Mktg. Int'l, Inc. v. Coolsavings.com. Inc.*, 289 F.3d 801, 809 (Fed. Cir. 2002).

D.I. 308, Ex. 8 at 13 n.4 (alteration original, emphasis added).  Now, Parse does an about-face and contends that the preamble *is limiting*.  Parse Br. at 31 (citing *Catalina*).

Parse was right before and is wrong now: "[A]s a general rule preamble language is not treated as limiting."  *Arctic Cat Inc. v. GEP Power Prods., Inc.,* 919 F.3d 1320, 1327 (Fed. Cir. 2019) (quoting *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1347 (Fed. Cir.

2012)).  For product claims, the Federal Circuit applies a "presumption against reading a statement of purpose in the preamble as a claim limitation" because patentability of such claims "depends on the claimed structure, not the use or purpose of that structure."  *Marrin v. Griffin*, 599 F.3 1290, 1294-95 (Fed. Cir. 2010) (quoting *Catalina*, 289 F.3d at 809).  "[T]he rule against giving invention-defining effect to intended-use preamble language reflects a longstanding aspect of the patent statute…."  *Arctic Cat*, 919 F.3d at 1328.

Relying now solely on *Catalina*—i.e., the case Parse previously cited for the conclusion that the preamble is not limiting—Parse refers to statements of "purpose," "function," and what the claimed kit "would be used for" as a basis for contending that "using the kit on 'target molecules' is an essential aspect of the claims *because it identifies the purpose of the kit* and is therefore limiting."  D.I.325 (Parse Br.) at 32 (emphasis added).  Federal Circuit precedent requires a contrary result.  In *Catalina*, the Court held that the statement of purpose in the preamble was not limiting "because it merely states an intended use for the claimed system." 289 F.3d at 807.  For this very reason, *Catalina* found that the preamble did not recite essential structure or steps: "a preamble is not limiting where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention."  *Id*. at 808 (internal quotation marks and citation omitted).

Those same facts apply to claim 1 of the '752 Patent, in which the body defines a structurally complete kit by enumerating the required components and the preamble merely states the intended use.  Parse does not contend (nor could it) that the preamble language at issue supplies antecedent basis for terms in the body of the patent or was relied on during prosecution to distinguish prior art—either of which could make the preamble limiting.  *Id*. at 808; *Arctic Cat*, 919 F.3d at 1329; *see also id*. (preamble language is not necessarily limiting even when

"underscored as important by the specification.")  Accordingly, the Court should hold that the preamble of claim 1 is not limiting and, for this additional reason, deny Parse's MSJ #3 with respect to the '752 Patent.

## IV.    Parse's MSJ #4 Should Be Denied As Moot.

Parse's MSJ #4 asserts that claim 11 of the '442 Patent, claims 1, 2, 5, and 6 of the '256 Patent, and claim 13 of the '341 Patent ("Asserted Method Claims") are not infringed by the use of Parse's accused products **with nuclei extracted from cells**.  Parse Br. at 34.  However, as to the Parse products accused of infringement in this action, ScaleBio no longer asserts that using such products with extracted nuclei and without cells infringes the Asserted Method Claims.[4]  Parse has asserted no counterclaims of non-infringement, only affirmative defenses.  *See* D.I. 71.  For that reason, Parse's MSJ #4 is moot.  *Spectrum Pharms., Inc. v. Innopharma, Inc.*, No. 12-260-RGA-CJB, 2015 WL 3374922, at *4 n.4 (D. Del. May 22, 2015) ("At oral argument, however, Plaintiffs clarified that they are no longer asserting that claims 10–14 of the '829 patent are infringed by Defendants. … In light of Plaintiffs' statements during oral argument, the Court recommends Defendants' Non-infringement Motion be denied as moot with regard to claims 10–14 of the '829 patent."), *report and recommendation adopted,* 2015 WL 4634827 (D. Del. Aug. 4, 2015).  Since Parse has not asserted non-infringement counterclaims, the heightened requirements for post-commencement mootness of counterclaims do not apply.  *Cf. Already, LLC v. Nike, Inc.*, 568 U.S. 85 (2013) (evaluating whether a covenant not to sue moots a counterclaim).  Parse's MSJ #4 should be denied as moot since it concerns a question of infringement that is no longer at issue in this case.

---

[4] ScaleBio still asserts that use of Parse's accused products **with cells** infringes the Asserted Method Claims and that use of those products with cells or nuclei infringes the asserted kit claims of the '752 Patent, as discussed in Part III above and in its Motion for Summary Judgment of infringement of the '752 Patent.  D.I. 296.  But use of those products with cells is outside the scope of Parse's MSJ #4.

V.    **Parse's *Daubert* Motions Regarding Mr. Mooney Should Be Denied.**

    A.    **Mr. Mooney's Reliance on the ████████████ Should Not Be Excluded.**

Mr. Mooney considered the undisputedly "most relevant" license to the hypothetical negotiation—the ████████████. He analyzed that Agreement's comparability to the hypothetical negotiation, apportioned value based on relevant differences and evidence tied to the facts of this case, and utilized its royalty rates as a starting point for his *Georgia Pacific* analysis. Mr. Mooney's analysis follows applicable law, is grounded in evidence, and is reliable.

    1.    **The Damages Experts Agree that the ████████████ is the Most Relevant License At The Hypothetical Negotiation.**

In moving to exclude certain opinions of Mr. Mooney, Parse challenges the "comparability" of the ████████████ to the question of what royalty rate ScaleBio (as patentee) and Parse (as adjudged infringer) would agree to in a hypothetical negotiation. Parse Br. at 38. While Parse now disputes Mr. Mooney's "comparability" assessment for purposes of his apportionment analysis (discussed in Section V.A.2., *infra*), **there is no dispute** that the ████████████ is the most relevant agreement for purposes of a hypothetical negotiation over infringement of the Asserted ScaleBio Patents because ████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████. Parse's expert, Dr. McDuff, "agree[s] that [under GP Factors 1 and 2] the ████████████████ *is the most informative license to the hypothetical negotiation for the Asserted ScaleBio Patents*" and uses the ████████████ as the basis for his own opinion related to the Asserted ScaleBio Patents. *See* Ex. 319, Ex. 37 (McDuff Reb.) ¶ 113; *see also id.* ¶ 111 (performing an "alternative" royalty analysis for the Asserted ScaleBio Patents "[with] *the negotiation for the*

*Asserted ScaleBio Patents identifying* ███████████████████████████

████████████████████████████████.").

### 2.    Mr. Mooney Performed a Reliable and Valid Apportionment Analysis.

Parse argues that Mr. Mooney's "opinion should be excluded" as "unreliable because he

failed to show built-in apportionment and to properly account for the differences between the

████████████ and the hypothetical negotiation."  Parse Br. at 38.  However, this critique is

based on a fundamental misunderstanding and therefore mischaracterization of Mr. Mooney's

apportionment analysis.  Properly understood, Mr. Mooney's apportionment analysis reliably

apportions value to ██████████████████████████████████████

████████████████████    Mr. Mooney conservatively apportioned a significant amount of

the value of the ██████████████████████████ *before* he then relied on a

different portion of the value (█████████████) as a starting point for a hypothetical

negotiation analysis.  And he did this *only after first* considering whether some apportionment of

the royalty *base* should be performed if, for instance, █████████████████████████

██████████████████████████████████████████.  As to this

question, he concluded (as did Parse's expert) ██████████████████████████

███████████████████████████████████████████

█████████████.  Mr. Mooney's two-part apportionment analysis is correct under existing case

law and should not be excluded.

#### a.    Mr. Mooney's First Apportionment Dealt With Whether the Asserted Patents Were Directed to a Component of the Saleable Units of the Royalty Base or the Full Units Themselves.

There are two apportionment inquiries when relying on comparable licenses as evidence

of what royalty a patentee and an adjudged infringer would agree to in the context of a

hypothetical negotiation.  Mr. Mooney answered both questions.  First, do the asserted patents

which were licensed in the comparable agreement relate to the full value of the accused products making up the royalty base, or is the technology of the asserted patents simply a component of the saleable products such that only a ***portion*** of the value (royalty base) of each saleable unit should be attributed to the asserted patents?

Mr. Mooney considered this question and concluded that ████████████████████
█████████████████████████████████████████████████████████████████.

Relying on case-law, Mr. Mooney explained that "[b]uilt-in apportionment effectively assumes that the negotiators of a comparable license settled on a ████████████████████
████████ embodying the value of the asserted patent." D.I. 313, Ex. 35 (Mooney Op. Rep.) ¶¶ 16-17, 212 (citing *Omega Patents, LLC v. CalAmp Corp.*, 13 F.4th 1361 (Fed. Cir. 2021)).



████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████ D.I. 319, Ex. 39 (McDuff Tr.) at 165:3-166:13 ("█████████████████████████████████████████████████████
████████████████████████████")[5].

Contrary to Parse's argument, Mr. Mooney's conclusion about the comparability of the ████████████████ to the hypothetical negotiation (as it relates to the value of the Asserted ScaleBio Patents to the Accused Parse Products) was not solely based on ██████████████
███████████████████████████. Parse Br. 37-38. Mr. Mooney explained at length that ███████████████████████████████████████████████████

---

[5] Parse's damages expert ███████████████████████████████████████████████
███. D.I. 319, Ex. 37 (McDuff Reb.) ¶ 116-17, FIG. 6 (██████████████████████████████
██████████████████████████████████████).

██████████████████████████████████████████████

██████████████████████████████████████ D.I.

313, Ex. 35 (Mooney Op. Rep.) ¶ 118 ("[I]t is my opinion that the reasonable royalty paid by

Parse would be the result of a ████████████████████████████████

██████████████████████ This is based, in part, on the fact that █████████████

████████████████████████████████████████████

████████████████████."); *see also id.* ¶¶ 127, 213-15 ███████████████

████████████████████████████████████████, 219,

65-77 (████████████████████████████████████████

██████).  He also considered the opinions of Dr. Sims that ████████████████

████████████████████████.  *Id.* ¶¶ 62, 185-92.  Mr.

Mooney's opinions on technical comparability are supported by evidence and are reliable.

Parse argues that because there is no opinion in this case as to whether ScaleBio's

products practice ***their own*** Asserted ScaleBio Patents, this somehow "guts his opinion that the

████████████ was ██████████████████████████" Parse Br. at 39.

However Parse provides no explanation as to why ScaleBio's practice of ***its own patents*** is

relevant to the question of the comparability of the royalty bearing products in the Asserted

ScaleBio Patents (those infringing the licensed patents) and the Accused Parse Products (which,

at the time of the hypothetical negotiation will be adjudged to be infringing the Asserted

ScaleBio Patents).  Again, Parse's complaint flies in the face of its own expert, Dr. McDuff, who

explicitly ***agrees*** that ███████████████████████████████

██████████████████████████.  D.I. 319, Ex. 39 (McDuff Tr.) at

165:3-166:13.  His report states this directly regarding his "alternative royalty calculation" for

36

the Asserted ScaleBio Patents: "█████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████" D.I. 319, Ex. 37

(McDuff Reb. Rep.) ¶ 112.[6] ██████████████████████████████████

███████████████████████████████████████████████

█████████ D.I. 319, Ex. 39 (McDuff Tr.) at 165:3-166:13; D.I. 313, Ex. 35 (Mooney Op.

Rep.) ¶ 213 ████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████

      **b.**    **Mr. Mooney Also Performed an Apportionment to Address Whether** ███████████████████████████████████████████
██████████████████████████████████████.

*In addition* to the question of technical comparability in scope between the Asserted

ScaleBio Patent claims and the Accused Parse Products, Mr. Mooney *also* considered the

question of comparability in scope between the Asserted ScaleBio Patents and ████████

██████████████████████. Mr. Mooney *did not* rely on "built-in apportionment" for

this second apportionment analysis but instead and "in addition…properly accounted for the

differences between the █████████████ and the hypothetical negotiation" specifically that

---

[6] Despite Dr. McDuff's agreement regarding the technical comparability of the ███████
███████████ to the hypothetical negotiation (D.I. 319, Ex. 37 (McDuff Reb. Rep.) ¶¶ 111-112),
Parse faults Mr. Mooney's technical comparability analysis as to the licensed patents stating,
"generally identifying ████████████████████ is insufficient to show technological
comparability. *Zimmer Surgical, Inc. v. Stryker Corp.*, 365 F. Supp. 3d 466, 495 (D. Del. 2019)."
Parse Br. at 41. Mr. Mooney does not ████████████████████████████████████████
█████████████████████████████████████████████████████████

"████████████████████████████████████████████████████████" D.I. 313, Ex. 35 (Mooney Op. Rep.) ¶ 213.

To perform this second and separate analysis, Mr. Mooney accounted for the ███ ████████████████████████████████████████ ██████████████████████████████████████████████ ████████████ . He therefore apportioned ████████████████████████████ ██████████████████████████████████████████ ██████████ D.I. 313, Ex. 35 (Mooney Op. Rep.) ¶¶ 146, 213.[7] After setting aside the ██████ ██████████████████████████████████████████, Mr. Mooney was left with the ██████████████ as indicative of where the parties would start in a hypothetical negotiation over the Asserted ScaleBio Patents.

Parse baldly asserts that "the only basis for Mr. Mooney's opinion that ██████████ ██████████████████ 'relates specifically to the patents-in-suit and ████████████ ██████████ is ██████████████████████.'" Parse Br. at 39. But this is flatly incorrect. While Mr. Mooney verified and buttressed the accuracy of the relationship between ████████████████ ████████████████████████████████████████████████████ with evidence such as ██████████████████████████████████████████████ ██████████████████, Mr. Mooney's opinion does not hinge upon such evidence because, again, █ ████████████████████████████████████████████ ██████████████████████████████████████████ In any

---

[7] At his deposition, Dr. McDuff had the opposite (incorrect) understanding of Mr. Mooney's analysis. Ex. Q (McDuff Tr.)at 329:19-330:5 ("Q: Is it your opinion that [Mr. Mooney] assigned the entire value of [the ██████████████] to the asserted patents? A: Yes.").

case, Mr. Mooney's ██████████████████ was proper and supported by other evidence,
and she will appear at trial and can be cross-examined on the same.

Parse's reliance on *Fundamental Innovation Sys. Int's v. Anker Innovations Ltd.*, 2025
WL 459916 (D. Del. Feb. 11, 2025), is inapposite.  In that case, like here, plaintiff's expert
examined a series of comparable license agreements as a starting point from which he then made
adjustments per a *Geogia Pacific* analysis.  Defendant challenged plaintiff's experts reliance on
the rates in those license agreements which contained much larger portfolios than the four
asserted patents at issue because that expert "considered apportioning but deemed it
unnecessary" and opined that the "four asserted patents *create all the value* for Fundamental's
patent portfolio."  Plaintiff's expert relied on certain statements from plaintiff's "personnel" that
the four asserted patents "drove negotiations over the comparable licenses" to support plaintiff's
expert's conclusion that apportionment was unnecessary.  *Id.* at *11-12.

The facts of this case do not align.  Mr. Mooney affirmatively acknowledges that the

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████  D.I. 328, Ex. 16 (Mooney Reply Rep.) ¶ 90.  Aside from the inapposite *Fundamental*
case, Parse cites no other case holding or otherwise denigrating an expert's reliance on a
conversation with a fact witness to confirm his or her understanding of damages-related scenario.
[8] In fact, as discussed in Section V.B. above, the opposite proposition is true.  Experts frequently

---

[8] Parse's citation to *Guardant Health, Inc. v. Found. Med., Inc.*, 2020 WL 2461551, at *18 (D.
Del. May 7, 2020), Report & Recommendation adopted, 2020 WL 5994155 (D. Del. Oct. 9,
2020) is likewise inapposite as that case involved exclusion of an expert's inexplicable
apportionment of 50% of the value of the accused products to the asserted patents. Again, there
is no dispute here that ████████████████████████████████████████████
███████████████████.  *See* Part V.A.2.a. above.  The instant case requires an

rely on conversations with fact witnesses to confirm their understanding (and such fact witnesses can be cross-examined at trial to test the credibility of their statements to such expert). *10x Genomics, Inc. v. Parse Biosciences, Inc.*, No. CV 22-1117, 2025 WL 572788, at *7 (D. Del. Feb. 21, 2025) (declining to exclude expert testimony—"because [this expert] relies upon findings of Plaintiffs' fact witness, Dr. Durruthy, Davis's opinions are not necessarily unreliable…Defendant will have the opportunity to cross-examine damages expert Julie Davis, fact witness Dr. Durruthy, and to present their own countervailing evidence on this point at trial."). As in the 10X case, Parse will have the opportunity to cross-examine Mr. Mooney and



Mr. Mooney found evidence to guide a proper apportionment strategy ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛. He determined ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛. D.I. 313, Ex. 35 (Mooney Op. Rep.) ¶ 145; D.I. 328, Ex. 16 (Mooney Reply Rep.) ¶ 90. And Mr. Mooney gathered sworn deposition testimony and statements in follow-up conversations regarding ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛. D.I. 313, Ex. 35 (Mooney Op. Rep.) ¶¶ 130, 146, 150, 205, 214; D.I. 328, Ex. 16 (Mooney Reply Rep.) ¶ 91. His analysis is reliable and firmly grounded in evidence.

Finally, while Parse avers that there is "no basis in fact to associate the royalty rate used in the ⬛⬛⬛⬛⬛ to the particular hypothetical negotiation at issue" (Parse Br. at 40), that is

_____

⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛, which Mr. Mooney reliably apportioned.

precisely what its own expert did. D.I. 319, Ex. 37 (McDuff Reb. Rep.) ¶ 114 (describing "the

███████████████ as the most informative to the hypothetical negotiation" ███████████████

███████████████████████████████████████), ¶ 115, FIG. 5.[9]

### 3. The Mechanics of Mr. Mooney's Apportionment Calculation Were Reliable and Based On the Available Evidence.

By page 40 of its Motion, Parse acknowledges that Mr. Mooney recognized the

differences between the ██████████ and the hypothetical negotiation and even concedes

that Mr. Mooney attempted to account for such differences, but takes issue with Mr. Mooney's

basis for "divvy[ing] up the licensed assets as he did." Parse Br. at 40-41.[10] Again, Parse's

argument overlooks the evidentiary record and mischaracterizes Mr. Mooney's analysis.

Mr. Mooney determined whether, in considering the ████████████ (which both he

and Dr. McDuff agree was the "most relevant" agreement to the hypothetical negotiation, *see*

Part V.A.1 above) the stated ██████████ could be used as a starting point or needed to be

adjusted to account for differences between the agreements. ████████████████████

████████████████████████████████████████████████

████████████████████████████ But, in addition, █████████████████

████████████████████████████████████████████████

██████████████████████ Mr. Mooney determined that ████████████

---

[9] Parse cites *Uniloc USA, Inc. v. Microsoft Corp.,* 632 F.3d 1292 (Fed. Cir. 2011) as requiring a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in the case. Parse Br. at 40. In *Uniloc* the challenged expert relied on the 25 percent rule of thumb which the court criticized because it "does not say anything about a particular hypothetical negotiation or reasonable royalty involving any particular technology, industry, or party." *Id.*, at 1317. By contrast, Mr. Mooney explained at length his "basis in fact" for ████████████████████████████████████████████████ ████████████████████████████████████ D.I. 313, Ex. 35 (Mooney Op. Rep.) ¶¶ 122-33.

[10] ScaleBio also challenges Dr. McDuff's method for divvying up such value. D.I. 307 at 42-49.

████████████████████████████████████████████████████████████

████████████████████████████. He did this by engaging in a reliable calculation of ██

████████████████████████████████████████████████████

██████ D.I. 328, Ex. 16 (Mooney Reply Rep.) ¶¶ 90-91 (████████████████████████

████████████████████████████████████████

████████████████████████████████████████);

D.I. 313, Ex. 35, (Mooney Op. Rep.) ¶¶ 145-46, 213.

Mr. Mooney also determined that this apportionment was consistent with other evidence such as ████████████████████████████████████████

████████████████████████████ and the opinions of Dr. Peter Sims about the foundational technologies covered by the licensed patents and the exclusionary rights they convey. D.I. 313, Ex. 35 (Mooney Op. Rep.) ¶¶ 62, 129-130, 205, 214; D.I. 328, Ex. 16 (Mooney Reply Rep.) ¶¶ 88-89. Again, this evidence does not support that ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████ Parse's attempt to paint Mr. Mooney's apportionment of ██████

████████████████████████ as arbitrary and lacking a "formula or method" should be rejected. *Zimmer,* 365 F. Supp. 3d at 495 ("The Federal Circuit does not limit apportionment to specific methodologies because flexibility is required to determine fact-dependent damages.").

To the extent Parse disagrees with Mr. Mooney's analysis, Parse will have an opportunity to challenge the same through cross-examination at trial. *ActiveVideo Networks, Inc. v. Verizon Communs., Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012) ("[T]he degree of comparability of the ... license agreements as well as any failure ... to control for certain variables are factual issues best addressed by cross examination and not by exclusion"); *Zimmer*, 365 F. Supp. 3d at 495 ("To the extent that Stryker disagrees with Dr. Mody's apportionment analysis, it is an issue of the weight of the evidence and witness credibility.").

**B.    Mr. Mooney's Reliance Upon ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ Should Not Be Excluded.**

     **1.** ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆.



Parse's motion to exclude Mr. Mooney's opinions relying on ▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ (Parse Br. 42-45) should be denied. ▆▆▆▆ was identified as a 30(b)(6) designee on topics relating directly and indirectly to the ▆▆ ▆▆▆▆, including ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆, and ScaleBio's competition with Parse (No. 34).  Ex. U.  She was deposed by Parse's attorneys on July 22, 2024.  In the preparation of his Opening and Rebuttal Reports, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆, alongside other evidence in this case and his extensive experience. Mr. Mooney's reliance on ▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆ is not improper and should not be excluded. *Emerson Elec. Co. v. Suzhou Cleva Elec. Appliance Co.*, 2015 WL 8916113, at *9 (E.D. Mo. Dec. 15, 2015) (admitting defense expert's opinions about non-infringing alternatives which were based upon

conversations with defendant's president about the defendant's capacity to substitute non-infringing alternatives); *Science Applications Int'l Corp. v. United States*,  2024 WL 94499, *13–*15 (Ct. Fed. Cl. 2024) (denying patentee's motion to exclude accused infringer's damages expert and rejecting the argument that by relying on…conversations with fact witnesses the expert was improperly acting as a "mouthpiece"); *Dialect, LLC v. Amazon.com Inc.*, 2024 WL 4123507, *5 (E.D. Va. 2024).

Parse cites *Koninklijke Philips Elecs. N.V. v. Zoll Lifecor Corp.*, 2017 WL 3140798, at *4 (W.D. Pa. July 25, 2017) as an example where "the court found a damages expert relaying the contents of an undocumented conversation with another expert unreliable."  Parse Br. at 44. *Koninklijke* is unhelpful to Parse's argument for at least two reasons.  First, ███████ is not "another expert" and she did not submit a report which Mr. Mooney could have otherwise relied upon. Second, in *Koninklijke*, while the Court was puzzled by reliance on an undocumented conversation, the statement was merely dicta as the Court had deemed the testimony itself irrelevant having excluded for different reasons the expert's apportionment analysis. *Id.* at *4.

Parse provides a laundry list of evidence on pages 42-44 of its Opening Brief that it alleges was improperly relied upon by Mr. Mooney. But the majority of this evidence is ████ ████████████████████████████████████. ████. For example, Parse disputes Mr. Mooney's reliance on ██████ for issues relating to ██████████████████████ but she was specifically designated as a 30(b)(6) witness on that Topic (No. 11).  But Parse was free to ask her questions on this topic at deposition (to which she testified—'████████████████"), and Parse will be free to do so again at trial. Ex. T (██████), 173:13-178:22.  As █████████████████ is knowledgeable about the company, its history, and its operations.  Mr. Mooney's reliance upon her sworn deposition

testimony and conversations in follow-up on the same were not improper, are not without

opportunity for meaningful cross-examination, and should not be excluded.



2.    **The Material Relied Upon From Mr. Mooney's ███████████ ████████ is Consistent With Other Evidence in this Case and Can Be Probed for Credibility at Trial.**

Finally, Parse's laundry list of purportedly unreliable evidence is fully consistent with

*other* evidence in this case, thus weighing against exclusion. ████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████. Ex. R (███████

Tr.) at 40:2-41:18; *see also id.* at 34:23-35:8.  In addition, ███████ testimony regarding ████

████████████████████████████████████████

█████████████████████ is consistent with the nature of exclusionary patent

rights themselves.  Ex. Q (McDuff Tr.) at 109:12-22, 118:6-17.  Likewise, the fact that the

███████████ licenses different patents that cover different technology than the ████████

████████ is apparent from that agreement and the patents enumerated, and is consistent with

███████████████████████████████. Ex. V at

SCALEBIO0090216-269; Ex. R (███████ Tr.) 35:3-8; 39:22-41:21.

Both Mr. Mooney and ██████████ will be available at trial and can be cross-examined on

such conversations at that time.  *10x Genomics, Inc.*, 2025 WL 572788, at *7.

## VI.    Parse's *Daubert* Motion Regarding Dr. Paz Should Be Denied.

Dr. Paz's market analysis and opinions are grounded in her years of experience providing

strategic advice to global and emerging pharmaceutical, biotechnology, and diagnostic

companies and careful review of the documentary evidence in this case.  As courts in this

District have recognized, the "reliability of testimony from a practical experience expert 'depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it.'"  *10x Genomics*, 2025 WL 572788, at \*4.  Parse does not actually dispute the breadth and depth of Dr. Paz's market analysis experience, and so instead lodges unfounded criticisms of Dr. Paz's specific exposure to RNA single-cell sequencing which go to the weight and credibility of her testimony, not its admissibility.  Parse's motion should be denied.

### A.    Dr. Paz Is Eminently Qualified as a Market Expert.

Despite Dr. Paz's extensive experience founding, running, and now advising biotechnology and pharmaceutical companies on market strategy, Parse contends that Dr. Paz "does not have the background or experience to be a market expert in RNA single-cell analysis." Parse Br. at 47.  The Third Circuit has "interpreted Rule 702's qualification requirement liberally."  *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008).  Accordingly, a "broad range of knowledge, skills, and training qualify an expert," and the Third Circuit has "eschewed imposing overly rigorous requirements of expertise and [has] been satisfied with more generalized qualifications."  *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994). Under this liberal standard, Dr. Paz is qualified to opine on the RNA single-cell analysis market.

Dr. Paz was asked to provide an assessment of "the market and potential markets for products sold by ScaleBio and Parse."  Ex. 9 (Paz Op. Rep.) ¶ 2.  Dr. Paz did not present herself as a "market expert in RNA single-cell analysis" specifically, nor would she need to be one in order to opine on that market.  Dr. Paz has "over twenty years of technical, entrepreneurial, and leadership experience in the healthcare and biotechnology fields" and "regularly provide[s] advice regarding business development and the identification of business opportunities in anticipation of market evolution, strategic planning, competitive intelligence, market access advice, partnership and collaboration opportunities, and technology assessment for due

diligence." Ex. 9 (Paz Op. Rep.) ¶¶ 5, 6.  This District and the Third Circuit have consistently recognized that experts may be qualified to opine on specific issues based on more generalized experience.  *See Hammond v. Int'l Harvester Co.*, 691 F.2d 646, 652-53 (3d Cir. 1982) (engineer with experience in automotive and agricultural equipment sales and teaching high school automobile repair could testify in products liability action involving tractors); *Knight v. Otis Elevator Co.*, 596 F.2d 84, 87-88 (3d Cir. 1979) (expert could testify regarding elevator button design defect despite lack of specific background in design and manufacture of elevators); *Evans v. Imo Indus., Inc.*, 2019 WL 3253781, at *2 (D. Del. July 19, 2019) (former Navy captain qualified to testify about procurement procedures without ever personally overseeing ordering of parts).  Dr. Paz has extensive experience analyzing markets in life sciences and diagnostic spaces and is qualified to opine on the market occupied by ScaleBio and Parse.

Parse instead distorts Dr. Paz's testimony to cast doubt on her experience.  First, Dr. Paz was asked what her "***previous*** understanding" of the RNA single-cell analysis market was, and she truthfully responded that ***prior to this case*** she had a "very general understanding" of the single-cell analysis market given ███████████████████████████.  Ex. 23 (Paz Tr.) at 153:6-16; *see* Ex. S at 120:5-121:6 (describing ██████████); Parse Br. at 47.  Second, as Dr. Paz repeatedly testified, her conversations with "experts" in the biotechnology and pharmaceutical industries, "are conversations that I constantly have with experts to do my work…in general to stay as a market expert." Ex. 23 (Paz Tr.) at 115:14-20.[11]  These conversations contribute to Dr. Paz's experience as a market expert, even if they were not conducted for the formal purpose of writing her reports.  Finally, Parse provides no reason why

---

[11] Dr. Paz explicitly disclosed that, "[i]n preparing [her opening] report, [she] relied on…personal interactions with customers and competitors in the RNA single [cell] sequencing market." Ex. 9 (Paz Op. Rep.) ¶ 16.

Dr. Paz, as a non-technical expert, would need to speak to ScaleBio's technical experts, use the accused products, or hold the kits in her hand to form an opinion on the relevant markets for these products.  Parse Br. at 47.  Parse's attacks on Dr. Paz's experience are unfounded.

> **B.    Dr. Paz's Instrument Free and Highly Scalable Market Definition Is Based on Her Extensive Experience Analyzing Markets.**

Dr. Paz based her opinions on an extensive review of the evidence and her years of experience in defining market niches for clients seeking market entry.  Parse misstates the standard under *Daubert* and Fed. R. Evid. 702 when it complains that Dr. Paz has no "scientific basis" for her highly scalable and instrument free market definition.  Parse Br. at 48.  Fed. R. Evid. 702 permits expert opinion based on "scientific, technical, ***or other specialized knowledge***," not just "methods and procedures of science."  *Daubert* "referred to scientific testimony because that was the nature of the expertise at issue."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-48 (1999).  All that must be assessed is "whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline."  *Id.* at 149.

Parse insists that Dr. Paz "did not follow any methodology when conducting the market analysis for this case" solely because she did not speak to various persons in forming her opinions.  Parse Br. at 48.  But "when examining expert testimony that is based on practical experience…the reliability of testimony from a practical experience expert depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it." *10x Genomics*, 2025 WL 572788, at *4.  As explained above, Dr. Paz is a highly qualified market expert, and she permissibly relied on that experience alongside testimony and other documentary market evidence in this case to form her opinions.  *See 360Heros, Inc. v. GoPro, Inc.*, 569 F. Supp. 3d 198, 204 (D. Del. 2021) (finding expert opinion dividing customer base into three subgroups reliable where the expert "rel[ied] on his own relevant experience in the

48

industry" since "[t]he Third Circuit and district courts within the Circuit have made clear that an expert's personal, relevant experience can serve as a foundation for reliability"); *Pers. Audio, LLC v. Google LLC*, No. CV 17-1751-CFC-CJB, 2021 WL 5038740, at *4 (D. Del. Oct. 25, 2021) (noting the expert's "decades of prior experience in the [relevant] industry" and concluding the expert "can surely rely upon this type of personal experience in order to draw reliable conclusions"). Dr. Paz's reliance on her experience, in addition to the evidence she discusses in her reports, is proper and her testimony should not be precluded.

Parse's complaints about Dr. Paz not speaking to industry stakeholders are a red herring. Dr. Paz testified that "any time [she] need[s] to create for [her]self an understanding of a particular market just to become an expert" there are "different ways to do it" and she is "constantly scouting for information" which can include conversations but also other things like reading publications and going to conferences. Ex. S (Add'l Paz Tr.) at 118:13-119:8. Ultimately, who she would want to speak with "will very much depend on the focus and objectives of the project." Ex. 23 (Paz Tr.) at 68:21-22; *see also id.* at 111:12-112:1; Ex. S (Add'l Paz Tr.) at 79:7-9, 85:12-18. Parse also omits that Dr. Paz testified that ***she had conversations with users of these products***, including "[l]ab managers in research [and academic] institutes," (Ex. S (Add'l Paz Tr.) at 108:18-22), and that she relied on deposition testimony from both Parse and ScaleBio witnesses about the products and competition between the parties in her reports. *See, e.g.*, Ex. 9 (Paz Op. Rep.) ¶¶ 55, 62-63.[12]

Parse cannot deny that Dr. Paz relied on a variety of documents in forming her opinions, so it instead takes issue with her selection and interpretation of certain documents. *See* Parse Br.

---

[12] Dr. Paz addressed ███████████████████████████████████ in her reply report. *See* Ex. 17 (Paz Reply Rep.) ¶ 21.

at 48-50. The "existence of conflicting evidence [is] not…a basis on which to exclude" an expert's opinion. *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 290 (3d Cir. 2012). Whether an expert "relied on the best data in forming h[er] opinions is a question for the jury." *Allscripts Healthcare, LLC v. Andor Health, LLC*, 2022 WL 3021560, at *15 (D. Del. July 29, 2022); *see also Summit 6*, 802 F.3d at 1296 ("[W]here the methodology is reasonable and its data or evidence are sufficiently tied to the facts of the case, the gatekeeping role of the court is satisfied, and the inquiry on the correctness of the methodology and of the results produced thereunder belongs to the factfinder."). Parse's issues with the factual underpinnings of Dr. Paz's reports are best addressed through cross examination and are not a basis to preclude her testimony.

**C.    Dr. Paz's Opinions On the Impact of** ███████████████ **on ScaleBio Is Based On Her Experience with Similar Outcomes in Other Markets.**



Dr. Paz's opinion that ████████████████████████████████████████ ████████████████████ products using split pool barcoding technology is supported both by documentary evidence and her own experience seeing this fact pattern play out in other markets. Ex. 9 (Paz Op. Rep.) ¶¶ 64, 68-69. Parse does not dispute, and cannot given its own documents admit as much, ███████████████████████████████████████████ ████████████████████. *See id.* ¶ 68. Knowing the particular customer bases for these products and having seen this fact pattern play out before (based on her prior market analysis experience), Dr. Paz applied her knowledge and experience to explain ██████████████ ██████████████████████████████████████████████████████ ██████. *See id.* ¶ 69; Ex. 17 (Paz Reply Rep.) ¶ 31 (███████████████████████████████ ██████████████████████████████████████). Dr. Paz was permitted to rely on her experience in reaching that conclusion. *360Heros*, 569 F. Supp. 3d at 204; *Pers. Audio*, 2021 WL 5038740, at *4. Her testimony should not be precluded.

OF COUNSEL:

Stephen S. Rabinowitz
srabinowitz@wolfgreenfield.com
WOLF, GREENFIELD, & SACKS, P.C.
605 Third Avenue
New York, NY 10158
212.697.7890

Chelsea A. Loughran
cloughran@wolfgreenfield.com
Stuart V.C. Duncan Smith
sduncansmith@wolfgreenfield.com
Emma L. Frank
efrank@wolfgreenfield.com
Arden E. Bonzo
abonzo@wolfgreenfield.com
WOLF, GREENFIELD, & SACKS, P.C.
600 Atlantic Avenue
Boston, MA 02210
617.646.8000

/s/ Sara M. Metzler
Kelly E. Farnan (#4395)
farnan@rlf.com
Sara M. Metzler (#6509)
metzler@rlf.com
RICHARDS, LAYTON, & FINGER, P.A.
920 North King Street
One Rodney Square
Wilmington, DE 19801
302.651.7700

*Counsel for Plaintiffs and Counterclaim
Defendant Scale Biosciences, Inc.*

Dated: March 24, 2025

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 24, 2025, true and correct copies of the foregoing document were caused to be served on the following counsel of record as indicated:

**<u>BY ELECTRONIC MAIL</u>**
Karen L. Pascale
Robert M. Vrana
Young Conaway Stargatt & Taylor, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801

**<u>BY ELECTRONIC MAIL</u>**
Byron L. Pickard
R. Wilson Powers III, Ph.D.
Chandrika Vira
Christopher M. Gallo, Ph.D.
Brady P. Gleason
David Y. Wang
Louis P. Panzica, Jr.
Jamie Dohopolski
Ryan N. Kaiser
Cristen A. Corry
Sterne, Kessler, Goldstein & Fox, P.L.L.C.
1101 K Street, NW, 10th Floor
Washington, DC 20005

*/s/ Sara M. Metzler*
Sara M. Metzler (#6509)
metzler@rlf.com