**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| SCALE BIOSCIENCES, INC. and ROCHE SEQUENCING SOLUTIONS, INC., <br><br> *Plaintiffs,* <br><br> v. <br><br> PARSE BIOSCIENCES, INC., <br><br> *Defendant,* | **REDACTED VERSION** <br> **Filed: April 24, 2025** <br><br><br> Civil Action No. 1:22-cv-01597-CJB <br><br>  |
| PARSE BIOSCIENCES, INC. and UNIVERSITY OF WASHINGTON, <br><br> *Counterclaim-Plaintiffs,* <br><br> v. <br><br> SCALE BIOSCIENCES, INC., <br><br> *Counterclaim-Defendant.* | |

**COUNTERCLAIM-PLAINTIFFS' OMNIBUS REPLY BRIEF IN SUPPORT OF
MOTIONS FOR SUMMARY JUDGMENT AND MOTIONS TO
EXCLUDE EXPERT OPINIONS AND TESTIMONY**

*Of Counsel:*

Byron L. Pickard
R. Wilson Powers III, Ph.D.
Chandrika Vira
Christopher M. Gallo
Brady P. Gleason
David Y. Wang
Louis P. Panzica, Jr.
Ryan N. Kaiser
Cristen A. Corry
**STERNE, KESSLER, GOLDSTEIN
  & FOX, P.L.L.C.**
1101 K Street, NW, 10th Floor
Washington, DC 20005
(202) 371-2600

**YOUNG CONAWAY STARGATT & TAYLOR LLP**
Karen L. Pascale (#2903)
Robert M. Vrana (# 5666)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
(302) 571-6600
kpascale@ycst.com
rvrana@ycst.com

*Attorneys for Defendant/Counterclaim-Plaintiff Parse Biosciences, Inc. and Counterclaim-Plaintiff University of Washington*

April 17, 2025

# TABLE OF CONTENTS

I.     Parse's MSJ #1 should be granted because the '442, '256 and '752 patents' asserted claims are invalid for lack of written description and enablement as a matter of law. ..................................................................................................1

    A.     Scale does not dispute the '752 patent's failure to describe and enable UBAs...............................................................................................................1

        1.     Scale offers no valid basis to excuse the '752 patent's failure to *enable* the claimed UBAs. ..........................................................1

        2.     Scale offers no valid basis to excuse the '752 patent's failure to *describe* the claimed UBAs. .......................................................4

    B.     The '442 and '256 patents' asserted claims are invalid as a matter of law. ...........6

        1.     Dr. Sims's new opinions do not create a triable issue. ...............6

        2.     Scale's claims are not exempt from the requirements to describe and enable the entire genus simply because they recite methods of use. ..................................................................................................9

II.    Parse's MSJ #2 should be granted because Scale's asserted claims are invalid for failing to claim essential features as a matter of law. .........................................................9

    A.     Scale's patents do not disclose any embodiment that omits a UBA and ESB. ........................................................................................................10

    B.     By omitting UBAs and ESBs, the asserted claims are unduly broad. ..................12

III.   Parse's MSJ #3 should be granted because Parse's proposed construction of "target molecules" is correct. ............................................................................................12

    A.     Scale projects the shortcomings of its own proposed construction in attacking Parse's definition, cherry-picking disclosures in the common specification to support its improper construction..................................................12

        1.     Scale ignores half of the definition that the common specification provides for the term "target molecules."...................................13

        2.     Parse's construction is wholly consistent with how the term "UBA" is defined in the specification and construed by the Court, and how the specification requires UBA/target molecule interaction. ....................................................................................14

        3.     Scale mischaracterizes the extrinsic evidence. ..........................16

    B.     The preamble of the '752 patent is limiting..........................................................18

C.    Under the proper construction of "target molecules," Parse's accused products do not identify, label, or barcode "target molecules."............................19

IV.    Mr. Mooney's opinions that are based on the ████████ should be excluded. ..........19

V.    Mr. Mooney's opinions that rely on ████████ conversations should be excluded. ...............................................................................................22

VI.    Dr. Paz's "generalized experience" and lack of methodology makes her opinion unreliable...............................................................................................24

CONCLUSION.............................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*10x Genomics, Inc. v. Parse Biosciences, Inc.*,
No. 22-1117, 2025 WL 572788 (D. Del. Feb. 21, 2025)........................................................21

*ABS Glob., Inc. v. Inguran, LLC*,
914 F.3d 1054 (7th Cir. 2019) ...........................................................................................2, 3

*Alcon Rsch., Ltd. v. Apotex Inc.*,
687 F.3d 1362 (Fed. Cir. 2012).............................................................................................2

*Allergan USA, Inc. v. MSN Lab'ys Priv. Ltd.*,
111 F.4th 1358 (Fed. Cir. 2024) .....................................................................................3, 10

*Amgen v. Sanofi*,
598 U.S. 594 (2023)....................................................................................................1, 4, 8

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
598 F.3d 1336 (Fed. Cir. 2010)..............................................................................................9

*Baxalta Inc. v. Genentech, Inc.*,
81 F.4th 1362 (Fed. Cir. 2023) ..............................................................................................4

*Baxalta Inc. v. Genentech, Inc.*,
972 F.3d 1341 (Fed. Cir. 2020)..............................................................................................2

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
289 F.3d 801 (Fed. Cir. 2002)..............................................................................................18

*Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*,
868 F.2d 1251 (Fed. Cir. 1989)............................................................................................18

*In re Entresto*,
125 F.4th 1090 (Fed. Cir. 2025) .......................................................................................1, 4

*Ferring B.V. v. Barr Lab'ys., Inc.*,
437 F.3d 1181 (Fed. Cir. 2006)............................................................................................11

*Fundamental Innovations Sys. Int'l LLC v. Anker Innovations Ltd.*,
No. 21-33-RGA, 2025 WL 459916 (D. Del. Feb. 11, 2025)................................................22

*General Electric Co. v. Nintendo Co., Ltd.*,
179 F.3d 1350 ......................................................................................................................18

iii

*INVISTA N. Am. S.À.R.L. v. M & G USA Corp.*,
    951 F. Supp. 2d 626 (D. Del. 2013) .................................................................3

*Jolivet v. Compass Grp. USA, Inc.*,
    340 F.R.D. 7 (2021) ........................................................................................23

*Juno Therapeutics, Inc. v. Kite Pharma, Inc.*,
    10 F.4th 1330 ...............................................................................................5, 7

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) ......................................................................................24

*LizardTech, Inc. v. Earth Resource Mapping, Inc.*,
    424 F.3d 1336 (Fed. Cir. 2005) ..................................................................9, 12

*In re McLeay*,
    No. 2023-2338, 2025 WL 516809 (Fed. Cir. Feb. 18, 2025) ..........................9

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
    959 F.3d 1091 (Fed. Cir. 2020) ...................................................................2, 3

*Natera, Inc. v. CareDx, Inc.*,
    No. 20-38-CFC-CJB, 2025 WL 592760 (D. Del. Feb. 24, 2025) ...................8

*Omega Pats., LLC v. CalAmp Corp.*,
    13 F.4th 1361 (Fed. Cir. 2021) ....................................................................19

*PureCircle USA Inc. v. SweeGen, Inc.*,
    No. 2022-1946, 2024 WL 20567 (Fed. Cir. Jan. 2, 2024) ..............................9

*SanDisk Corp. v. Memorex Prods., Inc.*,
    415 F.3d 1278 (Fed. Cir. 2005) ....................................................................13

*Sitrick v. Dreamworks, LLC*,
    516 F.3d 993 (Fed. Cir. 2008) .......................................................................2

*Sunoco Partners Mktg. & Terminals L.P. v. Powder Springs Logistics, LLC*,
    No. 17-1390-LPS-CJB, 2020 WL 1234822 (D. Del. Mar. 13, 2020) ..........4, 5

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
    247 F.3d 1316 (Fed. Cir. 2001) .....................................................................8

*Vectura Ltd. v. Glaxosmithkline LLC*,
    981 F.3d 1030 (Fed. Cir. 2020) ....................................................................20

## TABLE OF EXHIBITS[1]

| Exhibit No. | Description |
| --- | --- |
| 35. | Excerpts from the Rebuttal Expert Report of Peter A. Sims, Ph.D. Regarding the Validity of the Asserted ScaleBio Claims, dated November 12, 2024 ("Sims Rebuttal Rpt.") |
| 36. | Excerpts from the transcript of the Videotaped Deposition of Peter A. Sims, Ph.D., taken January 24, 2025 ("Sims Tr.") |
| 37. | ███████████████████████████████████████ |
| 38. | Excerpts from the transcript of the Videotaped Deposition of Maria Fe Paz De Paz, M.D., Ph.D., MBA, taken January 29, 2025 ("Paz Tr.") |
| 39. | ████████████████████ (PARSE0413722) ("Paz Dep. Ex. 109") |
| 40. | Excerpts from the transcript of the Videotaped Deposition of Michael J. Skogen, taken July 24, 2024 ("Skogen Tr.") |
| 41. | Excerpts from the transcript of the Videotaped Deposition of John Walsh, taken September 6, 2024 ("Walsh Tr.") |
| 42. | Excerpts from the transcript of the Videotaped Deposition of Melanie Masuda, taken July 18, 2024 ("Masuda Tr.") |

---

[1] The Exhibits are attached to the Supplemental Declaration of Brady P. Gleason, filed contemporaneously with this Reply Brief.

I.     **Parse's MSJ #1 should be granted because the '442, '256 and '752 patents' asserted claims are invalid for lack of written description and enablement as a matter of law.**

A.     **Scale does not dispute the '752 patent's failure to describe and enable UBAs.**

Parse's opening brief demonstrated that the '752 patent fails to describe and enable the claimed UBAs. D.I. 325, 12-19. That showing established: (i) the asserted claims encompass UBAs; (ii) UBAs are a functionally-defined genus—UBAs are the molecules designed to bind to target molecules; (iii) there are billions of potential UBAs that could serve in Scale's claimed invention, but only a small fraction possess the requisite binding functionality for a given target; (iv) there is a "vast" number of claimed target molecules; (v) making and using the full scope of UBAs (including antibodies and aptamers) requires undue experimentation; and (vi) the specification provides skilled artisans almost no guidance for determining the full scope of UBA-antibodies and UBA-aptamers for use in the claimed kits. *Id.*; D.I. 315, ¶¶ 1-4; D.I. 366, 12, 15.

Scale does not dispute any of this. Instead, Scale argues that none of it matters, claiming its patent does not even need to describe or enable UBAs because they are allegedly "optional" embodiments. D.I. 366, 1-2. It then points to *In re Entresto* for the proposition that optional embodiments are excused from the written description and enablement requirements. *Id.* at 3-7 (citing 125 F.4th 1090 (Fed. Cir. 2025)). But *Entresto* does not say that; it merely held that a patentee need not describe or enable later-arising technology, even if the claims cover that technology. Nor can Scale credibly contend that "UBAs" are an "optional" element of its inventions. The essence of Scale's claims is labeling target molecules (*see* D.I. 317, ¶ 15) and UBAs are the very things (the only things, really) the specification says are designed to attach barcodes to target molecules. D.I. 118; D.I. 325, 20-22.

1.     **Scale offers no valid basis to excuse the '752 patent's failure to *enable* the claimed UBAs.**

The more a patent claims, the more it must enable. *Amgen v. Sanofi*, 598 U.S. 594 (2023).

It is well-settled law that if the scope of a patent claim encompasses multiple embodiments, then the patent must enable each of those embodiments. *See McRO, Inc. v. Bandai Namco Games Am. Inc.*, 959 F.3d 1091, 1100 (Fed. Cir. 2020) (enablement "analysis has routinely involved concrete identification of at least some embodiment or embodiments asserted not to be enabled"). Because dependent claim 5's UBA embodiment is admittedly not enabled, independent claim 1 is similarly not enabled. *See Alcon Rsch., Ltd. v. Apotex Inc.*, 687 F.3d 1362, 1368 (Fed. Cir. 2012) (patentees cannot "simply disavow the invalid portion and keep the valid portion of the claim"). To hold otherwise would lead to the absurd result where a broader independent claim survives an enablement challenge while its narrower dependent claim fails for lack of enablement. *See ABS Glob., Inc. v. Inguran, LLC*, 914 F.3d 1054, 1076 (7th Cir. 2019). And because there is no dispute the '752 patent's other asserted claims rise and fall with claim 1, they too are invalid for lack of enablement. *Alcon Rsch.*, 687 F.3d at 1368; *see also* D.I. 359, 16.

For this reason, Scale's attempt (at 2) to rebrand UBAs as an "optional" feature is wrong and beside the point. Patentees cannot skirt enablement simply by drafting claims to cover different embodiments, leaving artisans with different "options" for making and using the invention. *See Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 1000 (Fed. Cir. 2008) (invalidating a claim that covered both video games and movies because one of those options was not enabled). Indeed, Scale all but agrees (at 6) that Parse's motion would invalidate dependent claim 5. Scale argues (at 2) that claim 5's UBAs "are not embodiments of" claim 1, *id.*, but this argument is contrary to law. *See Baxalta Inc. v. Genentech, Inc.*, 972 F.3d 1341, 1346 (Fed. Cir. 2020) ("explicitly claimed embodiments" recited in dependent claims are encompassed by a corresponding independent claim).

*Entresto* did not change the law, and its enablement analysis is not relevant here. That

determination rested entirely on black-letter law that "after-discovered" inventions "cannot be used to 'reach back' and invalidate the asserted claims." *Id.* at 1099-1100. Although *Entresto* acknowledged that "a specification must only enable the *claimed* invention," *id.* at 1099, that principle simply means only that it need not enable "matter outside the claims." *McRO*, 959 F.3d at 1100. Here, no "after-discovered" technology is being used to "reach back."

Scale argues (at 8) that the *Allergan* decision stands for the principle that "an optional component is not one that []must be" described or enabled. That is not true. The claims at issue in *Allergan* required various compounds "and optionally, a glidant." *Allergan USA, Inc. v. MSN Lab'ys Priv. Ltd.*, 111 F.4th 1358, 1364 (Fed. Cir. 2024); D.I. 366, 8. The question was not whether glidant (as an optional feature) categorically needed to be described or enabled, as Scale says, but rather whether the specification *disclosed both options—i.e.*, formations with *and* without glidant. *Id.* at 1373-74. Because it disclosed *both* embodiments (not just one), the claim element "and optionally, a glidant" was described. *Id.*

Scale's reliance on *INVISTA* is also misplaced. *INVISTA N. Am. S.À.R.L. v. M & G USA Corp.*, 951 F. Supp. 2d 626 (D. Del. 2013). There, the defendant argued that the patent lacked written description and enablement because the *specification* failed to disclose "the importance of sodium acetate ("NaAc") in controlling yellowness" in the claimed compositions. *Id.* at 653. The court rejected this argument because (i) not one claim recited NaAc, and (ii) no claim at issue imposed a yellowness requirement. Because the supposedly missing disclosure had no relationship to the claimed invention, the court held the lack of a NaAc disclosure was "irrelevant to the written description and enablement requirements." *Id.* at 654.

Here, Scale's claims are far broader and require as much experimentation as those invalidated in *Amgen* and *Baxalta*, yet they reside in a specification that provides less guidance

than what those cases held insufficient as a matter of law. D.I. 325, 18-19 (citing *Amgen*, 598 U.S. 594; *Baxalta Inc. v. Genentech, Inc.*, 81 F.4th 1362 (Fed. Cir. 2023)). Scale does not even try to marshal facts showing otherwise. Summary judgment is therefore warranted.

### 2.    Scale offers no valid basis to excuse the '752 patent's failure to *describe* the claimed UBAs.

Scale argues that the '752 patent does not need to *describe* UBAs because they are allegedly not "critical to the claimed invention." D.I. 366, 5 (citing *Sunoco Partners Mktg. & Terminals L.P. v. Powder Springs Logistics, LLC*, 2020 WL 1234822, at *2 (D. Del. Mar. 13, 2020) (extending this requirement to unrecited elements that "are critical to the claimed invention")). Thus, there should be no dispute that the law requires the '752 patent to describe all essential elements, even if they are not explicitly recited. *Sunoco*, 2020 WL 1234822, at *2. Because UBAs are essential, they must be described.

UBAs are essential because the asserted claims of the '752 patent require the recited APSs form "all or part of a cell or organelle origination barcode" (*i.e.*, COB), and these claimed COBs *by definition* must "provide a code that indicates the cell or organelle of origin." D.I. 108-1, at 3; D.I. 317, ¶ 11. This requirement mandates the use of a UBA because the claimed APSs and COB have no use without an association between the "cell or organelle of origin" and the target molecule. D.I. 328-1, Ex. 4 ('752 patent), 16:10-12; D.I. 118. The UBA's defined function is to bind target molecules, associating the target molecule with an ESB and a COB—providing the necessary "quantum" of information needed to achieve the patent's stated goal of identifying target molecules. D.I. 317, ¶¶ 11-15; Ex. 35 (Sims Rebuttal Rpt.), ¶ 484.

Against this backdrop, *Entresto* is inapposite. There, claims at issue required the administration of two pharmaceutical agents (valsartan and sacubitril) "in combination." 125 F.4th at 1094, 1097. The district court gave the limitation "in combination" its ordinary meaning

over the defendant's objection, which sought to exclude its accused product—"a valsartan-sacubitril *complex*"—that was distinct from the physical mixture of valsartan and sacubitril disclosed in the specification. *Id.* at 1095, 1098 (emphasis added). The Federal Circuit endorsed that construction, stating it would have been in error to construe the patent as claiming complexes, because the "complex" form of the claimed composition was an after-arising invention. *Id.* at 1099 n.5. And because the patent did not claim this after-arising technology, the patent did not need to describe them. *Id.* at 1098.

Here, the dispute over the '752 patent's treatment of UBAs is vastly different. *First*, the patent discloses and actually *claims* UBAs. D.I. 328-1, Ex. 4, claim 5. UBAs are thus more than simply "covered" by the literal scope of the asserted claims—they are indisputably a subset of that claim scope. *See* Section I.A.1. If the patent at issue in *Entresto* mentioned (without fully describing) complexes and contained dependent claims that recited complexes, *Entresto* would likely have come out the other way. *Second*, UBAs are not a later arising invention. In addition to being explicitly claimed, UBAs have a dedicated section of the specification and are the very first thing listed in the specification's disclosure of the "present invention." Ex. 4, 17:23-20:33, 34:46-49. *Third*, as noted above, UBAs are essential and, thus, under Scale's own case law must be described. D.I. 366, 5 (citing *Sunoco*, 2020 WL 1234822, at *2).

Finally, unlike the drug composition claims in *Entresto*, Scale's asserted claims define their boundaries using functionally-defined genera, including both UBAs and COBs. *See* D.I. 118 (construction of UBA); D.I. 108-1, 3 (construction of COB). In such instances, the Federal Circuit requires the patent to disclose "either [1] a representative number of species falling within the scope of the genus or [2] structural features common to the members of the genus so that one of skill in the art can 'visualize or recognize' the members of the genus." *Juno*

5

*Therapeutics, Inc. v. Kite Pharma, Inc.*, 10 F.4th 1330. 1335 (Fed. Cir. 2021). *Entresto* avoided this standard altogether. And the remaining cases cited by Scale (at 3-5) without meaningful discussion do not suggest that Scale's patents can similarly avoid the *Juno* standard. Because Scale does not even attempt to argue that the '752 patent satisfies *Juno*, the asserted claims are invalid for lack of written description as a matter of law. *See* D.I. 325, 12-17.

**B.    The '442 and '256 patents' asserted claims are invalid as a matter of law.**

The '442 and '256 patents' asserted claims require UBAs because they recite "uniquely labeling target molecules" (D.I 328-1, Ex. 1 ('442 patent), claim 11) or binding a "[UBA] nucleic acid tags" "to the nucleic acid targets" (Ex. 328-1, Ex. 2 ('256 patent), claims 1-2, 5, and 6), and the specification teaches that UBAs are essential to achieving these claimed results. Scale essentially concedes that the '442 and '256 patents need to describe and enable UBAs—specifically *nucleic acid aptamers*. D.I. 366, 12-15. Scale isolates these aptamers from other types of UBAs, arguing they do not need to be described or enabled, based on claim construction. *Id.* at 10-12, 14-15. Then, Scale points to new opinions from Dr. Sims to say a disputed material fact exists. *Id.*; D.I. 368 (Sims 2nd Decl.), ¶ 57, 59, 60-62. But, even if Dr. Sims is credited, summary judgment is proper because he fails to account for the full breadth of nucleic-acid aptamer UBAs.[2]

**1.    Dr. Sims's new opinions do not create a triable issue.**

Aptamers are like antibodies, in that they specifically "bind target molecules in a highly specific, conformation-dependent manner." D.I. 325, 7. The specification describes only one method of generating nucleic-acid aptamers: SELEX, which produces aptamer *candidates*

---

[2] Parse does *not* agree that the asserted claims categorically exclude the use of antibodies or peptide aptamers as UBAs. Rather, because summary judgment is proper irrespective of the merits of Scale's new claim construction arguments, Parse does not contest them here.

through an iterative, trial-and-error process that requires considerable additional testing. *Id.* Yet, insofar as it concerns their claimed use, the specification provides no guidance distinguishing suitable aptamers from non-suitable ones. *Id.* at 10 (citing D.I. 328-1, Ex. 1, 19:35-51).

Scale dismisses (at 13, 15) these issues because Dr. Sims contends that aptamers "can be designed" a different way by "using complementary sequences selected according to the Watson-Crick base pairing rules"—*i.e.*, the same way probes and primers are generated, which does not require undue experimentation. D.I. 368, ¶¶ 57, 59. But even accepting this *arguendo*, Dr. Sims's imagined primer/probe-type aptamers cannot sustain the full scope of the genus claimed. That is because "the Watson-Crick base pairing rules" that Scale says "correlate structure with function" for nucleic acids do not (and cannot) distinguish suitable from non-suitable aptamers *across the entire claimed genus. Cf* D.I. 366, 13. Take, for example, that for a given target nucleic-acid sequence, there are only a finite few nucleic-acid primers/probes capable of binding to it (*i.e.*, those complementary to its sequence). *See* Pachter 2nd Decl., ¶¶ 67-72. But, for the same target molecule, there is a vast unknown number of nucleic-acid aptamers that are capable of binding to it. *Id.* This difference is due to the complicated and unpredictable nature in which aptamers bind target molecules. *Id.* Indeed, many aptamers will not achieve a stable interaction with their intended target even if the Watson-Crick base pairing rules are perfectly followed—for these aptamers, other complex and unpredictable non-Watson-Crick interaction are required to achieve target binding. *Id.*

Scale's claims encompass of all of these aptamers, for each of the vast number of target molecules encompassed by the claims (*see* D.I. 325, 9), and so the law requires more from Scale's patents. It demands the disclosure of a representative number of aptamers or structural features common to all members of the genus. *Juno*, 10 F.4th at 1335. And, because they

undisputedly claim the *entire class* of nucleic acid aptamers functionally defined, the law demands sufficient information on how to make and use the entire class without undue experimentation. *Amgen*, 598 U.S. at 610. Scale has at best identified an incomplete characteristic that some aptamers could possess that in no logical way helps skilled artisans distinguish suitable aptamers *across the entire genus*. Because the patents do not describe or enable the full scope of aptamer-UBAs, the claims are invalid.

Moreover, Dr. Sims's analysis is not evidence because it is outside the scope of his expertise, unsupported, and conclusory. *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1329 (Fed. Cir. 2001). Dr. Sims testified that he has "never designed an aptamer" and that he is "not an expert in directed evolution," which is a term Dr. Sims said commonly referred to methods of developing nucleic-acid aptamers. D.I. 317, ¶¶ 26, 27; D.I. 368, ¶¶55-59; D.I. 329, Ex. 22 (Sims Tr.), 111:16-18; 114:9-19, 118:6-15; *see also id.* at 147:24-25 ("I am not an expert in SELEX"). Despite his personal lack of expertise and training, Dr. Sims proffers sweeping conclusions on how all nucleic-acid aptamers can be made and use without citing a single scientific publication or other corroborating evidence. Nor does Dr. Sims grapple with (1) the specification's distinction between primers/probes and aptamers (*compare* Ex. 4, 19:25-20:15 (describing aptamers used as a UBA), *with id.* at 15:9-26 (describing probes generally)) or (2) that the claims could have been (but are not) limited to UBA-primers/ probes. His newfound conclusory explanation, squarely contradicted by *actual* scientific evidence confirming that aptamers meaningfully differ from primers and probes because they rely on other molecular forces of attraction (not simply Watson-Crick base pairing), cannot avert judgment. Pachter 2nd Decl., ¶¶ 39-74; *Natera, Inc. v. CareDx, Inc.*, 2025 WL 592760, at *6 (D. Del. Feb. 24, 2025) (conclusory expert testimony cannot defeat judgement of invalidity).

**2.**     **Scale's claims are not exempt from the requirements to describe and enable the entire genus simply because they recite methods of use.**

Finally, Scale argues (at 15-16) that it need not describe or enable "the entire class" of claimed UBAs because it believes method claims are valid provided the patent describe or enable *one way* of practicing the claims. As an initial matter, Scale's argument conflicts with case law that emphasizes the importance of describing and enabling *the full scope of method claims*. *See*, *e.g.*, *PureCircle USA Inc. v. SweeGen, Inc.*, 2024 WL 20567, at *2, *4 (Fed. Cir. Jan. 2, 2024) (applying *Juno* to method claims); *In re McLeay*, 2025 WL 516809, at *2 (Fed. Cir. Feb. 18, 2025) (applying *Amgen* to method claims).

Moreover, Scale's argument (at 15) rests on a misreading of *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336 (Fed. Cir. 2010). There, at issue were methods that encompassed a genus of molecules capable of reducing NF-kappaB activity. *Id.* at 1354-55. The patent had to describe sufficiently "those molecules," and the parties agreed that the genus included specific inhibitors, dominantly interfering molecules, and decoy molecules. *Id.* at 1355, 1357. But the specification at best described only one of these three classes. *Id.* That was incapable, as a matter of law, of "bear[ing] the weight of the vast scope of these generic claims", and thus the claims were held invalid for lacking written description. *Id.* at 1358. The same outcome is proper here.

**II.     Parse's MSJ #2 should be granted because Scale's asserted claims are invalid for failing to claim essential features as a matter of law.**

Patentees cannot disclose one way of making and using an invention yet enforce broader claims that encompass both disclosed and undisclosed embodiments, unless "the specification would reasonably convey to a [POSA] that the inventor had possession of the claimed subject matter … and would enable [the POSA] to practice the full scope of the claimed invention." *LizardTech, Inc. v. Earth Resource Mapping, Inc.*, 424 F.3d 1336, 1346 (Fed. Cir. 2005) (cleaned up). Scale's specification fails in this regard because it describes one way of making

9

and using the claimed invention, by employing *both* a UBA and an ESB, D.I. 325, 20-22, but it claims ways that omit one or both essential elements. *Id.*

A.    **Scale's patents do not disclose any embodiment that omits a UBA and ESB.**

Scale argues (at 17, 18, 20) that its asserted claims do not need to recite UBAs and ESBs because the specification allegedly indicates both are "optional" elements. For the '752 patent, Scale's argument (at 17) is premised on just a few snippets from the specification where "and/or" appears in a list of various functionally defined genera and (at 18, 20) the specification's rote preface "in some embodiments" that are scattered throughout the specification hundreds of times. But the patents provide nothing to show how the omission of UBA or ESB would work in the patents' inventions. That is, these phrases ("and/or" or "in some embodiments") are nothing more than patent-drafting catchalls that lack any substance.

Scale's own case law proves this point. For example, *Allergan*'s finding that "glidant" was an optional element did not turn on the existence of non-limiting phrases, such as "in some embodiments" or "and/or." *Cf.* D.I. 366, 17-18. The Federal Circuit concluded that the specification disclosed *working* embodiments that both possessed and did not possess glidant, and "the specification attribute[d] no particular function or significance to the glidant." *Allergan*, 111 F.4th at 1375-76. Because the specification here defines UBAs and ESBs as providing a *function* necessary to make and use the claimed kits and methods (*see* § I.A.2; D.I. 325, 20-22), *Allergan* teaches that Scale's patents must provide artisans with enough information to make and use the claimed inventions in their absence. Scale's patents fail in this regard. For example, the '752 patent's claimed kits require the formation of a COB, which, as noted above, necessitates the use of a UBA and ESB to achieve the stated purpose of the claimed invention. *See* § I.A.2. In opposition, Scale has not attempted to show that either of these components could be omitted from the claimed kits and remain operational. Thus, the specification's use of non-limiting

phrases implicitly alluding to the absence of UBAs or ESBs cannot satisfy Section 112.

Scale's asserted method claims are similarly flawed. They require labeling target molecules, a result that cannot be achieved with something that binds to a target molecule (*i.e.*, a UBA). D.I. 325, 20. In opposition, Scale makes five points—none pointing to a patent disclosure capable of creating a triable issue. *First*, Scale begins (at 18) with a paragraph consisting of attorney arguments couched in parentheticals. In these parentheticals, Scale does not cite any expert testimony but instead appends its own phrase "with a UBA or ESB" to the end of various bald quotes from the specification. *Id.* But that is just attorney argument, not evidence. *Ferring B.V. v. Barr Lab'ys., Inc.*, 437 F.3d 1181, 1193 (Fed. Cir. 2006). *Second*, regarding the necessity of UBAs, Scale argues (at 20) that "COBs may be assembled on targets from a single cell." But Scale does not explain *how* this embodiment obviates the need of UBAs. *Id.* Nor does Scale or its expert even say that a POSA would have understood from this disclosure that UBAs are optional. *Id.* (citing D.I. 368-1, Ex. B (Sims Rebuttal Rpt.), ¶ 329). Scale's attorneys simply conclude as much, which is insufficient. *Ferring*, 437 F.3d at 1193. *Third*, Scale argues (at 19) that ESBs are "present only in 'some instances.'" *Id.* (quoting D.I. 328-1, Ex. 1, 24:64-25:3). But Scale's quoted part of the specification does not state ESBs are optional, only that "in some instances … [ESBs] can be included in the oligonucleotide that comprises the common linker." D.I. 328-1, Ex. 1, 24:64-25:3. *Fourth*, Scale argues (at 19) that ESBs are optional because, in certain embodiments, ESBs are not needed to "connect a UBA to a COB." This is a red herring, as connecting UBAs to COBs is not determinative of whether a molecule is or is not an ESB. Rather, "ESBs are molecules or assemblies that are designed to bind with at least one UBA or part of an UBA." D.I. 328-1, Ex. 1, 35:42-45. And, the opinions by Dr. Sims cited here do not substantiate Scale's contention. D.I. 366, 19 (citing D.I. 368-1, Ex. B, ¶¶ 330-31). *Fifth*, Scale

11

argues (at 19-20) that ESBs are optional because ESBs are "not required to create a cell-specific code that identifies the cell of origin." This only proves Parse's point, as COBs (not ESBs) are the class of molecules designed to identify the *cell of origin*. ESBs, conversely, are the molecules that identify the target to which the UBA is bound. D.I. 325, 22; D.I. 328-1, Ex. 1, 16:4-6.

### B.    By omitting UBAs and ESBs, the asserted claims are unduly broad.

Scale attempts to manufacture a disputed fact by arguing (at 20-22) that, although the claims do not recite in explicit terms "UBA" and "ESB," the "concepts" that define those terms are found in other claim elements. This does not solve the problem or save Scale's patents. That is because the limitations that Scale says cover "concepts" are so broad that they would grant Scale a claim scope far greater than what the specification teaches a skilled artisan how to make and use, which is precisely Parse's point. Said differently, the issue is not whether the claims encompass the use of UBAs and ESBs—they do. The issue is that, by omitting both terms from the expressed claim language, the claims are *broader* than the invention disclosed by the patents and claim embodiments where no ESB or UBA are involved. That is precisely the defect that proved fatal to the patent at issue in *LizardTech*. 424 F.3d at 1344-46.

### III.    Parse's MSJ #3 should be granted because Parse's proposed construction of "target molecules" is correct.

Scale's opposition to Parse's MSJ #3 hangs on a single argument: that Parse's proposed construction of the term "target molecules" should be rejected. D.I. 366, 22. Scale offers no reason why Parse's MSJ #3 should not be granted if the Court adopts Parse's construction. Because Parse's proposal reflects the term's plain and ordinary meaning and is supported by both intrinsic and extrinsic evidence, it should be accepted, and MSJ #3 should be granted.

### A.    Scale projects the shortcomings of its own proposed construction in attacking Parse's definition, cherry-picking disclosures in the common specification to support its improper construction.

Scale falsely accuses (at 23) Parse of "present[ing] ever-changing constructions that add a shifting set of narrowing limitations." But Parse's current proposed construction has not changed from the one offered at *Markman*. Indeed, it adds language only to clarify its position on what the Court had identified as "the nub of the parties' apparent dispute." D.I. 119. Furthermore, Parse did not "set[] forth and attack[]" a "straw-man construction" as Scale claims. D.I. 366, 22-23. Rather, because the parties did not exchange proposed constructions prior to summary judgment briefing, Parse had assigned Scale's expert's understanding of the term as Scale's construction.[3] D.I. 329, Ex. 18, ¶ 118 ("I conclude that 'target molecules' encompasses both specific molecules and classes of molecules that are being detected or quantified, where the individual molecules in the class may be known or unknown beforehand.").

1.    **Scale ignores half of the definition that the common specification provides for the term "target molecules."**

The specification describes "target molecules" using two separate statements: (1) "[t]he term 'epitope' and 'target molecule' are used interchangeably herein to refer to molecule of interest … being detected and/or quantified" and (2) "[t]arget molecules or epitopes are the molecules detected or measured by binding of a UBA whose target-specific regions(s) recognize thereto." D.I. 328-1, Ex. 1, 16:15-18; 33:40-42. This two-part definition applies to all "target molecules" disclosed in the specification and is not limited to any particular embodiment or example. *Id*. Instead of accounting for the complete definition, Scale improperly bases its construction on only the first half (D.I. 366, 23), ignoring the second half that contradicts its proposed construction. *See SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1285 (Fed.

---

[3] Scale appeared to have no problem doing the same and assigning Parse's expert's understanding of the term as Parse's construction. D.I. 366, 23 ("Then, in its expert reports … Parse … reassert[ed] its original constructions in full.").

Cir. 2005). However, with proper consideration for the specification's definition of "target molecules" in its entirety, a POSA would recognize that "target molecules" are detected by UBAs that bind *specifically* to that "target molecule," *i.e.*, via the UBA's "target-specific regions." D.I. 328-1, Ex. 14 (Pachter Rebuttal Rpt.), ¶¶ 139-140. As a result, a POSA would have understood that "target molecules" are specific molecules of interest with a known individual identity sufficient to distinguish the molecules being detected.

### 2. Parse's construction is wholly consistent with how the term "UBA" is defined in the specification and construed by the Court, and how the specification requires UBA/target molecule interaction.

Rather than showing why its proposed construction should be adopted,[4] Scale raises misguided arguments as to why the specification does not support Parse's proposed construction. D.I. 366, 24-25. Scale argues that because UBAs—according to the Court's construction (D.I. 118)—are designed to bind to "at least one target molecule," they are not target-specific, meaning they do not uniquely bind to only a specific molecule. D.I. 366, 24. Scale is incorrect. A UBA being able to bind to at least one target molecule does not mean that it is not specific to a "target molecule" with a known individual identity as Scale would suggest. Instead, the common specification reveals that some UBAs can be specific to one or more "target molecules."

Most notably, the common specification discloses that in embodiments where "the UBA is an antibody[5]," it can be "any immunoreactive component(s) of an antibody molecule that

---

[4] Scale argues (at 23-24) that its definition is supported by the specification, but Parse has already explained why the disclosures do not support Scale's construction. *See* D.I. 325, 28-29. Additionally, Scale admits (at 22) that even "under ScaleBio's [proposed] construction, there is at least a dispute of material fact whether use of Parse's accused products involves the claimed target molecules." Therefore, if the preamble of claim 1 of the '752 patent is construed to be limiting, the Court should deny Scale's MSJ #1 because, as admitted by Scale, even were the Court to accept its proposed construction, a dispute of material fact still remains.

[5] Nearly all of Scale's extrinsic "evidence about underlying scientific principles" is related to antibodies. D.I. 366, 27-29.

immunospecifically bind to at least one epitope," which includes "diabodies." D.I. 328-1, Ex. 1, 18:5-26. As explained by <u>Antibody Engineering</u>, a protocol cited in the specification (*id.*), "[d]iabodies are small dimeric bivalent or bispecific antibody fragments" that have "two antigen binding sites" and "recogni[ze] two different antigens." Pachter 2nd Decl., Ex. M, 619. Therefore, the common specification expressly discloses UBAs that uniquely bind to more than one specific "target molecule"—diabodies. Pachter 2nd Decl., ¶¶ 84-85. This is because diabodies are essentially two fused antibody fragments with two different unique binding sites, each of which is specific for a distinct "target molecule" with a known individual identity. *Id.* at ¶ 85; *id.*, Ex. M at 619. And although diabodies, as disclosed in the specification, may bind to more than one "target molecule," such UBAs do not contradict Parse's proposed construction because each of the two binding sites of a diabody is unique for a specific "target molecule."

Despite ignoring all but a single disclosure[6] in the specification, Scale accuses Parse of "focus[ing] … on specific embodiments in which a given UBA is specific for a particular target," projecting its own flawed reasoning onto Parse. D.I. 366, 24-25. However, this assertion does not have the effect that Scale likely intended. Rather than supporting Scale's position, this sentence instead admits that the common specification discloses embodiments using "UBAs [that are] specific for a ***particular target***," *i.e.*, a "target molecule" according to Parse's construction. *Id.* Additionally, Scale misleadingly frames its argument as if Parse is relying on only a single disclosed embodiment (*id.*), when in reality the specification is replete with embodiments and disclosures that support Parse's proposed construction. D.I. 325, 26-29; D.I. 328-1, Ex. 1, 16:44-47 ("Each UBA in the population is *specific* for a target molecule. Thus, the UBA provides the

---

[6] "Also the target molecule can have either a known or unknown structure or sequence." (D.I. 328-1, Ex. 1, 33:66-67).

*specificity* for the target molecule recognized in a cell."); *id*. at 4:31-32, 4:39-40, 4:48-49

(teaching "*target molecule-specific* unique binding agent[s]" (UBAs) that bind *uniquely to*

*specific target molecules*); *id*. at 2:59-60, 3:6-7, 10:29-30, 10:51-52, 34:56-57 (teaching "a first

UBA *specific for a first target molecule*"); *id*. at 56:63-57:18 (prophetic examples using

antibodies to detect specific molecules with known individual identities) (emphasis added). Yet

in the face of overwhelming intrinsic evidence, Scale incredulously asserts that "[n]othing in the

specification states that target molecules must have a known individual identity." D.I. 366, 25.

### 3.    Scale mischaracterizes the extrinsic evidence.

Scale's responses to Parse's extrinsic evidence begins by criticizing Nolan 2014 as

having a different specification from and not claiming priority to any of the Target Patents—

essentially faulting Parse's extrinsic evidence for being extrinsic. D.I. 366, 25-26. As to the

disclosures of Nolan 2014, Scale accuses Parse of "misstat[ing] the record" when in actuality,

Scale has failed to understand, either willfully or inadvertently, the teachings of Nolan 2014. *Id*.

at 26. This fundamental misunderstanding of the science has led Scale to incorrectly conclude

that Nolan 2014 "uses the term 'target … molecules' to describe the class of RNA molecules that

bind to a poly-dT UBA primer." *Id*. While Nolan 2014 discloses the use of poly-dT primers, they

are used in an *untargeted* approach to label the cell's entire transcriptome, such that each mRNA

molecule from the same cell is labeled with the same barcode: "a unique cell specific barcode for

identifying the cell of origin." D.I. 329, Ex. 26 (Nolan 2014), [0065-67]. Critically, in "some

embodiments" where "target RNA molecules of interest" are labeled, a separate "target specific

primer that also comprises a sequencing primer is used to selectively amplify the … target RNA

molecules of interest." *Id*. Therefore, the "target RNA molecules of interest" disclosed in Nolan

2014 are not the cell's entire transcriptome and Nolan 2014 clearly differentiates an untargeted

approach using only poly-dT primers to label the transcriptome with a cell-specific barcode and a

targeted approach using target-specific primers that selectively amplify "target molecules." *Id*.

Continuing its misunderstanding of the science, Scale says that "cross-reactivity" is a feature, not a bug, of antibodies. D.I. 366, 28. Cross-reactivity occurs when an antibody designed to bind to a specific target molecule mistakenly targets the wrong molecule. Pachter 2nd Decl., ¶¶ 79-80. Scale's own expert admitted this to be undesirable when he testified that "in the context of the '442 patent … the most important component [of his definition of antibody] is that antibodies selectively bind to … epitopes." Ex. 36 (Sims. Tr.), 151:13-153:5. Off-target binding through cross-reactivity is not a desirable or useful thing. When cross-reactivity occurs in the context of the Target Patents, even in the absence of any target molecules, a UBA binds to a non-target molecule, generating a false positive result. Pachter 2nd Decl., ¶ 81. Therefore, a POSA would have known that cross-reactivity in antibodies, especially when using antibodies to label or detect target molecules, should be avoided. *Id.* Scale's manufactured "cross-reactivity" arguments also run 180 degrees counter to Nolan's disclosure that the UBA "bind *uniquely to specific target molecules*." D.I. 328-1, Ex. 1, 2:59-60.

Finally, Scale presents an entirely new argument that it is possible to design a UBA when the identity of the "target molecule" is unknown by citing to extrinsic evidence about PSMA. D.I. 366, 29. Scale mischaracterizes the science presented in the publication. While the exact sequence or complete structure of the molecule PSMA was not known, its individual identity—sufficient to distinguish it from other molecules—was known. Pachter 2nd Decl., ¶¶ 76-77. Therefore, the antibody was developed by scientists who *had knowledge* of the identity of the specific "target molecule" they sought to detect sufficient to distinguish it from other molecules. And most importantly, were a scientist to use this antibody as an UBA, the antibody would bind to a "target molecule" with a known individual identity: PSMA. *Id*. at ¶ 78.

**B.      The preamble of the '752 patent is limiting.**

Scale argues that the preamble of the '752 patent is not limiting because it does not

"suppl[y] antecedent basis for terms in the body of the patent" and was not "relied on during

prosecution to distinguish prior art." D.I. 366, 31. However, those were not Parse's arguments.

Instead, Parse contends (D.I. 325, 31-32) that the preamble is limiting because the specification

repeatedly underscored it as important, and thus the words of the preamble "give 'life and

meaning' and provide further positive limitations to the invention claimed." *Corning Glass*

*Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989). Scale's only

rebuttal to Parse's actual argument is a parenthetical *see also* citation, stating that "preamble

language is not necessarily limiting even when 'underscored as important by the specification.'"

D.I. 366, 31-32 (citing a sentence from *Arctic Cat* quoting *Catalina*).

But the facts here align with those in *Corning Glass* and *General Electric*, Federal Circuit

cases cited by *Catalina* when it stated that "when reciting additional structure or steps

underscored as important by the specification, the preamble may operate as a claim limitation."

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002). In

*Corning Glass*, the "specification makes clear that the inventors were working on the particular

problem of an effective optical communication system not on general improvements in

conventional optical fibers." *Corning Glass*, 868 F.2d at 1257. In *General Electric*, the

"specification makes clear that the inventors were working on the particular problem of

displaying binary data on a raster scan display device and not general improvements to all

display systems." *General Electric Co. v. Nintendo Co., Ltd.*, 179 F.3d 1350. 1361-62 (Fed. Cir.

1999). Likewise, the specification of the '752 makes clear that the inventors worked on the

particular problem of designing a kit to split-pool barcode target molecules and not general

improvements on all kits. Therefore, "to read the claim indiscriminately to cover all types of"

18

kits "would be divorced from reality." *General Electric*, 179 F.3d at 1362.

    **C.**    **Under the proper construction of "target molecules," Parse's accused products do not identify, label, or barcode "target molecules."**

Scale claims that summary judgment should be precluded because it argues that, "Parse's contention that the Accused Parse Products achieve 'untargeted' labeling" is "sharply disputed." D.I. 366, 29. But Scale omits that its argument is conditional on the adoption of its proposed construction of "target molecules." *Id.* at 29-30. Only under Scale's improper construction can the transcriptome of a cell be considered "target molecules." However, under Parse's construction, there is no dispute that the mRNA transcripts making up the transcriptome are not "specific molecules of interest with a known individual identity sufficient to distinguish the molecules being detected or quantified." Because Parse's construction is consistent with the term's plain and ordinary meaning, and is supported by the intrinsic and evidence, it should be accepted by the Court. As a result, because Parse's accused products do not identify, label, or barcode "target molecules" under this correct construction, Parse's MSJ #3 should be granted.

**IV.**    **Mr. Mooney's opinions that are based on the** ███████████ **should be excluded.**

Scale cannot show that Mr. Mooney had a reliable basis for his opinion that the ████ ████ has "built-in apportionment," as it relates to the ████████ of the ██████████ and the hypothetical negotiation, or explain the basis of Mr. Mooney's allocation of the ██████████ ██ from the ████████████ to the hypothetical negotiation. Instead, Scale's opposition spends several pages on facts not in dispute or arguments that Parse did not make. For one, Parse does not as Scale asserts (at 33) challenge the relevance of the ████████████ to the hypothetical negotiation. What Parse challenges is Mr. Mooney's reliance on that license to the hypothetical negotiation, without properly accounting for the differences between the two, as prevailing law requires. *See Omega Pats., LLC v. CalAmp Corp.*, 13 F.4th 1361, 1380 (Fed. Cir. 2021) (while

"allegedly comparable licenses may cover more patents than are at issue in the action," an expert must account for that difference "when invoking [the licenses] to value the patented invention").

Further, Parse agrees with Scale that two apportionment concepts are relevant to a comparable-license analysis where the alleged comparable license includes the rights to the asserted patents: "Apportionment 1": whether the asserted patents relate to the full value of the allegedly infringing products, which can be accounted for with an adjustment to the royalty base, and "Apportionment 2": whether the asserted patents represent the full value of the comparable license; *i.e.*, whether the royalty rate should be adjusted. Scale focuses several pages of its brief on Apportionment 1, but Parse's present *Daubert* is directed to Apportionment 2, ███████ ██████████████████████████████████████████████████████.

Scale claims (at 34) that Parse misunderstands Mr. Mooney's ████████████████ opinion, which Scale now says applies only to the █████████ component of the ██████████. Notably, Scale cannot point to any paragraph from Mr. Mooney's expert reports or any deposition testimony in support of the fact that his built-in apportionment was so limited. And, Scale's citations to Mr. Mooney's report contradict its argument. As Mr. Mooney explained, "███████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████." D.I. 328-1, Ex. 8 (Mooney Opening Rpt.), ¶ 212 (quoting *Vectura Ltd. v. Glaxosmithkline LLC*, 981 F.3d 1030, 1041 (Fed. Cir. 2020)) (emphasis added). Mr. Mooney further states:



D.I. 328-1, Ex. 8, ¶ 213 (emphases added). But, as Scale concedes (at 36), there is no opinion in

this case that Scale practices the Asserted Scale Patents, and Scale can point to no testimony to explain what it means when it says (at 33) the ████████████████████████████ ███████████████████████████████████████.” Without that information, Mr. Mooney's basis for concluding there is "built-in apportionment" is unreliable.

Moreover, Mr. Mooney did not reliably account for ████████████████████████████. Scale (at 38) is correct that Mr. Mooney purported to apportion ████████████████ ███████████████████████████████████, but the issue is whether Mr. Mooney had a factual basis for his apportionment. *See* D.I. 325, 41. Mr. Mooney lacked any basis. His only claimed basis for ████████████████████████████ ████████████████████████████████████████ is a conversation with ████████ who was hired by Scale in 2023, after the ███████████ was executed.[7] Regarding ████████ deposition testimony, while she was willing to testify that the ████████████████████████████, she refused to share the reasons for that opinion, without ████████████████████████ her. ████████████████████ Without that conversation, all Mr. Mooney is left with is purported evidence that the four Asserted Scale Patents ████████████████████, which says nothing about ████████████████████ ████████████████████. *See, e.g.*, D.I. 328-1, Ex. 16 (Mooney Reply Rpt.), ¶¶ 88, 89.[8, 9]

---

[7] That ████████ has no personal knowledge of the license negotiations easily distinguishes *10x Genomics, Inc. v. Parse Biosciences, Inc.*, 2025 WL 572788, at *7 (D. Del. Feb. 21, 2025) (cited by Scale at 40). There, the relied-on discussions were with a witness having personal knowledge.

[8] While Scale also suggests (at 42) that Mr. Mooney relied on Dr. Sims' opinion about the "████████████████████████████," Mr. Mooney unambiguously opines that ████████████████████████████. D.I. 328-1, Ex. 16, ¶ 88.

[9] Scale mischaracterizes (at 37 n.6) Parse's argument about technical comparability. The point is that Mr. Mooney has no technical-comparability analysis of the Asserted Patents relative to ██ ████████████████████████.

Scale's attempt (at 39) to distinguish *Fundamental* misses the point. Mr. Mooney, like the expert in *Fundamental*, relied on statements from a fact witness to assign the ▓▓▓▓▓▓▓▓ to the asserted patents. As the *Fundamental* court found, it is improper for damages experts to serve as conduits for conclusory hearsay and non-expert testimony about the value of the asserted patents in a comparable license. *Fundamental Innovations Sys. Int'l LLC v. Anker Innovations Ltd.*, 2025 WL 459916, at *12 (D. Del. Feb. 11, 2025).

Finally, Scale asserts (at 41-42) that Mr. Mooney "determined that the ▓▓▓▓▓▓



by "engaging in a reliable calculation of the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓." However, Mr. Mooney never explained in his opening report how the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. D.I. 328-1, Ex. 8, ¶¶ 146, 213. And, although Mr. Mooney attempted to analyze that issue for the first time in his reply report, his analysis is flawed. *See* D.I. 328-1, Ex. 16, ¶ 90. Mr. Mooney ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. *Id.* But Scale's ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Therefore, if anything, Scale's ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. None of this "evidence" informs "a proper apportionment strategy," contrary to Scale's claim. D.I. 366, 40.

## V.    Mr. Mooney's opinions that rely on ▓▓▓▓▓▓▓▓ conversations should be excluded.

A fatal flaw in Scale's opposition is that the substance of ▓▓▓▓▓▓ conversations with

Mr. Mooney is inconsistent with or unsupported by her deposition testimony, and other evidence. According to Mr. Mooney, ███████ told him that ████████████████████████████ ████████████████, leading Mr. Mooney to find the ███████████ less relevant to the hypothetical negotiation. *See* D.I. 325, 43. But all ██████████ said at her deposition was that ████████████████████████████████████████████ ███████████████████ ████████████████ Relatedly, ███████████ refused to testify about how ████████████████ ████████████████████████████████████████████████████ on the basis of privilege. *Id.* at 157:16-158:5. This privilege assertion prevented Parse from exploring ████████████████████████████████████████████ ███████. But, in her call with Mr. Mooney, ████████████ told him that Scale had ████████████████ ██████████████████████████████████████████. *See* D.I. 325, 43. Having claimed privilege, Scale cannot now use information gleaned from ██████████ regarding ████████████████████████████████, to support Mr. Mooney's opinion. *See, e.g.*, *Jolivet v. Compass Grp. USA, Inc.*, 340 F.R.D. 7, 20 (2021) (a party cannot protect information as privileged while simultaneously using it against it adversary).

As for examples of conversations that are unsupported by evidence, Mr. Mooney relies solely on his undocumented conversation to support his conclusion that ████████████████████ ████████████████████████████████. *See* D.I. 325, 38; 43. However, there is no documented evidence of this fact, and therefore, no way to verify this seemingly arbitrary number. Similarly, there is no documented evidence that supports ████████████ unverified statement that ████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████. D.I. 325, 43. The lack of

evidence makes the entire conversation between ███████ and Mr. Mooney unreliable and improper, especially since ███████ appears to helpfully tell Mr. Mooney exactly what he wants to hear, for example, ████████████████████████████████████████ ████████████████████████████ D.I. 325, 42. Mr. Mooney's opinions that rely on ███████ conversation and deposition testimony should be excluded.

## VI.    Dr. Paz's "generalized experience" and lack of methodology makes her opinion unreliable.

Scale admits (at 46) that Dr. Paz "did not present herself as a 'market expert in RNA single-cell analys[es],'" but contends that Dr. Paz has a more "generalized experience." D.I. 366, 47. Even when describing Dr. Paz's "generalized experience," Scale did not precisely identify what that experience is, saying only it is "advising biotechnology and pharmaceutical companies" (at 46), experience in the "healthcare and biotechnology field" (*id.*), and experience in "life sciences and diagnostic spaces" (at 47). But, these fields identified by Scale are broad, and Scale specific the technical experience that Dr. Paz needs to provide a reliable opinion.

But, Dr. Paz's "very general understanding" of the single-cell analysis market that she obtained through previous experience she "provided for a client" (at 47) is not sufficient here because of the highly technical nature of Dr. Paz's opinion. Dr. Paz opined that Parse and Scale differ from all other instrument-free products because they both use "(1) the split pool barcoding method," which enables a "high level of scalability and throughput; and (2) their products work with fixed cells." D.I. 325, 46. While the case law allows for a flexible and "liberal" application of required experience, Dr. Paz has no specific technical experience that would allow her to determine that the split-pool barcoding method provides the properties of scalability and throughput she considers important or that that method is different enough from all other instrument-free products to put them in their own category.

Scale also does not explain Dr. Paz's lack of methodology for her market analysis, insisting (at 48) that her knowledge and experience are enough because she relied on documentary evidence. But, even with knowledge and experience, Dr. Paz needed to have used a reliable methodology. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151 (1999). And, she did not. She could not point to any evidence for her opinion that split-pool barcoding provided more scalability than other technology. And, as Parse explained its opening *Daubert* brief, it's not so much that conflicting evidence exists—it's that every single document of the eight documents that Dr. Paz relied on contradicted her opinion. *See* D.I. 325, 49-50. Similarly, as to knowledge, Dr. Paz admitted that she was unaware of several facts that are relevant to her opinion. *See id.* at 50; *see also* Ex. 38 (Paz Tr.), 306:11-307:15; Ex. 39 (Paz Dep. Ex. 109, 28). And, finally, Scale is disingenuous when it says (at 49) that Dr. Paz "had conversations with users of these products," as Dr. Paz admitted that "to form my opinions and to put them in this report for this particular purpose, no, I didn't speak to actual customers or users." D.I. 329, Ex. 23, 110:4-13. Additionally, while Dr. Paz claimed to review deposition testimony from fact witness depositions, she ignored the witnesses' testimony that Parse and Scale has several competitors, not just each other. *See* Ex. 40, (Skogen Tr.), 36:12-16; *see also* Ex. 41 (Walsh Tr.), 93:4-9; D.I. 329, ███████████████████; Ex. 42 (Masuda Tr.), 179:25-180:3.

## **CONCLUSION**

Parse respectfully asks that the Court grant its summary-judgment and *Daubert* motions[10].

---

[10] The Court should grant Parse's MSJ #4 in view of Scale's concession that it is not accusing Parse's accused products of infringement when used with nuclei. D.I. 366, 32.

DATED:  April 17, 2025

*Of Counsel:*

Byron L. Pickard
R. Wilson Powers III, Ph.D.
Chandrika Vira
Christopher M. Gallo
Brady P. Gleason
Louis P. Panzica, Jr.
David Y. Wang
Ryan N. Kaiser
Cristen A. Corry
**STERNE, KESSLER, GOLDSTEIN & FOX, P.L.L.C.**
1101 K Street, NW, 10th Floor
Washington, DC 20005
(202) 371-2600
bpickard@sternekessler.com
tpowers@sternekessler.com
cvira@sternekessler.com
cgallo@sternekessler.com
bgleason@sternekessler.com
lpanzica@sternekessler.com
dwang@sternekessler.com
rkaiser@sternekessler.com
ccorry@sternekessler.com

**YOUNG CONAWAY STARGATT & TAYLOR LLP**

*/s/ Karen L. Pascale*

Karen L. Pascale (#2903)
Robert M. Vrana (# 5666)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
(302) 571-6600
kpascale@ycst.com
rvrana@ycst.com

***Attorneys for Defendant/Counterclaim-Plaintiff Parse Biosciences, Inc. and Counterclaim-Plaintiff University of Washington***

26

## <u>CERTIFICATE OF SERVICE</u>

I, Karen L. Pascale, Esquire, hereby certify that on April 17, 2025, I caused to be electronically filed a true and correct copy of the foregoing sealed document with the Clerk of the Court using CM/ECF, and in addition caused true and correct copies of the foregoing sealed document to be served upon the following counsel of record by electronic mail:

*Attorneys for Plaintiff, Scale Biosciences, Inc.*
*and Nominal Defendant, Roche Sequencing Solutions, Inc.:*

Kelly E. Farnan                                          *farnan@rlf.com*
Sara M. Metzler                                         *metzler@rlf.com*
**RICHARDS LAYTON & FINGER, P.A.**
One Rodney Square
920 North King Street
Wilmington, DE 19801

*Attorneys for Plaintiff, Scale Biosciences, Inc.:*

**WOLF, GREENFIELD & SACKS, P.C.** : **wgs-scalebiosciencesv.parse@wolfgreenfield.com**

Stephen S. Rabinowitz                        *srabinowitz@wolfgreenfield.com*
605 Third Avenue
New York, NY 10158

Chelsea A. Loughran                          *cloughran@wolfgreenfield.com*
Emma L. Frank                                     *efrank@wolfgreenfield.com*
Stuart V. C. Duncan Smith                 *sduncansmith@wolfgreenfield.com*
Arden Bonzo                                        *arden.bonzo@wolfgreenfield.com*
600 Atlantic Avenue
Boston, MA 02210

*Attorneys for Nominal Defendant, Roche Sequencing Solutions, Inc.:*

**WILMERHALE**                                  **WHRSS-ScaleLit@wilmerhale.com**

Robert J. Gunther                               *Robert.Gunther@wilmerhale.com*
Barish Ozdamar Ph.D.                        *Barish.Ozdamar@wilmerhale.com*
7 World Trade Center
250 Greenwich Street
New York, NY 10007

Madeleine C. Laupheimer                  *Madeleine.Laupheimer@wilmerhale.com*
Kate Saxton                                         *Kate.Saxton@wilmerhale.com*
60 State Street
Boston, MA 02109

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

April 17, 2025

*/s/ Karen L. Pascale*

Karen L. Pascale (#2903) [kpascale@ycst.com]
Robert M. Vrana (#5666) [rvrana@ycst.com]
Rodney Square
1000 North King Street
Wilmington, DE  19801
Telephone: (302) 571-6600

*Attorneys for Parse Biosciences, Inc.*
*and University of Washington*