**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| SCALE BIOSCIENCES, INC. and ROCHE SEQUENCING SOLUTIONS, INC., | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 22-1597-CJB |
| PARSE BIOSCIENCES, INC., | ) | |
| Defendant. | ) | |

---

Kelly E. Farnan and Sara M. Metzler, RICHARDS, LAYTON, & FINGER, P.A., Wilmington, DE; Stephen S. Rabinowitz, WOLF, GREENFIELD, & SACKS, P.C., New York, NY; Chelsea A. Loughran, Stuart V.C. Duncan Smith, Emma L. Frank, and Arden E. Bonzo, WOLF, GREENFIELD, & SACKS, P.C., Boston, MA, Attorneys for Plaintiff Scale Biosciences, Inc.

Karen L Pascale and Robert M. Vrana, YOUNG CONAWAY STARGATT & TAYLOR LLP, Wilmington, DE; Byron L. Pickard (argued), R. Wilson Powers III, Chandrika Vira, Christopher M. Gallo, Brady P. Gleason, David Y. Wang, Louis P. Panzica, Jr., Ryan N. Kaiser, and Cristen A. Corry, STERNE, KESSLER, GOLDSTEIN & FOX, P.L.L.C., Washington, D.C., Attorneys for Defendant Parse Biosciences, Inc.

---

**MEMORANDUM OPINION**

August 18, 2026
Wilmington, Delaware

Christopher J. Burke
**BURKE, United States Magistrate Judge**

In this action, Plaintiffs Scale Biosciences, Inc. ("Scale") and Roche Sequencing Solutions, Inc. ("Roche," and together with Scale, "Plaintiffs") brought claims for patent infringement against Defendant Parse Biosciences, Inc. ("Parse" or "Defendant"), alleging infringement of United States Patent Nos. 10,626,442 (the "'442 patent"), 10,982,256 (the "'256 patent"), 11,512,341 (the "'341 patent") and 11,634,752 (the "'752 patent"). (D.I. 70 at ¶ 1) Presently before the Court[1] is Parse's "Motion for Summary Judgment #2: The Asserted Claims are Invalid Under Section 112 for Failing to Claim Essential Features" ("Motion"), filed pursuant to Federal Rule of Civil Procedure 56. (D.I. 316) For the reasons set forth below, the Motion is DENIED.[2]

## I. BACKGROUND

The Court incorporates by reference (and will not repeat here) its discussion of the factual and procedural background of this case found in its Memorandum Opinion dated October 8, 2025 ("October 8 MO"), to the extent it is relevant to the instant Motion. (D.I. 466 at 2-5) Below the Court includes additional background information also relevant to the Motion.

### A. Procedural Background

Parse filed the instant Motion on February 24, 2025—the same date that the parties each filed various other summary judgment and *Daubert* motions. (D.I. 316) The Motion was fully

---

1 The parties have jointly consented to the Court's jurisdiction to conduct all proceedings in these cases, including trial, the entry of final judgment, and all post-trial proceedings. (D.I. 12)

2 In line with the Court's typical convention, the case caption on the previous page includes those attorneys whose names were listed on the relevant briefs regarding the instant dispositive Motion (with a notation being made as to the attorney who argued the Motion). The Court additionally notes that here, a later-admitted attorney not on the briefing, Matthew Powers of TENSEGRITY LAW GROUP, LLP, Redwood Shores, CA, argued the Motion for Scale.

briefed as of April 17, 2025. (D.I. 395) The Court then heard very lengthy oral argument on the Motion on October 22, 2025. (D.I. 508 (hereafter "Tr."))

This Motion sought to invalidate claim 11 of the '442 patent, claims 1-2, 6-11, and 14 of the '752 patent, claims 1-2 and 5-6 of the '256 patent, and claim 13 of the '341 patent on the ground that they fail to satisfy the written description requirement of 35 U.S.C. § 112(a) ("Section 112(a)"). (D.I. 316 at 1; *see also* D.I. 439 at 1; D.I. 325 at 1, 19-22) However, in the October 8 MO, the Court granted Parse's motion for summary judgment of invalidity of all of the asserted claims of the '752 patent for lack of written description and lack of enablement (on different grounds from those at issue here). (October 8 MO at 28) And on June 30, 2026, the Court denied Scale's motion for reargument under Local Rule 7.1.5 with regard to the decision set out in the October 8 MO. (D.I. 552) In light of those rulings, the instant Motion is moot with respect to the '752 patent. (D.I. 468) Thus, below, the Court will address the Motion only as it relates to Parse's arguments regarding the above-referenced claims (collectively, the "challenged claims" or "asserted claims") of the '442 patent, the '256 patent, and the '341 patent (collectively, the "challenged patents" or "asserted patents").

**B. Factual Background**

The challenged patents all share the title, "Methods of Identifying Multiple Epitopes in Cells[,]" and are directed to "methods, compositions, kits and devices for the detection of target molecules" in a sample of cells. (*See e.g.*, '341 patent, cover page at (54), Abstract)[3] All of the challenged patents share a common specification. (D.I. 325 at 19-20; Tr. at 24)[4] The invention

---

3 The asserted patents are found in various places on the docket, including at D.I. 328, Exhibits 1-3. Hereafter, the Court will cite to these patents simply by their number.

4 As a result, herein the Court will typically cite to the '341 patent as exemplary, unless there is a particular reason to cite to one of the two other asserted patents.

described therein is said to address the "need for accurate and sensitive detection, identification and quantification of target molecules in every cell of a complex population and to retain cell specific information regarding that target molecule." ('341 patent, col. 1:48-52) Generally, the invention performs the claimed methods by attaching to a target molecule "a [tag or] plurality of tags[.]" (*Id.*, col. 1:65) Such tags, or "barcodes," include code that represents the identity of the target molecule and/or the identity of the cell that relates to that molecule. (*Id.*, col. 1:66-67)

Despite sharing a common specification, each asserted claim uses slightly different language to describe this process. Asserted claim 13 of the '341 patent, and claim 1 from which it depends, recite as follows (with certain relevant language set out in italics):

> **1**. A *method of barcoding cDNA in cells* or cell compartments, the method comprising:
>
> > (a) producing cDNA in the cells or cell compartments; and
> >
> > (b) *adding oligonucleotide barcodes onto the cDNA* in the cells or cell compartments by a method comprising at least two barcoding steps that comprise:
> >
> > > (i) splitting the cells or cell compartments and *adding* assayable oligonucleotide subunits to the cDNA while the cells or cell compartments are split; and then
> > >
> > > (ii) pooling the cells.
>
> **13**. The method of claim **1**, wherein the method is performed using cells from a cell suspension.

(*Id.*, col. 58:12-23, 50-51 (emphasis added))

With respect to the '442 patent, asserted claim 11 depends on dependent claim 9 and independent claim 1. For purposes of this Motion, claim 1 and claim 11 are relevant (certain portions of which are italicized below):

> **1.** A *method of uniquely labeling target molecules* within a plurality of cells, the method comprising:
>
> (a) *coupling a common linker sequence to target molecules* within the plurality of cells;
>
> (b) dividing the plurality of cells into at least two primary reaction volumes, the at least two primary reaction volumes comprising a first primary reaction volume and a second primary reaction volume;
>
> (c) providing primary nucleic acid tags to the at least two primary reaction volumes, wherein the primary nucleic acid tags provided to the first reaction volume are different from the primary nucleic acid tags provided to a second reaction volume;
>
> (d) coupling the common linker sequences within each of the at least two primary reaction volumes with the provided primary nucleic acid tags;
>
> (e) pooling the at least two primary reaction volumes;
>
> (f) splitting the combined primary reaction volumes into at least two secondary reaction volumes, the at least two secondary reaction volumes comprising a first secondary reaction volume and a second secondary reaction volume;
>
> (g) providing secondary nucleic acid tags to each of the at least two secondary reaction volumes, wherein the secondary nucleic acid tags provided to the first secondary reaction volume are different from the secondary nucleic acid tags provided to the second reaction volume; and
>
> (h) coupling the target molecules within each of the at least two secondary reaction volumes with the provided secondary nucleic acid tags. . . .
>
> **11.** The method of claim **9,** wherein the target molecules are RNA and wherein step (a) comprises *hybridizing the common linker to the RNA*.

('442 patent, cols. 57:62-58:25, 58:62-64 (emphasis added))

Finally, when looking to the challenged claims of the '256 patent, the language of claim 1 (upon which the rest of the asserted claims depend) is key. It is recited below (with relevant portions of the claim italicized):

> **1.** A *method for identifying whether a plurality of nucleic acid targets is present* in a plurality of cells comprising:
>
> a) *binding to the nucleic acid targets in the plurality of cells a plurality of unique binding agent (UBA) nucleic acid tags*;
>
> b) extending the UBAs bound to the targets, and
>
> c) assembling cell originating barcodes (COB) on the extended UBAs by subsequently adding multiple assayable polymer subunit (APS) oligonucleotides to each of the extended UBAs in the plurality of cells in an ordered manner during successive rounds of split pool synthesis wherein the APS oligonucleotides in each round anneal to the APS from a previous round and are covalently linked to the adjacently annealed APS to create unique codes that represent the identities of individual cells in which the tags are bound, and wherein the method does not include a step of isolating each cell in the plurality of cells.

('256 patent, col. 58:11-28 (emphasis added))

As can be seen from claim 1 of the '256 patent, the patents at times use the term "unique binding agent" (hereafter, "UBA"). One basis for this Motion relates to what UBAs are. (D.I. 325 at 19-22) The Court previously construed the term "unique binding agent" or "UBA" to mean "a molecule or assembly that is designed to bind with at least one target molecule, at least one target molecule surrogate, or both[.]" (D.I. 118; *see also* '341 patent, col. 17:20-22)[5] Indeed, in Figure 2 of the specification, a UBA is depicted being employed in a barcode

[5] Relatedly, in connection with the *Markman* proceedings in this case, the Court construed the term "target molecules" as used in the patents at issue to mean "molecules of interest . . . that are being detected or quantified." (D.I. 119) Later, in connection with the resolution of another summary judgment motion in this case, the Court further construed "target molecules" to mean "molecules of interest that are being detected or quantified and that need not be specific molecules with a known individual identity." (D.I. 592 at 19)

assembly to help bind the barcode assembly to the target molecule. (*See e.g.*, '341 patent, FIG. 2 & col. 13:36-38) A UBA can be an aptamer or an antibody. (October 8 MO at 4-5 (citing '442 patent, cols. 4:18-20, 5:42-44, 7:27-29, 11:42-44, 17:66, 19:18))

Another basis for this Motion relates to the term "epitope specific barcode" (or "ESB") and also the term "cell origination barcode" (or "COB"). (D.I. 325 at 19-22) As noted above, the patents explain that such barcodes can be attached to UBAs as a way to detect and label the target molecule. (*See, e.g.*, '341 patent, col. 16:49-54) Because they are *epitope* specific barcodes, ESBs are designed to include "unique code that can be associated *to a specific target molecule*." (*Id.*, cols. 16:49-50, 20:29-32 (emphasis added)) Similar to ESBs, a COB is a type of barcode; however, it contains information "that can be associated *to a specific cell of origin*." (*Id.*, cols. 16:53-54, 21:22-25 (emphasis added)) Thus, while one type of barcode (ESBs) identifies something about the specific *target molecule* within a given cell that is being labeled, the other type of barcode (COBs) identifies *what cell* that target molecule came from.

Additional facts relevant to resolution of the instant Motion will be discussed in Section III.

## II. STANDARD OF REVIEW

The Court incorporates by reference the legal standards applicable to summary judgment motions and to the concepts of invalidity and written description, which were set out in its October 8, 2025 MO. (October 8 MO at 5-8) To the extent that further legal standards or principles are relevant to resolution of the Motion, they will be discussed in Section III.

## III. DISCUSSION

With its Motion, Parse argues that the challenged claims are invalid under Section 112(a)'s written description requirement. (D.I. 325 at 19-22) Parse's arguments about the

sufficiency of the written description for the challenged patents can be broken down into two parts—one relating to UBAs and one relating to ESBs.

Below the Court will first set out the parties' arguments in some more detail and will also review some further relevant legal standards relating to the written description requirement. Then the Court will assess the merits. In taking up the merits, the Court will address Parse's UBA-related arguments and its ESB-related arguments in turn.

**A. The Parties' Arguments and Additional Relevant Legal Standards**

The Court begins its discussion of further relevant legal standards by noting that, in order to avoid invalidity for lack of sufficient written description, the patent application relied upon "must describe the invention sufficiently to convey to a person of skill in the art [a 'POSITA'] that the patentee had possession of the claimed invention at the time of the application, i.e., that the patentee invented what is claimed." *LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1345 (Fed. Cir. 2005). And, as a matter of first principles, a patentee must "compl[y] with the written description requirement 'by describing the invention, with *all* its claimed limitations[.]'" *Regents of the Univ. of California v. Eli Lilly & Co.*, 119 F.3d 1559, 1566 (Fed. Cir. 1997) (emphasis added); *see also Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 736 (2002) ("What is claimed by the patent application must be the same as what is disclosed in the specification; otherwise the patent should not issue."); *see also* (Tr. at 6, 101).

In the briefing on its Motion, Parse's written description argument proceeds as follows:

> (1) All of the asserted method claims of all three asserted patents require: (a) binding a tag or barcode to a target molecule (i.e., what a UBA does) and (b) that the tag must include target-specific information about the target molecule (i.e., what an ESB does). But while the language of the asserted claims of the '442 patent and the '341 patent claim embodiments that include use of UBAs, those claims also are broad enough to allow that *other things* could do the requisite binding work. Additionally, the language of the

> asserted claims of all three patents is broad enough to allow that ESBs will do the requisite target-specific labeling, but also that *other things* could do that work too. (D.I. 395 at 10-12; *see e.g.*, Tr. at 11-17)
>
> (2) That said, when the specification speaks to the binding of barcodes to target molecules or to the target-specific identification of target molecules, it does so only by describing the use of UBAs and ESBs, respectively. That is, Parse argues that there is "no description in the patents of an embodiment . . . of how to perform the claim[ed] methods without [using a] UBA or without [using] an ESB." (Tr. at 13; *see also* D.I. 325 at 20)
>
> (3) Therefore, the challenged claims are invalid for lack of sufficient written description, because the relevant patents: (a) include broad claim language that could cover, *inter alia*, UBAs and ESBs doing certain work required by the claims, but could *also* cover some other element doing this required work; and yet (b) don't sufficiently describe what those other elements might be. (D.I. 325 at 20-22; D.I. 395 at 9; Tr. at 13-17) Put another way, Parse is asserting that the claims are invalid because the patent specification "describe[s] [only] one way of how to make and use the invention [i.e., utilizing UBAs and ESBs] yet enforce[s] broader claims that cover both disclosed and *undisclosed* embodiments [i.e., embodiments that do *not* make use of UBAs and ESBs]." (D.I. 325 at 21; *see also* D.I. 395 at 9-10) In the parlance of Parse's Motion, UBAs and ESBs are described by the patents as being "essential features" of the claimed invention, and the asserted claims are invalid because they don't recite limitations "requiring the use of a UBA and an ESB." (D.I. 325 at 20 (emphasis altered))

To further explain how its argument (set out above) relates to existing written description law, Parse analogizes the facts of the present case to those of *LizardTech, Inc. v. Earth Resource Mapping, Inc.*, 424 F.3d 1336 (Fed. Cir. 2005) and *ICU Medical, Inc. v. Alaris Medical Systems, Inc.*, 558 F.3d 1368 (Fed. Cir. 2009). (D.I. 325 at 21-22; D.I. 395 at 9-12; Tr. at 20) In those cases and others, the United States Court of Appeals for the Federal Circuit has explained that patents do not satisfy the written description requirement when the claims omit reference to an element that was essential to the invention as described in the specification, or where the

specification includes a narrow disclosure that simply and utterly fails to teach a potential configuration of elements that are claimed. *See ICU Med.*, 558 F.3d at 1376-79; *Rivera v. Int'l Trade Comm'n*, 857 F.3d 1315, 1322-23 (Fed. Cir. 2017) ("[T]his case is substantially similar to several of our cases holding claims unsupported by the written description, in which the specification fails to teach a potential configuration of elements.") (citing *ICU Med.*, 558 F.3d at 1377-79); *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1479 (Fed. Cir. 1998) ("However, in a given case, the scope of the right to exclude may be limited by a narrow disclosure."); (D.I. 325 at 21; D.I. 395 at 9; Tr. at 13).[6] It is worth reviewing the Federal Circuit's decisions in *LizardTech* and *ICU Medical* to better understand the kind of argument that Parse is making here.

In *LizardTech*, claim 1 of the patent-in-suit recited "[a] method for selectively viewing areas of an image at multiple resolutions in a computer[,]" comprising multiple steps, one of those steps being "maintaining updated sums of said [discrete wavelet transform ('DWT')] coefficients from said discrete tile image . . . to form a seamless DWT of said image." 424 F.3d at 1340. Claim 21 in that case recited an identical method minus two limitations; one of the absent limitations was the limitation that recited "maintaining updated sums." *Id.* at 1343. The Federal Circuit observed that the specification disclosed only a "single way of creating a seamless DWT"—i.e., a method accomplished by maintaining updated sums of DWT coefficients. *Id.* at 1344. However, Claim 21 was broader than claim 1, in that it was not limited to creating a seamless DWT by maintaining updated sums as recited in claim 1, and could thus

[6] *See also Reiffin v. Microsoft Corp.*, 214 F.3d 1342, 1345 (Fed. Cir. 2000) ("The purpose of th[e written description] provision is to ensure that the scope of the right to exclude, as set forth in the claims, does not overreach the scope of the inventor's contribution to the field of art as described in the patent specification.").

implicate the creation of a seamless DWT in other ways. This was a problem from a written description perspective, according to the Federal Circuit, in that a POSITA would not have understood the inventor to have "invented a method for making a seamless DWT, *except by* 'maintaining updating sums of DWT coefficients'" since there was "*no evidence that the specification contemplate[d]* a more generic way of creating a seamless array of DWT coefficients." *Id.* at 1344-45 (emphasis added). The *LizardTech* Court came to this conclusion not simply because the specification only described one way of creating a seamless DWT—but additionally because "[a]fter reading the patent, a [POSITA] would not understand how to make a seamless DWT generically and would not understand LizardTech to have invented a method for making a seamless DWT, except by 'maintaining updating sums of DWT coefficients.'" *Id.* at 1345.

Similarly, in *ICU Medical*, the Federal Circuit confronted a claim directed to medical valves for use in transmission of fluids to or from a medical patient, such as when using an intravenous setup. 558 F.3d at 1372. The valves disclosed in the specification all contained a spike "for the purpose of piercing a seal inside the valve." *Id.* at 1374-75; *see also id.* at 1378. Yet, the claims did not include a "spike" limitation and instead covered valves that operate with a spike and those that operate without one. *Id*. at 1378. The Federal Circuit ruled that the specification "describe[d] only medical valves with spikes[,]" and so there was no support for the claims to spikeless valves. *Id.* at 1378-79. The Court rejected the argument that "the figures and descriptions that included spikes somehow demonstrate that the inventor possessed a medical valve that operated without a spike." *Id.* It explained that the patentee failed to identify any disclosure of a spikeless valve and concluded that the specification unambiguously made clear that a spike was necessary to use the claimed invention. *Id.*; *Crown Packaging Tech., Inc. v. Ball*

*Metal Beverage Container Corp.*, 635 F.3d 1373, 1382 (Fed. Cir. 2011) ("In [*Tronzo*, *LizardTech*, and *ICU Medical*], the specification unambiguously limited the scope of the invention.").[7] The *ICU Medical* Court concluded that "[b]ased on th[e] disclosure, a [POSITA] would not understand the inventor of the . . . patents to have invented a spikeless medical valve[,]" and so the Federal Circuit affirmed the district court's grant of summary judgment of invalidity under Section 112. *ICU Med.*, 558 F.3d at 1378-79.

Now, with all of that said—and as the *LizardTech* Court noted in its decision—the law on written description is also clear that "[a] claim will not be invalidated on [S]ection 112 grounds simply because the embodiments of the specification do not contain examples explicitly covering the full scope of the claim language." *LizardTech*, 424 F.3d at 1345. Moreover, "a specification's focus on one particular embodiment or purpose cannot limit the described invention where the specification *expressly contemplates* other embodiments or purposes." *ScriptPro LLC v. Innovation Assocs., Inc.*, 833 F.3d 1336, 1341 (Fed. Cir. 2016) (emphasis added). Relatedly, if the specification actually discloses embodiments of the invention that do not make use of a particular feature—even if the inventors do not necessarily describe that

[7] "One shows that one is in possession of the *invention* by describing the *invention*, with all its claimed limitations, not that which makes it obvious." *See Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997) ("[T]he specification must contain an equivalent description of the claimed subject matter[.]") (internal quotation marks and citation omitted). In *ICU Medical*, the Federal Circuit found that a spike was necessary in using the claimed invention based on the description provided, even though: (1) the specification did disclose a preslit (or precut) seal that *could* permit fluid transmission without the piercing of a spike, and (2) it may have been "obvious to a [POSITA] that a preslit trampoline seal *could* be used without a spike[.]" *ICU Med.*, 558 F.3d at 1378-79 (emphasis added). Why? The Cout did so because this type of preslit seal *could also* be used *with* a spike that was capable of piercing it, because the specification had described the preslit seal in question as "facilitating piercing and resealing, rather than as eliminating the need for piercing[,]" and because the patentee had "failed to point to any disclosure in the patent specification that describes a spikeless valve with a preslit trampoline seal." *Id.* (emphasis added); *see also Rivera*, 857 F.3d at 1322-23.

feature as "optional"—then it may be difficult for a patent challenger to argue that such feature is an "essential feature," or that claims that do not require use of that feature are invalid for lack of written description. *See Allergan USA, Inc. v. MSN Lab'ys Priv. Ltd.*, 111 F.4th 1358, 1374-76 (Fed. Cir. 2024) (explaining that where the specification described "at least two embodiments in which a glidant is not required[,]" this indicated that a claim was not invalid due to lack of written description simply because it was broad enough to exclude reliance on a glidant) (*cited in* D.I. 366 at 20); (Tr. at 102, 133; D.I. 366 at 18). Additionally, if "there is no disclosure [in the specification that actually states] that the [alleged essential feature] is essential or otherwise necessary to the invention[,]" this may help the patentee to later demonstrate that the feature is not, in fact, essential or necessary. *Allergan USA, Inc.*, 111 F.4th at 1375.[8]

With these legal standards now set out, below the Court takes up the substance of the parties' written description disputes.

### B. Sufficiency of the Written Description of the Challenged Claims

Turning to the merits, Parse argues that similar to *LizardTech* and *ICU Medical*, here all challenged claims should be invalid for failing to claim either UBAs or ESBs (or both), as those components are "essential features" of the barcodes or tags at issue—in that UBAs and ESBs are the only things described in the specification that allow those barcodes/tags to perform certain required, claimed functionalities. (D.I. 325 at 19-20; D.I. 395 at 10-12; Tr. at 13) In support, Parse states that the common specification "does not disclose any embodiments of labeling a given target molecule without using both an UBA and an ESB." (D.I. 317 at ¶ 26 (citations omitted))

[8] The Court pauses here to note that, in their summary judgment briefing, the parties' citation to (and explanation of) the relevant case law in this so-called "essential features"/written description area was sparse.

Below, the Court will address the Motion first as to Parse's UBA-related arguments (applicable to the '341 and the '442 patents only), and then as to Parse's ESB-related arguments (applicable to all three patents). In doing so, the Court will engage in claim construction, to the extent it is necessary. That is because the written description inquiry inherently implicates the scope of the relevant asserted claims. That is, the Court must articulate what is encompassed by those claims, so that the reader understands the scope of the claimed invention that must be sufficiently described in the patent's specification. *See Atl. Rsch. Mktg. Sys., Inc. v. Troy*, 659 F.3d 1345, 1353-54 (Fed. Cir. 2011); *see also* (October 8 MO at 12-13). The Court will additionally assess the evidence cited by the parties, in order to determine if there is a genuine dispute of material fact as to these written description-related disputes.

**1. UBA-related Arguments Regarding the '341 and '442 Patents**

The Court begins with the '341 and the '442 patents, and Parse's argument that the asserted claims of these patents do not require the use of a UBA. In doing so, it is first helpful to again take up what a UBA does in the claimed invention.

On that front, the specification provides the following information about the "present invention" (with relevant language set off in italics):

> The present invention provides methods for detection and quantification of target molecules in biomolecular samples. In particular, *the invention provides UBAs that are capable of binding individual target molecules*. . . . Methods of making and using such UBAs . . . are also provided.

('341 patent, col. 34:37-48 (emphasis added)) As previously noted, the Court's construction of "UBA" was "a molecule or assembly that is *designed to bind* with at least one target molecule, at least one target molecule surrogate, or both." (D.I. 118 (emphasis added)) This construction, which uses language pulled directly from the specification, ('341 patent, col. 17:20-22), defines

UBAs in terms of their functionality in the claimed invention. (D.I. 118 (citing D.I. 101 at 5, 13, 15, 19; D.I. 114 at 34, 64)) The specification also articulates that the discussed methods for identifying target molecules within cells "compris[e] binding to the targets a [tag or] plurality of tags[.]" ('341 patent, cols. 1:63-67, 2:12-25). Putting this all together, a UBA, which is an acronym for "unique *binding* agent[,]" (*id.*, col. 2:63-64 (emphasis added)), is consistently described as a part of the invention that functions to bind the tag to the target molecule at issue. (*See, e.g.*, *id.*, col. 4:62-64 ("In some embodiments, said UBA is capable of directly binding to the target molecule."); *id.*, col. 16:6-8 ("Through epitope specific barcodes and cell origination barcodes, the binding of [UBAs] to target molecules results in identification of the target molecules."); *id.*, col. 16:43-54 ("In some embodiments, the invention provides [UBAs] for the analysis of target molecules. . . . Each UBA in the population is specific for a target molecule. . . . The binding of the target molecules to the UBA is then detected[.]"); *id.*, col. 17:45-46 ("UBAs comprise at least one reaction portion that allow them to bind to or interact with at least one target molecule[.]"))

Unlike with the asserted claims of the '256 patent, in the asserted claims of the '341 and the '442 patents, UBAs are not explicitly recited. In claim 1 of the '341 patent (from which asserted claim 13 depends), the claim recites "[a] method of barcoding cDNA in cells . . . comprising . . . adding oligonucleotide barcodes onto the cDNA[,]" while claim 1 of the '442 patent (from which asserted claim 11 depends) recites "[a] method of uniquely labeling target molecules . . . comprising . . . (a) coupling a common linker sequence to target molecules[.]" ('341 patent, col. 58:12-16; '442 patent, col. 57:62-65) Parse argues that the asserted claims of these two patents must fail as unduly broad because: (1) those claims require that barcodes must be attached or bound to a target molecule; (2) the claims claim all methods of doing such

binding, not limited to using UBAs (or any specific method); and yet (3) in the specification, the patent discloses only one "essential" way to do it—i.e., via the use of a UBA. (D.I. 325 at 19-22; D.I. 395 at 9-12; Tr. at 8-14)

In evaluating this argument, the Court begins by assessing what the claims require. It starts with claim 11 of the '442 patent. During the hearing on the Motion, Scale argued that either as a matter of claim construction, or as a matter of (potentially disputed) fact, claim 11's reference to "hybridizing the common linker to the RNA" inherently requires the use of a UBA—because under the Court's construction of the term UBA, a UBA is the only thing (for lack of a better word) that can do what claim 11 requires. (Tr. at 158-69)

To the extent that Scale was arguing here that the Court should engage in claim construction as to the phrase "hybridizing the common linker to the RNA" and then determine that the correct construction would be "binding via a UBA to RNA" (or something like that), such an argument has been waived or forfeited. *See Tomasko v. Ira H. Weinstock*, *P.C.*, 357 F. App'x 472, 479 (3d Cir. 2009); *Light v. Davis*, 694 F. Supp. 3d 541, 560-61 (D. Del. 2023), *affirmed in part, vacated in part on other grounds*, No. 23-2785, 2024 WL 4144066 (3d Cir. Sept. 11, 2024). Nowhere in Scale's answering brief did Scale make such a claim construction-related argument as to this portion of the '442 patent (nor did it suggest a proposed construction for the term at issue, or anything of that nature). Instead, the most that Scale offered in its brief as to this claim language was the argument that, as to claim 11, "there is a least a *factual* dispute about whether step (a)'s hybridizing of a common linker provides the 'concept' of a UBA that Parse contends is missing." (D.I. 366 at 21 (emphasis added); *see also* Tr. at 61-62) Whatever it is that Scale was saying there, (Tr. at 61-62, 88, 93), it was not clearly seeking claim construction of any term in claim 11. That said, the Court still needs to assess the meaning of the relevant

claim terms at issue, in order to properly engage in the written description analysis. *See supra* at 14. And so in the absence of any preserved arguments regarding the scope of the claim term "hybridizing the common linker to the RNA," the Court will give this term its plain and ordinary meaning. And simply as a matter of linguistics, this term does not clearly appear to require the use of a UBA to make the connection between the "common linker" and the RNA in question.

With respect to claim 13 of the '341 patent, in its answering brief, Scale argued that: (1) because the claim recites (in non-asserted claim 1) "producing cDNA in the cells or cell compartments[;]"; and (2) because cDNA is made by reverse transcription, which in turn requires hybridizing a primer to an RNA target; then (3) "there is thus at least a *factual* dispute about whether [the claimed step of] 'producing cDNA'—which requires hybridizing a primer to an RNA target—provides the 'concept' of a UBA that Parse contends is missing." (D.I. 366 at 21-22 (emphasis added); Tr. at 158-59) Again, whatever Scale was attempting to argue with this "concept" language, it was not clearly making a claim construction-related argument in its brief. So again here, the Court will give terms found in claim 1 their plain and ordinary meaning. It sees no evidence that the use of a UBA to do any work required by claim 1 (i.e., adding barcodes to cDNA) is absolutely required. ('341 patent, col. 58:12-17)

To sum up so far, there can be no doubt that a fundamental, required aspect of the claimed invention is labeling a target molecule with a barcode/tag. And yet the asserted claim language of these two patents is plainly indifferent to the method by which the tags are bound to the molecule in question. They do not seem to explicitly require use of a UBA to do so. (D.I. 325 at 19-20; *see* '341 patent, cols. 58:12-23, 58:50-51; '442 patent, cols. 57:62-58:25)

The Court then turns to the question of whether the patents' specification (as Parse argues) treats UBAs as an "essential feature" of the claimed invention, and essentially discloses

that only UBAs may be used to accomplish this labeling/binding task. To start, there is of course no doubt that the specification discloses binding barcodes and target molecules *using UBAs*. (*See, e.g.*, '341 patent, col. 34:36-44 ("The present invention provides methods for detection and quantification of target molecules[.] . . . In particular, the invention provides UBAs that are capable of binding individual target molecules. The invention also provides the use of ESBs and COBs[.] . . . Through the ESBs' and COBs' codes, the binding of the UBAs to target molecules results in the identification of the target molecules in single cells."))

But *what else* does the specification disclose that can perform the labeling/binding function? Is there any other portion of the specification that suggests that there is some other mechanism for accomplishing this process, other than using a UBA? According to Parse, the answer is no. (D.I. 325 at 21 (citing D.I. 329, ex. 19 ("Pachter Reply Report") at ¶¶ 90-91, 113-14, 128, 133, 268); *see also* D.I. 317 at ¶ 26) This portion of the Motion was difficult. (D.I. 492) And as we will see, it was made even more difficult due to the nature of Scale's answering brief.

To get to the point where the Court can resolve this summary judgment question, it makes sense to track each of Scale's responses as to this issue. Scale had many such arguments (some of them it had briefed, some of them it did not). The Court will address them one by one.

First, Scale noted in its answering brief that the specification sometimes states that "[i]n *some embodiments*, the tag comprises a UBA" or that "[i]n *some embodiments*, the invention provides methods comprising UBA for the analysis of target molecules" or that "[i]n *some embodiments*, said at least one target molecule is directly bound to said first UBA[,]" and the like. ('341 patent, cols. 2:37-39, 6:58-60, 39:47-52 (emphasis added); *see also id.*, cols. 4:37-45, 8:14-55, 9:10-12; 10:30-11:27; D.I. 366 at 18, 20) Scale's point was that this kind of language is

indicative of the patentee's view that there can *also* be embodiments wherein the claimed tagging process can occur without the use of a UBA. And to be sure, when engaging in the *claim construction* process, this type of evidence would help to demonstrate that claims like these should not be limited to the use of UBAs. *See supra* at 14; *see also e.g.*, *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1345 (Fed. Cir. 2001) (noting that in assessing claim construction, similar language reflected the inventor's teaching that the invention could be embodied in various ways); *Alltech Assocs., Inc. v. Teledyne Instruments, Inc.*, Civil Action No. 13–425–RGA, 2014 WL 4214953, at *5 (D. Del. Aug. 25, 2014) (same, noting that the phrase "in one embodiment" contemplates other embodiments); (Tr. at 131). However, the problem for Scale from a *written description* perspective is that a bald reference like this in the specification to unnamed, other "embodiments" doesn't really disclose or discuss the *specifics* of any *actual* other embodiment, nor does it sufficiently describe what such an embodiment would look like. (Tr. at 37, 119, 131; *see also* D.I. 395 at 10-11); *cf. Crown Packaging Tech.*, 635 F.3d at 1382 (finding *LizardTech* inapplicable because the "patents [at issue] identify at least two ways of solving the problem of metal usage[,]" while the patents in *LizardTech* "disclosed only one specific method for solving one particular problem"); *Allergan USA*, 111 F.4th at 1373-75 (distinguishing *ICU Medical* because the specification disclosed at least two actual, described working embodiments that did not include the unclaimed glidant element in that they disclosed ingredients that could be used instead of the glidant). Put differently, the fact that the patentee did not want to limit itself in the claims to tagging methods with UBAs—or that the inventor may have imagined the existence of a tagging method that would work without using UBAs—does not necessarily equate to the patentee sufficiently *disclosing* possession of such a method to the world. *Cf. ICU Med.*, 558 F.3d at 1378 (rejecting the "contention that the figures and

descriptions that include spikes somehow demonstrate that the inventor possessed a medical valve that operated without a spike"); *see also* (D.I. 395 at 10-11; Tr. at 36, 41-42 (Parse's counsel arguing that it is not enough for purposes of written description to "hint at the possibility" of the existence of some other embodiment, and that "[y]ou have to show . . . possession of how to" practice the full scope of the claims)). Therefore, the Court cannot conclude that this "some embodiments" language, standing alone, suffices to create a material dispute of fact on written description.[9] (Tr. at 34-42)

Next—and in further support of the idea that "[s]uch embodiments without a UBA are possible"—Scale cited to one paragraph of the Rebuttal Report of its expert Dr. Peter A. Sims. (D.I. 366 at 20 (citing D.I. 368, ex. B at ¶ 329 ("Sims Rebuttal Report")) But all that paragraph does is note that the specification uses the "[i]n some embodiments" phraseology referenced above, nothing more. That is, in that paragraph Dr. Sims never says what a POSITA would have actually understood the relevant other embodiment *to be or to look like* (i.e., regarding the binding process at issue). (Tr. at 143-46 (Scale's counsel, acknowledging this)) And so this paragraph is not particularly helpful to Scale here, either, in terms of creating a genuine issue of material fact.

Next, during oral argument, Scale's counsel noted that another portion of the specification includes a discussion of a barcode containing "assayable polymer subunits" (or "APSs") and refers to "methods for identifying target molecules . . . comprising labeling . . .

[9] Scale also notes that at times, the patents make a general statement that they use methods "of 'binding to the targets a plurality of tags[.]'" (D.I. 361 at ¶ 26 (quoting '441 patent, cols. 1:58-2:21); D.I. 366 at 18 (same)) But, as Parse points out, those quoted portions of the specification don't say anything about *how* this binding happens or what element is used to make it happen; they are simply silent on the matter. (D.I. 395 at 11)

targets"; counsel suggested that this language indicates that something other than a UBA, such as APS oligonucleotides, can perform the claimed labeling/binding function. (Tr. at 140-42 (referencing '341 patent, col. 5:54-66)) The problem there is, as Scale's counsel acknowledged, (*id.*), such an argument was never made in Scale's answering brief. And so it was waived or forfeited for purposes of resolution of this Motion, and is of no moment here. (Tr. at 37-38, 48-49); *see supra* at 16.[10]

Next, at the hearing, Scale's counsel made another argument as to this issue. Here, counsel pointed to the specification's reference to something called "CLICK chemistry"—and the patent's statement that "[s]uitable methods to link various molecules using CLICK chemistry are known in the art[.]" ('341 patent, col. 27:59-64)[11] Scale asserted that this is an example of how the challenged patents disclose methods for linking tags and target molecules without using a UBA. (Tr. at 174-76)

Once again, this argument regarding CLICK chemistry (and why it can substitute for the functionality of a UBA) came as a surprise to the Court—and likely to Parse as well. That's because—again—it was not an argument clearly made in Scale's briefing. (Tr. at 173; *id.* at 176-77 (Scale's counsel conceding that, on the one hand, this argument seems "so crucial" and

[10] The Court offers no opinion here on whether this argument, if otherwise properly preserved, might be a strong or viable one at trial.

[11] The specification makes some other references to CLICK chemistry. When it does, however, the specification seems to describe the use of CLICK chemistry to link components of the tag itself (i.e., APSs, ESBs, or UBAs) together—not using CLICK chemistry to connect the tag to a target molecule. (*See* '341 patent, cols. 2:53-55, 3:41-45, 5:2-5, 7:44-47, 9:60-63, 12:9-12, 27:59-60) The prophetic examples disclosed in the specification specifically mention using CLICK chemistry to "permanently stitch[] together" APSs, which are undisputedly part of the barcode. (*Id.*, cols. 54:35-37, 55:16-18, 55:58-60, 56:41-43; *see, e.g.*, *id.*, col. 22:37-38 (describing APSs as the building blocks for the COB))

yet also acknowledging that "I can't speak to why it's not in the brief. . . . I would have put it in the brief.")) The only reference to Dr. Sims' testimony about CLICK chemistry in the briefing was in connection with an argument about *ESBs* (not *UBAs*)—i.e., related to the assertion that ESBs are not needed to connect UBAs and COBs. (D.I. 366 at 19 (citing Sims Rebuttal Report at ¶¶ 330-31); Tr. at 173) And so again, for reasons the Court has previously explained, *see supra* at 16, the Court notes that arguments made for the first time at oral argument—and not fairly raised in the relevant briefing—are waived or forfeited. That is the case here.[12]

With all of the above said, there was one argument that (1) Scale did make in its briefing; and that (2) in the Court's view is strong enough to create a genuine issue of material fact as to whether the specification discloses an alternative method of binding barcodes to target molecules, other than via use of a UBA. On this front, Scale claimed that "embodiments without a UBA are possible because [the specification states,] '[i]n any of the embodiments herein, COBs may be assembled on targets from a single cell.'" (D.I. 366 at 20 (quoting '442 patent, col. 28:28-30)) During the hearing on the Motion, Scale's counsel asserted that this reference to COBs being "assembled on targets . . . means that they're binding the targets"—suggesting that this portion of the specification discloses that COBs themselves can bind directly to target molecules without use of a UBA. (Tr. at 178-80; D.I. 491-4 at 41)

Now, to Scale's detriment, so far as the Court can tell, it did not direct the Court to any testimony of its expert suggesting that this particular specification excerpt is, in fact, referring to a scenario where a barcode is binding to a target molecule without the help of a UBA. But this language is in the patent. Just from reading it, the Court can see how it could be describing just

[12] Again, if otherwise properly preserved, it may be that this will be a viable written description argument for Scale at trial.

such an outcome. *See ScriptPro, LLC v. Innovation Assocs., Inc.*, 762 F.3d 1355, 1361 (Fed. Cir. 2014) (noting that, in reversing a district court's finding on summary judgment of invalidity for lack of written description, "the specification itself creates a genuine issue of material fact on this question"). And the Court is unconvinced that Parse's response on this point is sufficient to preclude finding a genuine dispute of material fact. (*See* D.I. 395 at 11)[13] On an important matter such as this one, the jury should be the final arbiter about what the patent fairly discloses.

For this reason, the Court concludes that Parse's UBA-related arguments, though strong, are not sufficient to warrant grant of summary judgment as to the relevant asserted claims at issue.

**2. ESB-related Arguments Regarding All of the Asserted Patents**

The Court will now turn to Parse's argument as it relates to ESBs, which implicates the asserted claims of all three patents.

With regard to these asserted claims, Parse argues that their scope *requires* the target molecule to be labeled in a *target-specific* manner. (Tr. at 12-16, 83, 85, 150; *see* D.I. 325 at 21-22; D.I. 395 at 12) As discussed above, ESBs are defined as barcodes that identify the specific target molecule (or epitope) being labeled. ('341 patent, col. 16:51-52) And much like with its UBA-related arguments, Parse then asserts that: (1) the specification fails to disclose any other way of doing target-specific labeling without the use of an ESB; but (2) although the claims

[13] To be sure, there may well be good contrary arguments. Figure 2 of the patent, for example, provides "a graphical representation of one embodiment of the components of . . . the cell[ origination] barcodes of the invention and their assembly." ('341 patent, col. 13:36-38) The COB depicted therein has a UBA attached to it. (*Id.*, FIG. 2) Similarly, in its discussion of Figure 2, the specification states that "[t]hrough the . . . COBs' codes, the *binding of the UBAs to the target molecules* results in the identification of the target molecules[.]" (*Id.*, col. 34:41-44 (emphasis added); *see also* D.I. 361 at ¶¶ 18-21) These portions of the specification might suggest that, according to the asserted patents, UBAs always work in conjunction with COBs, in order to perform the binding function.

require target-specific labeling, they do not say that only ESBs can be used to accomplish that type of labeling; and so (3) the claims are invalid for lack of written description—in that they allow that other methods of accomplishing target-specific labeling can be used, yet the patents fail to sufficiently describe any such methods. (Tr. at 7-8, 13, 16-17, 85) In support of this invalidity argument, Parse relies on the testimony of Dr. Pachter, who opines that "[t]he specification fails to provide any working examples or guidance for a POS[IT]A to identify a nucleic acid target within cells without using an ESB[.]" (Pachter Reply Report at ¶ 128 (*cited in* D.I. 325 at 21); *see also* Tr. at 25)

The Court begins by addressing the actual language of the asserted claims. In doing so, it first needs to figure out which *portions* of those claims might possibly be said to implicate the function or the work of an ESB. The parties seem to disagree on even this basic issue.

For example, with regard to the '256 patent, Parse argued that the function of an ESB is implicated by the preamble and step (a) of claim 1, which recites: "[a] method for identifying whether a plurality of nucleic acid targets is present in a plurality of cells comprising: a) binding to the nucleic acid targets in the plurality of cells a plurality of unique binding agent (UBA) nucleic acid tags[.]" ('256 patent, col. 58:11-15; *see also* Tr. at 12-13) However, Scale argued that it is actually step (b) and its recitation of "extending UBAs bound to the targets" that "provides the 'concept' of an ESB that Parse contends is missing." ('256 patent, col. 58:16; *see also* D.I. 366 at 21 (citing Sims Rebuttal Report at ¶ 448); D.I. 491-4 at 45)

Next, as to the '341 patent, Parse argued that as to asserted claim 1 (from which asserted claim 13 depends), an ESB's work is implicated by the preamble's reference to "[a] method of barcoding cDNA in cells or cell compartments" and by step (b)'s reference to "adding oligonucleotide barcodes onto the cDNA in the cells or cell compartments[.]" ('341 patent, col.

58:11-17; *see also* Tr. at 11) Scale, on the other hand, seems to think that the claim's reference in step (a) to "producing cDNA in the cells or cell compartments" is key here. ('341 patent, col. 58:14; *see also* D.I. 366 at 21-22 (Scale again noting that it is this step that "provides the 'concept' of an ESB that Parse contends is missing"))

Lastly, as to claim 1 of the '442 patent (from which asserted claim 11 depends), Parse argued that the key claim language implicating the work of an ESB is the preamble's reference to a "method of uniquely labeling target molecules within a plurality of cells[.]" ('442 patent, col. 57:62-63; *see also* Tr. at 11-12) Scale, for its part, seems to focus on step (a)'s reference to "coupling a common linker sequence to target molecules within the plurality of cells[,]" and to asserted claim 11's further requirement that "step (a) comprises hybridizing the common linker to the RNA[.]" ('442 patent, cols. 57:62-65, 58:62-64; *see also* D.I. 366 at 21; Tr. at 149-57)

But whether we focus on the claim language that Parse is relying on, or the claim language cited by Scale, does any of this language actually *require* that the asserted claims have to have labels that are *target-specific*, like Parse says? When the Court simply reads the above-referenced portions of the asserted claims—assigning the terms therein their plain and ordinary meaning, *see Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc)—this doesn't seem so. That is, the Court is unable to see how the asserted claims *mandate* labeling target molecules *in a target-specific manner* (i.e. to indicate "the particular molecule itself that [came] from [a given] cell")—the purported function of ESBs. (Tr. at 78)

For one thing, the language of the asserted claims does not facially or explicitly say that this is required. Again, claim 1 of the '256 patent just recites "[a] method for *identifying* whether a plurality of *nucleic acid targets* is present in a plurality of cells" and then binding to the targets a "plurality of . . . UBA[] nucleic acid tags[.]" ('256 patent, col. 58:11-15 (emphasis added))

This appears to mean only that the claimed method requires *a mechanism* for identifying such nucleic acid targets (not that that mechanism *must* do so by including information that is *unique to targets*—as opposed to, for example, including information that is *unique to the cells* that those targets originate from). Similarly, claim 1 of the '341 patent just says that the method is one for "barcoding cDNA in cells or cell compartments" and "adding oligonucleotide barcodes onto the cDNA"; the claim doesn't say that those barcodes *must* have *target-specific* information in them (as opposed to *cell-specific* information). ('341 patent, col. 58:11-17) And with regard to the '442 patent, claim 11 similarly only requires (by way of claim 1) "uniquely labeling target molecules within a plurality of cells" and doing so, in part, by "hybridizing the common linker to the RNA." ('442 patent, cols. 57: 62-63; 58:62-64)[14]

Moreover, the specification advises that it is possible to have a barcode attached to a target molecule wherein the barcode only includes information about the cell that the molecule originated from (i.e., via the use of a COB)—and need not also include information about the target molecule itself (i.e., via the use of an ESB). ('341 patent, cols. 24:67-25:6 ("The COB can be attached to the UBA . . . . In *some instances*, the epitope specific barcode can be included . . . .") (emphasis added); *id*., col. 17:11-16 ("Accordingly, certain aspects of the present invention provide a population of unique *COBs or ESB/COBs*, each comprised of a unique APS-based combination, wherein each *COBs or ESB/COBs* in the population is distinct from the other *COBs*

[14] Additionally, claim 19 of the '442 patent appears to help solidify the conclusion that asserted claim 11 of that patent does not require identifying molecules in a target-specific manner. That claim (which, like claim 11, ultimately depends from claim 1), notes that the "labeled target molecules from a single cell all comprise the same series of assembled nucleic acid tags." ('442 patent, col. 59:25-27) Parse acknowledges that this claim language requires *cell-specific* labeling (which is what COBs do). (Tr. at 83) And so this suggests that claim 1 would be broad enough to allow for embodiments wherein the labels at issue include COBs but not ESBs. (Sims Rebuttal Report at ¶ 332)

*or ESB/COBs* in the population.") (emphasis added); Tr. at 147-48, 150, 155) And there is certainly sufficient evidence in the patent to create an issue of fact as to whether the specification describes multiple ways to do what the claims *do require*: i.e., the labeling and identification of certain molecules.

In the end, then, in light of the language of the asserted claims and the other intrinsic evidence cited above, the claims simply do not require the use of target-specific labeling, via the use of ESBs (or otherwise). With this established, the entire premise of this portion of Parse's Motion disintegrates. Again, Parse's view was that: (1) the asserted claims *do require* target-specific labeling; (2) they claim broadly enough to capture ways to do this beyond just via the use of an ESB; but (3) the specification only describes ESBs as a mechanism that can perform this required function (i.e., that the patents suggest that ESBs are an "essential feature" of the invention); thus (4) leading to invalidity for lack of written description. (Tr. at 13-17) But if target-specific labeling *isn't required* by the claims in the first place, then the syllogism on which Parse's argument is built falls apart. (*Id.* at 149-57) That is, Parse's motivating premise for this portion of the Motion—i.e., that the patent describes the use of an ESB as an "essential feature" of the invention—is just not correct. And Parse did not put forward any *different* ESB-related argument as to why the claims are invalid for lack of written description. (*Id*. at 156-57 (Scale's counsel noting that Parse is "stuck with their motion as posited; we can't rewrite [it] now"))

Therefore, this portion of the Motion relating to ESBs is also not sufficient to warrant summary judgment for Parse on lack of written description-grounds.

## IV. CONCLUSION

For the foregoing reasons, the Motion is DENIED. An appropriate Order will issue.